# EXHIBIT A

COMMONWEALTH OF PENNSYLVANIA
OFFICE OF ATTORNEY GENERAL
EASTERN REGIONAL OFFICE
By: James A. Donahue, III
First Deputy Attorney General
Identification No. 42624
1600 Arch Street Suite 300
Philadelphia, PA 19103
Telephone: (215) 560-2402

---

| | | |
|---|---|---|
| **COMMONWEALTH OF** | : | **COURT OF COMMON PLEAS** |
| **PENNSYLVANIA** | : | **OF DELAWARE COUNTY** |
| **By MICHELLE A. HENRY,** | : | |
| Attorney General, | : | |
| Plaintiffs, | : | **No.** |
| v. | : | |
| | : | |
| **PROSPECT MEDICAL** | : | **CIVIL ACTION-LAW** |
| **HOLDINGS, INC.,** | : | |
| **PROSPECT CROZER, LLC,** | : | |
| **LEONARD GREEN AND PARTNERS,** | : | |
| **SAMUEL LEE,** Individually, and | : | |
| **DAVID TOPPER,** Individually, | : | |
| Defendants. | : | |

## <u>NOTICE TO DEFEND</u>

**You have been sued in court. If you wish to defend against the claims set forth on the following pages, you must take action within twenty (20) days after this Complaint and Notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice or any money claimed in the Complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.**

**YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE!** IF YOU DO NOT HAVE A LAWYER, OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

IF YOU CANNOT AFFORD TO HIRE A LAWYER, THE OFFICES BELOW MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDICED FEE OR NO FEE.

| | | |
|---|---|---|
| **LAWYER REFERRAL SERVICE**<br>**DELAWARE COUNTY BAR ASSOCIATION**<br>Front & Lemon Streets<br>P.O. Box 466<br>Media, PA 19063<br>(610) 566-6625 | <u>OR</u> | **PENNSYLVANIA LAWYER REFERRAL SERVICE**<br>P.O. Box 1086<br>100 South Street<br>Harrisburg, PA 17108<br>PA Residents Phone: 1-800-692-7375 |

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA<br>By MICHELLE A. HENRY,<br>Attorney General, | : <br> : <br> : <br> : | COURT OF COMMON PLEAS<br>OF DELAWARE COUNTY |
| Plaintiffs, | : | No. |
| v. | : <br> : | |
| PROSPECT MEDICAL<br>HOLDINGS, INC.,<br>PROSPECT CROZER, LLC,<br>LEONARD GREEN AND PARTNERS,<br>SAMUEL LEE, Individually, and<br>DAVID TOPPER, Individually,<br>Defendants. | : <br> : <br> : <br> : <br> : <br> : <br> : | CIVIL ACTION-LAW |

## SCHEDULING ORDER

AND NOW, this_____day of _____2024, it is hereby **ORDERED**

**and DECREED** that a hearing with counsel is scheduled for _____at

_____, at the Delaware County Courthouse, located at 201 W. Front Street, Media, PA, 19103.


BY THE COURT:


_____

J.

COMMONWEALTH OF PENNSYLVANIA
OFFICE OF ATTORNEY GENERAL
EASTERN REGIONAL OFFICE
By:     James A. Donahue III
First Deputy Attorney General
Identification No. 42624
1600 Arch Street Suite 300
Philadelphia, PA 19103
Telephone: (215) 560-2402

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA By MICHELLE A. HENRY, Attorney General, | : : : : | COURT OF COMMON PLEAS OF DELAWARE COUNTY |
| Plaintiffs, | : | No. |
| v. | : : | |
| PROSPECT MEDICAL HOLDINGS, INC., PROSPECT CROZER, LLC, LEONARD GREEN AND PARTNERS, SAMUEL LEE, Individually, and DAVID TOPPER, Individually, | : : : : : : | CIVIL ACTION-LAW |
| Defendants. | : | |

## COMPLAINT

The Commonwealth of Pennsylvania acting as *parens patriae* through its Attorney General, Michelle A. Henry, files this instant complaint to sustain healthcare in Delaware County through: seeking Preliminary Injunctive Relief, redressing Prospect Medical Holdings breach of contract; revoking the corporate franchise of the defendant Prospect Crozer, LLC; appointing a receiver over the assets of the said defendant; and providing funding for the operational costs of Prospect Crozer throughout the receivership. In support, the Commonwealth respectfully offers the following:

# **BACKGROUND**

In 2016, this Court approved the sale of the assets of the nonprofit, charitable Crozer

Keystone Health System ("CKHS") based upon the commitments of Prospect Medical Holdings

set forth in the January 8, 2016, Asset Purchase Agreement (the "APA") to continue the mission

of CKHS in providing access to affordable medical care to the community.  A true and correct

copy of the APA is attached as Exhibit "A."  Instead of managing the health care system in a

commercially reasonable manner, however, Prospect Medical Holdings funded the distribution

of at least $457 million in dividends to its investors through a $1.12 billion dollar loan.  Prospect

Medical Holdings then proceeded to engage in the sale and lease-back of the system's real estate

holdings.  The resulting additional lease obligations contributed to the Prospect Medical

Holdings' financial instability and Prospect Crozer's shuttering a variety of program service

lines; closing two of the former CKHS's hospitals; failing to pay lease obligations; failing to

timely pay real estate taxes; failing to timely pay its staff and vendors,  failing to fully fund and

terminate the system's pension obligations; failing to maintain major service lines without

support from other systems in the area; and the losing of accreditation of the surgical residency

program.  Moreover, the dividend was made despite the system's insolvency and unjustly

enriched Leonard Green and Partners, Samuel Lee, and David Topper, at the public's injury and

expense as the intended third-party beneficiary of the APA.

Prospect Crozer LLC has indicated that its financial problems may result in the reduction

of other available critical services at its Crozer-Chester Medical Center.  Further suspension of

services and closure of its facilities will violate the obligations of Prospect Medical Holdings

pursuant to the APA.

## JURISDICTION

1.      This Court has jurisdiction over this action and the Defendants pursuant to 42 Pa. C.S. § 931(a).

## VENUE

2.      Venue rests in this Court pursuant to 42 Pa. C.S. § 931(c); Paragraph 14.6 of the APA which provides that, "any dispute arising out of this Agreement shall be the state or federal courts of the Commonwealth of Pennsylvania;" and the presence of Prospect Medical Holdings and Prospect Crozer LLC ("Defendants Prospect").

## PARTIES

3.      Plaintiff is the Commonwealth of Pennsylvania acting as *parens patriae* through its Attorney General, Michelle A. Henry ("COMMONWEALTH"), with its pertinent office at 1600 Arch Street, Suite 300, Philadelphia, PA 19103.

4.      Defendant Prospect Medical Holdings ("HOLDINGS") is a Delaware Corporation with its principal office located at 3415 Sepulveda Blvd., Los Angeles, CA 90034.

5.      Defendant Prospect Crozer, LLC ("PROSPECT CROZER") is a Pennsylvania limited liability company with its principal place of business located at 100 West Sproul Road, Springfield, PA 19064.

6.       Prospect Crozer is comprised of four hospitals: Crozer-Chester Medical Center ("Crozer-Chester"), located at 1 Medical Center Blvd., Chester, PA 19013, Delaware County Memorial Hospital (DCMH"), located at 501 N. Lansdowne Avenue, Drexel Hill, PA 19026, Springfield Hospital ("Springfield"), located at 100 W. Sproul Road, Springfield, PA, 19064, and Taylor Hospital ("Taylor"), located at 175 E. Chester Pike, Ridley Park, PA 19078.

- 3 -

7.      Defendant Samuel Lee ("LEE") serves as HOLDINGS' Chief Executive Officer and has served as Chairman of HOLDINGS' Board of Director's since HOLDINGS' purchase of CKHS.

8.      Defendant David Topper ("TOPPER") is the Co-Chief Executive Officer of HOLDINGS and President of Alta Hospital Systems, LLC.

9.      Defendant Leonard Green & Partners ("PARTNERS") operates as a private equity firm located at 1111 Santa Monica Blvd., Suite 2000, Los Angeles, California, 90025.

## FACTS

### A. Prospect's Acquisition of the Crozer Keystone Health System

10.      Paragraphs 1 through 9 are incorporated herein as if fully set forth.

11.      HOLDINGS acquired its interests in CKHS through the January 8, 2016 APA approved by this Court on June 28, 2016.  See Order Exhibit "A."

12.      HOLDINGS pledged to maintain important health care services in the community by keeping all CKHS hospitals open for at least a ten (10) year period.

13.      Under Paragraph 11.15 of the APA, entitled "Availability of Services," HOLDINGS agreed that "Buyers shall: (a) for as long as buyers own and operate one or more of the hospitals, use commercially reasonable efforts to ensure the residents of Delaware County, Pennsylvania have access to a full range of healthcare services including primary, secondary and tertiary care, specialty and hospital-based services, and emergency and urgent care facilities to support the needs of the community . . . ."   A true and correct copy of the APA is attached as Exhibit "B", pgs. 58-59.

14.      Pursuant to Paragraph 11.16 of the APA entitled, "Future Sale or Closing," HOLDINGS agreed not to close any of CKHS's hospitals offering general acute care services for

a period of ten (10) years without obtaining consent from the Local Advisory Board and Foundation. See Exhibit B, pg. 59.

15.    Pursuant to Paragraph 2.4 of the APA entitled, "*Pension Funding*," HOLDINGS agreed to assume the CKHS Employees Retirement Plan. See Exhibit B, pgs.14-15.

16.    On May 4, 2016, the Commonwealth convened a public hearing in Upland, PA, during which public comments were made by HOLDINGS officials which included Tom Reardon, who at the time was President of Prospect East. Mr. Reardon publicly stated in discussing the pension plan, "We have also committed to terminate the plan within five years of the acquisition of Crozer-Keystone and fully fund 100 percent of the benefits in accordance with applicable laws after the termination - normally within 12 to 18 months." A true and correct copy of the public hearing transcript is attached as Exhibit "C", pg. 17.

17.    At the public hearing Mr. Reardon further stated, "We've also committed to the critical service lines, such as emergency department, trauma, behavioral health, maternity, and pediatrics who will remain in place or expand. We are an expansion company, not a contraction company." See Exhibit C, pg. 17.

18.    The Commonwealth reviewed the terms of the APA prior to the sale and, based upon the representations and commitments made by the HOLDINGS, did not raise any objections.

19.    Thereafter, following an evidentiary hearing, this Court entered the June 28, 2016 Order approving the sale. The Order further allowed "After payment of the debts and liabilities of the Crozer-Keystone Health System, Crozer-Keystone Health System is authorized to transfer to Crozer-Keystone Community Foundation ("the Foundation") the net proceeds and cash or investments assets remaining from the sale proceeds." See Exhibit A.

20.     Subsequently, on June 30, 2016, the parties to the APA agreed to a Third Amendment.  A true and correct copy of the same is attached as Exhibit "D".

21.     Section 7(c) of the Third Amendment to the APA, entitled "Post-Closing Commitment" provides:

> "Within five (5) years after the Effective Time and subject to applicable filing and authorization by the applicable Government entity, Buyers shall adopt a plan amendment to terminate the DB Pension Plan effective within such five (5) year period and thereafter, in accordance with applicable law, shall liquidate fully fund and satisfy, and pay all benefits owed to participants and beneficiaries of, the DB Pension Plan by providing for lump sum distributions to participants, purchasing annuities for participants who do not elect for a lump sum distribution or otherwise in accordance with the terms, conditions and provisions of the DB Pension Plan (as in effect at the Effective Time) and with applicable law."

22.     The section goes on to defer the termination for up to two years depending upon whether the discount rate of the Internal Revenue Service fell below 4.12% during certain time periods.  See Exhibit "D", pgs. 3-4.

23.     In September 2024, the Pension Benefit Guaranty Corporation (PBGC) asserted a lien against HOLDINGS for failing to pay into Prospect Crozer's employees' pension plan, for an amount totaling approximately $12 million dollars.

24.     To date, HOLDINGS has not yet fulfilled its pension obligation commitment pursuant to the APA.

### B. *HOLDINGS's Debt Recapitalization and Rhode Island Findings*

25.     In 2018, HOLDINGS borrowed $1.12 billion dollars, secured by HOLDINGS' properties owned in Pennsylvania, California and Connecticut.

26.    Upon information and belief, HOLDINGS then distributed $457 million in dividends to its private shareholders and executives, including distributions to LEE and TOPPER, of which at least $90 million was distributed to LEE.

27.    Upon information and belief, during the time that PARTNERS had an ownership interest in HOLDINGS, PARTNERS received over $600 million in dividends and management fees.

28.    Upon information and belief, to repay the 2018 $1.12 billion loan, HOLDINGS sold properties in its California, Connecticut and Pennsylvania healthcare systems to Medical Properties Trust ("MPT").

29.    The sale of these properties saddled PROSPECT CROZER with excessive monthly rent liabilities it could not afford to sustain.  In the case of the Crozer hospitals, that rental payment was approximately $35 million per year.  According to reports filed with the Pennsylvania Healthcare Cost Containment Council, Crozer Health System has had negative net patient revenue in almost every year since 2016.  See Table 1.

**TABLE 1**
**NET AMOUNTS IN MILLIONS**

| YEAR | HOSPITAL | PATIENT REVENUE | OPERATING EXPENSES | PROFIT/LOSS |
|------|----------|-----------------|--------------------|-------------|
| 2023 | Crozer-Chester | $427 | $559 | $-132 |
| 2022 | Crozer-Chester | $429 | $520 | $-91 |
| 2021 | Crozer-Chester | $511 | $524 | $-13 |
| 2020 | Crozer-Chester | $499 | $508 | $-9 |
| 2019 | Crozer-Chester | $521 | $517 | $4 |
| 2018 | Crozer-Chester | $496 | $537 | $-41 |
| 2017 | Crozer-Chester | $542 | $527 | $15 |
| 2016 | Crozer-Chester | $488 | $490 | $-2 |
| 2023 | DCMH | $30 | $55 | $-25 |
| 2022 | DCMH | $56 | $113 | $-57 |
| 2021 | DCMH | $150 | $140 | $10 |

- 7 -

| 2020 | DCMH | $133 | $144 | $-11 |
| 2019 | DCMH | $141 | $154 | $-13 |
| 2018 | DCMH | $129 | $163 | $-34 |
| 2017 | DCMH | $157 | $168 | $-11 |
| 2016 | DCMH | $153 | $162 | $-9 |

**Source:  Pennsylvania Cost Containment Council Hospital Financial Reports**

30.    Not only was the Crozer Health System not generating enough surplus revenue to afford another $35 million in rent, it was not generating enough revenue for general capital improvements, replacement of equipment like CAT scans and MRIs and physician recruitment, and was essentially insolvent.

31.    In 2021, PARTNERS sold its approximate 60% share in HOLDINGS for $12 million to LEE and TOPPER who had been minority owners.  The money to buy back PARTNERS' shares was paid by HOLDINGS.

32.    In the recent Rhode Island Attorney General's action against HOLDINGS, the Rhode Island court found that, "the 2018 [dividend] transaction substantially weakened the balance sheet of [Respondent], benefitting the shareholders while providing minimal or no funds to any of the local operating entities (citations omitted)."  A true and correct copy of the Rhode Island Court's June 12, 2024 Opinion is attached as Exhibit "E."  See pgs. 5-6.

33.    The Rhode Island court found that HOLDINGS has been "effectively using the Hospitals' accounts payable as a line of credit to pay bills for its other hospitals around the country" and prioritizing its California investments over other states citing testimony from HOLDINGS' CFO who testified:

> "In the last year our regulator, the California regulators and the Department of Managed Healthcare and our lenders have required us to replace our collateral into cash for what is being needed to meet [California Department of Managed Healthcare] requirements. . . ."
> Furthermore, Defendant states in order to meet regulatory

- 8 -

requirements for licensing by the California Department of Managed Healthcare, it must have over $130 million in cash or cash equivalents available.

See Exhibit E, pgs. 25-26.

34.     HOLDINGS' representative testified that the company has total assets of $2 billion and total liabilities of $4 billion. See Exhibit "E," pg. 28.

35.     HOLDINGS taking on $1.12 billion in debt, distributing $457 million in dividends to its shareholders, and the subsequent funding of LEE and TOPPER'S purchase of HOLDINGS' shares from Partners, did not constitute "commercially reasonable efforts to ensure the residents of Delaware County, Pennsylvania have access to a full range of health care services..." See Exhibit B, pgs. 58-59.

## C. *Dismantling of the Prospect Crozer Health System*

36.     As of the date of HOLDINGS' acquisition of CKHS in 2016, there were four hospitals operating in the system: Crozer-Chester, DCMH, Springfield, and Taylor were operated

37.     Despite HOLDINGS's contractual commitment to keep all of the CKHS's hospitals open for ten (10) years, both Springfield and DCMH are now closed.

38.     Upon information and belief, Prospect Crozer has been unable to properly maintain and staff its critical service lines at Crozer-Chester without substantial outside assistance from Temple Health, Jefferson Health, and Nemours Children hospital systems.

39.     At Crozer-Chester, Temple Health is providing its medical services for kidney transplant, cardiac surgery, and interventional pulmonary. Jefferson Health is providing its medical services for neurosurgery. Nemours Children is providing its medical services for neonatal intensive care unit and well-baby nursery.

40.     According to PROSPECT CROZER's website, all hospital-based services at Springfield Hospital were temporarily suspended as of January 14, 2022.  More than two years later, the "temporary" suspension remains and the hospital has not reopened in violation of the 2016 APA.  A true and correct copy of the Crozer Health Website Printout is attached as Exhibit "F."

41.     On or about September 21, 2022, PROSPECT CROZER announced that DCMH would be converted from an acute care hospital to a behavioral health center without noticing the Foundation nor receiving its consent as required under the APA.

42.     On September 23, 2022, PROSPECT CROZER's Vice President of Human Resources, Thomas Shull, issued a WARN Notice. The Notice stated that DCMH intended to discontinue acute care service lines as of November 26, 2022, and 334 employees' jobs would be impacted. A true and correct copy of the WARN Notice attached as Exhibit "G".

43.     Additionally, around this same time, HOLDINGS issued its health and stabilization plan. The implementation of this plan would reduce the number of hospitals within PROSPECT CROZER from four to two.  A true and correct copy of the Health and Stabilization Plan attached as Exhibit "H".

44.     Prior to this announcement, PROSPECT CROZER had already eliminated several key service lines at DCMH including the ICU, Labor and Delivery, and Pulmonology.

45.     On September 28, 2022, the Foundation for Delaware County ("Foundation") filed for a Preliminary injunction against Defendants HOLDINGS and PROSPECT CROZER to stop the closure of DCMH.

46.     On October 5, 2022 the Attorney General's Office filed a joinder to the Foundation's Petition.

47.     After an evidentiary hearing on the Foundation's petition, this Court entered an Order on October 11, 2022 requiring that Defendants "shall maintain all services presently offered at Delaware County Memorial Hospital and all present operations of Delaware County Memorial Hospital and shall not directly or indirectly engage in any activity that would in any way materially and adversely affect such services or operations."

48.     On November 1, 2022, this Court denied HOLDINGS' motion to dissolve the Preliminary Injunction, affirming its decision to prevent Defendants from closing DCMH.

49.     On November 4, 2024, due to inadequate radiological staffing, the Department of Health issued an Order suspending emergency department services and banning admissions, which effectively closed DCMH until the violations could be cured.

50.     On November 10, 2022, HOLDINGS filed its Application for an Expedited Appeal to the Commonwealth Court of this Court's preliminary injunction.

51.     On December 8, 2022, the Commonwealth Court granted HOLDINGS' Application for a Stay of this Court's Preliminary Injunction

52.     On December 20, 2023, the Supreme Court granted the Foundation's Petition for Allowance of Appeal of the Commonwealth Court's decision.

53.     The Supreme Court has not yet issued its decision on whether the Commonwealth Court erred in its decision to Stay the Preliminary Injunction.

### D. The Stay of Litigation to Find a Successor Nonprofit Provider and Failed Sale Process

54.     While the Court's decision was on appeal, all parties reached an agreement to stay the underlying litigation for a period of 270 days to attempt to find a nonprofit buyer for the assets of PROSPECT CROZER. The agreement was approved by this Court on February 1, 2024.

55.    The stay expired on Monday, October 28, 2024 and the sale process has now failed.

56.    The Commonwealth has been advised that Prospect will discontinue key service lines at some point in the near future.

57.    Crozer-Chester Medical Center is the only hospital within Delaware County with Burn and Trauma services.

58.    Crozer-Chester Medical Center's burn center is the only accredited burn center in Delaware County. The next closest burn centers are: Temple Health (approximately 43 minutes away), Jefferson Health (approximately 29 minutes away), Saint Christopher in Philadelphia (36 minutes away), Lehigh Valley in Allentown (1 hour 18 minutes away) and John Hopkins in Baltimore, Maryland (1 hour 50 minutes away).  Residents of Southern New Jersey do not have a burn center and they likewise rely heavily on Crozer to treat their burn patients.

59.    Crozer-Chester is the only accredited Level 2 trauma center in Delaware County. The next closest trauma centers are: Penn Presbyterian Medical Center Level 1- Philadelphia (28 minutes away); Children's Hospital of Philadelphia Level 1 – Philadelphia (28 minutes away); Lankenau Hospital Level 2 - Wynnewood (36 minutes away); Paoli Memorial Hospital Level 2- Paoli (42 minutes away); Thomas Jefferson University Level 1 – Philadelphia (29 minutes away); Christiana Care Hospital Level 1 - Newark, DE. (32 minutes away); Nemours Children Hospital Level 1 – Wilmington DE (23 minutes away).

60.    These critical service lines play an essential role in providing timely and specialized care that saves lives.

61.    PROSPECT CROZER's critical service lines are vital not only for immediate emergency care but also long-term recovery and rehabilitation.

- 12 -

62.     If Crozer-Chester Medical Center burn and trauma centers close, it would immediately impact the health and safety of the residents of Delaware County and leave a significant gap in these healthcare services.

63.     The threatened closure of critical services lines will also result in the public's loss to accessible health care providers, and other adverse consequences, including, but not limited to:

    a.    Putting immense pressure on surrounding hospitals, leading to longer response times in critical situations, including longer Emergency Room waiting times, and ultimately jeopardizing the well-being of the entire community;

    b.    Increasing demand for services at the nearest hospitals beyond their abilities to absorb additional patients affecting not only the additional patients but those already receiving care at those hospitals;

    c.    Diminishing the likelihood of good medical outcomes for impacted patients;

    d.    Frustrating patient families without their own transportation to participate in the care and treatment of their loved ones; and

    e.    Burdening EMS transports as they will require additional time to get to hospitals located further away.

64.     In a statement published by the Delco Times in September 2024, PROSPECT CROZER admitted that its Burn Center and Level II Trauma Center provides crucial lifesaving services for the residents of Delaware County. It specifically states, "Our facilities provide the essential medical care that can mean the difference between life and death." A true and correct

copy of the statement contained on the Crozer Health website at www.crozerhealth.org is attached as Exhibit "I".

### D. *Need to transfer PROSPECT CROZER back to nonprofit charitable entity.*

65.     HOLDINGS's intentional diminution of PROSPECT CROZER's ability to function by prioritizing unwarranted, unlawful dividends to investors and insiders, as well as its overall mismanagement has left PROSPECT CROZER little chance to continue as a going concern.

66.     PROSPECT CROZER is expected to provide emergency room services for more than 65,000 thousand patient visits through 2024.  A true and correct copy of the Statistics Provided by Prospect Crozer's CEO's Anthony Esposito is attached as Exhibit "J."

67.     PROSPECT CROZER operates a trauma unit and operates one of only 7 burn units in Pennsylvania.

68.     PROSPECT CROZER's closure of service lines will harm the citizens of Pennsylvania generally and the citizens of Delaware County specifically.

69.     Based upon the Commonwealth's experience, nearly every for-profit hospital owner in Pennsylvania has eventually closed or sold back to nonprofit systems, and it is not in the public's interest to allow PROSPECT CROZER to retain ownership and control of the remaining assets of the former CKHS while it closes the service lines as alleged.

### CLAIMS FOR RELIEF

### *COUNT I – BREACH OF CONTRACT*
### Contractual Violations of the Asset Purchase Agreement and Order Approving the Sale
### *Commonwealth v. Holdings, Prospect Crozer, Lee, and Topper*

70.     Paragraphs 1 through 69 are incorporated as if fully set forth.

- 14 -

71.     Pursuant to Section 5976 of the Nonprofit Corporation Law, 15 Pa.C.S. § 5976, it is unlawful to sell property committed to charitable purposes if the sale will divert the assets from the purposes to which the property was originally committed without an Order approving the sale pursuant to 15 Pa.C.S. § 5547.

72.     The June 28, 2016 Order granting the sale of CKHS to HOLDINGS and PROSPECT CROZER found that the sale would not result in a diversion of charitable assets based upon Prospect's commitments and representations made to the Commonwealth, this Court, and the public.

73.     HOLDINGS and PROSPECT CROZER have since closed two of the four hospitals in the former Crozer Health System, which has resulted in the elimination of acute care service lines, mass employee layoffs, unpaid vendors, and extended travel times for emergency care.

74.     Prospect agreed not to "close any of the licensed Hospitals, including any campus of a licensed hospital providing inpatient acute care services as of the Effective Time [July 1, 2016], acquired as part of the transactions contemplated hereby unless consented to by the Advisory Board and the FOUNDATION in advance." See Exhibit A Section 11.16

75.     Additionally, under the APA Section 2.4(a) entitled Pension Liability Prospect agreed to become the sponsor of the Crozer-Keystone Health Systems Employees Retirement Plan. See Exhibit A, pg. 14.

76.     Under the Third Amendment to the APA Section 7(c) Prospect agreed that "within five (5) years after the Effective Time and subject to applicable filing and authorization by the applicable Government entity, Buyer shall adopt a plan amendment to terminate the DB Pension Plan (the "Plan Termination Agreement") effective within such five (5) year period and

- 15 -

thereafter, in accordance with applicable law, shall liquidate, fully fund and satisfy, and pay all benefits owed to participants and beneficiaries of, the DB Pension Plan ("Pension") by providing for lump sum distributions to participants, purchasing annuities for participants who do not elect a lump sum distribution or otherwise in accordance with the terms, conditions of the DB Pension Plan (as in effect at the Effective Time) and with applicable law." The amendment goes on to allow for two one year extension if certain conditions are met. See Exhibit D, pgs. 3-4.

77.     Not only has Prospect not fully funded the Pension but it is in default of its ongoing obligations.

### COUNT II - BREACH OF CONTRACT
#### Negligent Misrepresentation
*Commonwealth v. Holdings, Prospect Crozer, Lee, Topper, and Partners*

78.     Paragraphs 1 through 77 are incorporated as if fully set forth.

79.     Defendants Holdings, Prospect Crozer Lee, Topper, Partners Holdings, Prospect Crozer Lee, Topper, Partners knew or should have known that the representations made to the Commonwealth, this Court and the public were false.

80.     "The four elements of a common law claim for negligent misrepresentation are: (1) a misrepresentation of material fact; (2) made under circumstances in which the actor should have known of its falsity; (3) with an intent to induce another to act on it; (4) thereby causing injury to a party who justifiably relied upon the misrepresentation." See *Gregg v. Ameriprise Financial Inc.* 664 Pa. 567, 581 (2021), citing *Bortz v. Noon*, 556 Pa. 489, 729 A.2d 555, 560 (1999).

81.     HOLDINGS has a history of taking out massive loans secured by hospital real estate and saddling its hospital systems with unsustainable ongoing lease obligations.

82.    In 2018, only two years after purchasing CKHS, HOLDINGS took a loan resulting in a $1.12 billion debt, secured by the physical assets of PROSPECT CROZER, along with HOLDINGS other out-of-state hospitals.

83.    To pay back this massive loan, HOLDINGS sold its properties in Pennsylvania, Connecticut, and California to MPT, who leased it back to PROSPECT CROZER through a costly lease agreement.

84.    By 2020, after HOLDINGS distributed $457 million in dividends to its owners, HOLDINGS' liabilities exceeded its assets by more than $1 billion, with assets totaling $2,042,389,000 and liabilities totaling $3,102,004,000. See Rhode Island Court's June 12, 2024 Opinion, attached as Exhibit "E."

85.    Following this lease agreement, PROSPECT CROZER was unable to pay its rent.

86.    HOLDINGS and MPT have since converted the lease-back in Pennsylvania into a mortgage in exchange for MPT acquiring an equity stake in certain portions of HOLDINGS California business interests.

87.    HOLDINGS knew or should have known that the sale and lease-back transactions burdened PROSPECT CROZER hospitals with new financial liabilities that they could not sustain risked defaulting on HOLDINGS' obligations to operate a hospital system for 10 years.

### *COUNT III – UNJUST ENRICHMENT*
### *Commonwealth v. Holdings, Prospect Crozer, Lee, Topper, and Partners*

88.    Paragraphs 1 through 87 are incorporated as if fully set forth.

89.    Unjust enrichment is an equitable doctrine. See *Gutteridge v. J3 Energy Group*, Inc., Pa. Super. 2017165 A. 3d 908, 916 (citing *Styer v. Hugo* 619 A.2d 347 (Pa. Super. 1993)).

90.    The elements necessary to prove unjust enrichment are: (1) Benefits conferred on defendant by plaintiff, (2) Appreciation of such benefits by defendant, and (3) Acceptance and

retention of such benefits under such circumstances that it would be inequitable for defendant to retain that benefit without payment of value. *Id.* at 917.

91.    As alleged, HOLDINGS distributed $457 million in dividends to its private shareholders and executives.

92.    Upon information and belief, during the time that PARTNERS had an ownership interest in HOLDINGS, PARTNERS received over $600 million in dividends and management fees.

93.    LEE, TOPPER and PARTNERS received the lion's share of those dividends.

94.    This distribution was made despite HOLDINGS' obligations to operate the PROSPECT CROZER hospitals for 10 years, an obligation that HOLDINGS could not meet without the cash distributed for the dividends.

95.    Upon information and belief, little of the $1.12 billion loan secured by the sale of the medical properties in Pennsylvania was reinvested in the PROSPECT CROZER health system – on the contrary, PROSPECT CROZER was burdened with an additional annual lease and/or mortgage obligation of $35 million which contributed to its financial unsustainability.

96.    HOLDINGS and PROSPECT CROZER failed to operate the hospital system in a commercially reasonable manner.

97.    LEE, TOPPER, and PARTNERS unequivocally enriched themselves at the expense of Delaware County residents and the Commonwealth.

### *COUNT IV – CONSTRUCTIVE TRUST*
### *Commonwealth v. Holdings, Prospect Crozer Lee, Topper, and Partners*

98.    Paragraphs 1 through 97 are incorporated as if fully set forth.

99.    A constructive trust occurs when a person holding the property's title is subject to an equitable duty to convey it to another if that person would receive unjust enrichment if that property were retained. See *Gray v. Leibert*, 357 Pa. 130, 135 (1947).

100.    HOLDINGS, PROSPECT CROZER, LEE, TOPPER, and PARTNERS acquired enormous profits by stripping away the hospitals' main assets, saddling millions of dollars of ongoing financial obligations upon PROSPECT CROZER, terminating acute care services, and downgrading health care services to the Delaware county community.

101.    HOLDINGS, PROSPECT CROZER, LEE, TOPPER, and PARTNERS engaged in wrongful conduct in order to increase their profits while refusing to operate the hospitals in a manner consistent with the representations made to the Commonwealth and this Court and failing to expend the capital necessary for the hospitals to operate and function properly.

102.    HOLDINGS, PROSPECT CROZER, LEE, TOPPER, and PARTNERS are subject to an equitable duty to convey the dividends to the Commonwealth for distribution to an appropriate successor or successors to restore health care services to the local community and public-at-large.

103.    Accordingly, the Commonwealth asks this Court to impose a constructive trust upon the distribution of dividends made to HOLDINGS, PROSPECT CROZER, LEE, TOPPER, and PARTNERS.

### *COUNT V – BREACH OF FIDUCIARY DUTY*
*Commonwealth v. Holdings, Prospect Crozer, Lee, Topper, and Partners*

104.    Paragraphs 1 through 103 are incorporated as if fully set forth.

105.    Pursuant to 15 Pa.C.S. § 1712, Officers and Directors shall perform their fiduciary duties in good faith and in a manner that is in the best interest of the corporation, with the amount of care that a reasonable person would exercise.

106.     Upon information and belief, in 2018, HOLDINGS borrowed $1.12 billion to, in part, fund $457 million in dividends to themselves, of which LEE, TOPPER, and PARTNERS received large shares.

107.     Upon information and belief, during the time that PARTNERS had an ownership interest in HOLDINGS, PARTNERS received over $600 million in dividends and management fees.

108.     As officers and/or directors of PROSPECT CROZER, the individual Defendants LEE and TOPPER violated their fiduciary duties when they engaged in the 2018 loan and dividend distributions.

109.     LEE, TOPPER, and PARTNERS, each of whom had a conflict of interest, engaged in self-dealing and violated their fiduciary duties in receiving their shares.

### COUNT VI – REVOCATION OF CORPORATE FRANCHISE AND APPOINTMENT OF RECEIVER
### Commonwealth v. Prospect Crozer

110.     Paragraphs 1 through 109 are incorporated as if fully set forth.

111.     Section 503 of the Associations Code, 15 Pa.C.S. § 503, entitled *Actions to revoke corporate franchises,* provides:

> (a) General rule. - - The Attorney General may institute proceedings to revoke the articles and franchises of a corporation if it:
>
> (1) Misused or failed to use its powers, privileges or franchises;
>
> (2) Procured its articles by fraud; or
>
> (3) Should not have been incorporated under the statutory authority relied upon.
>
> (b) Powers of court. - - In every action or proceeding instituted under subsection (a), the court shall have power to wind up the affairs of and

to dissolve the corporation in the manner provided in this part or as otherwise provided by law.

112.    As alleged, PROSPECT CROZER has misused the powers and privileges bestowed upon PROSPECT CROZER.

113.    Moreover, PROSPECT CROZER violated its representations to the public and within the APA as to its commitments to provide essential healthcare in the community.

114.    As such, the corporate franchise of PROSPECT CROZER should be revoked and entity's assets placed under receivership for distribution to one or more successors to restore the public's access to health care.

### COUNT VII – FUNDING TO SUPPORT TRANSITION TO NONPROFIT SUCCESSOR
### Commonwealth v. Holdings, Lee. Topper, and Partners

115.    Paragraphs 1 through 114 are incorporated as if fully set forth.

116.    As alleged, based on the Commonwealth's experience, the transfer to one or more nonprofit charitable successor(s) will provide the best chance to enable what remains of the former CKHS system to develop clinical relationships with other credible health care providers and restore confidence in the system's employees as well as the public.

117.    Toward that end, funding is required to maintain the operational costs of PROSPECT CROZER in order to effectuate the transfer to one or more nonprofit systems.

118.    HOLDINGS has a contractual obligation to provide that funding and should be ordered to maintain PROSPECT CROZER's operations until a transition to one or more appropriate nonprofit successors has been achieved.

119.    Likewise, Defendants LEE, TOPPER, and PARTNERS should be ordered to repay the imprudent and illegal dividends they have received which contributed to the financial demise of PROSPECT CROZER as alleged.

[INTENTIONALLY BLANK]

## PRAYER FOR RELIEF

**WHEREFORE,** the Commonwealth respectfully requests this Honorable Court enter an order:

A.   Declaring Defendants' HOLDINGS, PROSPECT CROZER, LEE, TOPPER, and PARTNERS conduct described herein to be in violation of the terms of the APA and contrary to the material representations relied upon by the Commonwealth and this Court in approving the sale resulting in the unjust enrichment of Defendants TOPPER, LEE, and PARTNERS;

B.   Enjoining Defendants HOLDINGS, PROSPECT CROZER, LEE, TOPPER, and PARTNERS and all other persons acting on their behalf directly or indirectly, from engaging in any future violations;

C.   Imposing a constructive trust on the dividends paid out to TOPPER, LEE, and PARTNERS;

D.   Requiring TOPPER, LEE, and PARTNERS to pay back all of the unlawful dividends received to be used proportionally by Pennsylvania, Connecticut, Rhode Island, and California to fund health care initiatives in the communities impacted by the actions complained of;

E.   Requiring HOLDINGS to fund the operating costs of PROSPECT CROZER during the sale/transition to one or more nonprofit charitable successors;

F.   Revoking the franchise of PROSPECT CROZER and placing its assets in receivership for distribution to one or more successors to restore the public's access to health care;

- 23 -

G.   Directing Defendants HOLDINGS, PROSPECT CROZER, LEE, TOPPER, and

PARTNERS to pay the Commonwealth's costs of investigation and attorneys'

fees incurred in this matter; and

H.   Granting such other relief as this Court deems necessary and appropriate.

Respectfully submitted,

MICHELLE A. HENRY
ATTORNEY GENERAL

By:  /s/James A. Donahue III
James A. Donahue III
First Deputy Attorney General
Identification No. 42624
1600 Arch Street Suite 300
Philadelphia, PA 19103

Mark A. Pacella
Executive Deputy Attorney General
Attorney I.D. 42214

Eugene Herne
Chief Deputy Attorney General
Attorney I.D. 82033

Rosalind M. Karlin
Senior Deputy Attorney General
Attorney I.D. 308417

Pamela S. Fingerhut
Senior Deputy Attorney General
Attorney I.D. 84079

October 28, 2024

# **VERIFICATION**

I, James A. Donahue, III, hereby state that I am the First Deputy Attorney General with the Office of the Attorney General for the Commonwealth of Pennsylvania. I verify that the averments made in the foregoing Complaint are true and correct to the best of my knowledge, information, and belief. I understand that the statements therein are made subject to penalties of 18 Pa. C.S. § 4904 relating to unsworn falsification to authorities.

Dated: October 28, 2024

/s/ James A. Donahue, III
James A. Donahue, III
First Deputy Attorney General

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA By MICHELLE A. HENRY, Attorney General, | : : : : | COURT OF COMMON PLEAS OF DELAWARE COUNTY |
| Plaintiffs, | : | No. |
| v. | : : | |
| PROSPECT MEDICAL HOLDINGS, INC., PROSPECT CROZER, LLC, LEONARD GREEN AND PARTNERS, SAMUEL LEE, Individually, and DAVID TOPPER, Individually, Defendants. | : : : : : : : | CIVIL ACTION-LAW |

## CERTIFICATE OF COMPLIANCE

I certify that this filing complies with the provisions of the *Public Access Policy of the Unified Judicial System of Pennsylvania Case Records of the Appellate and Trial Courts* that require filing confidential information and documents differently from non-confidential information.

Respectfully submitted,

MICHELLE A. HENRY
ATTORNEY GENERAL

By:  /s/ James A. Donahue, III
James A. Donahue, III
First Deputy Attorney General
Identification No. 42624
1600 Arch Street Suite 300
Philadelphia, PA 19103
Telephone: (215) 560-2402

October 28, 2024

# EXHIBIT A

COMMONWEALTH OF PENNSYLVANIA
DELAWARE COUNTY

IN THE ORPHANS COURT DIVISION        No. 0342-1997

OF THE COURT OF COMMON PLEAS

OF DELAWARE COUNTY, PENNSYLVANIA

### IN THE MATTER OF ACQUISITION OF ASSETS OF
### CROZER-KEYSTONE HEALTH SYSTEM

### FINAL DECREE

AND NOW, TO WIT, this _28TH_ day of _JUNE_, 2016, upon consideration of

the Petition for Court Approval of the Acquisition of the Assets of the Crozer-Keystone Health

System, and a response by the Attorney General of the Commonwealth of Pennsylvania and any

other party, and following a public hearing duly advertised and held pursuant to the Review

Protocol for Fundamental Change Transactions Affecting Health Care Nonprofits conducted by

the Attorney General of the Commonwealth of Pennsylvania, on May 4, 2016, and following a

hearing held before the Court on the 27th day of June, 2016, it is hereby ORDERED and

DECREED that the prayer of the Petition for Court Approval of the Acquisition of the Assets of

the Crozer-Keystone Health System be, and the same is hereby, GRANTED, and the Court

makes the following findings of fact and conclusions of law:

     1.      This Court has jurisdiction over the within Petition and the Petitioner pursuant to

Sections 314, 5547(a) and (b) and 5930 of the Pennsylvania Nonprofit Law of 1988, as amended

(the "NCL"), 15 Pa. C.S.A. §§ 314, 5547(a) and (b) and 5930; under Section 711(21) of the

Pennsylvania Probate, Estates and Fiduciary Code, (the "PEF Code"), 20 Pa. C.S.A. § 711(21);

and under Rule 2156 of the Pennsylvania Rules of Judicial Administration.

2.      Pursuant to Section 726 of the PEF Code, 20 Pa. C.S.A. § 726, venue of the Petition is proper in Delaware County, Pennsylvania.

3.      The sale of the assets of the Crozer-Keystone Health System to Prospect Crozer, LLC, and the payment of proceeds to the Crozer-Keystone Health System pursuant to the Asset Purchase Agreement ("Agreement") and as described in the Petition, is approved.

4.      After payment of the debts and liabilities of the Crozer-Keystone Health System, Crozer-Keystone Health System is authorized to transfer to the Crozer-Keystone Community Foundation ("the Foundation") the net proceeds and cash or investment assets remaining from the sale proceeds.

5.      The assets to be sold pursuant to the Agreement do not include restricted charitable assets; accordingly, the sale will not result in a diversion of assets committed to charitable purposes from the objects for which such assets were donated, granted or devised, and the sale is not subject to the provisions of 15 Pa. C.S.A. §5547(b).

6.      The sale of assets pursuant to the Agreement will not result in any prohibited self-dealing or inurement of charitable assets for the benefit of private individuals.

7.      As a condition of this Decree, Prospect shall submit Status Reports to the Office of Attorney General, Charitable Trusts and Organizations Division providing informational accounting of satisfying its $200 million commitment to modernize facilities and improve services, accounting of Prospect's charity care, and Prospect's initiatives to promote wellness, health education and other community programs, to be submitted on a yearly basis for five years post Closing Date.

8.      As a condition of this Decree, Crozer-Keystone Health System and/or the Foundation shall provide Status Reports to the Office of Attorney General, Charitable Trusts and

Organizations Division, providing informational accounting of the distribution of the proceeds of the sale and any transfer or use of restricted funds on or before September 30, 2017.

9. As a condition of this Decree, the Crozer-Keystone Community Foundation shall submit Status Reports to this Court and the Office of Attorney General, Charitable Trusts and Organizations Division providing informational accounting of the Foundation's charitable activities on the 1st, 4th, 7th and 10th anniversary of the Closing Date.

10. In the event that future bequests or donations are made to Crozer-Keystone Health System, Prospect and/or the Foundation will request that the donor direct the bequest to the Foundation.

11. Without admitting liability and without waiving any defenses, the Petitioner or Foundation shall set aside and maintain sufficient funds to settle or satisfy any judgment in the pending tax appeals by Chester-Upland School District vs. Crozer-Chester Medical Center and any additional transfer tax liability of Crozer-Keystone Health System arising as a result of the instant transaction (the "Restricted Tax Fund"). The Petitioner or Foundation shall maintain the Restricted Tax Fund until final resolution of the litigation.

12. The purpose clause of the Amended and Restated Articles of Incorporation of the Crozer Keystone Community Foundation shall read as follows:

The Corporation is organized, and may undertake any activities authorized, under the provisions of the Nonprofit Corporation Law of 1972, as amended, exclusively for charitable, scientific and educational purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as the same may be amended and modified or replaced by any future United States Internal Revenue Law (the "Code"), or for any purpose pursuant to court order. The purpose of the

Corporation is to build a better community through the support of healthcare

education, healthcare-related social service and healthcare initiatives and

programs in Delaware County.

~~13.   The Petitions to Intervene on a Limited Basis and Motions to Bifurcate the~~

~~Proceedings filed by the Borough of Upland and the Upper Darby School District are hereby~~

~~denied.~~   *CFK, 6-28-16*

BY THE COURT:

HONORABLE CHAD F. KENNEY,
PRESIDENT JUDGE

**ATTACHMENT B**

**AMENDED AND RESTATED
ARTICLES OF INCORPORATION**

**OF**

**CROZER-CHESTER FOUNDATION**

In compliance with all the requirements of 15 Pa. C.S. Section 5915 (relating to articles of incorporation), the undersigned, desiring to amend and restate its Articles of Incorporation, hereby certifies that:

1.    **Name.**   The name of the Corporation is **Crozer-Keystone Community Foundation**.

2.    **Principal Office.** The location and post office address of the registered office of the Corporation in this Commonwealth is One Medical Center Boulevard, Upland, PA  19013, Delaware County, PA.

3.    **Purposes and Powers.** The Corporation is organized, and may undertake any activities authorized, under the provisions of the Nonprofit Corporation Law of 1972, as amended, exclusively for charitable, scientific and educational purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as the same may be amended and modified by any future United States Internal Revenue Law (the "Code"), or for any purpose pursuant to court order. The purpose of the Corporation is to build a better community through the support of healthcare education, healthcare-related social service and healthcare initiatives and programs in Delaware County.

Notwithstanding any other provision of these Articles, the Corporation shall not engage directly or indirectly in any activity which would prevent it from qualifying, and continuing to qualify, as a Corporation described in Section 501(c)(3) of the Code (hereinafter referred to in these Articles as an "exempt organization"), or as a Corporation contributions to which are deductible under Section 170(c)(2) of the Code. No substantial part of the activities of the Corporation shall be devoted to the carrying on of propaganda, or otherwise attempting to influence legislation (except as otherwise provided in Section 501(h) of the Code), and the Corporation shall not participate in or intervene in (including the publishing or distributing of statements) any political campaign on behalf of or in opposition to any candidate for public office.

4.    **Restricted Funds.** Unless otherwise subject to donor specific restrictions, any funds transferred to the Corporation in connection with the merger of Delco Memorial Foundation, with and into the Corporation, and the proceeds received from Crozer-Keystone Health System in connection with its sale to Prospect Medical Holdings, Inc., (such funds collectively hereinafter referred to as the "Transferred Restricted Funds"), shall be restricted to solely support the purposes set forth in paragraph 3 above. The Corporation may support other

charitable purposes, as determined by its Board of Directors, through any funds that are not Transferred Restricted Funds and that are not otherwise subject to donor-specific restrictions.

5. **Nonprofit Status**. The Corporation does not contemplate pecuniary gain or profit, incidental or otherwise and is organized on a nonstock basis.

6. **Term**. The term for which the Corporation is to exist is perpetual.

7. **Members**. The Corporation shall have no members.

8. **Amendment**. These Articles of Incorporation and the Bylaws of the Corporation may be recommended for amendment, restatement, or repeal, or new Bylaws or Articles of Incorporation may be recommended upon the approval of the Board of Directors. No provisions of the Articles of Incorporation or Bylaws of the Corporation shall vest any property or contract right in any person.

9. **No Private Inurement**. Notwithstanding any other provision of these Articles, no part of the net earnings of the Corporation shall inure to the benefit of or be distributable to its, Directors, officers, or any other private individual; provided, however, that the Corporation shall be authorized and empowered to pay reasonable compensation for services rendered to the extent that such payments do not prevent it from qualifying, and continuing to qualify, as an exempt organization and to make such lawful payments and distributions in furtherance of the purposes set forth in Article 3 hereof as may from time to time be either required or permitted by Section 501(c)(3) of the Code.

10. **Dissolution**. Upon the dissolution or liquidation of the Corporation, whether such be de jure or de facto, in whole or in part, after paying or making provision for the payment of all of the liabilities of the Corporation, any remaining assets of the Corporation shall be distributed to one or more organizations organized and operated exclusively for charitable, educational, religious, or scientific purposes as shall at the time qualify as exempt organizations under Section 501(c)(3) of the Code, as amended, as the Board of Directors of the Corporation shall determine, subject to the laws of the Commonwealth of Pennsylvania. No private individual shall share in the distribution of any Corporation net assets upon dissolution of the Corporation.

11. **Code References**. References in these Articles to a section of the Code shall be construed to refer both to such section and to the regulations promulgated thereunder, as they now exist or may hereafter be amended, and to the corresponding provisions of any future federal tax code and the regulations thereunder.

# EXHIBIT B

Execution Version

# ASSET PURCHASE AGREEMENT

## BY AND AMONG

## CROZER-KEYSTONE HEALTH SYSTEM

### AND

## PROSPECT CROZER, LLC

### AND

## PROSPECT MEDICAL HOLDINGS, INC.

**January 8, 2016**

# TABLE OF CONTENTS

*Description*                                                                                           *Page*

1. ASSET PURCHASE ...................................................................................................2
   1.1. Assets ........................................................................................................2
   1.2. Excluded Assets .......................................................................................5
   1.3. Assumed Liabilities ..................................................................................6
   1.4. Excluded Liabilities ..................................................................................8
2. PURCHASE PRICE ..................................................................................................10
   2.1. Purchase Price .........................................................................................10
   2.2. Net Working Capital, Estimates and Audits ............................................12
   2.3. Other Adjustments, Estimates and Audits ...............................................13
   2.4. Pension Funding .......................................................................................14
   2.5. Tax Prorations ..........................................................................................15
   2.6. Net Operating Loss Reconciliation ..........................................................16
   2.7. Allocation of Purchase Price ....................................................................16
   2.8. Sellers Tenant Leases Rent Prorations .....................................................16
3. CLOSING ................................................................................................................16
   3.1. Closing .....................................................................................................16
   3.2. Actions of Sellers at Closing ....................................................................17
   3.3. Actions of Buyers at Closing ...................................................................19
4. REPRESENTATIONS AND WARRANTIES OF SELLERS ...................................20
   4.1. Existence and Capacity ............................................................................20
   4.2. Powers; Consents; Absence of Conflicts With Other Agreements, Etc ....20
   4.3. Binding Agreement ...................................................................................20
   4.4. Financial Statements .................................................................................21
   4.5. Certain Post-Balance Sheet Results .........................................................22
   4.6. Licenses ....................................................................................................23
   4.7. Condition of Assets ..................................................................................23
   4.8. Medicare Participation/Accreditation/Registration .................................23
   4.9. Compliance with Laws .............................................................................24
   4.10. Equipment ..............................................................................................25
   4.11. Real Property ..........................................................................................25
   4.12. Title ........................................................................................................27

## TABLE OF CONTENTS
(continued)

*Description* | *Page*

4.13. Employee Benefit Plans .................................................................... 27

4.14. Litigation or Proceedings ................................................................ 28

4.15. Environmental Laws ........................................................................ 29

4.16. Hill-Burton and Other Liens ........................................................... 30

4.17. Taxes ................................................................................................ 30

4.18. Employee Relations ......................................................................... 31

4.19. Contracts and Commitments ............................................................ 32

4.20. Unclaimed Property ......................................................................... 33

4.21. Inventory/Supplies .......................................................................... 33

4.22. Insurance .......................................................................................... 34

4.23. Third Party Payor Cost Reports ...................................................... 34

4.24. Medical Staff Matters ...................................................................... 34

4.25. Intellectual Property; Computer Software ...................................... 34

4.26. Compliance Program ........................................................................ 35

4.27. Full Disclosure ................................................................................. 35

5. REPRESENTATIONS AND WARRANTIES OF BUYERS ........................ 35

5.1. Existence and Capacity .................................................................... 35

5.2. Powers; Consents; Absence of Conflicts with Other Agreements, Etc .......... 36

5.3. Binding Agreement ........................................................................... 36

5.4. Full Disclosure ................................................................................. 36

5.5. Litigation/Investigations .................................................................. 37

5.6. Compliance with Laws ..................................................................... 37

5.7. Licenses/Permits .............................................................................. 37

6. COVENANTS OF SELLERS PRIOR TO CLOSING ................................. 38

6.1. Information ........................................................................................ 38

6.2. Operations ......................................................................................... 38

6.3. Negative Covenants .......................................................................... 39

6.4. Governmental Approvals .................................................................. 40

~ ii ~

## TABLE OF CONTENTS
### (continued)

| *Description* | *Page* |
|---|---|
| 6.5. Hart-Scott-Rodino Notification | 41 |
| 6.6. Additional Financial Information | 41 |
| 6.7. Exclusivity | 41 |
| 6.8. Insurance Ratings | 42 |
| 6.9. Medical Staff Disclosure | 42 |
| 6.10. Consent for Assignment of Contracts | 42 |
| 6.11. Corporate and Bulk Sales Clearance Certificate | 43 |
| 6.12. Unions | 43 |
| 6.13. Foundation Merger | 43 |
| 6.14. Consulting Agreement | **Error! Bookmark not defined.** |
| 7. COVENANTS OF BUYERS PRIOR TO CLOSING | 44 |
| 7.1. Governmental Approvals | 44 |
| 7.2. Hart-Scott-Rodino Notification | 44 |
| 7.3. Unions | 44 |
| 8. CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYERS | 44 |
| 8.1. Representations/Warranties | 45 |
| 8.2. Pre-Closing Confirmations | 45 |
| 8.3. Title Policy | 45 |
| 8.4. Actions/Proceedings | 48 |
| 8.5. Adverse Change | 48 |
| 8.6. Insolvency | 48 |
| 8.7. Material Consents | 48 |
| 8.8. Vesting/Recordation | 49 |
| 8.9. Surveys and Reports | 49 |
| 8.10. Closing Deliveries | 49 |
| 8.11. Satisfaction of Indebtedness | 49 |
| 8.12. Pension Funding | 49 |
| 8.13. Delivery of Other Agreements | 49 |

TABLE OF CONTENTS
(continued)

| *Description* | *Page* |
|---|---|
| 9. CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLERS | 49 |
| 9.1. Representations/Warranties | 49 |
| 9.2. Governmental Approvals | 50 |
| 9.3. Actions/Proceedings | 50 |
| 9.4. Insolvency | 50 |
| 9.5. Closing Deliveries | 50 |
| 10. RESTRICTIVE COVENANTS | 50 |
| 10.1. Purchase Price Proceeds | 50 |
| 10.2. Enforcement Authority; Annual Reports | 50 |
| 10.3. Non-Compete | 50 |
| 10.4. Non-Solicitation | 51 |
| 10.5. Remedies | 51 |
| 11. ADDITIONAL COVENANTS AND AGREEMENTS | 51 |
| 11.1. Supplement to Schedules | 51 |
| 11.2. Termination Prior to Closing | 52 |
| 11.3. Post-Closing Access to Information | 54 |
| 11.4. Preservation and Access to Records after the Closing | 54 |
| 11.5. Tax and Medicare Effect | 55 |
| 11.6. Reproduction of Documents | 55 |
| 11.7. Cooperation on Tax Matters | 55 |
| 11.8. Cost Reports | 55 |
| 11.9. Misdirected Payments, Etc. | 56 |
| 11.10. Employee Matters | 56 |
| 11.11. Transition Services | 57 |
| 11.12. Local Advisory Board | 57 |
| 11.13. Financial Assistance Policies | 58 |
| 11.14. Community Benefit, Education Programs and Affiliations | 58 |
| 11.15. Availability of Services | 58 |

## TABLE OF CONTENTS
(continued)

| Description | Page |
|---|---|
| 11.16. Future Sale or Closing | 59 |
| 11.17. Capital Expenditures | 59 |
| 11.18. Strategic Planning | 59 |
| 11.19. Branding and Identity | 60 |
| 11.20. Corporate Functions and Services | 60 |
| 11.21. Medical Staff and Physicians | 60 |
| 11.22. Quality Reporting | 60 |
| 11.23. Continuation of Insurance | 61 |
| 11.24. Cooperation on Payor Matters | 61 |
| 11.25. Section 4204 Sale of Assets | 62 |
| 11.26. Environmental Matters | 62 |
| 12. CONFIDENTIALITY | 63 |
| 12.1. Confidential Information | 63 |
| 12.2. Public Announcements | 64 |
| 13. INDEMNIFICATION | 64 |
| 13.1. Indemnification by Buyers | 64 |
| 13.2. Indemnification by Sellers | 64 |
| 13.3. Limitations | 65 |
| 13.4. Indemnification Procedures | 66 |
| 13.5. Exclusive Remedy; Set Off | 68 |
| 13.6. Survival | 68 |
| 14. MISCELLANEOUS | 69 |
| 14.1. Schedules and Other Instruments | 69 |
| 14.2. Additional Assurances | 69 |
| 14.3. Consented Assignment | 69 |
| 14.4. Consents, Approvals and Discretion | 69 |
| 14.5. Knowledge | 69 |
| 14.6. Choice of Law | 70 |

- v -

**TABLE OF CONTENTS**
(continued)

*Description*                                                                                    *Page*

14.7.   Benefit/Assignment ...................................................................................... 70

14.8.   No Brokerage ................................................................................................ 70

14.9.   Cost of Transaction ..................................................................................... 70

14.10.  Waiver of Breach ......................................................................................... 70

14.11.  Notice ............................................................................................................ 71

14.12.  Severability .................................................................................................. 72

14.13.  Interpretation ............................................................................................... 72

14.14.  Divisions and Headings .............................................................................. 72

14.15.  Risk of Loss ................................................................................................. 72

14.16.  Affiliates ...................................................................................................... 72

14.17.  Material Adverse Effect ............................................................................. 73

14.18.  Accounting Date .......................................................................................... 73

14.19.  No Inferences ............................................................................................... 73

14.20.  No Third Party Beneficiaries ..................................................................... 73

14.21.  Enforcement of Agreement ........................................................................ 73

14.22.  Force Majeure .............................................................................................. 73

14.23.  Entire Agreement/Amendment ................................................................... 74

14.24.  PMH Guaranty ............................................................................................. 74

14.25.  Counterparts ................................................................................................. 74

14.26.  Municipal Resale Certificates .................................................................... 74

# EXHIBITS

Exhibit A      List of Crozer Members

Exhibit B      List of Prospect Members (and assets/liabilities acquired by each)

Exhibit C      General Assignment, Conveyance and Bill of Sale

Exhibit D      Assignment and Assumption Agreement

Exhibit E      Lease Assignment and Assumption Agreement

Exhibit F      License Assignment and Assumption Agreement

Exhibit G      DB Pension Plan Assignment and Assumption Agreement

Exhibit H      Other Benefit Plan Assignment and Assumption Agreement

Exhibit I      Transition Services Agreement

Exhibit J      Initial List of Advisory Board Members and Charter

Exhibit K      Indemnification and Restrictive Covenant Agreement

## SCHEDULES

Schedule 1.1(a)     Crozer Owned Real Property

Schedule 1.1(b)     Crozer Personal Property

Schedule 1.1(d)     Crozer Prepaid Expenses

Schedule 1.1(f)     Crozer Contracts

Schedule 1.1(k)     Crozer Intellectual Property

Schedule 1.1(m)     Crozer Included Grants

Schedule 1.1(o)     Crozer For Profit Affiliates, Joint Ventures and Other Affiliated Organizations

Schedule 1.1(q)     Crozer Graduate Medical Education Programs

Schedule 1.1(s)     Crozer Assumed Benefit Plan Assets

Schedule 1.2(i)     Excluded Crozer Assets, Properties and Rights

Schedule 1.2(j)     Excluded Crozer Contracts

Schedule 1.2(k)     Excluded Crozer Non-Profit/Conditional Grants

Schedule 1.3(b)     Crozer Capital Lease Obligations

Schedule 1.3(i)     Crozer Severance/Termination Liabilities to Executive/Management Employees

Schedule 1.3(k)     Crozer Retention Bonuses

Schedule 1.3(l)     Crozer Other Assumed Liabilities

Schedule 1.4(c)     Excluded Crozer Claims and Obligations

Schedule 2.2(b)     Sample Net Working Capital Calculation

Schedule 2.1(a)     Additional Purchase Price Deductions

Schedule 2.3        Sample Other Adjustments Calculation

Schedule 2.4        Crozer Pension Plan Actuarial Assumptions, Terms, and Conditions

Schedule 4.1        Crozer Disclosure Schedule -- List of Entities

- viii -

Schedule 4.2          Crozer Disclosure Schedule – Conflicts with other Agreements

Schedule 4.4(a)       Crozer Disclosure Schedule – Financial Statements

Schedule 4.4(b)       Crozer Disclosure Schedule – GAAP Exceptions

Schedule 4.4(c)       Crozer Disclosure Schedule – Accounts Receivable

Schedule 4.4(d)       Crozer Disclosure Schedule – Liabilities/Obligations with Material Adverse Effect

Schedule 4.5          Crozer Disclosure Schedule – Certain Post-Balance Sheet Results

Schedule 4.6          Crozer Disclosure Schedule – Licenses

Schedule 4.7          Crozer Disclosure Schedule – Material Defects

Schedule 4.8(a)       Crozer Disclosure Schedule – Pending/Threatened Investigations or Surveys

Schedule 4.8(b)       Crozer Disclosure Schedule – Reimbursement Reductions for Failure to Report Quality Data

Schedule 4.9          Crozer Disclosure Schedule – Compliance with Laws

Schedule 4.10         Crozer Disclosure Schedule – Equipment Depreciation Schedule

Schedule 4.11(b)      Crozer Disclosure Schedule – Zoning Compliance

Schedule 4.11(e)      Crozer Disclosure Schedule – Tenant Leased Real Property

Schedule 4.11(f)      Crozer Disclosure Schedule – Landlord Leased Real Property

Schedule 4.11(h)      Crozer Disclosure Schedule – Flood Plains

Schedule 4.11(i)      Crozer Disclosure Schedule – Operating Condition of Buildings, Plans and Structures

Schedule 4.13         Crozer Disclosure Schedule – Employee Benefit Plans

Schedule 4.14         Crozer Disclosure Schedule – Litigation or Proceedings

Schedule 4.15         Crozer Disclosure Schedule – Environmental Law/Permits

Schedule 4.16         Crozer Disclosure Schedule – Hill-Burton and other Liens

| | |
|---|---|
| Schedule 4.18(a) | Crozer Disclosure Schedule – Labor, Unions, Collective Bargaining Agreements |
| Schedule 4.18(b) | Crozer Disclosure Schedule – Employee Claims/Complaints |
| Schedule 4.18(c) | Crozer Disclosure Schedule – WARN Act |
| Schedule 4.19 | Crozer Disclosure Schedule – Material Contracts and Commitments |
| Schedule 4.22 | Crozer Disclosure Schedule – Insurance Policies |
| Schedule 4.23 | Crozer Disclosure Schedule – Cost Reports |
| Schedule 4.24 | Crozer Disclosure Schedule – Medical Staff Matters |
| Schedule 4.26 | Crozer Disclosure Schedule – Compliance Program |
| Schedule 5.6(a) | Prospect Disclosure Schedule – Compliance with Laws |
| Schedule 6.2(l) | Crozer Pension Contribution Schedule |
| Schedule 6.3(a) | Permitted Pre-Closing Crozer Contracts |
| Schedule 6.3(c) | Crozer Executive Management Personnel |
| Schedule 6.3(f) | Permitted Pre-Closing Crozer Capital Expenditures |
| Schedule 8.3 | Crozer Title Commitments, Permitted Encumbrances, Owned Real Property and Leased Real Property |
| Schedule 8.7 | Material Consents |
| Schedule 10.1 | Use of Purchase Price Proceeds; Projected Foundation Funds |
| Schedule 10.4 | Crozer Key Management Personnel |
| Schedule 11.10(a) | Prospect Post-Closing Employee Benefits |
| Schedule 11.20(a) | Prospect Comprehensive Support and Back Office Services |
| Schedule 11.21 | Closed Hospital Departments |
| Schedule 14.5(a) | Specified Crozer Personnel for Knowledge Standard |
| Schedule 14.5(b) | Specified Prospect Personnel for Knowledge Standard |
| Schedule 14.8 | Brokers |

- x -

## GLOSSARY OF DEFINED TERMS

| Defined Term | Location of Definition |
|---|---|
| Accounting Firm | Section 2.2(c) |
| Accounts Receivable | Section 1.1(c) |
| Act 2 | Section 11.26(b) |
| Advisory Board | Section 11.12 |
| Affiliates | Section 14.16 |
| Agreement | Heading |
| Anti-Kickback Law | Section 5.6(b) |
| Assets | Section 1.1 |
| Assignment and Assumption Agreement | Section 3.2(c) |
| Assumed Liabilities | Section 1.3 |
| Balance Sheet Date | Section 4.4(a)(i) |
| Benefit Plan Assignment and Assumption Agreement | Section 3.2(g) |
| Benefit Plans | Section 4.13(a) |
| Books and Records | Section 1.1(h) |
| Buyer Indemnified Parties | Section 13.2 |
| Buyer/Buyers | Heading |
| Cassatt | Section 1.1(o) |
| CCMC | Section 4.6 |
| CERCLA | Section 4.15 |
| CH | Section 4.6 |
| Claim Notice | Section 13.4(a) |

| Defined Term | Location of Definition |
|---|---|
| Closing | Section 3.1 |
| Closing Date | Section 3.1 |
| CMS | Section 4.8(b) |
| COBRA | Section 1.3(l) |
| Code | Section 2.7 |
| Code Violation Cure Amount | Section 14.26 |
| Competing Business | Section 10.3 |
| Compliance Program | Section 4.26 |
| Confidential Information | Section 12.1 |
| Contracts | Section 1.1(f) |
| CRC | Section 11.20 |
| Crozer | Heading |
| Crozer Campus | Section 4.6 |
| Crozer Foundation | Recitals |
| Crozer Members | Heading |
| Cure Estimates | Section 8.3(a) |
| DB Pension Plan | Section 2.4(a) |
| DB Pension Plan Assignment and Assumption Agreement | Section 3.2(f) |
| DCMH | Section 4.6 |
| Delco Foundation | Recitals |
| Effective Time | Section 3.1 |
| HER | Section 1.1(g) |

| Defined Term | Location of Definition |
|---|---|
| Environmental Laws | Section 4.15 |
| Environmental Reports | Section 4.15 |
| ERISA | Section 4.13(a) |
| Estimated Net Working Capital | Section 2.2(b) |
| Estimated Other Adjustments | Section 2.3 |
| Estimated Purchase Price | Section 2.1(a) |
| Excluded Assets | Section 1.2 |
| Excluded Liabilities | Section 1.4 |
| Execution Date | Heading |
| False Claims Act | Section 5.6(b) |
| Final Net Working Capital | Section 2.2(b) |
| Final Other Adjustments | Section 2.3(c) |
| Financial Statements | Section 4.4(a) |
| Financing Failure | Section 11.2(f) |
| Foundation | Recitals |
| Foundation Funds | Section 10.1 |
| FTC | Section 6.5 |
| GAAP | Section 2.2(a) |
| GME | Section 1.1(q) |
| Governmental Entity/Entities | Section 4.9 |
| GPO | Section 11.20 |
| Hazardous Substances | Section 4.15 |

- xiii -

| Defined Term | Location of Definition |
| --- | --- |
| HIPAA | Section 4.9 |
| Hired Employees | Section 11.10 |
| Hospitals | Recitals |
| HSR Act | Section 6.5 |
| Indemnification Cap | Section 13.3 |
| Indemnified Party | Section 13.4 |
| Indemnifying Party | Section 13.4 |
| Insured Lease | Section 8.3(a) |
| Insured Lease Parcel | Section 4.11(c) |
| Insured Lease Parcels | Section 4.11(c) |
| Insured Leases | Section 8.3(a) |
| Intellectual Property | Section 1.1(k) |
| Interim Statements | Section 6.6 |
| Inventory | Section 4.21 |
| Justice Department | Section 6.5 |
| Key Management Personnel | Section 10.4 |
| Landlord Leased Real Property | Section 1.1(a) |
| Lease Assignment and Assumption Agreement | Section 3.2(d) |
| Leasehold Title Policy | Section 8.3(c) |
| License Assignment and Assumption Agreement | Section 3.2(e) |
| Licenses | Section 4.6 |
| Liquidated Damages | Section 11.2(e) |

- xiv -

| Defined Term | Location of Definition |
|---|---|
| LLC | Section 1.1(o) |
| Material Adverse Effect | Section 14.17 |
| Material Consents | Section 8.7 |
| Material Contracts | Section 4.19(a) |
| Monetary Liens | Section 8.3(e) |
| Net Pension Liability | Section 2.4(a) |
| Net Working Capital | Section 2.2(a) |
| New Matter Title Notice | Section 8.3(d) |
| New Title Objections | Section 8.3(d) |
| New Title Objections Cure Amount | Section 8.3(d) |
| NOLs | Section 2.6 |
| Non-Assignable Contract | Section 6.10(a) |
| Notice Period | Section 13.4(b) |
| ORYX | Section 4.8(b) |
| Other Adjustments | Section 2.3(c) |
| Other Assumed Liabilities | Section 1.3(l) |
| Owned Real Property | Section 1.1(a) |
| Owner's Title Policy | Section 8.3(b) |
| PaDEP | Section 11.26 |
| Party/Parties | Heading |
| Patient Records | Section 1.1(g) |
| Pension Benefit Guaranty Corporation | Section 2.4(d) |

| Defined Term | Location of Definition |
|---|---|
| Pension Fund | Section 11.25 |
| Pension Plan Contribution | Section 2.4(b) |
| Permitted Encumbrances | Section 8.3 |
| PMH | Heading |
| Prospect | Heading |
| Prospect Members | Heading |
| PTO | Section 1.3(f) |
| Purchase Price | Section 2.1(a) |
| Quality Programs | Section 4.8(b) |
| RCRA | Section 4.15 |
| Real Property | Section 1.1(a) |
| Real Property Leases | Section 3.2(d) |
| Records | Section 1.1(h) |
| Registered Seller | Section 4.8(b) |
| Residency Programs | Section 1.1(q) |
| Restricted Area | Section 10.3 |
| Restricted Fund | Section 2.1(b) |
| Seller/Sellers | Heading |
| Seller Indemnified Parties | Section 13.1 |
| Sellers Cost Reports | Section 11.8 |
| Sellers Landlord Leases | Section 1.3(c) |
| Sellers Tenant Leases | Section 1.3(c) |

| Defined Term | Location of Definition |
| --- | --- |
| Ship Creek Discharge | Section 11.26 |
| Side Letter | Section 14.23 |
| Springfield | Section 4.6 |
| SSA | Section 4.18(d) |
| Stark Law | Section 5.6(b) |
| Strategic Planning Process | Section 11.18 |
| Survey Notice | Section 8.3(a) |
| Survey Objection Cure Period | Section 8.3(a) |
| Survey Objections | Section 8.3(a) |
| Survey Objections Cure Amount | Section 8.3(a) |
| Surveys | Section 8.3(a) |
| Survival Period | Section 13.8 |
| System | Recitals |
| Tax/Taxes | Section 4.17(b) |
| Tax Clearance Certificates | Section 6.11 |
| Taylor | Section 4.6 |
| Tenant Leased Real Property | Section 1.1(a) |
| Termination Payment | Section 11.2(f) |
| Threshold Amount | Section 13.3 |
| Title Commitment | Section 8.3 |
| Title Company | Section 8.3 |
| Transition Services Agreement | Section 3.2(h) |

| Defined Term | Location of Definition |
|---|---|
| Unclaimed Property | Section 4.20(b) |
| WARN Act | Section 4.18(c) |

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (the "Agreement") is made and entered into as of January 8, 2016 (the "Execution Date"), by and among **CROZER-KEYSTONE HEALTH SYSTEM**, a Pennsylvania nonprofit corporation ("Crozer"), on behalf of itself and its health system members listed on Exhibit A hereto ("Crozer Members" with Crozer and the Crozer Members collectively referred to as "Sellers" and with each Crozer Member and Crozer individually referred to as a "Seller"), **PROSPECT MEDICAL HOLDINGS, INC.**, a Delaware corporation ("PMH"), and **PROSPECT CROZER, LLC**, a Pennsylvania limited liability company ("Prospect") on behalf of itself and its wholly-owned affiliates listed on Exhibit B hereto ("Prospect Members") (PMH, Prospect, and Prospect Members are collectively referred to as "Buyers" and individually referred to as a "Buyer"). (Sellers and Buyers shall each be referred to individually herein as a "Party" and, collectively, as the "Parties.")

## RECITALS:

**A.** Sellers operate an integrated health care delivery system which includes two (2) licensed hospitals (the "Hospitals") with multiple campuses, multiple outpatient centers, a fully integrated network of employed primary care physicians, specialist physicians and other providers, medical office buildings and other facilities and interests in various other organizations and joint ventures (collectively, the "System") in furtherance of its mission of providing health care services to the members of its community located primarily in Delaware County, Pennsylvania.

**B.** Crozer-Chester Foundation, a Pennsylvania nonprofit corporation ("Crozer Foundation") and Delco Memorial Foundation, a Pennsylvania nonprofit corporation ("Delco Foundation") accept gifts and bequests, receive grants and engage in fundraising activities for the sole benefit of the Hospitals, and, prior to closing, Sellers will cause Delco Foundation to merge with and into Crozer Foundation, with Crozer Foundation to be the surviving organization and renamed "Crozer-Keystone Community Foundation" (the "Foundation.")

**C.** PMH operates a comprehensive network of hospitals, outpatient centers, clinics and affiliated medical groups in several parts of the country and provides coordinated regional health care services designed to meet the needs of its patients.

**D.** Sellers desire to sell to Buyers and Prospect and the Prospect Members have been formed by PMH to purchase from Sellers all of the business and assets owned by Sellers (other than the Excluded Assets) on the terms and conditions set forth in this Agreement.

**E.** The Parties seek to enter into the above-described transaction to support their shared vision to deliver patient-centered, quality care in an efficient, cost-effective and caring manner, meeting the health needs of the community. Specifically, the Parties intend to:

    **i.** Continue the mission and commitment of Sellers by providing key services to vulnerable populations, extending community benefits, and supporting medical education;

1

    ii.    Deliver high value care to the community through a commitment to practicing evidence-based medicine and protocols;

    iii.    Provide exceptional growth and leadership opportunities for Sellers' existing employees;

    iv.    Support strategic needs and initiatives to ensure future growth and sustainability;

    v.    Continue strong medical staff relationships, improve physician practice management, further clinical and economic alignment with physicians, and improve physician access;

    vi.    Grow healthcare service offerings in the community;

    vii.    Further value-based accountable care infrastructure and capabilities; and

    viii.    Ensure ongoing input from the community in the strategic direction of the delivery of healthcare.

NOW, THEREFORE, in consideration of the premises and the agreements, covenants, representations, and warranties hereinafter set forth, and intending to be legally bound hereby, the Parties agree as follows:

1.    **ASSET PURCHASE.**

    **1.1.**    **Assets.** Subject to the terms and conditions of this Agreement, as of the Closing (as defined in Section 3.1 hereof), each Seller agrees to sell, convey, transfer, assign and deliver (and to cause Foundation to sell, convey, transfer, assign and deliver, as applicable) to the respective Buyer, as designated on Exhibit B hereto, and each such Buyer agrees to purchase, acquire and accept, all of such Seller's (or Foundation's, as applicable) right, title and interest in and to all of the assets owned or used by such Seller (or Foundation, as applicable), other than the Excluded Assets (hereinafter defined) (the "Assets"), which Assets shall include, without limitation, the following:

    (a)    the owned real property described on Schedule 1.1(a) hereto, including all buildings, structures and facilities thereon, together with all improvements and fixtures, any construction in progress, and all rights, privileges and easements appurtenant thereto (collectively, the "Owned Real Property"); the real property, buildings, structures and/or facilities which are leased by any of the Sellers as the tenant (or subtenant or equivalent) thereof and described on Schedule 4.11(e) hereto (the "Tenant Leased Real Property"); and the real property, buildings, structures and/or facilities which are leased by any of the Sellers as the landlord (or sublandlord or equivalent) thereof and described on Schedule 4.11(f) hereto (the "Landlord Leased Real Property" and collectively with the Owned Real Property and the Tenant Leased Real Property, the "Real Property");

2

(b)    all personal property of Sellers, including all items of fixed or movable medical equipment, information systems (including computers, servers, data storage centers, telecommunications systems (including all switches, telephones and related equipment), office equipment (including copiers and printers), furniture, furnishings, Sellers' inventory of medical and office supplies, and vehicles, the current list and general location of which are set forth on Schedule 1.1(b) hereto;

(c)    all accounts receivable (including patient receivables arising from rendering of services to System patients, and other receivables, including "disproportionate share payments," "meaningful use" payments, graduate medical education payments, periodic interim payments and other forms of governmental, payor and other third party reimbursement or subsidies, including, without limitation, capitation payments, incentive payments under managed care contracts and cost report receivables), billed and unbilled, recorded or unrecorded, with collection agencies or otherwise, accrued and existing in respect of items or services rendered up to the Effective Time (collectively, the "Accounts Receivable") and all bank accounts, depository accounts, safety deposit boxes, post office boxes or lockboxes associated therewith (but not including cash or investment assets as excluded by Section 1.2(a));

(d)    all prepaid expenses and deposits related to the System, including prepaid lease expense, lease/security deposits, utility deposits, all medical staff fund balances (to be held for the benefit of and/or transferred to the medical staffs of the Hospitals), and all other assumable deposits and claims for refunds in connection with the System, a list of which is attached hereto as Schedule 1.1(d);

(e)    all present and future claims, causes of action, and judgments in favor of each Seller relating to the Assets and, to the extent assignable by Sellers, all manufacturers and vendors' warranties (express or implied) and rights and claims assertable by (but not against) Sellers related to the Assets;

(f)    all rights and interests of the applicable Seller in the contracts, commitments, leases and agreements listed on Schedule 1.1(f) or otherwise listed on Schedule 4.11(e) or Schedule 4.11(f) hereto (the "Contracts");

(g)    all patient lists, demographic information, patient credit information and histories, charts, files, medical records (whether maintained in hard copy or via electronic health record ("EHR") system), X-rays and other imaging records (regardless of medium) and other documents and records generated in connection with the System's patients (the "Patient Records");

(h)    all books, records, files, reports, minute books and other documents of Sellers of whatever nature and wherever located (whether in hard copy or stored or maintained electronically) that relate to the Assets or the operation of the System, including financial, business and accounting records, medical staff records, personnel records, only the records of those Benefit Plans that are expressly assumed hereunder by Buyer, records relating to union collective bargaining agreements, records relating to System physicians and other providers and the System's suppliers or vendors, equipment records, medical and administrative libraries,

3

catalogs, operating manuals, and policies and procedures (the "Books and Records," and collectively with the Patient Records, the "Records");

(i)     to the extent assignable or transferable, all Licenses (as that term is defined in Section 4.6 hereof) held by any Seller relating to the ownership, development, or operation of the Assets or the System (including any pending governmental approvals);

(j)     to the extent assignable, all Medicare participation agreements and related provider numbers of Sellers;

(k)     all of Sellers' intellectual property, including the tradename, "Crozer-Keystone Health System," and each other Seller's trade name, and any variations thereof, together with all other trademarks, service marks, logos or symbols, trade secrets, know-how, processes and all inventions, patents, copyrights, research results, discoveries, and any royalties therefrom, and website domain names, telephone and facsimile numbers, and all applications and registrations with respect to any of the foregoing, all computer programs and software, including source codes (where transferrable) and access codes thereto, and all other items of intellectual property owned or registered by the Sellers, including the intellectual property listed on Schedule 1.1(k) hereto (the "Intellectual Property");

(l)     to the extent not included above, the "deferred tax asset (Healthplex)" and all other assets reflected on the Sellers' Financial Statements (as defined in Section 4.4), and any additions thereto up through the Effective Time, less assets sold or consumed in the ordinary course of business;

(m)     all research and other grants from any governmental entity or third party, including those of the Foundation, except those that require non-profit status or other requirements imposed by the grantor that Buyer cannot satisfy, all as set forth on Schedule 1.1(m);

(n)     the interest of any Seller in all property of the foregoing types, arising or acquired in the ordinary course of the business of Sellers between the date hereof and the Effective Time;

(o)     all of the stock, limited liability company ("LLC") membership, partnership or other ownership, control or beneficial interests held by one or more of the Sellers in Sellers' for profit Affiliates (as defined in Section 14.16 below), joint ventures with third parties or other non-wholly owned affiliated organizations all as specifically listed on Schedule 1.1(o), which shall include any stock or other rights or interests in Cassatt Insurance Company, Ltd. and Cassatt RRG Holding Company (collectively "Cassatt");

(p)     to the extent assignable, all rights and interests of any Seller under the Environmental Permits (defined below) listed in Schedule 4.15 and all pending applications therefor or renewals thereof issued to any Seller by any Government Entity (defined below) or other jurisdiction or instrumentality;

4

(q)  all graduate medical education ("GME") programs, including those set forth on Schedule 1.1(q) hereto (collectively, the "Residency Programs");

(r)  all goodwill associated with the System and the Assets;

(s)  all rights and interests to all assets held for and under each Benefit Plan that is expressly assumed by Buyers hereunder as set forth on Schedule 1.1(s); and

(t)  all other tangible and intangible assets, other than the Excluded Assets, of every kind, character or description owned by each Seller, whether or not reflected on the Financial Statements, wherever located and whether or not similar to the items specifically set forth above, and all other businesses and ventures owned by each Seller.

Each Seller shall convey its Assets to the appropriate Buyer free and clear of all claims, assessments, security interests, liens, restrictions and encumbrances of any kind, other than the Permitted Encumbrances (as hereinafter defined), the Assumed Liabilities (as hereinafter defined) or taxes, assessments or other sums being prorated at Closing pursuant to this Agreement.

**1.2.  Excluded Assets.** Notwithstanding anything to the contrary herein, including Section 1.1 hereof, those assets of Sellers described below shall be retained by Sellers or one or more Affiliates of Sellers as the case may be (collectively, the "Excluded Assets") and shall not be conveyed to any of the Buyers:

(a)  cash and investment assets, other than the medical staff fund balances referenced in Section 1.1(d);

(b)  board-designated, temporarily and permanently restricted and endowment funds, other donor-restricted assets, beneficial interests in charitable trusts, debt service reserve funds and other assets limited as to use and accrued earnings on all of the foregoing;

(c)  deferred financing costs and workers' compensation deposits;

(d)  all Seller records relating to the Excluded Assets and Excluded Liabilities (as defined below) to the extent that any Buyer does not need the same in connection with the ongoing activities of the System, the Assets, or the Assumed Liabilities (as defined below), the records of those Benefit Plans that are not expressly assumed hereunder by Buyer, as well as all records which by law, Sellers are required to maintain in their possession, including, but not limited, to personnel records for those employees of Seller who do not become Hired Employees or who do not accept an offer of employment with Buyer;

(e)  all rights and interest to the assets of all Benefit Plans not expressly assumed by Buyers hereunder, including any right or interest in future credits, rebates, returned deposits, refunds or other returns of assets, whether attributable to activity prior to, or after, the Closing Date;

5

(f)     the assets of or any rights or interests with respect to the Crozer Foundation and Delco Foundation, each a Pennsylvania nonprofit corporation, except as set forth in Section 1.1(m);

(g)     the assets of or any rights or interests with respect to The Donaldson Trust;

(h)     any rights or interests in VHA, Inc. and its Affiliates to the extent not also Affiliates of Seller;

(i)     the assets, properties and rights specifically set forth in Schedule 1.2(i);

(j)     the contracts, commitments, leases and agreements listed on Schedule 1.2(j) hereto;

(k)     all research and other grants from any governmental entity or third party listed on Schedule 1.2(k) that require non-profit status or other requirements imposed by the grantor that Buyers cannot satisfy; and

(l)     any rights or interests in Noble Health Alliance, LLC.

1.3.    **Assumed Liabilities.** In connection with the conveyance of the Assets to Buyers, Buyers agree to assume, as of the Effective Time, the future payment and performance of the following liabilities (the "Assumed Liabilities") of Sellers:

(a)     all obligations accruing, arising or to be performed after the Effective Time with respect to the Contracts assigned to and assumed by Buyers, but only to the extent such Contracts are listed on Schedule 1.1(f), and subject to Buyers' rights to have Sellers reasonably amend, terminate or otherwise not assign any such Contract prior to Closing;

(b)     the capital/financing lease obligations set forth on Schedule 1.3(b) hereto (which shall include the current portion thereof), and the leases associated with the Broomall project referenced in Section 11.17, which shall be included on Schedule 4.11(e) or Schedule 4.11(f) as applicable;

(c)     all obligations accruing, arising or to be performed on or after the Effective Time with respect to the leases of any of the Tenant Leased Real Property (such leases being referred to as the "Sellers Tenant Leases" and being set forth on Schedule 4.11(e) hereto) and all obligations accruing, arising or to be performed on or after the Effective Time with respect to the leases of any of the Landlord Leased Real Property (such leases being referred to as the "Sellers Landlord Leases" and being set forth on Schedule 4.11(f) hereto), which shall include leases associated with the Broomall project referenced in Section 11.17, but subject to Buyers' rights to have Sellers reasonably amend, terminate or otherwise not assign any such Sellers Tenant Leases or Sellers Landlord Leases;

(d)     the DB Pension Plan and Net Pension Liability (as both terms are defined herein) determined pursuant to and subject to the requirements and limitations of Section 2.4;

6

(e)      accounts payable and accrued expenses of Sellers, but only to the extent such accounts payable and accrued expenses are included in Net Working Capital and subject to the Net Working Capital adjustment as provided in Section 2.2(a);

(f)      obligations and liabilities as of the Effective Time with respect to accrued paid time off ("PTO") of the Hired Employees, but only to the extent such PTO is included in Net Working Capital and subject to a Net Working Capital adjustment as provided in Section 2.2(a) and accrued sick time and provided that Buyers would not be required under any applicable law or otherwise to pay out such PTO or accrued sick time to the Hired Employees at or on account of Closing;

(g)      all liabilities and obligations under the Benefit Plans (with the exception of the DB Pension Plan which is covered in Section 1.3(d)) expressly assumed by Buyers hereunder arising on or after the Effective Time other than those resulting from negligence of Sellers or Sellers' officers, directors, employees or agents prior to Closing, all provided that: (i) Buyers will not assume, before, on or after the Closing Date, any Benefit Plans that are intended to satisfy section 401(a), 401(k), 403(b), 457, or 409A of the Code, or any rights, duties, obligations or liabilities thereunder, nor shall Buyers become a successor employer or be responsible in any way for Sellers' (or their Affiliate's) participation in or obligations or responsibilities with respect to any such Benefit Plans, other than the DB Pension Plan which is covered in Section 1.3(d); (ii) all of the Sellers' Benefit Plans (which shall expressly not include the DB Pension Plan which is covered in Section 1.3(d)) that are intended to satisfy sections 401(k), 403(b), 457(b), 409A (including the supplemental executive retirement plans) and 401(a) of the Code as defined contribution plans shall be frozen as of the Effective Time and, to the extent permitted by applicable law, terminated within 180 days thereafter; and (iii) the Buyers' 401(k) plan shall accept rollover contributions from the Sellers' 401(k) and 403(b) and defined contribution plans (excluding outstanding loans);

(h)      all liabilities and obligations under the union collective bargaining agreements or contracts assumed by the Buyers hereunder, if any, that arise from events after the Effective Time, and including any event that results in withdrawal liability with respect to the Pension Fund identified in Section 11.25;

(i)      all liabilities and obligations under the Sellers' severance policies, including executive severance and change-in-control arrangements for payment of severance or termination benefits to executive / management employees, as set forth on Schedule 1.3(i) hereto, provided further that such arrangements were in effect prior to June 30, 2015 have not been materially amended since June 30, 2015, and provided that Buyers would not be required under any applicable law or otherwise to pay out any such benefits at or on account of Closing, except for any such employee not hired by Buyer as of Closing;

(j)      all liabilities and obligations under the Environmental Permits transferred to Buyer pursuant to Section 1.1(p) arising after the Effective Time (but excluding any liabilities and obligations arising from or related to any breach by any Seller that occurred prior to the Effective Time);

7

    (k) all liabilities and obligations for the executive retention bonuses and any other retention bonuses accrued in the normal course of business but only to the extent of such amounts set forth on Schedule 1.3(k) and applicable to the employees identified thereon, subject to the Net Working Capital adjustment as provided in Section 2.2(a) which will include any such retention bonuses accrued on a monthly basis up to the Effective Time, as consistent with Section 6.2(m);

    (l) the following assumed liabilities: (i) those liabilities specifically identified on Sellers' Financial Statements (defined below) under the category of (A) "Current Liabilities": "Due to third parties" (i.e., associated with Sellers' cost reports) and (B) "Long Term Liabilities/ Other Liabilities": (ii) those liabilities associated with Sellers' "Other Postretirement Benefits (FAS 106)" (other than the DB Pension Plan), "Long-term lease incentive", "Long-term accrued sick pay" and "Other Liabilities" (to the extent specified), and (iii) any liabilities or obligations to former employees of any Seller and their dependents for ongoing continuation coverage under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA") existing under or with respect to the Sellers' group health plan as of the Closing Date, provided that in each case above, Buyers are only assuming such liabilities to the extent specifically set forth on Schedule 1.3(l) (collectively, "Other Assumed Liabilities") and subject to the assumptions, limitations and conditions stated therein; and

    (m) all employment related liabilities and obligations incurred by Buyers after the Effective Time, including but not limited to any liability resulting from Buyer's termination of any employees or other employment-related action of Buyer.

   **1.4.** **Excluded Liabilities.** Except for the Assumed Liabilities, Buyers shall not assume and under no circumstances shall Buyers be obligated to pay or assume, and none of the assets of Buyers shall be or become liable for or subject to any liability, indebtedness, commitment, or obligation of Sellers, whether known or unknown, fixed or contingent, recorded or unrecorded, currently existing or hereafter arising or otherwise (collectively, the "Excluded Liabilities"), including the following Excluded Liabilities, which shall not, in any case, include any liabilities that are subject to the Net Working Capital adjustment set forth in Section 2.2:

    (a) any obligations or liability under any tax exempt or other bonds or any other debt, note, obligation, expense or liability that is not an Assumed Liability;

    (b) liabilities with respect to claims or potential claims for medical malpractice, premises liability, directors and officers liability, general liability or other claims to the extent arising out of events occurring prior to the Effective Time, subject to Buyers' obligation to maintain certain insurance coverage as further described in Section 11.23 and provided that Buyers shall not be liable for any liabilities not covered by such insurance;

    (c) those claims and obligations (if any) specified in Schedule 1.4(c) hereto;

    (d) any liabilities or obligations to the extent arising out of or otherwise associated with any of the Excluded Assets, including among others, the research and other grants constituting Excluded Assets under Section 1.2(k);

8

(e)       those liabilities and obligations of any Seller in excess of what is included in the calculation of Net Working Capital, as described further in Section 2.2 of this Agreement, and with respect to any period prior to the Effective Time arising under the terms of the Medicare, Medicaid, CHAMPUS/TRICARE, Blue Cross, or other third party payor programs including any liabilities with respect to CMS Recovery Audit Contractor actions, and other billing and/or compliance matters involving other audit/review agencies and organizations;

(f)       federal, state or local tax liabilities or obligations of any Seller with respect to periods prior to the Effective Time or resulting from the consummation of the transactions contemplated herein, including any income tax, any franchise tax, any tax recapture, any FICA, FUTA, workers' compensation and any and all other taxes or amounts due and payable as a result of the exercise by its employees of such employee's right to vacation, sick leave, and holiday benefits accrued while in the employ of Sellers;

(g)       liability for any and all claims by or on behalf of any employee or former employee (including any retiree) of Sellers to the extent arising out of or related to acts, omissions, events or occurrences prior to the Effective Time, including liability (other than those expressly assumed pursuant to Section 1.3) for any pension or profit sharing plans, deferred compensation, supplemental executive retirement plan, group health, life insurance, disability insurance or any other employee health and welfare benefit plans, liability for any EEOC claim, ADA claim, FMLA claim, wage and hour claim, unemployment compensation claim, or workers' compensation claim, and any liabilities or obligations to former employees of any Seller under COBRA (provided, however, that this Section 1.4(g) shall not apply to any employee benefits claims or obligations constituting Assumed Liabilities under Section 1.3 hereof);

(h)       any obligation or liability accruing, to the extent arising out of, or relating to any federal, state or local investigations of, or claims or actions against, any Seller or any of such Seller's Affiliates or any of its employees, medical staff, or agents with respect to acts or omissions occurring prior to the Effective Time, including, without limitation, with respect to federal 340B prescription drug program audits and investigations by Health Resources and Service Administration, Office of Pharmacy Affairs;

(i)       any civil or criminal obligation or liability accruing, to the extent arising out of, or relating to any acts or omissions of any Seller, its Affiliates or their directors, officers, employees and agents claimed to violate any constitutional provision, statute, ordinance or other law, rule, regulation, interpretation or order of any Government Entity;

(j)       liabilities or obligations to the extent arising as a result of any breach by any Seller at any time of any contract or commitment that is not assumed by any Buyer, or any breach by any Seller prior to the Effective Time of any Contract assumed by Buyers;

(k)       any obligation or liability asserted under the federal Hill-Burton program or other restricted grant and loan programs with respect to the ownership or operation of the System or the Assets;

9

(l)     any obligations or any liability under any tax exempt or other bonds or any other debt, obligation, expense, or liability of any Seller arising out of or incurred solely as a result of any transaction of such Seller occurring after the Effective Time; and

(m)    any other liabilities or obligations with respect to claims, actions, suits, proceedings, or investigations against or related to any Seller, the System or the Assets, at law or in equity, before or by any federal, state or municipal court or other governmental agency, department, commission, board, bureau or instrumentality wherever located with respect to acts or omissions occurring prior to the Effective Time;

(n)     any obligation or liability with respect to (i) any proceeding relating to the compliance or noncompliance with Environmental Laws (defined below); (ii) the presence, generation, management, storage, disposal, release (or threatened release), escape, seepage, leakage or clean-up of any Hazardous Substances at, on, in, emanating from or under all or a portion of any part of the Assets or Real Property in violation of any Environmental Laws; (iii) the migration of any Hazardous Substance from any of the Assets or Real Property to any other property or onto the Real Property from any property or area adjacent to the Real Property; (iv) the past treatment, removal, disposal, storage, decontamination or clean-up of any Hazardous Substances or the transportation of any Hazardous Substances onto or from the Assets or Real Property; (v) the incorporation of any Hazardous Substances into the Real Property; and (vi) any activity carried on or undertaken on the Real Property in connection with the treatment, elimination and removal of any Hazardous Substance, in each case regardless of whether any claim was caused by action or inaction of the Sellers, a prior owner of the Real Property, or any other person whatsoever, except for any claim relating solely and exclusively to Hazardous Substances first introduced to the Real Property by the actions of Buyers or, Hazardous Substances that did not exist or occur at the Real Property prior to the Effective Time; and

(o)     all liabilities and obligations of any Seller relating to any oral agreements, oral contracts or oral understandings with any referral sources including, but not limited to, physicians, unless reduced to writing and expressly assumed as part of the Contracts.

2.    **PURCHASE PRICE.**

2.1.    **Purchase Price.**

(a)     **Purchase Price.** The purchase price (the "Purchase Price") for the Assets shall be Three Hundred Million Dollars ($300,000,000.00), with the following adjustments: (i) plus the amount of the Final Net Working Capital, as defined in Section 2.2(b) below, as of the Effective Time; (ii) minus the amount of any capital/financing lease obligations that are assumed by any Buyer and identified on Schedule 1.3(b) hereto (excluding any portion of such liabilities included in the Net Working Capital calculation); (iii) minus One Hundred Twenty Million Dollars ($120,000,000.00) if the Net Pension Liability assumed by any Buyer pursuant to Section 2.4(a) equals or exceeds One Hundred Ten Million Dollars ($110,000,000.00), provided that if the amount of the Net Pension Liability as of the Effective Time is less than One Hundred Ten Million Dollars ($110,000,000.00), then the deduction under this subsection (iii) shall be equal to One Hundred Twenty Million Dollars ($120,000,000.00) less 50% of the

10

amount by which the actual Net Pension Liability as of the Effective Time is less than One Hundred Ten Million Dollars ($110,000,000.00); (iv) minus the amount of Other Assumed Liabilities that are assumed by any Buyer and identified on Schedule 1.3(l); (v) minus a deduction of Fifteen Million Dollars ($15,000,000.00) for Buyers costs to obtain the "prior acts" professional and general liability insurance coverage referenced in Section 11.23 below; (vi) minus the additional deductions listed on Schedule 2.1(a); and (vii) minus any credits against the Purchase Price issued pursuant to the terms of Section 8.3(a) or Section 8.3(d). As part of the Purchase Price, Buyers shall also assume the Assumed Liabilities. The Purchase Price shall initially be calculated as of the Closing ("Estimated Purchase Price") based upon the Estimated Net Working Capital (as defined in Section 2.2(b)) and Estimated Other Adjustments (as defined in Section 2.3), subject to adjustment after the Closing in accordance with Section 2.2(b) to reflect the Final Net Working Capital (as defined in Section 2.2(b)) and in accordance with Section 2.3 to reflect the Final Other Adjustments (as defined in Section 2.3). Buyers shall pay the Estimated Purchase Price to Sellers at the Closing by wire transfer of immediately available funds to an account designated by Sellers, subject to Buyers' direct funding at Closing of Sellers' pension liabilities pursuant to Section 2.4(b).

(b)    **Restricted Fund.** At Closing, Sellers shall cause the Foundation's governing body to set aside and maintain at least Fifteen Million Dollars ($15,000,000.00) (the "Restricted Fund") to secure Sellers' and Foundation's obligations to Buyers, which Restricted Fund shall not be reduced, transferred, expended or otherwise utilized except as expressly permitted pursuant to this Section 2.1, and which Restricted Fund amount shall not be construed as a cap or other limitation on Sellers' and/or Foundation's indemnification or other liability to Buyers. Without limiting any of Buyers' rights or other legal or equitable remedies, the Buyers shall have the right to, upon prior written notice to the Foundation, request payment from the available Restricted Fund of any liabilities of one or more Sellers with respect to any matter which is subject to the Sellers' indemnification obligations, pursuant to the procedures and provisions of Article 13, whether arising before or after the Effective Time and irrespective of when asserted or finally determined.

(c)    Sunsetting of Restricted Funds. Except as otherwise provided below, at the expiration of the first anniversary of the Effective Time, the unapplied balance of the Restricted Fund shall be reduced to Ten Million Dollars ($10,000,000.00); at the expiration of the second anniversary of the Effective Time, the unapplied balance of the Restricted Fund shall be reduced to Five Million Dollars ($5,000,000.00); and at the expiration of the third anniversary of the Effective Time, the unapplied balance of the Restricted Fund shall be reduced to Zero Dollars ($0.00); provided, however, that if any claim by Buyers that is within the coverage of the Restricted Fund is in dispute between the Buyers and Sellers with respect thereto and has not been resolved by the expiration of any anniversary of the Effective Time subsequent to the filing of such claim, then the Sellers shall cause the Foundation to continue to maintain the unapplied balance of the Restricted Fund on each such anniversary date to the extent of such claim until final resolution of such dispute. During the pendency of any resolution of such dispute, no other claims may be made against the Restricted Fund after the expiration of the third anniversary of the Effective Time. For the avoidance of doubt, recognizing that the Restricted Fund balance may be insufficient to satisfy Buyers' claims for indemnification or any other liability of Sellers'

11

and/or Foundation to Buyers, Buyers may pursue claims at any time against the Foundation and/or Sellers and their respective remaining assets (other than restricted endowments) as applicable, subject to Section 13.6 below.

### 2.2. Net Working Capital, Estimates and Audits.

(a)    Net Working Capital.  As used herein, the term "Net Working Capital" shall mean (i) the sum of the following "current assets" of Sellers, as such terms are defined on Sellers' Financial Statements:  all accounts receivable including patient receivables (less accounts deemed uncollectible), supplies, inventories and prepaid expenses (but excluding any Excluded Assets that would otherwise be included in the foregoing), (ii) minus accounts payable and accrued expenses of Sellers that are assumed by any Buyer pursuant to Section 1.3(e) hereof (excluding any Excluded Liabilities that would otherwise be included in accounts payable and accrued expenses), all as determined in accordance with generally accepted accounting principles ("GAAP").  For purposes of the computation of Net Working Capital, the current portion of accrued paid time off and sick time benefits with respect to the Hired Employees that are assumed by any Buyer under Section 1.3(f) shall be included in accounts payable and accrued expenses.

(b)    Net Working Capital Estimates and Final Adjustments.  Schedule 2.2(b) sets forth a sample calculation of Net Working Capital using Sellers' most recent audited Financial Statements as of June 30, 2015, all determined in accordance with GAAP and consistent with past practice.  Not more than ten (10) but in no event less than five (5) business days prior to the Closing, Sellers shall deliver to Buyers a good faith estimate of the Net Working Capital as of the Effective Time following the same principles, specifications and methodologies used to determine the foregoing sample calculation of Net Working Capital as set forth on Schedule 2.2(b), based on the most recent Interim Statements (the "Estimated Net Working Capital") except with respect to counting and valuing inventory and supplies, as described in more detail below.  The Estimated Net Working Capital shall be used for purposes of calculating the Estimated Purchase Price payable as of the Closing and shall be subject to prior good faith review and comment by Buyers.  No later than ninety (90) days after the Closing, Buyers shall deliver to Sellers their determination of the final Net Working Capital as of the Effective Time (following the same principles, specifications and methodologies used to determine the Estimated Net Working Capital) (the "Final Net Working Capital").  Sellers shall have full access to Buyers' Books and Records pertaining to the Assets and the System to confirm or audit the Final Net Working Capital computations.  In the event Sellers disagree with Buyers' determination of Final Net Working Capital, Sellers shall notify Buyers within sixty (60) days after Buyers' delivery of their determination of Final Net Working Capital.  If Sellers and Buyers fail to agree within thirty (30) days after Sellers' delivery of notice of disagreement on the amount of Final Net Working Capital, such disagreement shall be resolved in accordance with the procedure set forth in Section 2.2(c) which shall be the sole and exclusive remedy for resolving accounting disputes relative to the determination of Final Net Working Capital.  The Purchase Price shall be:  (i) increased to the extent of the positive difference of Final Net Working Capital minus Estimated Net Working Capital; or (ii) decreased by the absolute value of the negative difference of Final Net Working Capital minus Estimated Net Working Capital,

and within five (5) business days after determination thereof any increase in the Purchase Price shall be paid in cash by Buyers to Sellers, and any decrease in the Purchase Price shall be paid in cash by Sellers to Buyers. Notwithstanding the foregoing, the portion of Net Working Capital constituting the value of inventory and supplies shall be determined based on a physical count conducted by Sellers on a date not more than five (5) business days before the Closing Date. Sellers shall give Buyers at least five (5) business days prior notice of the date of the count and permit Buyers to monitor the count. Sellers shall count the usable items of inventory and supplies that are not damaged, obsolete, or slow moving, and that are of a type, quality and quantity that may be used in the ordinary course of business of the Sellers (having due regard for the services offered by the Sellers). Sellers shall conduct the count in the same manner that Sellers conducted the count of, and will count the same classes and categories of items that Sellers counted to determine the value of, inventory and supplies in the most recent audited Financial Statements. Upon completion of the count, Sellers shall determine the value of the inventory and supplies (determined by the lower of cost or market on a first in, first out basis). If the results of the count and the resulting value of inventory and supplies are available by Closing, then, for purposes of the Estimated Net Working Capital calculation, the portion of Net Working Capital attributable to inventory and supplies will be the value determined pursuant to the count (updated for actual usage and purchases between the date of the count and the Closing Date). If the results of the count or the resulting value of inventory and supplies are not available by Closing, then for purposes of the Estimated Net Working Capital calculation, the value of the inventory and supplies will be the amount set forth in the most recent Interim Statements and the value of the inventory and supplies determined pursuant to the count (updated for actual usage and purchases between the date of the count and the Closing Date) will be utilized for purposes of determining Final Net Working Capital.

(c)     **Dispute of Adjustments.**  In the event that Sellers and Buyers are not able to agree on the Final Net Working Capital within thirty (30) days after Sellers' delivery of notice of disagreement, Sellers and Buyers shall each have the right to require that such disputed determination be submitted to CliftonLarsonAllen LLC (the "Accounting Firm"), for computation or verification in accordance with the provisions of this Agreement. The Accounting Firm shall review the matters in dispute and, acting as arbitrators, promptly shall decide the proper amounts of such disputed entries (which decision shall also include a final calculation of the Final Net Working Capital). The submission of the disputed matter to the Accounting Firm shall be the exclusive remedy for resolving accounting disputes relative to the determination of Net Working Capital. The Accounting Firm's determination shall be binding upon Sellers and Buyers. The Accounting Firm's fees and expenses shall be borne equally by Sellers and Buyers.

2.3.     **Other Adjustments, Estimates and Audits.**  Schedule 2.3 sets forth a sample calculation of:

(a)     the capital/financing lease obligations that are assumed by any Buyer and identified on Schedule 1.3(b) hereto (excluding any portion of such liabilities included in the Net Working Capital calculation);

13

      **(b)**    the amount of Net Pension Liability assumed by any Buyer pursuant to Section 2.4(a) and the related deduction under Section 2.1(a)(iii) subject to the limits and modifications thereunder; and

      **(c)**    the amount of Other Assumed Liabilities that are assumed by any Buyer and identified on Schedule 1.3(l),

(collectively, the "**Other Adjustments**"), all using Sellers' most recent audited Financial Statements as of June 30, 2015 and all determined in accordance with GAAP and consistent with past practice. Not more than ten (10) but in no event less than five (5) business days prior to the Closing, Sellers shall deliver to Buyers a good faith estimate of the Other Adjustments as of the Effective Time following the same principles, specifications and methodologies used to determine the foregoing sample calculation of the Other Adjustments as set forth on Schedule 2.3, and where actuarially determined, based on the most recent Interim Statements (the "**Estimated Other Adjustments**"). The Estimated Other Adjustments shall be used for purposes of calculating the Estimated Purchase Price payable as of the Closing and shall be subject to prior good faith review and comment by Buyers. No later than ninety (90) days after the Closing, Buyers shall deliver to Sellers their determination of the final Other Adjustments as of the Effective Time (following the same principles, specifications and methodologies used to determine the Estimated Other Adjustments) (the "**Final Other Adjustments**"). Sellers shall have full access to Buyers' Books and Records pertaining to the Assets and the System to confirm or audit the Final Other Adjustments computations. In the event Sellers disagree with Buyers' determination of Final Other Adjustments, Sellers shall notify Buyers within sixty (60) days after Buyers' delivery of their determination of Final Other Adjustments. If Sellers and Buyers fail to agree within thirty (30) days after Sellers' delivery of notice of disagreement on the amount of Final Other Adjustments, such disagreement shall be resolved in accordance with the same procedures as set forth in Section 2.2(c) for resolving Net Working Capital disputes, which shall be the sole and exclusive remedy for resolving accounting disputes relative to the determination of Final Other Adjustments. The Purchase Price shall be: (i) decreased to the extent of the positive difference of Final Other Adjustments minus Estimated Other Adjustments; or (ii) increased by the absolute value of the negative difference of Final Other Adjustments minus Estimated Other Adjustments, and within five (5) business days after determination thereof any increase in the Purchase Price shall be paid in cash by Buyers to Sellers, and any decrease in the Purchase Price shall be paid in cash by Sellers to Buyers.

    **2.4.**    **Pension Funding.**

      **(a)**    **Pension Liability.** Buyers agree to become the sponsor of, and assume, as of the Effective Time, the Crozer-Keystone Health System Employees Retirement Plan, an employee non-contributory, defined benefit pension plan (the "**DB Pension Plan**") and therewith all of the assets and the liability, less the Sellers' Pension Plan Contribution defined in Section 2.4(b) below ("**Net Pension Liability**"), all subject to the specific actuarial assumptions and all other terms, conditions and provisions as specifically set forth on Schedule 2.4 hereto.

      **(b)**    **Funding by Sellers.** At Closing and subject to such contribution being permissible under the Code without giving rise to penalties or other adverse consequences to

14

Sellers, Sellers shall pay, out of the Purchase Price, One Hundred Million Dollars ($100,000,000.00) to fund, in part, the underfunded DB Pension Plan liability then outstanding ("Pension Plan Contribution"). Such Pension Plan Contribution shall be designated as a prefunding payment. If Sellers reasonably determine such payment would result in penalties or other adverse consequences to Sellers under the Code, then Sellers shall make such payment directly to Buyers outside the DB Pension Plan. Upon reasonable prior notice from Buyers to Sellers, and absent timely objection by Sellers, Buyers may elect to pay Sellers' Pension Plan Contribution directly, on Sellers' behalf, at Closing out of the Purchase Price payable to Sellers.

(c)   **Post-Closing Commitment.**   Within five (5) years after the Effective Time and subject to applicable filing and authorization by the applicable Government Entity, Buyers shall adopt a plan amendment to terminate the DB Pension Plan effective within such five (5) year period and thereafter, in accordance with applicable law, shall liquidate, fully fund and satisfy, and pay all benefits owed to participants and beneficiaries of, the DB Pension Plan by providing for lump sum distributions to participants, purchasing annuities for participants who do not elect a lump sum distribution or otherwise in accordance with the terms, conditions and provisions of the DB Pension Plan (as in effect at the Effective Time) and with applicable law.

(d)   **PBGC Matters.**   Sellers and Buyers agree to cooperate in connection with any pre-Closing inquiry, investigation, audit or other proceeding of, or by, the Pension Benefit Guaranty Corporation ("PBGC"), including without limitation formulating and implementing any amendments to this Agreement as may be required by the PBGC in connection with the assignment, assumption, funding and termination of the DB Pension Plan. Sellers shall be responsible for any pension costs associated with any of the foregoing matters.

**2.5.   Tax Prorations.**   Subject to Section 14.9(iii), all real property Taxes, personal property Taxes, or ad valorem obligations or assessments and any similar Taxes or fees on the Assets and Assumed Liabilities for taxable periods ending prior to the Effective Time shall be paid for by Sellers. All real property Taxes, personal property Taxes, or ad valorem obligations or assessments and any similar Taxes or fees on the Assets and Assumed Liabilities for taxable periods beginning on or before, and ending on or after, the Effective Time, shall be prorated between Buyer and Sellers based on the number of days of such taxable period up to and including the Closing Date (which shall be for the account of Sellers) and the number of days of such taxable period after the Closing Date (which shall be for the account of Buyer). All real property Taxes, personal property Taxes, or ad valorem obligations or assessments and any similar Taxes or fees on the Assets and Assumed Liabilities for taxable periods commencing on the Effective Time shall be paid for by Buyer. Any real property Taxes, personal property Taxes, or ad valorem obligations or assessments and any similar Taxes or fees on the Assets and Assumed Liabilities which are due and payable in installments on or after the Effective Date shall be paid for by Buyers. Any real property Taxes, personal property Taxes, or ad valorem obligations or assessments and any similar Taxes or fees on the Assets and Assumed Liabilities which are due and payable in installments prior to the Effective Date shall be paid for by Sellers, provided any which are for the installment period in which Closing occurs, shall be prorated between Buyers and Sellers for such installment period. The foregoing provisions shall only

apply to Real Property which is Owned Real Property. Notwithstanding anything the contrary herein, this Section 2.5 and the prorations described herein shall not apply to any Taxes, obligations, assessments or fees to the extent included in Net Working Capital and subject to the adjustments described in Section 2.2.

2.6. **Net Operating Loss Reconciliation.** To the extent Buyers acquire the stock, shares or other ownership or beneficial interest in any for profit Affiliates of Sellers as listed on Schedule 1.1(o) that have net operating loss carryovers ("NOLs") as of the Effective Time, Buyers shall pay to Sellers as additional Purchase Price an amount equal to fifty percent (50%) of the reduction in federal income tax liability attributable to deductions taken on account of the NOLs of such for profit Affiliates of Sellers that were in existence as of the Effective Time. Such payments, if any, shall be made by Buyers to Sellers within one hundred and eighty (180) days of filing of the federal income tax return wherein such NOL deductions are taken.

2.7. **Allocation of Purchase Price.** The Purchase Price shall be allocated among the various classes of Assets in accordance with and as provided by Section 1060 of the Internal Revenue Code (the "Code"). At least sixty (60) days prior to the Closing, Buyers shall provide Sellers with a preliminary allocation of the Purchase Price for Sellers' review and approval. The Parties agree that any tax returns or other tax information they may file or cause to be filed with any Government Entity shall be prepared and filed consistently with such agreed upon allocation. In this regard, the Parties agree that, to the extent practicable, they will each properly prepare and timely file Form 8594 in accordance with Section 1060 of the Code.

2.8. **Sellers Tenant Leases Rent Prorations.** Any rent, additional rent or other sums payable or paid in or for the month in which Closing occurs under or pursuant to any Sellers Tenant Leases shall be prorated between Buyers and Sellers as of the Effective Time on a per diem basis for such month. After Closing, if any additional sums are due from the tenant to the landlord under any Sellers Tenant Lease or to the tenant from the landlord under any Sellers Tenant Lease for a period of time during which the Closing occurred, then such amount shall be prorated between Buyers and Sellers as of the Effective Time with Buyers obligated to pay, or entitled to receive, such sums from and after the Effective Time and Sellers obligated to pay, or entitled to receive, such sums prior to the Effective Time. If the landlord gives a credit against future rent or other sums payable under any Sellers Tenant Lease, any portion of which belongs to Sellers pursuant to the foregoing, Buyers shall be obligated to pay such sum to Sellers in cash. Any and all such sums due to or from one Party to another, shall be paid in ten (10) business days from the receipt of written demand for the same. The terms hereof shall survive Closing. Notwithstanding anything the contrary herein, this Section 2.8 and the prorations described herein shall not apply to any rent, additional rent or other sums payable to the extent included in Net Working Capital and subject to the adjustments described in Section 2.2.

3. **CLOSING.**

3.1. **Closing.** Subject to the terms and conditions of this Agreement, the consummation of the transactions contemplated by this Agreement (the "Closing") shall take place on the last day of the month immediately after all of the conditions precedent to Closing set forth herein are either satisfied or waived (other than conditions which, by their nature, are to be

16

satisfied on the Closing Date), but no later than sixty (60) days after receipt of all necessary regulatory approvals as set forth herein, or on such other date as Sellers and Buyers may mutually agree in writing. The date on which the Closing is to occur is herein referred to as the "Closing Date." Subject to the satisfaction on the Closing Date of all conditions which, by their nature, are to be satisfied on the Closing Date, including payment of the Purchase Price by Buyers as described in Section 3.3, the Closing shall be effective as of 12:00:01 a.m., Eastern Time, on the first calendar day of the month immediately following the Closing Date (the "Effective Time").

   **3.2.    Actions of Sellers at Closing.**    At the Closing and unless otherwise waived in writing by Buyers, Sellers shall deliver to Buyers the following:

        (a)    Deeds containing special warranty of title, fully executed by the appropriate Seller in recordable form, conveying to the appropriate Buyer fee title to the Owned Real Property pursuant to the terms of Section 8.3 of this Agreement;

        (b)    A General Assignment, Conveyance and Bill of Sale in substantially the form attached hereto as Exhibit C, fully executed by the appropriate Seller, as applicable, conveying to the appropriate Buyer title to all assets which are a part of the Assets;

        (c)    An Assignment and Assumption Agreement in substantially the form attached hereto as Exhibit D (the "Assignment and Assumption Agreement"), fully executed by the appropriate Seller, conveying to the appropriate Buyer such Seller's interest in the Contracts (other than the Real Property Leases);

        (d)    An Assignment and Assumption of Leases in substantially the form attached hereto as Exhibit E (the "Lease Assignment and Assumption Agreement"), fully executed by the appropriate Seller, conveying to the appropriate Buyer such Seller's interest in all Sellers Tenant Leases and all Sellers Landlord Leases (Sellers Tenant Leases and Sellers Landlord Leases collectively, the "Real Property Leases");

        (e)    An Assignment and Assumption of Licenses in substantially the form attached hereto as Exhibit F (the "License Assignment and Assumption Agreement"), fully executed by the appropriate Seller, conveying to the appropriate Buyer such Seller's interest in all assignable Licenses (as defined in Section 4.6 hereof);

        (f)    An Assignment and Assumption of Pension Plan Obligations in substantially the form attached hereto as Exhibit G (the "DB Pension Plan Assignment and Assumption Agreement"), fully executed by the appropriate Seller, conveying to the appropriate Buyer such Seller's interest in all of the assets and liabilities of the DB Pension Plan;

        (g)    An Assignment and Assumption of Benefit Plan Obligations (other than the DB Pension Plan) in substantially the form attached hereto as Exhibit H (the "Benefit Plan Assignment and Assumption Agreement"), fully executed by the appropriate Seller, conveying to the appropriate Buyer such Seller's interest in all of the assets and certain liabilities of the assignable Benefit Plans (other than the DB Pension Plan) assumed by Buyers hereunder;

17

(h)     The Transition Services Agreement in substantially the form attached hereto as Exhibit I (the "Transition Services Agreement"), fully executed by the appropriate Seller(s) (as described in Section 11.11 hereof);

(i)     All instruments and documents reasonably and customarily required by the Title Company (as defined in Section 8.3 hereof) to issue the Title Policy (as defined in Section 8.3 hereof) as described in and provided by Section 8.3 hereof;

(j)     Copies of resolutions duly adopted by the Board of Directors or other governing body, as applicable, of each of the Sellers, authorizing and approving its performance of the transactions contemplated hereby and the execution and delivery of this Agreement and the documents described herein on such Sellers' behalf, certified as true and of full force as of the Closing, by the appropriate officers of each Seller;

(k)     Certificates of the Chief Executive Officer, President or a Vice President of each Seller, certifying that each covenant and agreement of such Seller to be performed prior to or as of the Closing pursuant to this Agreement has been performed in all material respects and each representation and warranty of such Seller is true, accurate and complete in all material respects on the Closing Date, as if made on and as of the Closing;

(l)     Certificates of incumbency for the respective officers of each Seller executing this Agreement (or the Indemnification Agreement attached hereto as Exhibit K) or making certifications for the Closing dated as of the Closing Date;

(m)     Certificates of existence and good standing of each Seller from the state in which it is incorporated, dated the most recent practical date prior to the Closing;

(n)     All forms required for the termination of any assumed names of each Seller used in the operation of the System and registered with the Commonwealth of Pennsylvania, fully executed by the appropriate Seller;

(o)     Documentation of all Material Consents (as defined in Section 8.7);

(p)     All certificates of title and other documents evidencing an ownership interest conveyed as part of the Assets;

(q)     the Indemnification and Restrictive Covenant Agreement attached hereto as Exhibit K fully executed by the Foundation and complete copies of the Statement of Merger and Plan of Merger (with all attachments thereto) associated with the merger of Delco Foundation into Crozer Foundation pursuant to Section 6.13; and

(r)     Such other instruments and documents as any Buyer reasonably deems necessary to effect the transactions contemplated hereby.

18

**3.3.** **Actions of Buyers at Closing.** At the Closing and unless otherwise waived in writing by Sellers, Buyers shall deliver to Sellers the following:

(a)     An amount equal to the Estimated Purchase Price in immediately available funds to an account (or accounts) designated by Sellers prior to Closing, subject to Buyers' election to directly pay Seller's DB Pension Plan Contribution in accordance with Section 2.4(b);

(b)     An Assignment and Assumption Agreement, fully executed by the appropriate Buyer, pursuant to which such Buyer shall assume the future performance of the Contracts as herein provided;

(c)     A Lease Assignment and Assumption Agreement, fully executed by the appropriate Buyer, pursuant to which such Buyer shall assume the future performance of the Real Property Leases as herein provided;

(d)     A License Assignment and Assumption Agreement, fully executed by the appropriate Buyer, pursuant to which such Buyer shall assume the future performance of the Licenses as herein provided;

(e)     A DB Pension Plan Assignment and Assumption Agreement in substantially the form attached hereto as Exhibit G, fully executed by the Buyers, pursuant to which such Buyers shall assume such Seller's interest and obligations in all of the assets and liabilities of the DB Pension Plan;

(f)     A Benefit Plan Assignment and Assumption Agreement (other than the DB Pension Plan) in substantially the form attached hereto as Exhibit H, fully executed by the Buyers, conveying to the appropriate Buyer the interests of Sellers' in all assignable Benefit Plans (other than the DB Pension Plan) assumed by Buyers hereunder;

(g)     The Transition Services Agreement in substantially the form attached hereto as Exhibit I, fully executed by the appropriate Buyer(s) (as described in Section 11.11 hereof);

(h)     Copies of resolutions duly adopted by the governing bodies of each of Prospect and PMH, authorizing and approving its performance of the transactions contemplated hereby and the execution and delivery of this Agreement and the documents described herein, certified as true and in full force as of the Closing, by the appropriate officers of each of Prospect and PMH;

(i)     Certificates of an executive officer of Buyers certifying that each covenant and agreement of each Buyer to be performed prior to or as of the Closing pursuant to this Agreement has been performed in all material respects and each representation and warranty of each Buyer is true, accurate and complete in all material respects on the Closing Date, as if made on and as of the Closing;

19

(j)     Certificates of incumbency for the respective officers of each of Buyers executing this Agreement or making certifications for the Closing dated as of the Closing Date;

(k)     the Indemnification and Restrictive Covenant Agreement attached hereto as Exhibit K fully executed by PMH and Prospect; and

(l)     Such other instruments and documents as any Seller reasonably deems necessary to effect the transactions contemplated hereby.

4.     **REPRESENTATIONS AND WARRANTIES OF SELLERS.**

As of the date hereof, as updated pursuant to Section 11.1, and as of the Closing Date, Sellers jointly and severally represent and warrant to each of the Buyers the following:

4.1.     **Existence and Capacity.** Each Seller is validly existing in good standing under the laws of the Commonwealth of Pennsylvania, in the corporate form and taxable or tax-exempt status specified on Schedule 4.1. Each Seller has all requisite power and authority to enter into this Agreement, to perform its obligations hereunder and to conduct its business as now being conducted in each jurisdiction where such business is conducted.

4.2.     **Powers; Consents; Absence of Conflicts With Other Agreements, Etc.** The execution, delivery, and performance of this Agreement by each Seller, and all other agreements referenced herein, or ancillary hereto, to which any Seller is a party, and the consummation of the transactions contemplated herein by each Seller:

(a)     are within its corporate powers, are not in contravention of law or of the terms of its organizational documents, and have been duly authorized by all appropriate corporate action;

(b)     except as provided in Section 6.4 and Section 6.5 below, do not require any approval or consent of, or filing with, any Government Entity or authority bearing on the validity of this Agreement which is required by law or the regulations of any such agency or authority;

(c)     except as set forth on Schedule 4.2, will neither conflict with, nor result in any breach or contravention of, or the creation of any lien, charge, or encumbrance under, any indenture, agreement, lease, instrument or understanding to which it is a party or by which it is bound;

(d)     will not violate any statute, law, rule, or regulation of any Government Entity to which any Seller or the Assets may be subject; and

(e)     will not violate any judgment, decree, writ or injunction of any court or Government Entity to which any Seller or the Assets may be subject.

4.3.     **Binding Agreement.** This Agreement and all agreements to which any Seller will become a party pursuant hereto are and will constitute the valid and legally binding

20

obligations of each such Seller, and are and will be enforceable against each Seller in accordance with the respective terms hereof or thereof.

**4.4.    Financial Statements.**

(a)    Sellers have delivered to Buyers copies of the following financial statements of or pertaining to Sellers ("Financial Statements"), which Financial Statements are maintained on an accrual basis, and copies of which are attached hereto as Schedule 4.4(a):

(i)    Audited Consolidated Balance Sheets, Income Statements, and Statements of Cash Flows for Sellers for the fiscal years ended June 30, 2015 (the "Balance Sheet Date"), June 30, 2014, and June 30, 2013, together with the notes thereto and the audit report thereon by Sellers' independent auditors;

(ii)    Unaudited Consolidated Balance Sheets for the Sellers, dated as of November 30, 2015; and

(iii)Unaudited    Consolidated Income Statements for Sellers for the five-month period ended on November 30, 2015.

(b)    The Financial Statements are true, accurate and complete and present fairly in all material respects the financial condition and results of operations of Sellers as of the dates indicated thereon, and for the periods indicated therein. The Financial Statements have been prepared in accordance with GAAP, applied on a consistent basis throughout the periods indicated, except as may be specified in Schedule 4.4(b). The Sellers have heretofore provided Buyers with copies of all annual management letters with respect to the Sellers from their independent certified public accountants for each of the last three fiscal years to the extent issued.

(c)    Except as set forth in Schedule 4.4(c), all Accounts Receivable of Sellers reflected on the Financial Statements constitute *bona fide* receivables resulting from a *bona fide* sale to a patient or customer in the ordinary course of business, the amount of which was actually due on the date thereof and has been collected, or which Sellers, as of the Effective Time, are using reasonable efforts to collect, in the ordinary course of business. The Books and Records of the Sellers state correctly the facts with respect to each of the Accounts Receivable of Sellers and the balance due thereon. Each payment reflected in such Books and Records as having been made on each such Account Receivable was made by the respective account debtor and not directly or indirectly by any director, officer, employee or agent of any of the Sellers. Each document and instrument evidencing, securing or relating to each Account Receivable, including, without limitation, each insurance policy, certificate, bill or statement, is correct and complete in all respects, is genuine and valid and is enforceable in accordance with its terms. There are no defenses, claims of disabilities, counterclaims, offsets, refusals to pay or other rights of setoff against any Accounts Receivable and there is no threatened, intended or proposed defense, claim of disability, counterclaim, offset, refusal to pay or other right of setoff with respect thereto. Each Account Receivable, each document and instrument and each transaction underlying or relating thereto conforms in all material respects, including, without

21

limitation, in respect of interest rates charged, notices given and disclosures made, to the requirements and provisions of each applicable law, rule, regulation or order relating to credit, consumer credit, credit practices, credit advertising, credit reporting, retail installment sales, credit cards, collections, usury, interest rates and truth-in-lending, including, without limitation, the Federal Truth in Lending Act, as amended, and Regulation Z issued by the Board of Governors of the Federal Reserve System thereunder. Accounts Receivable reserve allowances have been established on the basis of historical experience in accordance with GAAP consistently applied (which reserves and allowances are set forth in Schedule 4.4(c)).

        **(d)**     Except as set forth in the Financial Statements, or as otherwise set forth on Schedule 4.4(d), there are no contingent or other liabilities or obligations which have, or with reasonable foreseeability may have, a Material Adverse Effect (as defined in Section 14.17) on any Seller or their respective business or operations.

    **4.5.**   **Certain Post-Balance Sheet Results.**  Except as set forth in Schedule 4.5 hereto, since June 30, 2015 there has not been any:

        **(a)**     material damage, destruction, or loss (whether or not covered by insurance) affecting the System or the Assets;

        **(b)**     any event, change or occurrence which has or could reasonably be expected to have a Material Adverse Effect;

        **(c)**     threatened employee strike, work stoppage or labor dispute within the System, as further described in Section 4.18(a), except as set forth on Schedule 4.18(a);

        **(d)**     sale, assignment, transfer, or disposition of any item of property, plant or equipment included in the Assets having a value in excess of Two Hundred Fifty Thousand Dollars ($250,000.00) (other than supplies), except in the ordinary course of business or with a comparable replacement thereof;

        **(e)**     general increases in the compensation payable by any Seller to any of its employees or any general increase in, or general institution of, any bonus, insurance, pension, profit-sharing or other employee benefit plan, remuneration or arrangements made to, for or with such employees, other than those increases in compensation or the general institution of any bonus, insurance, pension, profit-sharing arrangement, other employee benefit plan, remuneration or arrangement required under any collective bargaining agreement or otherwise made in the ordinary course of business by any Seller;

        **(f)**     changes in the composition of the medical staffs of the two licensed Hospitals or other facilities operated by Sellers, other than normal turnover occurring in the ordinary course of business;

        **(g)**     changes in the rates charged by the Hospitals, its physicians or other providers for their services, other than changes made in the ordinary course of business;

(h)     changes in the accounting methods or practices employed by Sellers or changes in depreciation or amortization policies; or

(i)     transactions pertaining to the Hospitals or any of the other Assets by any Seller outside the ordinary course of business (other than those contemplated by this Agreement).

4.6.     **Licenses.** Crozer-Chester Medical Center ("CCMC") is duly licensed by the Pennsylvania Department of Health as an acute care hospital with four campuses: (a) the Crozer Medical Center campus ("Crozer Campus"), a tertiary care teaching facility with 300 licensed and 260 staffed beds in Upland, Pennsylvania; (b) Taylor Hospital ("Taylor"), an acute care facility with 105 licensed and staffed beds in Ridley Park, Pennsylvania; (c) Springfield Hospital ("Springfield"), an acute care facility with 25 licensed and staffed beds in Springfield, Pennsylvania; and (d) Community Hospital ("CH"), an outpatient facility that coordinates a full range of outpatient behavioral and community health services in Chester, Pennsylvania. In addition, Delaware County Memorial Hospital ("DCMH") is separately licensed by the Pennsylvania Department of Health as a general acute care hospital with approximately 168 licensed and staffed beds. The pharmacies, laboratories and all other ancillary departments or other healthcare services located at the Hospitals or Sellers' other facilities which are required to be specially licensed are so duly licensed by the appropriate licensing agency pursuant to the laws of the Commonwealth of Pennsylvania. Sellers have all other licenses, registrations, permits, certificates, accreditations, authorizations and approvals which are required by law to operate the Assets and the System (collectively, the "Licenses"). Schedule 4.6 sets forth of all such Licenses, owned or held by Sellers relating to the ownership or operation of the System or the Assets, all of which are in good standing, and none of the foregoing has been revoked or limited, or, to Sellers' knowledge, has been threatened to be revoked or limited.

4.7.     **Condition of Assets.** The Assets constitute the assets which are owned by Sellers or held or used by Sellers in the conduct of the business and operation of the System in the manner conducted as of the date of this Agreement. Schedule 4.7 lists any material defects (which shall include for this purpose all known noncompliance with applicable building and safety codes and all known life safety issues) in the buildings, structures, facilities and major equipment. The furniture, fixtures, machinery, equipment, vehicles and other items of tangible personal property currently owned or leased by Sellers are sufficient for the continued conduct of Sellers' business after the Effective Time in substantially the same manner as conducted prior to the Effective Time and constitute substantially all of the rights, property and assets necessary to conduct the business of Sellers as currently conducted.

4.8.     **Medicare Participation/Accreditation/Registration.**

(a)     The Hospitals, the employed physicians and other providers within the System, as applicable, are qualified for participation in the Medicare, Medicaid/Medical Assistance and CHAMPUS/TRICARE programs, have current and valid provider numbers and contracts with such programs, are in compliance with the conditions of participation in such programs, and have received all approvals or qualifications necessary for reimbursement. The Hospitals are duly accredited, with no contingencies, by The Joint Commission. A copy of the most recent accreditation letter from The Joint Commission pertaining to each Hospital has been

23

provided to Buyers. All billing practices of Sellers with respect to the Hospitals, its employed physicians and other providers for all third party payors, including the Medicare, Medicaid and CHAMPUS/TRICARE programs and private commercial insurance companies, have been in compliance with all applicable laws, regulations and policies of such third party payors and the Medicare, Medicaid and CHAMPUS programs, and no Seller has billed or received any payment or reimbursement in excess of amounts allowed by law. No Seller, Hospital, employed physician or other provider has been excluded from participation in the Medicare, Medicaid or CHAMPUS/TRICARE programs, nor to Sellers' knowledge is any such exclusion threatened. None of the officers, directors or employees of Seller have been excluded from participation in the Medicare, Medicaid or CHAMPUS/TRICARE programs. Except as set forth in a writing delivered by Sellers to Buyers and set forth on Schedule 4.8(a), Seller has not received any written notice from any of the Medicare, Medicaid or CHAMPUS/TRICARE programs, or any other third party payor programs of any pending or threatened investigations or surveys.

(b)     Each Seller required to be registered (each, for purposes of this paragraph, a "Registered Seller") has registered with My Quality Net (formerly QNet Exchange) and any other quality reporting data exchanges as required by The Centers for Medicare and Medicaid Services ("CMS") under its quality reporting programs (the "Quality Programs"). Each Registered Seller has submitted all quality data required under the Quality Programs to CMS or its agents, and all quality data required under the ORYX Core Measure Performance Measurement System ("ORYX") to The Joint Commission, for all reporting periods concluded prior to the date of this Agreement, except for any reporting period for which the respective reporting deadlines have not yet expired. All such submissions of quality data have been made in accordance with applicable reporting deadlines and in the form and manner required by CMS and The Joint Commission, respectively. Sellers have made available to Buyers the "validation results" for all reporting periods concluded prior to the date of this Agreement, except for any reporting period for which the respective reporting deadlines have not yet expired. Except as set forth on Schedule 4.8(b), no Registered Seller has received notice of any reduction in reimbursement under the Medicare program resulting from its failure to report quality data to CMS or its agent as required under the Quality Programs.

4.9.    **Compliance with Laws.** Except as set forth in a writing delivered by Sellers to Buyers and set forth on Schedule 4.9, Sellers are in compliance in all material respects with all applicable statutes, rules, regulations, and requirements of the Government Entities having jurisdiction over the System and the Assets. As used herein, "Government Entity" means any government or any agency, bureau, board, directorate, commission, court, department, official, political subdivision, tribunal or other instrumentality of any government, whether federal, state or local. Each Seller has timely filed all reports, data, and other information required to be filed with the Government Entities. No Seller, or any of Seller's employees have committed a violation of federal or state laws regulating healthcare and/or healthcare fraud, including but not limited to the following laws: the Federal (Title XIX of the Social Security Act) and state Medicaid programs and their implementing regulations, the Medicare Program (Title XVIII of the Social Security Act) and its implementing regulations; the Federal False Claims Act (31 U.S.C. §§ 3729 et seq.); the Federal Health Care Program Anti-Kickback Statute (42 U.S.C.

24

§ 1320a 7b(b)); the Federal Physician Self-Referral Law (42 U.S.C. § 1395nn); the Federal Administrative False Claims Law (42 U.S.C. § 1320a 7b(a)); the Federal Confidentiality of Alcohol and Drug Abuse Patient Records Act (42 U.S.C. 290ee 3); the Rehabilitation Act, the Americans with Disabilities Act, the Occupational Safety and Health Administration statutes and regulations for blood borne pathogens and workplace risks, and any state and local laws that address the same or similar subject matter. Without limiting the generality of the foregoing, Sellers are in compliance in all material respects with the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), including the electronic data interchange regulations and the health care privacy regulations, and including the applicable rules and regulations promulgated under HIPAA pursuant to 45 CFR Parts 160, 162, and 164 (subparts A, D and E) and the changes thereto imposed by the Health Information Technology for Economic Clinical Health Act, Division A, Title XIII § 1301 *et seq.* of the American Recovery and Reinvestment Act of 2009, all as of the applicable effective dates for such requirements.

**4.10. Equipment.** Schedule 4.10 sets forth a depreciation schedule as of the Balance Sheet Date which takes into consideration all the equipment constituting any part of the System and the Assets having a book value greater than Ten Thousand Dollars ($10,000.00).

**4.11. Real Property.** Based solely on the Title Commitments (as defined in Section 8.3 below), each Seller owns good, marketable, and indefeasible fee simple title to the Owned Real Property and good, valid and subsisting leasehold title to the Insured Leases (as defined in Section 8.3 below), subject only to the Permitted Encumbrances (as defined in Section 8.3 below). With respect to the Owned Real Property or the Insured Lease Parcels (as defined in Section 4.11(c) below):

(a) To the knowledge of the applicable Seller which is the record title owner of the applicable Owned Real Property or the Seller which is the tenant under the applicable Insured Lease, such applicable Seller has not received during the past three (3) years written notice of a violation of any applicable ordinance or other law, order, regulation, or requirement of any governmental authority applicable to such Owned Real Property or Insured Lease Parcel that has not been corrected or complied with;

(b) To Sellers' knowledge, except as described on Schedule 4.11(b), the Real Property and its operation are in material compliance with all applicable zoning ordinances, and, to the knowledge of Seller, subject to Seller's satisfaction of the terms of Section 14.26 below, as may be applicable, the consummation of the transactions contemplated herein will not result in a violation of any applicable zoning ordinance or the termination of any applicable zoning variance now existing;

(c) Based solely on the Title Commitments and subject to the Permitted Encumbrances and any fact which current and accurate surveys of the Owned Real Property and/or the parcels of land leased pursuant to the Insured Leases (such parcels being referred to as the "Insured Lease Parcels" or individually as an "Insured Lease Parcel") would disclose, to the knowledge of Sellers, neither the Owned Real Property nor the Insured Lease Parcels are subject to any easements, restrictions, ordinances, or other limitations on title so as to make the same unusable for its current use;

25

(d)     To the knowledge of Sellers, the Owned Real Property and the Insured Lease Parcels are in compliance in all material respects with the applicable provisions of the Rehabilitation Act of 1973, Title III of the Americans with Disabilities Act, and the provisions of any comparable state statute relative to accessibility, and there is no pending, or written threat of litigation, administrative action or complaint (whether from state, federal or local government or from any other person, group or entity) relating to compliance of any of the Owned Real Property or the Insured Lease Parcels with the Rehabilitation Act of 1973, Title III of the Americans with Disabilities Act or the provisions of any comparable state statute relative to accessibility;

(e)     The only real property leases to which any of the Sellers is a tenant are the Sellers Tenant Leases described in Schedule 4.11(e), and no tenant has paid rent in advance for more than one month and no improvement credit or other tenant allowance of any nature is owed to any tenant, nor is any landlord improvement work required, except as described on Schedule 4.11(e);

(f)     Attached to Schedule 4.11(f) is a "rent roll" which sets forth all Sellers Landlord Leases where a Seller is landlord: (i) the names of then current tenants; (ii) the rental payments for the then current month under each of the Sellers Landlord Leases; (iii) a list of all then delinquent rental payments; (iv) a list of all concessions granted to tenants; (v) a list of all tenant deposits and a description of any application thereof, and (vi) a list of all uncured material defaults under the Sellers Landlord Leases known to the appropriate Seller;

(g)     To the knowledge of Sellers, during the past three (3) years, no Seller of any of the Owned Real Property nor as tenant of any of the Insured Leases has received written notice from any governmental authority or any agent of any governmental authority, of any existing or proposed eminent domain proceeding of such governmental authority that would result in the taking of either (i) all of any parcel constituting a part of the Owned Real Property or the Insured Lease Parcels or (ii) a part of any of parcel constituting a part of the Owned Real Property or the Insured Lease Parcels that would adversely affect the current use of such parcel of the Owned Real Property or Insured Lease Parcels;

(h)     Except as set forth on Schedule 4.11(h), to the knowledge of Sellers, none of the Owned Real Property or Insured Lease Parcels are located within a one hundred year flood plain or an area identified by the Secretary of Housing and Urban Development as having "special flood hazards," as such term is used in the National Flood Insurance Act of 1968, as amended and supplemented by The Flood Disaster Protection Act of 1973, and in regulations, interpretations and rulings thereunder; and

(i)     The Owned Real Property and Insured Lease Parcels are supplied with utilities and other services sufficient for the operation thereof as are currently being operated. To the knowledge of the Seller, except as set forth on Schedule 4.11(i), the buildings, plants and structures, including heating, ventilation and air conditioning systems, roof, foundation and floors, of the Owned Real Property and Insured Lease Parcels are in good operating condition, subject to ordinary wear and tear.

26

**4.12.   Title.** As of the Closing, Sellers shall own and hold good and valid title to all of the Assets, and at the Closing Sellers shall assign and convey to Buyers good, valid and marketable title to all of the Assets, or any part thereof, subject to no mortgage, lien, pledge, security interest, conditional sales agreement, right of first refusal, option, restriction, liability, encumbrance, or charge other than the Permitted Encumbrances and the Assumed Liabilities, or mortgages, liens, pledges, security interests or the like being paid off, satisfied or released as of Closing. As to the Owned Real Property and the Sale/Lease Back Leased Real Property the terms of this Section 4.12 are subject to the terms of Section 4.11(a) and Section 8.3.

**4.13.   Employee Benefit Plans.** Except as set forth on Schedule 4.13 hereto:

(a)      Sellers do not sponsor or participate in, nor have they, within the last five (5) calendar years including the calendar year that includes the Effective Time, sponsored or participated in any pension, profit-sharing, stock bonus, deferred compensation, or other retirement plans as would be defined as an "employee pension benefit plan" in Section 3(2) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), including any Code Section 401(a), Section 403(b) or Section 457 plans; "employee welfare benefit plans," as would be defined in Section 3(1) of ERISA including group health, life, disability or similar plans; fringe benefit, cafeteria, flexible benefit, or tuition assistance plans; executive compensation agreements, bonus, or incentive plans; retention or severance plans; vacation, holiday, sick-leave, paid-time-off, or other employee compensation plans, programs, payroll practices, policies, or agreements; or any annuity contracts, custodial agreements, trusts or other agreements related thereto (all collectively, the "Benefit Plans"). With respect to such Benefit Plans appearing on Schedule 4.13, Sellers have delivered to Buyers accurate and complete copies of the Benefit Plans that have written instruments and, for those that do not, general summaries or explanations (including descriptions from employee handbooks and other materials); insurance contracts or any other funding instruments; governmental correspondence issued within the last five (5) calendar years including the calendar year that includes the Effective Time; determination, advisory, notification, or opinion letters issued within the last five (5) calendar years including the calendar year that includes the Effective Time; currently in effect as of the Effective Time contracts with third-party administrators and other independent contractors; and summary plan descriptions, modifications, memoranda, employee handbooks, and other material written communications. Except as may be set forth on Schedule 4.13: all returns, reports, disclosure statements, and premium payments relating to the Benefit Plans appearing on Schedule 4.13 have been timely filed, delivered, or paid, or appropriate extensions obtained, as applicable and as required by applicable law. For the purposes of Section 4.13, Sellers shall refer to Sellers and any entity required to be aggregated with Sellers pursuant to the controlled group rules under Code Section 414(b), (c), (m) and (o).

(b)      Other than as set forth on Schedule 4.13, with respect to such Benefit Plans, Sellers do not currently and have not participated in or sponsored, contributed to, or had an obligation to contribute to a multiemployer plan (as defined in ERISA), multiple employer plan (as defined in ERISA), or single employer plan to which at least two or more of the contributing sponsors are not part of the same controlled group (as determined in accordance with the controlled group rules under Code Section 414(b), (c), (m) and (o)); sponsored or

27

participated in any benefit plan that is self-insured or is a self-funded multiple employer welfare arrangement; participated in, engaged in, or been a party to any prohibited transaction for which there is no statutory exemption; had asserted against them any claim for any excise tax, interest, or penalty; or committed a material breach of any responsibilities or obligations imposed upon fiduciaries under ERISA. Other than as set forth in Schedule 4.13 or expressly assumed by one or more Buyers pursuant to provisions of this Agreement (including but not limited to Sections 1.1 and 1.3), Sellers do not have any liability under any Benefit Plan for which Buyers have or will have any liability, contingent or otherwise, under Parts I or IV of ERISA, the Code, or other applicable law.

(c)     Other than as set forth on Schedule 4.13, each Benefit Plan that is a pension or other retirement plan and each related trust agreement, annuity contract, or other funding instrument is and has been since its inception qualified and tax-exempt under the provisions of Sections 401(a), 403(b), 457 or 501(a) of the Code applicable to such Benefit Plan; each Benefit Plan is and has been since its inception in material compliance with its terms and, both as to form and in operation, with the requirements prescribed by any and all laws that are applicable to such Benefit Plan; does not have and has not had since its inception any unfunded accrued liability; to the best knowledge of Sellers, has not experienced any reportable events (as such term is defined in ERISA Section 4043); has not had any accumulated funding deficiencies or liquidity shortfalls (both as defined under the Code); does not have any liabilities required to be disclosed that have not been disclosed; and has not been partially or fully terminated, nor has any Government Entity instituted or threatened a proceeding to terminate any such Benefit Plan or to appoint a trustee. Each Benefit Plan that is not a pension, or other retirement, plan not included in the preceding sentence is in material compliance with its terms and, both as to form and in operation, with the requirements prescribed by any and all laws that are applicable to such Benefit Plan. Sellers have no knowledge of any material noncompliance with applicable laws with respect to any Benefit Plan that would create any liability for Buyers.

(d)     Except as set forth on Schedule 4.13, no Benefit Plan is currently or has been within the last five (5) calendar years including the calendar year that includes the Effective Time under audit, inquiry, or investigation by the any Government Entity, and to Sellers' knowledge, there are no outstanding issues with reference to the Benefit Plans pending before any Government Entity. Other than routine claims for benefits, there are no actions, mediations, audits, arbitrations, suits, claims, or investigations pending or, to Sellers' knowledge, threatened against or with respect to any of the Benefit Plans or their assets, and there are no threatened or pending claims by or on behalf of the Benefit Plans or by any participants in the Benefit Plans alleging a breach of fiduciary duties or violations of law nor, to Sellers' knowledge, is there any basis for such claims.

**4.14. Litigation or Proceedings.**     Schedule 4.14 lists all pending litigation or proceedings to which any Seller is a party or which otherwise involve the System or any of the Assets. No Seller is in default under any order of any court or federal, state, municipal, or other governmental department, commission, board, bureau, agency or instrumentality wherever located. Except as set forth on Schedule 4.14, there are no claims, actions, suits, proceedings, or investigations pending, or to the knowledge of Sellers, threatened against or related to any Seller,

28

the System or the Assets, at law or in equity, or before or by any federal, state, municipal, or other governmental department, commission, board, bureau, agency, or instrumentality wherever located.

**4.15. Environmental Laws.** Except as set forth on Schedule 4.15 hereto, to the knowledge of Sellers (i) the Real Property is not subject to any material environmental hazards, risks, or liabilities, (ii) no Seller is in material violation of any federal, state or local statutes, regulations, laws, orders or common law pertaining to the protection of human health and safety or the environment (collectively, "Environmental Laws"), including the Comprehensive Environmental Response Compensation and Liability Act, as amended ("CERCLA"), the Pennsylvania Solid Waste Management Act, as amended, the Pennsylvania Hazardous Sites Cleanup Act, as amended, the Pennsylvania Infectious and Chemotherapeutic Waste Law, as amended, the Clean Air Act, as amended, the Clean Water Act, as amended, the Solid Waste Disposal Act, as amended, and the Resource Conservation and Recovery Act, as amended ("RCRA") and (iii) no Seller has received any notice alleging or asserting either a violation of any Environmental Law or a legal obligation to investigate, assess, remove, or remediate any property that is an Asset under this Agreement, including, but not limited to, the Real Property, under or pursuant to any Environmental Law. Except as set forth on Schedule 4.15 hereto, no "Hazardous Substances" (which for purposes of this Agreement shall mean and include polychlorinated biphenyls, asbestos, and any hazardous substances, materials, constituents, or wastes which are regulated by any Environmental Law, including CERCLA and RCRA) have been possessed, stored, managed, processed, treated, released, handled, discharged, disposed of on or released or discharged from or onto, or threatened to be released from or onto, the Real Property (including groundwater) by any Seller, or to Sellers' knowledge, any third party, in material violation of any applicable Environmental Law. Except as set forth on Schedule 4.15 hereto or the documents referenced thereon, to the knowledge of Sellers, neither radon nor any radon progeny is present in any enclosed and occupied structure present on any area of the Owned Real Property in excess of four (4) picocuries/liter. Except as set forth on Schedule 4.15 hereto, to the knowledge of Sellers, the physical plants constituting a portion of the Assets do not contain regulated, friable asbestos-containing material. Without limiting the generality of the foregoing, to the knowledge of Sellers: (i) all current or former underground storage tanks located on the Real Property and all information in Sellers' possession relating to the capacity, uses, dates of installation and contents of such tanks located on the Real Property are identified in Schedule 4.15; (ii) there are no, nor have there ever been, any collection dumps, pits, and disposal facilities or surface impoundments located on the Real Property for the containment of Hazardous Substances except as identified in Schedule 4.15 or in the documents referenced thereon; and (iii) all existing underground storage tanks located on the Real Property have been maintained in material compliance with all Environmental Laws. To the knowledge of Sellers, except as set forth on Schedule 4.15 hereto, no Seller has transported or arranged for the transportation of any Hazardous Substance to any location not owned, operated or leased by any Seller that is the subject of an action by any Governmental Entity or any other third party that would reasonably be expected to result in a claim against any Seller. Copies of all environmental investigations, studies, audits, tests, reviews or other analyses (collectively, the "Environmental Reports") conducted by, or that are in the possession of, Sellers relating to the System or Real Property have been made available to Buyer and all such Environmental Reports

29

are listed on Schedule 4.15. Sellers have all Environmental Permits required under applicable Environmental Laws for Sellers to use the Real Property and any equipment located thereon as currently used by Sellers; all such Environmental Permits are valid and in effect; Sellers are in compliance in all material respects with all such Environmental Permits and all such Environmental Permits are listed on Schedule 4.15.

4.16.   **Hill-Burton and Other Liens.**  Except as set forth on Schedule 4.16 hereto, no Seller has received any loans, grants or loan guarantees pursuant to the Hill-Burton Act program, the Health Professions Educational Assistance Act, the Nurse Training Act, the National Health Planning and Resources Development Act, and the Community Mental Health Centers Act, as amended, or similar laws or acts relating to healthcare facilities. The transactions contemplated hereby will not result in any obligation on any Buyer to repay any of such loans, grants or loan guarantees, nor subject any Buyer or the Assets to any lien, restriction or obligation, including any requirement to provide uncompensated care.

4.17.   **Taxes.**

(a)    During the last five (5) tax years, each Seller has filed all federal, state and local tax returns required to be filed by it (all of which are true and correct in all material respects) and has duly paid or made provision for the payment of all taxes (including any interest or penalties and amounts due state unemployment authorities) which are due and payable to the appropriate tax authorities. During the last five (5) calendar years, each Seller has withheld proper and accurate amounts from its employees' compensation in compliance with all withholding and similar provisions of the Code, including employee withholding and social security taxes, and any and all other applicable laws. No deficiencies for any of such taxes have been asserted or threatened in writing, and no audit on any such returns is currently under way or threatened in writing. There are no outstanding agreements by any Seller for the extension of time for the assessment of any such taxes. No Seller has taken any action in respect of any federal, state or local taxes (including any withholdings required to be made in respect of employees) which may have an adverse impact upon the System or the Assets as of or subsequent to Closing. There are no liens for delinquent taxes on any of the Assets.

(b)    For purpose of the Agreement, "tax" or "taxes" means (i) all federal, state, local or foreign taxes, charges, fees, imposts, contributions, levies or other assessments, including all net income, alternative minimum or add-on minimum tax, gross income, profits, gross receipts, franchise, capital, paid-up capital, capital stock, sales, use, value-added, ad valorem, property, inventory, transfer, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, business privilege, mercantile, estimated taxes, environmental, windfall profits, customs duties, fees, or other like assessments and charges of any kind whatsoever, (ii) all interest, penalties, fines, additions to tax or additional amounts imposed by any taxing authority in connection with any item described in clause (i), and (iii) any transferee liability in respect of any items described in clauses (i) and/or (ii) payable by reason of contract, assumption, transferee liability, operation of law, or otherwise, in each case whether or not disputed. For purpose of the Agreement, "tax return" means any return, report or statement filed or required to be filed with respect to any tax (including any attachments thereto,

30

and any amendment thereof) including any information return, claim for refund, amended return or declaration of estimated tax.

### 4.18. Employee Relations.

(a)    Except as set forth on Schedule 4.18(a), all employees of the System are employees of one of the Sellers. Except as set forth on Schedule 4.18(a), there is not presently pending or, to Sellers' knowledge within the last three (3) calendar years including the calendar year that includes the Effective Time, threatened, and no event has occurred that could provide any reasonable basis for any strike, slowdown, picketing, work stoppage, or employee grievance process, or any proceeding against or affecting any Seller relating to an alleged violation of any legal requirements pertaining to labor relations, including any charge, complaint, or unfair labor practices claim filed by an employee, union, or other person with the National Labor Relations Board or any comparable Government Entity, organizational activity, or other labor dispute against or affecting any Seller or the System. Except as set forth on Schedule 4.18(a), with respect to the employees of each Seller, no collective bargaining agreement exists or is currently being negotiated by Seller; to Sellers' knowledge no application for certification of a collective bargaining agent is pending; no written demand has been made for recognition by a labor organization; to Sellers' knowledge, no union representation question exists; to Sellers' knowledge, no union organizing activities are taking place; and no employee of any Seller is represented by any labor union or organization.

(b)    Each Seller has complied in all material respects with all legal requirements relating to employment; employment practices; terms and conditions of employment; equal employment opportunity; nondiscrimination; immigration; wages; hours; payment of employment, social security, and similar payroll taxes; occupational safety and health; and plant closing. No Seller is liable for the payment of any compensation, damages, taxes, fines, penalties, interest, or other amounts, however designated, for failure to comply with any of the foregoing legal requirements. Except as set forth in Schedule 4.18(b), there are no pending or, to Sellers' knowledge, threatened claims before the Equal Employment Opportunity Commission (or comparable state agency), complaints before the Occupational Safety and Health Administration (or comparable state agency), wage and hour claims, unemployment compensation claims, workers' compensation claims, or the like.

(c)    Sellers have made available to Buyers the personnel records of all of the employees of each Seller and the salary or wage records for such employees including records reflecting sick or extended illness, paid time off, vacation and holiday benefits that, as of the Effective Time, are accrued or credited but unused or unpaid. Sellers have made available to Buyers copies of each employment, consulting, independent contractor, bonus, retention or severance agreement to which any Seller is a party. Schedule 4.18(c) sets forth the employees who had an "employment loss," as such term is defined in the Worker Adjustment and Retraining Notification Act (the "WARN Act"), within the ninety (90) days preceding the Closing; in relation to the foregoing, Sellers have not violated the WARN Act or any similar state or local legal requirements. To Sellers' knowledge, no employee of any Seller is bound by any contract that purports to limit the ability of such employee to engage in or continue or perform any conduct, activity, duties or practice relating to the business of any Seller.

31

(d)   All necessary visa or work authorization petitions required to be filed by Sellers have been timely and properly filed on behalf of any employees of any Seller requiring a visa stamp, I-94 status document, employment authorization document, or any other immigration document to legally work for Sellers in the United States. and all paperwork retention requirements with respect to such applications and petitions have been met. To the knowledge of Sellers, no current employee of any Seller has ever worked for such Seller without employment authorization from the Department of Homeland Security or any other Government Entity that must authorize such employment. I-9 Forms have been timely and properly completed by Sellers for all current employees of Sellers. I-9 Forms have been lawfully retained and re-verified by Sellers. There are no claims, lawsuits, actions, arbitrations, administrative or other proceedings, or to Sellers' knowledge, governmental investigations or inquiries pending or threatened against any Seller relating to such Seller's compliance with immigration laws. There have been no letters received by any Seller from the Social Security Administration ("SSA") regarding the failure of such Seller's employee's Social Security number to match their name in the SSA database.

### 4.19.   Contracts and Commitments.

(a)   Schedule 4.19 sets forth an accurate list of all material written commitments, contracts, leases, and agreements, which materially affect the System or the Assets, to which any Seller is a party or by which any Seller, the System or the Assets are bound, and which involve future payments, performance of services or delivery of goods to or by Seller in an amount or value in excess of One Hundred Thousand Dollars ($100,000.00) per contract on an annual basis, which have terms (including renewal options and rights) in excess of one (1) year, or which involve a contract with a physician, physician organization or other referral source ("Material Contracts"), including: (a) agreements with individual physicians or physician groups and any other agreements with potential referral sources; (b) agreements with health insurance payors, health maintenance organizations, preferred provider organizations, accountable care organizations; clinically integrated networks, or other alternative delivery systems; (c) joint venture or partnership agreements; (d) employment contracts or any other contracts or commitments with individual employees or agents; (e) contracts or commitments materially affecting ownership of, title to, use of or any interest in the Real Property (including the Real Property Leases); (f) equipment leases; (g) equipment maintenance agreements; (h) agreements with municipalities; (i) collective bargaining agreements or other contracts or commitments with any labor unions, labor organizations, or other employee representatives or groups of employees; (j) loan agreements, bonds, mortgages, liens, or other security agreements; (k) patent licensing agreements or any other agreements, licenses, or commitments with respect to patents, patent applications, trademarks, trade names, service marks, technical assistance, copyrights, or other like terms affecting the System or the Assets; (l) contracts or commitments providing for payments based in any manner on the revenues or profits of the System or the Assets; and (m) agreements, licenses, or commitments relating to data processing programs, software, or source codes utilized in connection with the System or the Assets.

(b)   Sellers have made available to Buyers, subject to applicable law, true, accurate and complete copies of all of the Contracts, including, among others, the Material

32

Contracts. Sellers represent and warrant with respect to each Contract, including Material Contracts, that:

(i)     Such Contract constitutes the valid and legally binding obligation of the Seller which is a party thereto and is enforceable against such Seller in accordance with its terms;

(ii)    Such Contract constitutes the entire agreement by and between the respective parties thereto with respect to the subject matter thereof;

(iii)All    obligations required to be performed by the Seller under the terms of such Contract have been performed in all material respects, no act or omission by the Seller has occurred or failed to occur which, with the giving of notice, the lapse of time or both would constitute a default under the Contract, and such Contract is in full force and effect without default on the part of the Seller;

(iv)    Except as expressly set forth on Schedule 4.19, the Contract does not require consent to the assignment and assumption of such Contract by the appropriate Buyer;

(v)     Except as expressly set forth on Schedule 4.19, the assignment of the Contract to and assumption of such Contract by the appropriate Buyer does not require any fee and will not result in any penalty or premium, breach, default, termination or variation of the rights, remedies, benefits or obligations of any Party thereunder; and

(vi)    Each Contract is in compliance in all material respects with all applicable federal, state and local laws, regulations, judicial and administrative decisions.

4.20.   **Unclaimed Property.**

(a)     Each Seller is, and at all time has been, in compliance with the applicable state laws regarding abandoned or unclaimed property or escheat in all material respects. Each Seller has reported and remitted to each state as required by Law all amounts held, due or owing by Seller remaining unclaimed or unpaid for a period of time such that they are presumed abandoned under the applicable state laws. No amounts which are, or would be, or would become, unclaimed property or presumed abandoned under the applicable state laws regarding abandoned or unclaimed property have been written off, written or reversed to income, or otherwise removed or excluded from the Seller's Balance Sheet Liabilities.

(b)     For purpose of the Agreement, "unclaimed property" means tangible and intangible property held by the Seller as custodian for the apparent owner which is deemed abandoned or unclaimed under applicable state laws.

4.21.   **Inventory/Supplies.**   All the inventory of medical and office supplies ("Inventory") constituting any part of the Assets is substantially of a quality and quantity usable and salable in the ordinary course of business of the System. Obsolete items or inventory items

33

greater than one (1) year old have been written off the Financial Statements. The Inventory is carried at the lower of cost or market, on a first-in, first-out basis and is properly stated in the Financial Statements. The Inventory levels are based on past practices of Sellers and are reasonable and justified under the normal operations of the Sellers.

**4.22. Insurance.** Schedule 4.22 hereof lists the insurance policies covering the ownership and operations of the System and the Assets, which Schedule reflects the policies' numbers, terms, identity of insurers, amounts, coverage, and loss experience for the last five (5) years per policy. All of such policies are in full force and effect with no premium arrearage. During the past five (5) years, Sellers have given in a timely manner to their insurers all notices required to be given under their insurance policies with respect to all of the claims and actions covered by insurance, and no insurer has denied coverage of any such claims or actions. Except as set forth on Schedule 4.22, at no time during the past five (5) years has any Seller (a) received any written notice or other communication from any such insurance company cancelling or materially amending any of such insurance policies, and, to Sellers' knowledge, no such cancellation or amendment is threatened; or (b) failed to present any material claim which is still outstanding under any of such policies with respect to the System or any of the Assets.

**4.23. Third Party Payor Cost Reports.** Each Seller required to file cost reports has duly and timely filed all such required reports for all the fiscal years through and including the most recently completed fiscal year. All of such cost reports completely and accurately reflect the information required to be included thereon and such cost reports do not claim and no Seller has received reimbursement in any amount in excess of the amounts provided by law or any applicable agreement. Schedule 4.23 indicates which of such cost reports have not been audited and finally settled and a brief description of any and all notices of program reimbursement, proposed or pending audit adjustments, disallowances, appeals of disallowances, and any and all other unresolved claims or disputes in respect of such cost reports. Each Seller has established adequate reserves to cover any potential reimbursement obligations or other liabilities such Seller may have in respect of any such third party cost reports pertaining to any periods prior to the Effective Time, regardless of when such cost reports are filed, and such reserves are set forth in the Financial Statements.

**4.24. Medical Staff Matters.** Sellers have made available to Buyers true, correct, and complete copies of the bylaws and rules and regulations of the medical staff of each Hospital, as well as a list of all current members of the medical staffs. Except as set forth on Schedule 4.24 hereto, there are no adverse actions pending with respect to any medical staff members of the Hospitals or any current applicant thereto for which a medical staff member or current applicant has requested a judicial review hearing which has not been scheduled or has been scheduled but has not been completed, and there are no pending or, to the knowledge of Sellers, threatened disputes with current applicants or medical staff members of the Hospitals.

**4.25. Intellectual Property; Computer Software.** All Intellectual Property (whether registered or common law) currently owned by Sellers is listed and described on Schedule 1.1(k) hereto. No proceedings have been instituted or are pending or, to the knowledge of Sellers, threatened which challenge the validity of the ownership by any Seller of such Intellectual Property, and Sellers know of no basis therefor. No Seller has licensed anyone to use such

34

Intellectual Property and Sellers have no knowledge of the use or the infringement of any such Intellectual Property by any other person. Sellers, collectively, own (or possesses licenses or other rights to use) all Intellectual Property, including all computer software programs and similar systems used in the operation of the System and the Assets.

**4.26.   Compliance Program.**  Sellers have made available to Buyers a copy of the current compliance program materials related to Sellers and the System, including all program descriptions, compliance officer and committee descriptions, and, to the extent they exist, ethics and risk area policy materials, training and education materials, auditing and monitoring protocols, reporting mechanisms, and disciplinary policies. Except as set forth in a writing delivered by Sellers to Buyers which specifically makes reference to this Section 4.26 and set forth on Schedule 4.26, no Seller (a) is Party to any current, valid and binding Corporate Integrity Agreement with the Office of Inspector General of the Department of Health and Human Services, (b) has any current reporting obligation pursuant to any Settlement Agreement entered into with any Government Entity, (c) to Sellers' knowledge, has, at any time during the past five (5) years, been the subject of any Federal health care program investigation conducted by any federal or state enforcement agency, (d) to Sellers' knowledge, has, at any time during the past five (5) years, been a defendant in any qui tam/False Claims Act litigation, (e) has, during the past five (5) years, been served with or received any search warrant, subpoena, civil investigative demand, or contact letter from any federal or state enforcement agency (except in connection with medical services provided to third-parties who may be defendants or the subject of investigation into conduct unrelated to the operation of the healthcare businesses conducted by Sellers), and (f) has, during the past five (5) years, received any written complaints (or complaints through their compliance "hotline") from employees, independent contractors, vendors, physicians, or any other person that would indicate that Seller has violated any law or regulation. Schedule 4.26 includes a description of each audit and investigation conducted by any Seller pursuant to its compliance program during the last five (5) years. For purposes of this Agreement, the term "compliance program" refers to provider programs of the type described in the compliance guidance published by the Office of Inspector General of the Department of Health and Human Services.

**4.27.   Full Disclosure.**  To the knowledge of Sellers, copies of all documents referred to in any Schedule delivered by Sellers hereto have been delivered or made available to Buyers and constitute true, accurate and complete copies thereof and include all amendments, exhibits, schedules, appendices, supplements or modifications thereto or waivers thereunder, unless noted on the relevant schedule. No representation or warranty made by Sellers hereunder contains an untrue statement of a material fact or omits to state a material fact required to be stated herein or necessary to make the statements contained herein not misleading.

## 5.   REPRESENTATIONS AND WARRANTIES OF BUYERS.

As of the date hereof, as updated pursuant to Section 11.1, and as of the Closing Date, Buyers jointly and severally represent and warrant to Sellers the following:

**5.1.   Existence and Capacity.**  Each Buyer (other than PMH) is a limited liability company, duly organized and validly existing in good standing under the laws of the

35

Commonwealth of Pennsylvania or such other jurisdiction where domesticated. Each Buyer has the requisite power and authority to enter into this Agreement, to perform its obligations hereunder, and to conduct its business as now being conducted in all material respects. PMH is a corporation, duly organized and validly existing in good standing under the laws of the State of Delaware. PMH has the requisite power and authority to enter into this Agreement, to perform its obligations hereunder and to conduct its business as now being conducted. Each Buyer (other than PMH) is a direct or an indirect, wholly-owned subsidiary of PMH.

5.2.    **Powers; Consents; Absence of Conflicts with Other Agreements, Etc.**  The execution, delivery and performance of this Agreement by each Buyer and all other agreements referenced herein, or ancillary hereto, to which each Buyer is a Party, and the consummation of the transactions contemplated herein by each Buyer:

(a)    are within its corporate powers, are not in contravention of law or of the terms of its organizational documents, and have been duly authorized by all appropriate corporate action;

(b)    except as provided in Section 7.1 and Section 7.2 below, do not require any approval or consent of, or filing with, any Government Entity or authority bearing on the validity of this Agreement which is required by law or the regulations of any such agency or authority;

(c)    will neither conflict with, nor result in any breach or contravention of, or the creation of any lien, charge or encumbrance under, any indenture, agreement, lease, instrument or understanding to which it is a party or by which it is bound;

(d)    will not violate any statute, law, rule, or regulation of any Government Entity to which any Buyer may be subject; and

(e)    will not violate any judgment, decree, writ, or injunction of any court or Government Entity to which any Buyer may be subject.

5.3.    **Binding Agreement.**  This Agreement and all agreements to which Buyers will become a Party pursuant hereto are and will constitute the valid and legally binding obligations of each Buyer, respectively, and are and will be enforceable against each Buyer, respectively, in accordance with the respective terms hereof and thereof.

5.4.    **Full Disclosure.**  Copies of all documents referred to in any schedule delivered by Buyers have been delivered and made available to Sellers and constitute true, accurate and complete copies thereof and include all amendments, exhibits, schedules, appendices, supplements or modifications thereto. No representation or warranty made by Buyers hereunder contains an untrue statement of a material fact or omits to state a material fact required to be stated herein or necessary to make the statements contained herein not misleading. Without limitation, the foregoing expressly includes all of the Title Commitments and any and all documents, instruments, easements, agreements, covenants or restrictions referred to therein.

36

**5.5.   Litigation/Investigations.**  There are no actions, proceedings, or investigations pending or, to the knowledge of Buyers, threatened, that if determined adversely to Buyers would have a materially adverse effect on Buyers' ability to consummate the transactions contemplated by this Agreement.

**5.6.   Compliance with Laws.**

(a)   **Generally.**   Except as disclosed in Schedule 5.6(a) hereto, to the knowledge of Buyers, Buyers are in material compliance and have at all times within the past three (3) years complied with all Laws with respect to Buyers' ownership, use and operation of their business except for noncompliance that would not have a materially adverse effect on Buyers' ability to consummate the transactions contemplated by this Agreement. During the past three (3) years, except as so disclosed, to Buyers' knowledge, Buyers have: (i) properly filed all material reports and other documents required by any Governmental Entity; and (ii) not received any notice from any Governmental Entity that any of its assets or business procedures or practices fails to comply in any material respect with any applicable Laws; except for noncompliance that would not have a materially adverse effect on Buyers' ability to consummate the transactions contemplated by this Agreement.

(b)   **Health Care Laws.**   In the three (3) year period immediately preceding the Execution Date hereof, to the knowledge of Buyers, neither Buyers nor any of Buyer's employees while an employee of Buyers has committed a violation of federal or state Laws regulating health care, including the Anti-Kickback Law, 42 U.S.C. Section 1320a (the "Anti-Kickback Law"), the Stark I and II laws, 42 U.S.C. Section 1395nn, as amended (the "Stark Law"), and the False Claims Act, 31 U.S.C. Section 3729, et seq, (the "False Claims Act"), except for violations that would not have a materially adverse effect on Buyers' ability to consummate the transactions contemplated by this Agreement. Neither Buyers nor any of their employees or the physicians on their medical staff, have been excluded from participation in Medicare or any other federal health care program (as that term is defined in 42 U.S.C. Section 1320a-7b(f)), subject to sanction pursuant to 42 U.S.C. 1320a-7a or 1320a-8 or convicted of a criminal offense under the Anti-Kickback Law, except for exclusions, sanctions or convictions that would not have a materially adverse effect on Buyers' ability to consummate the transactions contemplated by this Agreement.

**5.7.   Licenses/Permits.**   To the knowledge of Buyers, Buyers have lawful authority and have, or will reasonably promptly obtain prior to or within a reasonable period of time after the Closing Date, as applicable, all material federal, state and local Licenses and Permits necessary for or required to conduct their business operations where the failure to hold such Licenses and Permits would have a materially adverse effect on Buyers' ability to consummate the transactions contemplated by this Agreement. All such materials Licenses and Permits are or will be valid and in full force and effect. To the knowledge of Buyers, Buyers are in material compliance with all such currently held Licenses and Permits and the terms and requirements of all Governmental Entities with respect thereto except for noncompliance that would not have a materially adverse effect on Buyers' ability to consummate the transactions contemplated by this Agreement. To the knowledge of Buyers, no notice from any authority in respect to the revocation, termination, suspension, or limitation of any such Licenses or Permits has been

37

issued or given, nor are Buyers aware of the proposed or threatened issuance of any such notice, except where such notice would not have a materially adverse effect on Buyers' ability to consummate the transactions contemplated by this Agreement.

## 6.    COVENANTS OF SELLERS PRIOR TO CLOSING.

Between the Execution Date of this Agreement and the Closing:

**6.1.    Information.**  Sellers shall afford to the officers, authorized representatives and agents (which shall include accountants, attorneys, bankers, and other consultants) of Buyers full and complete access during normal business hours to and the right to inspect, at Buyers' sole cost and expense, the plants, properties, equipment, books, and records of the Sellers, and will furnish Buyers with such additional financial and operating data and other information as to the business and properties of Sellers as Buyers may from time to time reasonably request without regard to where such information may be located.  Buyers' right of access and inspection shall be exercised in such a manner as not to interfere unreasonably with Sellers' operations.

**6.2.    Operations.**  Sellers shall:

(a)    carry on their business in substantially the same manner as presently conducted and not make any material change outside of the ordinary course of business in personnel, operations, finance, accounting policies, Real Property or personal property;

(b)    maintain the Assets and the System and all parts thereof in substantially the same operating condition;

(c)    maintain the Inventory at substantially the same levels as exist as of the Execution Date of this Agreement;

(d)    perform all of their obligations under agreements relating to or affecting the System, the Assets or Sellers' operations;

(e)    keep in full force and effect their present insurance policies or other comparable insurance;

(f)    use reasonable efforts to maintain and preserve their business organizations intact, retain their present employees within the System, and maintain their relationships with physicians, suppliers, customers, and others having business relations with the System;

(g)    comply with all applicable laws in all material respects;

(h)    keep, hold and maintain all Licenses reasonably necessary for the conduct and operation of Sellers' business;

(i)    use reasonable measures to avoid rendering any representation or warranty contained in this Agreement inaccurate or untrue as of the Closing;

38

(j)       promptly notify Buyers in writing of any lawsuits, claims, administrative actions or other proceedings asserted or commenced against any of the Sellers or their officers, directors or employees involving in any material way the ability of any such Seller to consummate the transactions contemplated or required by this Agreement, or materially affecting such Seller's business, properties or its assets;

(k)       promptly notify Buyers in writing of any facts or circumstances that come to their attention and that cause, or through the passage of time could reasonably cause, any of the representations and warranties made by Sellers and contained in this Agreement to be untrue or misleading at any time from the Execution Date through the Closing;

(l)       continue to make (i) any and all required or other scheduled contributions to the DB Pension Plan for the 2016 plan year in the amounts set forth on Schedule 6.2(l) hereto (as may be increased or decreased pursuant to the January 1, 2016 DB Pension Plan actuarial determination) on a pro-rata basis up to the Closing Date (where such pro-ration shall be based on the number of days occurring between the start of the pro-ration period and the Closing Date), and (ii) the outstanding required contributions for the 2015 plan year in the amounts also set forth on Schedule 6.2(l) (plus accrued interest, if any) (as such contributions may be increased or decreased pursuant to the January 1, 2016 DB Pension Plan actuarial determination), provided that if Closing occurs prior to Sellers' full payment of the contributions for the 2015 plan year, Sellers shall pay the remaining balance of such contributions to the DB Pension Plan on or before the Closing Date; and Sellers shall pay PBGC premiums on a timely basis; and

(m)       continue to accrue any executive retention bonuses and any other retention bonuses set forth on Schedule 1.3(k) on a monthly basis up to the Effective Time in accordance with past practice and in monthly amounts not less than have been historically accrued for such bonuses.

6.3.    **Negative Covenants**. Sellers shall not, without the prior written consent of Buyers:

(a)       amend, renew or terminate any of the Contracts, enter into any contract or commitment, or incur or agree to incur any liability which would constitute a Contract to the extent such Contract: (i) is outside of the ordinary course of business of Sellers; (ii) involves future payments, performance of services or delivery of goods to or by Sellers in an amount or value in excess of One Hundred Thousand Dollars ($100,000.00) on an annual basis; (iii) has one or more physicians or physician organizations as a party and provides for total annual compensation (including any incentives, bonuses, benefits or other reimbursement) exceeding, or potentially exceeding, Five Hundred Thousand Dollars ($500,000.00); and/or (iv) is not terminable by Sellers without cause and without penalty upon prior notice of twelve (12) months or less, all except as provided herein or as set forth on Schedule 6.3(a);

(b)       increase compensation payable or to become payable or make any bonus, incentive or severance payment to or otherwise enter into one or more bonus, severance, profit-sharing, deferred compensation, stock option, purchase, retainer, consulting, retirement, welfare or incentive plan Contracts (including any plan or agreement under which "fringe

benefits" are afforded) with any employee of the Sellers, except in the ordinary course of business in accordance with existing personnel policies, consistent with past merit-based practices in accordance with existing personnel policies or pursuant to Contract requirements in force on the date of this Agreement;

(c)     enter into (or materially amend existing) agreements for employment, indemnity, retention, severance, change-in-control, employee lease, deferred compensation, or incentive compensation with, or agreements regarding loans or advances to, Sellers' executive management personnel as listed on Schedule 6.3(c);

(d)     create, assume, or permit to exist any new debt, mortgage, pledge, or other lien or encumbrance upon any of the Assets or System in excess of One Hundred Thousand Dollars ($100,000), whether now owned or hereafter acquired;

(e)     sell, assign, lease, or otherwise transfer or dispose of any property, plant, or equipment except in the ordinary course of business with comparable replacement thereof, if appropriate;

(f)     incur capital expenditures in an aggregate amount exceeding One Hundred Thousand Dollars ($100,000) except for expenditures identified on Schedule 6.3(f);

(g)     adopt any plan of merger, consolidation, reorganization, liquidation or dissolution or file a petition in bankruptcy under any provisions of federal or state bankruptcy law or consent to the filing of any bankruptcy petition against it under any similar law;

(h)     purchase or otherwise acquire any property or asset for an amount in excess of One Hundred Thousand Dollars ($100,000), except for purchases of inventory or supplies in the ordinary course of business;

(i)     take any material action outside the ordinary course of business of the System, the Assets or Sellers generally;

(j)     enter into any agreement, undertake any action or fail to take any action that would have a Material Adverse Effect;

(k)     amend any provision of the Hospitals' Medical Staff Bylaws or Medical Staff rules and regulations; or

(l)     settle any third party payor or governmental claims or cost report appeals or related proceedings or any other billing and/or compliance matters involving other audit/review agencies and organizations.

6.4.    **Governmental Approvals.** Sellers shall (i) use reasonable efforts to obtain all governmental approvals (or exemptions therefrom, including the Office of Attorney General of the Commonwealth of Pennsylvania and the Court of Common Pleas of Delaware County, Pennsylvania, Orphans' Court Division) necessary or required to allow Sellers to perform their obligations under this Agreement; and (ii) assist and cooperate with Buyers and their

40

representatives and counsel in obtaining all governmental consents, approvals, and licenses which Buyers deem necessary or appropriate and in the preparation of any document or other material which may be required by any Government Entity as a predicate to or as a result of the transactions contemplated herein.

6.5.  **Hart-Scott-Rodino Notification.**  If not completed prior to the Execution Date of this Agreement, Sellers shall, if and to the extent required by law, file all reports or other documents required or requested by the Federal Trade Commission ("FTC") or the United States Department of Justice ("Justice Department") under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 ("HSR Act"), and all regulations promulgated thereunder, concerning the transactions contemplated hereby, and, as instructed by counsel, comply with any requests by the FTC or Justice Department for additional information concerning such transactions, in an effort to allow the waiting period specified in the HSR Act to expire as soon as reasonably possible after the execution and delivery of this Agreement. Sellers shall furnish to Buyers such information concerning Sellers as Buyers need to perform their obligations under Section 7.2 of this Agreement. Sellers and Buyers shall each pay one-half (1/2) of the filing fees required under the HSR Act and all regulations promulgated thereunder.

6.6.  **Additional Financial Information.**  Within five (5) business days after they are created (but in any event no later than twenty (20) days following the end of each calendar month prior to Closing), Sellers shall deliver to Buyers true, accurate and complete copies of the unaudited balance sheets and the related unaudited statements of income (collectively, the "Interim Statements") of, or relating to, the Sellers for each month then ended, together with a year-to-date compilation and the notes, if any, related thereto, which shall have been prepared from and in accordance with the Books and Records of Sellers, and shall fairly present in all material respects the financial position and results of operations of the System as of the date and for the period indicated, all in accordance with GAAP consistently applied, except as set forth in Schedule 4.4(b).

6.7.  **Exclusivity.**  No Sellers or any of their respective representatives, agents, directors, officers or employees, directly or indirectly, shall:  (a) offer any of the Assets described in this Agreement for sale, lease or other disposition to any person or entity other than Buyers, except in the ordinary course of business; (b) merge or conduct any business combination of any sort involving Sellers or any Affiliate thereof with any other person or entity except that any Seller may merge with any other Seller or transfer all or substantially all of its assets to another Seller in connection with the transactions contemplated herein; (c) transfer the membership, control or any ownership interest in any Seller or any Affiliate thereof (including any joint venture, LLC membership or partnership interests) to any other person or entity except as required under a joint venture, operating or partnership agreement and necessary to meet a closing condition of under this Agreement that has not been waived by Buyer; (d) enter into a partnership, LLC or any other joint venture involving any Seller or any Affiliates thereof; (e) enter into any agreement with any person or entity other than Buyers with respect to any of the matters set forth in (a) through (d) above; or (f) solicit, encourage (by way of furnishing non-public information or otherwise), negotiate, hold discussions regarding, entertain, accept, or take any other actions to facilitate, any offers regarding any of the matters or actions set forth in

41

(a) through (e) above. Sellers will promptly communicate to Buyers the substance of any inquiry or proposal concerning any such potential offer or transaction described above.

  **6.8. Insurance Ratings.** Sellers shall take all action reasonably requested by Buyers to enable Buyers to succeed to the Workers' Compensation and Unemployment Insurance ratings, and other ratings for insurance or other purposes established by Sellers. Buyers shall not be obligated to succeed to any such ratings, except as they may elect to do so. At Buyer's election and to the extent allowable under the Pennsylvania Unemployment Compensation Law, one or more Sellers shall join in an application to transfer the whole or appropriate part of such Seller's Pennsylvania Unemployment Compensation experience record and reserve account balance to Buyer and file with the Pennsylvania Department of Labor and Industry such supporting schedules or other information with respect to such experience record and reserve account balance as said Department may require.

  **6.9. Medical Staff Disclosure.** Sellers shall deliver to Buyers a written disclosure containing a brief description of all adverse actions taken against medical staff members of the Hospitals or applicants thereof during the past three (3) years which could result in claims or actions against any Seller and which are not disclosed in the minutes of the meetings of the Medical Executive Committee of the medical staff of the Hospitals, which have been made available to Buyers.

  **6.10. Consent for Assignment of Contracts.**

    (a) To the extent a Contract is not capable of being assigned without the consent of a third party as set forth in Section 4.19 or if such assignment or attempted assignment would constitute a breach thereof or a violation of any law (a "Non-Assignable Contract"), nothing in this Agreement shall constitute an assignment or an attempted assignment thereof prior to the time at which all consents necessary for such assignment shall have been obtained and all legal restrictions removed.

    (b) Sellers shall use commercially reasonable efforts to obtain the consent to the assignment of any Contracts hereunder, including Non-Assignable Contracts, and Buyers shall reasonably cooperate with their efforts. To the extent that any of such consents under Material Contracts are not obtained: (i) Buyers shall not be required to consummate the transactions described herein pursuant to Section 8.7; and (ii) if Buyers nevertheless elect to waive the condition to closing under Section 8.7 and consummate the transactions described herein, then to the extent requested by Buyers, Sellers shall, during the term of the affected Material Contract, use commercially reasonable efforts to (A) provide to Buyer the benefits under any such Material Contract, (B) cooperate in any reasonable and lawful arrangement designed to provide such benefits to Buyers, and (C) enforce for the account of Buyers, any rights of Sellers under the affected Material Contract (including the right to elect to terminate such Material Contract in accordance with the terms thereof upon the written direction of Buyers) and for the period that Buyers are receiving the benefit that would otherwise inure to Sellers under the Material Contract, Buyers will be responsible for the obligations of Sellers under the Material Contract relating to such period. Buyers shall cooperate with Sellers to

42

enable Sellers to provide to Buyers the benefits contemplated by the immediately preceding sentence.

(c)   If assignment of any Contract requires any additional payment by Sellers of any fees, expenses, premiums, expenditures, assessments or penalties in excess of One Thousand Dollars ($1,000.00) in order to effect assignment (provided that such payments are not contemplated in such Contract), Sellers shall promptly notify Buyers of such payment and Buyers may elect to either pay such amounts due in excess of One Thousand Dollars ($1,000.00) or not accept assignment of such Contract. Sellers and Buyers shall reasonably cooperate in negotiating with third parties any payments associated with assignment of any Contracts hereunder.

**6.11.   Corporate and Bulk Sales Clearance Certificate.** Prior to Closing, Sellers shall timely notify all Pennsylvania tax authorities, to the extent required by applicable law, of the transactions contemplated by this Agreement in the form and manner required by such tax authorities. After Closing, Sellers shall file with the Pennsylvania tax authorities to receive applicable tax clearance certificates ("Tax Clearance Certificates"). From and after Closing, Sellers shall defend, indemnify and hold harmless the Buyers having taken title to any of the Assets from and against any and all of such Seller's tax liabilities which are imposed upon or asserted against such Buyers or the Assets, including any fines, penalties or interest thereon, solely as a result of, or with respect to, Sellers' failure to obtain and deliver to Buyers any such Tax Clearance Certificates prior to Closing.

**6.12.   Unions.** Prior to the Closing, Sellers shall keep Buyers reasonably apprised of, and consult with Buyers, regarding the status of any negotiations (which shall include routine pending grievances, arbitrations or similar complaints) regarding any collective bargaining agreement or the demand for recognition of any labor organization. Sellers shall not enter into any new collective bargaining agreement or extension of any existing collective bargaining agreement or recognize any labor organization without prior written consent from the Buyer. Such consent shall not be required if Sellers reasonably determine and notify Buyers that it would interfere with Sellers' bargaining or other obligations under the National Labor Relations Act.

**6.13.   Foundation Merger.** Prior to or simultaneous with the Closing, Sellers shall cause Delco Foundation to merge with and into Crozer Foundation with Crozer Foundation to be the surviving organization and successor in interest to all assets and liabilities of both organizations, and renamed "Crozer-Keystone Community Foundation." Upon effectuation of such merger, Sellers shall cause Foundation to execute and deliver to Buyers the Indemnification Agreement attached hereto as Exhibit K and shall deliver to Buyers complete copies of the Statement of Merger and Plan of Merger (with all attachments thereto) associated with the merger of Delco Foundation into Crozer Foundation.

**6.14.   Consulting Agreement.** Subject to compliance with applicable laws, as promptly as practicable after the Execution Date but by no later than thirty (30) days after the Execution Date, the Parties shall negotiate and finalize a consulting agreement pursuant to which Buyers provide operational support to Sellers' leadership. The consulting agreement shall not be

43

executed or take effect until thirty (30) days after the Parties make their required filing pursuant to the Hart-Scott-Rodino Act pursuant to the terms of this Agreement. The consulting fee payable to Buyers under such consulting agreement shall be equal to 0.75% of "net patient revenue" (as defined on Sellers' financial statements) of the System per month. Sellers agree to reasonably consent to make recommended operational changes under the terms of such consulting agreement. The consulting fees payable to Buyers would be deferred and would only be payable to Buyers if the Closing does not occur as a result of a breach of this Agreement, where such breach is willful and intentional by one or more Sellers and based on factors within one or more Sellers' control.

## 7. COVENANTS OF BUYERS PRIOR TO CLOSING.

Between the Execution Date of this Agreement and the Closing:

**7.1.    Governmental Approvals.** Buyers shall (i) use reasonable commercial efforts to obtain all governmental approvals (or exemptions therefrom) necessary or required to allow Buyers to perform their obligations under this Agreement; and (ii) assist and cooperate with Sellers and their representatives and counsel in obtaining all governmental consents, approvals, and licenses which Sellers deem necessary or appropriate and in the preparation of any document or other material which may be required by any Government Entity as a predicate to or as a result of the transactions contemplated herein.

**7.2.    Hart-Scott-Rodino Notification.** If not completed prior to the Execution Date, Buyers shall, if and to the extent required by law, file all reports or other documents required or requested by the FTC or the Justice Department under the HSR Act, and all regulations promulgated thereunder, concerning the transactions contemplated hereby, and comply promptly with any requests by the FTC or Justice Department for additional information concerning such transactions, so that the waiting period specified in the HSR Act will expire as soon as reasonably possible after the execution and delivery of this Agreement. Buyers agree to furnish to Sellers such information concerning Buyers as Sellers need to perform their obligations under Section 6.5 of this Agreement. Sellers and Buyers shall each pay one half (1/2) of the filing fees required under the HSR Act and all regulations promulgated thereunder.

**7.3.    Unions.** Buyers shall recognize the existing labor unions representing Sellers' employees as such employees certified representative. Following approval by the Office of Attorney General of Pennsylvania, as set forth in Section 6.4, and not prior thereto unless otherwise mutually agreed upon by Sellers and Buyers, Buyers and Buyers' representatives may meet with each union to discuss the terms and conditions of employment for the bargaining units they represent subject to Buyers' obligations under Section 11.10 and Section 11.25. Buyers shall keep Sellers apprised of such meetings and discussions.

## 8. CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYERS.

Notwithstanding anything herein to the contrary, the obligations of Buyers to consummate the transactions described herein are subject to the fulfillment by Sellers, on or prior

44

to the Closing Date, of the following conditions precedent unless waived in writing by Buyers at or prior to the Closing:

**8.1.** **Representations/Warranties.** The representations and warranties of Sellers contained in this Agreement shall be true in all material respects when made and as of the Closing Date as though such representations and warranties had been made on and as of such Closing Date. Each and all of the terms, covenants, and conditions of this Agreement to be complied with or performed by Sellers on or before the Closing Date pursuant to the terms hereof shall have been duly complied with and performed in all material respects.

**8.2.** **Pre-Closing Confirmations.** Buyers shall have received documentation from the Sellers or other evidence satisfactory to Buyers in their reasonable discretion that Sellers have:

(a)     Received approval from all Government Entities whose approval is required to complete the transactions herein contemplated, provided that no such approval is conditioned upon or otherwise imposes any changes or additional requirements with respect to the transactions contemplated hereby that are not acceptable to Buyers, in Buyers' reasonable discretion;

(b)     Received confirmation from all applicable licensure agencies that upon the Closing all material Licenses required by law to operate the System and the Assets as currently operated and carry on Sellers' business will be transferred to, or issued or reissued in the name of, the appropriate Buyer;

(c)     Obtained reasonable assurances that Medicare and Medicaid certification of the System and the Assets for their operation by Buyers will be effective as of the Closing and that Buyers may participate in and receive reimbursement from such programs effective as of the Closing; and

(d)     Obtained such other consents and approvals as may be legally or contractually required for the consummation of the transactions described herein.

**8.3.** **Title Policy.** For purposes of clarification, the processes and other actions described in this Section 8.3 shall have been completed in accordance with the terms and conditions hereof prior to the Closing Date as one of the conditions under this Article 8 to Buyers' obligations to consummate the transactions.

(a)     Attached to this Agreement as Schedule 8.3 is a list of encumbrances, agreements, easements and exceptions or objections to title pursuant to the title commitments of Commonwealth Land Title Insurance Company (the "Title Company") being so identified on Schedule 8.3. All encumbrances, agreements, easements, or exceptions on Schedule 8.3 are referred to as the "Permitted Encumbrances," and the title commitments are referred to as the "Title Commitments" and individually as a "Title Commitment" with respect to the corresponding Owned Real Property identified on Schedule 8.3 and the corresponding leases of the Leased Real Property, as designated by Buyers, identified on Schedule 8.3 (such leases on Schedule 8.3 being referred to as the "Insured Leases" and individually as an "Insured Lease").

45

Buyers shall promptly following the execution of this Agreement obtain current as-built ALTA surveys with respect to the Owned Real Property and the Insured Lease Parcels as designated by Buyers (collectively, the "Surveys"). Buyers shall provide Sellers with a copy of the Surveys as and when received. Buyers shall provide written notice to Sellers ("Survey Notice") of any matters shown on the Surveys which adversely affects Seller's title to or use and operation of the Owned Real Property and/or the Insured Lease Parcels as currently being so used and operated (collectively, the "Survey Objections"), which are not satisfactory to Buyers in their reasonable discretion and which the Title Company raises as an exception to coverage. In the event that Buyers provide the Sellers with a Survey Notice, Sellers shall use commercially reasonable efforts, during the Survey Objection Cure Period (as hereinafter defined), to cure to the reasonable satisfaction of Buyers (which Buyers agree shall be so satisfied if the Title Company agrees not to raise the same as an exception to coverage or insure over the same) the Survey Objections identified in the Survey Notice. As used in this Agreement, the term "Survey Objection Cure Period" means the thirty (30) day period beginning on each date on which Sellers receive a Survey Notice. Those matters disclosed on the Surveys to which Buyers do not object shall be deemed Permitted Encumbrances. In the event that Sellers have not completed the cure of any of the Survey Objections by 6:00 p.m., Eastern Standard Time, on the first business day after the last day of a Survey Objection Cure Period, Buyers shall provide Sellers with a reasonable estimate of the dollar amount of the claims, losses, liabilities, damages, taxes, costs (including court costs and costs of appeal) and expenses (including reasonable attorneys' fees and fees of expert consultants and witnesses) resulting from Seller's failure to cure all such Survey Objections ("Survey Objection Cure Estimate"). If the aggregate amount of such Survey Objections Cure Estimate and any New Title Objections Cure Estimate, as defined in Section 8.3(d) below (collectively, the "Cure Estimates"), does not exceed Five Million Dollars ($5,000,000.00), then Sellers shall grant a credit to Buyers against the Purchase Price in the aggregate amount of Buyers' Cure Estimates and Buyers shall proceed to Closing subject to the terms and conditions of this Agreement. If the aggregate amount of the Cure Estimates exceeds Five Million Dollars ($5,000,000.00), Buyers shall have the right, to be exercised in Buyers' sole and exclusive discretion, to terminate this Agreement upon written notice of the same being given to Sellers, which termination shall be effective on the date which is ten (10) business days after the date such notice is received by Sellers, unless prior to the expiration of said ten (10) business day period, Sellers agree, by written notice being sent to Buyers, to grant a credit to Buyers against the Purchase Price in the aggregate amount of Buyers' Cure Estimates, at which point Buyers shall proceed to Closing subject to the terms and conditions of this Agreement. In the event this Agreement is terminated by Buyers pursuant hereto, neither party will thereafter have any further rights, obligations or liability hereunder except with respect to provisions hereof which by their express terms survive a termination of this Agreement.

(b)     Subject to Buyers complying with all requirements, conditions and obligations of Buyers under or pursuant to the Title Commitments, with respect to the Owned Real Property, at the Closing, the Title Company shall be ready, willing and able to issue a pro forma policy of owner's title insurance pursuant to the Title Commitments (the "Owner's Title Policy") or mark-up the Title Commitments, in an amount equal to the portion of the Purchase Price being allocated to the Owned Real Property and shall insure to Buyers good and marketable, fee simple title to the Owned Real Property subject only to (i) the Permitted

46

Encumbrances attributable to the same pursuant to <u>Schedule 8.3</u>, as the same may be amended pursuant hereto, and (ii) taxes for the current year and subsequent years.

(c)     Subject to Buyers complying with all requirements, conditions and obligations of the Buyers under or pursuant to the Title Commitments, at the Closing, the Title Company shall be ready, willing and able to issue a pro forma policy of leasehold title insurance pursuant to the Title Commitments (the "Leasehold Title Policy") or mark-up the Title Commitments, in an amount equal to the portion of the Purchase Price being allocated to the Insured Leases and shall insure to Buyers good and marketable, leasehold title to the Insured Leases subject only to the Permitted Encumbrances, attributable to the same pursuant to <u>Schedule 8.3</u>, as the same may be amended pursuant hereto.

(d)     Prior to Closing, Buyers may provide written notice to Sellers ("New Matter Title Notice") of any new matters raised by the Title Company affecting or relating to title to the Owned Real Property or any Insured Leases provided such new matters were (i) not previously listed on the Title Commitment for the same, (ii) not pertaining to any of the Buyers or any requirements, conditions or obligations of the Buyers and (iii) not already a Permitted Encumbrance (such new matters being collectively referred to as the "New Title Objections"), which are not satisfactory to Buyers in their sole and absolute discretion. Buyers shall include with such New Matter Title Notice a copy of the updated Title Commitment referencing the New Title Objection and a copy of any such document, instrument, agreement, lien, encumbrance, easement or the like which is the basis of such New Matter Title Notice and New Title Objection. In the event that Buyers provide Sellers with a New Matter Title Notice, Sellers shall, at Sellers' sole cost and expense, cure such New Title Objections to the reasonable satisfaction of the Title Company so that the Title Company shall either remove or insure over the same at Closing. In the event Sellers fail to cure any New Title Objections pursuant hereto, Buyers shall provide Sellers with a reasonable estimate of the dollar amount of the claims, losses, liabilities, damages, taxes, costs (including court costs and costs of appeal) and expenses (including reasonable attorneys' fees and fees of expert consultants and witnesses) resulting from Seller's failure to cure all such New Title Objections ("New Title Objections Cure Estimate"). If the aggregate amount of the Cure Estimates, as defined <u>in Section 8.3(a)</u> above, does not exceed Five Million Dollars ($5,000,000.00), Sellers shall grant a credit to Buyers against the Purchase Price in the aggregate amount of Buyers' Cure Estimates and Buyers shall proceed to Closing subject to the terms and conditions of this Agreement. If the aggregate amount of the Cure Estimates does exceed Five Million Dollars ($5,000,000.00), Buyers shall have the right, to be exercised in Buyers' sole and exclusive discretion, to terminate this Agreement upon written notice of the same being given to Sellers, which termination shall be effective on the date which is ten (10) business days after the date such notice is received by Sellers, unless prior to the expiration of said ten (10) business day period, Sellers agree, by written notice being sent to Buyers, to grant a credit to Buyers against the Purchase Price in the aggregate amount of the Cure Estimates, at which point Buyers shall proceed to Closing subject to the terms and conditions of this Agreement. In the event this Agreement is terminated by Buyers pursuant hereto, neither party will thereafter have any further rights, obligations or liability hereunder except with respect to provisions hereof which by their express terms survive a termination of this Agreement.

47

(e)     Notwithstanding the foregoing, Sellers must discharge and satisfy, and cause to be released of record at or prior to Closing any mortgage, judgment, construction lien or monetary encumbrance (collectively, "Monetary Liens") secured by or otherwise encumbering the Owned Real Property or the tenant's leasehold interest in the Insured Lease Parcels, except to the extent the same pertain to Buyers. Sellers' obligation to cause the release of any such Monetary Liens pursuant to the immediately preceding sentence shall survive the Closing. In the event any Monetary Lien exists as of Closing which Sellers dispute, and the Title Company is agreeable to insuring over the same, Buyers shall be obligated to proceed to Closing and the terms of this Section 8.3(e) shall be deemed to be satisfied.

(f)     In the event that title to any of the Owned Real Property or the Insured Leases is not as provided for in this Agreement as of the Closing, Buyers shall proceed to Closing, in which event Sellers will remain liable, in accordance with Section 13.2, for any and all claims, losses, liabilities, damages, taxes, costs (including court costs and costs of appeal) and expenses (including reasonable attorneys' fees and fees of expert consultants and witnesses) that a Buyer Indemnified Party (as defined in Section 13.2) incurs as a result of or with respect to such failure of title, subject to the limitations of Section 13.3.

**8.4.     Actions/Proceedings.**  No action or proceeding before a court or any other Government Entity or body shall have been instituted or threatened to restrain or prohibit the transactions herein contemplated, and no Government Entity shall have taken any other action with respect to the Sellers, Assets or the System as a result of which Buyers reasonably and in good faith deem it impracticable to proceed with the transactions hereunder.

**8.5.     Adverse Change.**  Since the Execution Date, there shall not have occurred any event, change or occurrence that has or could reasonably be expected to have a Material Adverse Effect, and Sellers, collectively, shall not have suffered any change, loss or damage to the Assets or the System, whether or not covered by insurance, which would have a Material Adverse Effect.

**8.6.     Insolvency.**  Sellers, collectively, shall not (i) be in receivership or dissolution, (ii) have made any assignment for the benefit of creditors, (iii) have admitted in writing its inability to pay its debts as they mature, (iv) have been adjudicated a bankrupt, or (v) have filed a petition in voluntary bankruptcy, a petition or answer seeking reorganization, or an arrangement with creditors under the federal bankruptcy law or any other similar law or statute of the United States or any state, nor shall any such petition have been filed against Sellers.

**8.7.     Material Consents.**  Sellers shall have obtained all consents, waivers and estoppels of third parties, including in connection with assignment of certain Material Contracts and in connection with Buyers' acquisition of interests in for profit Affiliates, joint ventures or other affiliated organizations of Sellers pursuant to Section 1.1(o), that are material to the consummation of the transactions contemplated in this Agreement (collectively, the "Material Consents") as listed on Schedule 8.7. The Material Consents shall be in form and substance reasonably satisfactory to Buyers.

48

**8.8.    Vesting/Recordation.**  Sellers shall have furnished to Buyers, in form and substance reasonably satisfactory to Buyers, assignments or other instruments of transfer and consents and waivers by others, necessary or appropriate to transfer to and effectively vest in Buyers all right, title, and interest in and to the Assets, in proper statutory form for recording if such recording is necessary or appropriate.

**8.9.    Surveys and Reports.**  Promptly following the Execution Date, Buyers, in their discretion and at their sole cost, may commission from one or more reputable environmental consulting or engineering firms:   (i) a Phase II environmental sampling and analysis of environmental media at or beneath the Real Property, if deemed necessary or appropriate by Buyers based on the results of Buyers' Phase I environmental assessments; and/or (ii) an architectural and structural report on the Owned Real Property and the facilities situated thereon. The scope, findings and conclusions of such reports shall be reasonably satisfactory to Buyers.

**8.10.    Closing Deliveries.**  Sellers shall have made the deliveries required to be made by them under Section 3.2 hereof.

**8.11.    Satisfaction of Indebtedness.**  Sellers shall have paid off or otherwise satisfied as of Closing (including, as may be necessary, through payment of the Purchase Price at Closing) all indebtedness, including defeasance of any bonds, as is reasonably necessary for each Seller to convey its Assets to the appropriate Buyer free and clear of all claims, assessments, security interests, liens, restrictions and encumbrances of any kind, other than the Permitted Encumbrances and the Assumed Liabilities and/or as otherwise necessary to carry out the transactions contemplated hereby, and Sellers shall have delivered reasonable documentation thereof to Buyers as may be requested.

**8.12.    Pension Funding.**   Sellers shall have satisfied their Pension Plan Contribution funding obligations set forth in Section 2.4(b).

**8.13.    Delivery of Other Agreements.**  Sellers shall have executed and delivered all other agreements determined by Buyers to be reasonably necessary or appropriate to be entered into prior to the Closing to effect the transactions contemplated herein.

**9.    CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLERS.**

Notwithstanding anything herein to the contrary, the obligations of Sellers to consummate the transactions described herein are subject to the fulfillment by Buyers, on or prior to the Closing Date, of the following conditions precedent unless waived in writing by Sellers at or prior to the Closing:

**9.1.    Representations/Warranties.**   The representations and warranties of Buyers contained in this Agreement shall be true in all material respects when made and as of the Closing Date as though such representations and warranties had been made on and as of such Closing Date.  Each and all of the terms, covenants, and conditions of this Agreement to be complied with or performed by Buyers on or before the Closing Date pursuant to the terms hereof shall have been duly complied with and performed in all material respects.

49

**9.2.    Governmental Approvals.**  All material consents, authorizations, orders and approvals of (or filings or registrations with) any Government Entity or other Party required in connection with the execution, delivery and performance of this Agreement, as described in Section 7.1, shall have been obtained or made by Buyers when so required, except for any documents required to be filed, or consents, authorizations, orders or approvals required to be issued, after the Closing Date.

**9.3.    Actions/Proceedings.**  No action or proceeding before a court or any other Government Entity or body shall have been instituted or threatened to restrain or prohibit the transactions herein contemplated, and no Government Entity shall have taken any other action with respect to the Sellers, Assets or the System as a result of which Sellers reasonably and in good faith deem it impracticable to proceed with the transactions hereunder.

**9.4.    Insolvency.**  Buyers, collectively, shall not (i) be in receivership or dissolution, (ii) have made any assignment for the benefit of creditors, (iii) have admitted in writing its inability to pay its debts as they mature, (iv) have been adjudicated a bankrupt, or (v) have filed a petition in voluntary bankruptcy, a petition or answer seeking reorganization, or an arrangement with creditors under the federal bankruptcy law or any other similar law or statute of the United States or any state, nor shall any such petition have been filed against Buyers.

**9.5.    Closing Deliveries.**  Buyers shall have made the deliveries required to be made by them under Section 3.3 hereof.

## 10.    RESTRICTIVE COVENANTS.

**10.1.    Purchase Price Proceeds.**  As promptly as practicable after the Closing Date, Sellers shall, after reserving for and/or paying off Sellers' debt and other liabilities, transfer the net proceeds of the Purchase Price paid to Sellers and any other net cash or investment assets to the Foundation (the "Foundation Funds"). The term "Foundation Funds" shall include any return on the investment thereof. A detailed description of Sellers' proposed use of the Purchase Price proceeds and projected amount of Foundation Funds is set forth on Schedule 10.1 hereto.

**10.2.    Enforcement Authority; Annual Reports.**  For a period of ten (10) years after the Effective Time, Buyers shall develop and provide an annual report to the Foundation regarding progress in meeting its commitments and compliance with covenants as set forth in Sections 2.4 and 11.12 through 11.20 hereof, as applicable during such time period. Subject to limitations on remedies set forth in Section 14.21, Foundation shall have authority to enforce, on behalf of Sellers, all legal and equitable rights and remedies of Sellers against Buyer pursuant to this Agreement.

**10.3.    Non-Compete.**  The Sellers hereby covenant and agree that, at all times during the period of ten (10) years after the Effective Time, neither the Sellers nor any of their respective Affiliates shall, directly or indirectly, own, lease, manage, operate, control, or participate in any manner with the ownership, leasing, management, operation or control of any business which offers healthcare services in competition with the Buyers, including but not limited to any acute care hospital, specialty hospital, rehabilitation facility, diagnostic imaging

50

center, ambulatory or other type of surgery center, urgent care center, or physician clinic or physician medical practice (any of such uses being referred to herein as a "Competing Business"), within thirty-five (35) miles of any Hospital campus (the "Restricted Area"), without Buyers' prior written consent (which Buyers may withhold in their sole and absolute discretion); provided, however, that no Seller or any of their Affiliates will be precluded from (i) participating in community benefit activities that promote healthcare services for residents of the communities historically served by Sellers and their Affiliates, or (ii) providing financial support to or on behalf of uninsured or underinsured individuals in order for those individuals to access health care services (including from a Competing Business), so long as they do not provide financial support to another Competing Business within the Restricted Area.

**10.4.   Non-Solicitation.** The Sellers hereby covenant and agree that, at all times during the period of five (5) years after the Effective Time, neither the Seller nor any of their respective Affiliates shall, directly or indirectly, recruit or solicit for hire (other than through placing advertisements or job postings in print or electronic media of general circulation) any officers or executive management team members of any Buyer as listed on Schedule 10.4 ("Key Management Personnel") or otherwise encourage or induce any such Key Management Personnel to leave employment of Buyers, whether for business or other purposes, where such conduct or actions would have a reasonable likelihood of ending, curtailing, reducing or interfering with the business or other relationship between the Buyers and such Key Management Personnel.

**10.5.   Remedies.** In the event of Seller's breach of this Article 10, Sellers recognize that monetary damages shall be inadequate to compensate Buyers and Buyers shall be entitled, without the posting of a bond or similar security, to an injunction restraining such breach, with the reasonable costs (including reasonable attorneys' fees) of securing such injunction to be borne by the breaching Seller or Affiliate. Nothing contained herein shall be construed as prohibiting Buyers from pursuing any other remedy available to it for such breach or threatened breach.   All Parties hereto hereby acknowledge the necessity of protection against the competition of Sellers and their Affiliates and that the nature and scope of such protection under this Article 10 has been carefully considered by the Parties. Sellers further acknowledge and agree that the covenants and provisions of this Article 10 form part of the consideration under this Agreement and are among the inducements for Buyers entering into and consummating the transactions contemplated herein. The period provided, activities restricted and the area covered are expressly represented and agreed to be fair, reasonable and necessary. The consideration provided for herein is deemed to be sufficient and adequate to compensate for agreeing to the restrictions contained in this Article 10. If, however, any court determines that the foregoing restrictions are not reasonable, such restrictions shall be modified, rewritten or interpreted to include as much of their nature and scope as will render them enforceable.

## 11.   ADDITIONAL COVENANTS AND AGREEMENTS.

**11.1.   Supplement to Schedules.** From time to time prior to the Closing Date, the Parties shall supplement or amend with reasonable frequency, or promptly following the reasonable request of the other Party, the information contained in their respective disclosure schedules with respect to any material matter arising after the Execution Date, which, if existing

51

or occurring on the Execution Date, would have been required to be set forth or described in any disclosure schedule; provided, however, that no such supplement or amendment by a Party shall be deemed to modify its disclosure schedules for the purpose of, as the case may be, (i) certifying the accuracy of any representation or warranty made by Sellers in this Agreement or in the Officer's Certificates under Section 3.2(k) hereof, (ii) determining whether any of the conditions set forth in Article 8 or Article 9 hereof have been satisfied, (iii) indemnification in Article 13 hereof, and (iv) increasing the liabilities or obligations of Buyers. In the event that a Party supplements or amends the information contained in one or more of its disclosure schedules prior to Closing, the other Party may supplement or amend its schedules as it deems reasonably necessary with respect thereto (e.g., if Sellers add contracts requiring consent to their list of Material Contracts on, or referenced on, Schedule 4.19 prior to Closing, Buyers may, in their discretion, supplement or amend their list of Material Consents on Schedule 8.7 to add one or more of such contracts).

**11.2. Termination Prior to Closing.** Notwithstanding anything herein to the contrary, this Agreement may be terminated at any time:

(a) on or prior to the Closing Date by mutual written agreement of Sellers and Buyers;

(b) on or prior to the Closing Date by Buyers following ten (10) days written notice, if satisfaction of any condition to Buyers' obligations under Section 7 of this Agreement becomes impossible or impractical with the use of commercially reasonable efforts (unless the failure results primarily from one or more Buyers materially breaching any representation, warranty, or covenant herein) and such condition shall not have been waived by Buyers;

(c) on or prior to the Closing Date by Sellers following ten (10) days written notice, if satisfaction of any condition to Sellers' obligations under Section 8 of this Agreement becomes impossible or impractical with the use of commercially reasonable efforts (unless the failure results primarily from one or more Sellers materially breaching any representation, warranty, or covenant herein) and such condition shall not have been waived by Sellers;

(d) by Buyers or Sellers if the Closing Date shall not have taken place on or before September 30, 2016 (which date may be extended by mutual agreement of Buyers and Sellers and which date may be extended by Buyers by up to ninety (90) days in the event that the documentation and approvals required by Section 8.2 have not yet been provided); provided that the right to terminate this Agreement under this Section 11.2(d) shall not be available to any Party if the failure of the Closing to take place by September 30, 2016 (as may be extended) results primarily from such Party's (or such Party's Affiliates) breach of any representation, warranty or covenant herein;

(e) by Sellers upon thirty (30) days' prior written notice if Buyers have a change of control where more than fifty percent (50%) of Buyers' outstanding equity interest, or substantially all of Buyers' assets, are to be transferred to a third party, but only if such third party transferee is, or is owned or controlled by, a health system or health plan whose principal business is operating hospitals or health systems, provided that, in addition to Sellers' right to

52

terminate pursuant to this Section, Buyers shall also pay to Sellers Five Hundred Thousand Dollars ($500,000.00), as liquated damages, to cover the estimated costs incurred in connection with the Transaction ("Liquidated Damages") with Buyers and Sellers acknowledging that the Liquidated Damages set forth herein are not intended to be a penalty and have been determined to be a reasonable and good faith estimate of the probable loss and costs suffered by Sellers if this Agreement is terminated by Sellers as a result of such a change of control; for the avoidance of doubt and without limiting the generality of the foregoing, acquisition by a private equity firm or other investment firm of more than fifty percent (50%) of the outstanding voting equity interests of Buyers, or substantially all of the assets of Buyers, shall not be considered a change of control triggering Sellers' termination rights and rights to Liquidated Damages under this Section 11.2(e), even if such firm has investments in other health systems or health plans; or

(f)     by Buyers immediately upon written notice to Sellers, if all of the conditions to Buyers' and Sellers' obligations to close as set forth in Article 8 and Article 9 have been satisfied or waived except that Buyers, as of the Closing Date, are unable to pay, or otherwise fail to pay, despite commercially reasonable efforts to obtain financing on terms and conditions that are acceptable to Buyers, in their sole discretion, in accordance with Section 2.1(a) and Section 3.3(a), in immediately available funds an amount equal to the Estimated Purchase Price (a "Financing Failure"). If Buyers terminate this Agreement in accordance with this Section 11.2(f) or for any other reason as a result of a Financing Failure, PMH shall pay to Crozer, by no later than three (3) business days following the date of termination, an amount equal to Three Million Dollars ($3,000,000.00) (the "Termination Payment"). The Termination Payment shall be secured by a letter of credit issued by City National Bank no later than five (5) business days after the execution of this Agreement and PMH shall take all reasonably necessary steps to allow Crozer to draw upon such letter of credit by no later than the fourth (4th) business day following termination of the Agreement pursuant to this Section 11.2(f) if the Termination Payment has not been previously paid by PMH. Termination under this Section 11.2(f) and receipt of the Termination Payment shall represent the sole and exclusive legal and/or equitable remedy available to Sellers under this Agreement, or otherwise, with respect to or otherwise on account of a Financing Failure (which includes, among other situations, any breach of, inaccuracy with respect to, default under or failure to satisfy or fulfill any covenant, obligation, representation, condition or warranty under the Agreement with respect to or otherwise on account of a Financing Failure) and Buyers (including PMH) shall be released by Sellers from any and all claims related to such Financing Failure upon receipt of the Termination Payment.

If this Agreement is terminated pursuant to this Section 11.2, this Agreement shall be null and void and all rights and obligations of Sellers and Buyers hereunder shall terminate without any liability of any Party to any other Party, except that with respect to a termination of this Agreement under Sections 11.2(a), (b) or (c), nothing herein shall prevent any Party from pursuing any of its legal rights or remedies that may be granted to any Party(ies) by law against the other Party(ies) to this Agreement as a result of any default by the other Party(ies) in the observance or in the due and timely performance of such Party(ies) of any of the covenants herein contained.

**11.3. Post-Closing Access to Information.** Sellers and Buyers acknowledge that subsequent to Closing each Party may need access to information or documents (including but not limited to personnel files included in the definition of Assets above) in the control or possession of the other Party(ies) for the purposes of, without limitation, concluding the transactions herein contemplated, audits, compliance with governmental requirements and regulations, and the prosecution or defense of third party claims. Accordingly, Sellers and Buyers agree that for a period of seven (7) years after Closing, each will make reasonably available to the other's agents, independent auditors, counsel, and/or governmental agencies upon written request and at the expense of the requesting Party such documents and information as may be available relating to the Assets and the System for periods prior and subsequent to Closing to the extent necessary to facilitate, without limitation, concluding the transactions herein contemplated, audits, compliance with governmental requirements and regulations, and the prosecution or defense of claims.

**11.4. Preservation and Access to Records after the Closing.** After the Closing, Buyers shall, in the ordinary course of business and as required by law, keep and preserve in their original form all Records of the System and Assets existing as of the Closing, and which constitute a part of the Assets delivered to Buyers at the Closing. Buyers acknowledge that as a result of entering into this Agreement and operating the System they will gain access to patient and other information which is subject to rules and regulations regarding confidentiality. Buyers agree to abide by any such rules and regulations relating to the confidential information it acquires. Buyers agree to maintain the Patient Records delivered to Buyers at Closing within the System after Closing in accordance with applicable law (including, if applicable, Section 1861(v)(i)(I) of the Social Security Act (42 U.S.C. § 1395(v)(I)(i)), the privacy requirements of the Administrative Simplification subtitle of HIPAA and applicable state requirements with respect to medical privacy and requirements of relevant insurance carriers, all in a manner consistent with the maintenance of patient records generated within the Buyers' system after Closing. Upon reasonable notice, during normal business hours, at the sole cost and expense of Sellers and upon Buyers' receipt of appropriate consents and authorizations, Buyers will afford to the representatives of Sellers, including their counsel and accountants, full and complete access to, and copies of, the Records transferred to Buyers at the Closing (including access to Patient Records in respect of patients treated by Sellers within the System). Upon reasonable notice, during normal business hours and at the sole cost and expense of Sellers, Buyers shall also make their officers and employees available to Sellers at reasonable times and places after the Closing. In addition, Sellers shall be entitled, at Sellers' sole risk, to remove any such Patient Records from Sellers' facilities, but only for purposes of pending litigation involving a patient to whom such records refer, as certified in writing prior to removal by counsel retained by Sellers in connection with such litigation and only upon Buyers' receipt of appropriate consents and authorizations; provided that if the litigation is brought by or on behalf of the patient to whom the records relate, such patient shall be deemed to have consented to disclosure and use in accordance with this Section. Any Patient Record so removed from the System shall be promptly returned to Buyers following its use by Sellers. Any access to the System , the Records or Buyers' personnel granted to Sellers in this Agreement shall be upon the condition that any such access not materially interfere with the business operations of Buyers.

54

**11.5.   Tax and Medicare Effect.**  None of the Parties (nor such Parties' counsel or accountants) has made or is making any representations to any other Party (nor such Party's counsel or accountants) concerning any of the tax, Medicare, Medicaid or other reimbursement effects of the transactions provided for in this Agreement as each Party hereto represents that each has obtained, or may obtain, independent tax, Medicare, Medicaid and reimbursement advice with respect thereto and upon which it, if so obtained, has solely relied.

**11.6.   Reproduction of Documents.**  This Agreement and all documents relating hereto, including:  (a) consents, waivers and modifications which may hereafter be executed, (b) the documents delivered at the Closing, and (c) financial statements, certificates and other information previously or hereafter furnished to Sellers or to Buyers, may, subject to the provisions of Article 12 hereof, be reproduced by Sellers and by Buyers by any photographic, photostatic, microfilm, micro-card, miniature photographic or other similar process and Sellers and Buyers may destroy any original documents so reproduced.  Sellers and Buyers agree and stipulate that any such reproduction shall be admissible in evidence as the original itself in any judicial, arbitral or administrative proceeding (whether or not the original is in existence and whether or not such reproduction was made by the Sellers or Buyers in the regular course of business) and that any enlargement, facsimile or further reproduction of such reproduction shall likewise be admissible in evidence.

**11.7.   Cooperation on Tax Matters.**  Following the Closing, the Parties shall cooperate fully with each other and shall make available to the other, as reasonably requested and at the expense of the requesting Party, and to any taxing authority, all information, records or documents relating to tax liabilities or potential tax liabilities of Sellers or Buyers and any information which may be relevant to determining the amount payable under this Agreement, and shall preserve all such information, records and documents (to the extent a part of the Assets delivered to Buyers at Closing) at least until the expiration of any applicable statute of limitations or extensions thereof.

**11.8.   Cost Reports.**  As set forth in more detail in the Transition Services Agreement, Sellers, at their expense, shall prepare and timely file all terminating and other cost reports required or permitted by law to be filed under the Medicare and Medicaid or other third party payor programs and the State Health Agency for periods ending on or prior to the Effective Time, or as a result of the consummation of the transactions described herein ("Sellers Cost Reports").  Buyers shall forward to Sellers any and all correspondence relating to Sellers Cost Reports within fifteen (15) business days after receipt by Buyers.  Sellers shall remit to Buyers any receipts of funds relating to Sellers Cost Reports within fifteen (15) business days after receipt by Sellers.  Buyers shall receive all rights to Sellers Cost Reports for any amounts receivable and assume all liabilities with respect to Sellers Cost Reports for any amounts payable, in respect of such reports or reserves relating to such reports, without limiting any of Buyers' rights or remedies hereunder.  To the extent assignable and transferrable, Buyers' rights shall include the right to appeal any Medicare or Medicaid determinations relating to Sellers Cost Reports.  Sellers shall retain the originals of Sellers Cost Reports, correspondence, work papers and other documents relating to the Sellers Cost Reports.  Sellers shall furnish copies of such cost reports, correspondence, work papers and other documents to Buyers upon request.

**11.9.   Misdirected Payments, Etc.**  Sellers and Buyers covenant and agree to remit, with reasonable promptness, to the other any payments received, which payments are on or in respect of accounts or notes receivable owned by (or are otherwise payable to) the other (including any incentive payments, Meaningful Use funds, etc.) pursuant to the terms hereof.  In addition, and without limitation, in the event of a determination by any governmental or third-party payor that payments to the Sellers resulted in an overpayment or other determination that funds previously paid by any program or plan to the Sellers must be repaid, Sellers shall be responsible for repayment of said monies (or defense of such actions) if such overpayment or other repayment determination was for services rendered prior to the Effective Time and Buyers shall be responsible for repayment of said monies (or defense of such actions) if such overpayment or other repayment determination was for services rendered after the Effective Time.  In the event that, following the Closing, Buyers suffer any offsets against reimbursement under any third-party payor or reimbursement programs due to Buyers relating to amounts owing under any such programs by Sellers, Sellers shall, within five (5) business days following demand from Buyers, pay to Buyers the amounts so billed or offset.  These obligations shall be in addition to any other remedies available herein.

**11.10.   Employee Matters.**

(a)   As of the Closing Date, Sellers shall terminate all of their respective employees and Buyers shall offer to hire all active employees of such Sellers who are in good standing as of the Effective Time (including the management team) (the "Hired Employees") in positions and at compensation levels and health and welfare benefit levels substantially similar to those being provided by Sellers as of the Closing Date, subject to the standard pre-employment screening process conducted by Buyers and their Affiliates.  For purposes of this subsection, "active" employees shall mean those individuals on the employment rolls who are reporting to and attending work on a regular basis and shall also mean: (i) employees who are on maternity or paternity leave and are entitled to reemployment rights under applicable law, (ii) employees who are on leave pursuant to the Family and Medical Leave Act and are entitled to reemployment rights under such law, and (iii) employees who are on leave due to service in the uniformed services pursuant to the Uniform Services Employment and Reemployment Rights Act of 1994 and are entitled to reemployment rights under such law.  An employee in "good standing" shall mean an employee who Seller indicates is not suspended according to Sellers' policies as of the Closing Date.  Individuals who are not active employees due to long-term or short-term disability, workers compensation or other leaves of absence not mentioned herein shall not be an "active" employee until such time when they notify Sellers they are ready and meet all requirements for reporting to work, at which time Sellers will notify Buyer and Buyer then will consider them for employment as an active employee of Seller.  Notwithstanding the foregoing, Buyers reserve the right not to hire or continue the employment of any individual employee for cause (*i.e.*, with a legitimate reason with respect to such employee's job performance or conduct) or based on staffing considerations, upon reasonable advance notice to Sellers (if prior to the Closing) and the employee.  Nothing herein shall be deemed to affect or limit in any way normal management prerogatives of Buyers with respect to employees or to create or grant to any such employees third-party beneficiary rights or claims of any kind or nature.  Within the period of ninety (90) days before the Closing, Sellers shall not take any action

56

that would result in WARN Act liability with respect to employees of the System. With respect to terminations of employees following the Closing, Buyers shall be responsible for any notification required under the WARN Act. In respect of the Hired Employees, Buyers shall provide such employees with employee benefits as described in Schedule 11.10(a), provided, however, that for the remainder of the 2016 calendar year following the Closing Date, the health and welfare benefits levels shall be substantially similar to those benefits levels provided by Sellers as of the Closing Date. Buyers shall recognize the existing seniority and service credit with Sellers of all Hired Employees for benefits purposes in Buyers' retirement plans and shall provide credit under such plans for purposes of determining eligibility and vesting and the rate of benefit accrual (but not actual benefit accrual); provided, however, that no such credit need be given in respect of any new plan commenced or participated in by Buyers in which no prior service credit is given or recognized to or for other similarly-situated plan participants. In providing benefits to Hired Employees under Buyers' welfare benefit plans, Buyers welfare benefit plans shall waive pre-existing conditions limitations, waiting periods, evidence of insurability or other exclusions or limitations in Buyers' welfare benefit plans which might otherwise apply to such Hired Employees and shall recognize the existing seniority and service credit with Sellers of all such Hired Employees to provide credit under such plans for the purpose of determining eligibility, except to the extent such Hired Employees have not satisfied such limitations under the current welfare benefit plans of Sellers or such waiver of pre-existing conditions is requested of an insurer, but after diligent pursuit is not permitted under one or more of Buyers' short-term or long-term disability plans provided through insurance contracts or policies. Buyers shall give all Hired Employees credit for their years of service with Sellers for the purpose of determining benefits under Buyers' vacation, sick pay and other paid-time-off programs.

(b)     Buyers shall give credit to all Hired Employees for their actual accumulated and unused paid time off hours to the extent included in the calculation of Net Working Capital. Buyers shall also give credit to all Hired Employees for their actual and unused sick time hours for each Hired Employee. Such amounts shall not otherwise be subject to reduction, offset, or any other limitation under Buyers' sick time benefits policies and procedures.

**11.11. Transition Services.** Pursuant to the terms and conditions of the Transition Services Agreement attached hereto as Exhibit I, following the Closing, the Buyers shall provide Sellers with certain specified items and services as reasonably necessary to assist Sellers in transitioning ownership and operation of the System and Assets and winding down operations, all upon reasonable and customary terms mutually agreed upon by the Parties.

**11.12. Local Advisory Board.** Buyers and Sellers shall establish and appoint a local advisory board (the "Advisory Board") to ensure ongoing, meaningful input from local community and physician leaders with respect to the System. The Advisory Board shall be comprised of nine (9) individuals, including local community and physician leaders, four (4) of whom shall be appointed by Crozer's Board of Directors subject to Buyers' prior approval, which approval shall not be unreasonably withheld, and four (4) of whom shall be appointed by Buyers, with the remaining member selected by the Foundation from among its Board of

57

Directors to serve as a voting *ex-officio* member. The Advisory Board shall be self-perpetuating with annual elections conducted by the then current Advisory Board members on a staggered basis such that roughly one-third (1/3) of the members are subject to election each year, with the exception of the slot for the Foundation board member, who shall be selected and appointed by the Foundation from time to time, provided that, at all times: (i) at least fifty percent (50%) of the members shall be physicians on the active Medical Staff of one or more of Buyers' Hospitals; and (ii) the Advisory Board members shall reasonably attempt to maintain the same member composition and representation described above. For as long as Buyers own and operate one or more of the Hospitals, the Advisory Board shall meet on a regular basis and have the following responsibilities, all of which shall be advisory in nature and not binding with respect to Buyers: (a) make recommendations and suggestions with respect to medical staff credentialing; (b) provide input on policies and clinical programs; (c) provide input in the development and review of strategic plans; (d) provide input on operating and capital budgets; (e) provide input and support physician recruitment efforts; (f) provide input on succession plans for executive leadership at the Hospitals; (g) promote community health initiatives; and (h) monitor the commitment to maintain and improve quality indicators. The initial list of Advisory Board members (with their initial staggered terms) and the charter for the Advisory Board are attached as Exhibit J hereto prior to the Closing Date.

**11.13. Financial Assistance Policies.** For a period of at least five (5) years after the Effective Time, Buyers shall: (a) adopt and maintain Sellers' charity care policies for the treatment and financial assistance of indigent patients of the Hospitals in accordance with applicable law; (b) cause the Hospitals to treat any patient presented to the emergency room who has a medical emergency or who, in the judgment of a staff physician, has an immediate emergency need; (c) not turn away any such patient on account of age, race, gender or inability to pay; and (d) cause the Hospitals to continue to provide medically necessary services to patients in the communities served by Sellers, including those unable to pay for emergent and/or medically necessary care, subject to Sellers' charity care policies. This covenant shall be subject in all respects to changes in governmental policy.

**11.14. Community Benefit, Education Programs and Affiliations.** For as long as Buyers own and operate one or more of the Hospitals, Buyers shall: (a) support the health and well-being of residents in the communities served by Sellers through wellness, health education and other community programs; (b) maintain Sellers' graduate medical education programs in existence as of the Closing provided that there are no material changes in the reimbursement or clinical requirements for such programs; and (c) maintain a strategic alignment with ChesPenn Health Services, Inc., which operates a federally qualified health center, in order to continue providing critical primary care access to underserved and low socioeconomic, at-risk populations in the communities served by Sellers, on commercially reasonable terms mutually agreed upon by the Parties and generally consistent with the pre-Closing relationship with Sellers.

**11.15. Availability of Services.** Buyers shall: (a) for as long as Buyers own and operate one or more of the Hospitals, use commercially reasonable efforts to ensure that residents of Delaware County, Pennsylvania have access to a full range of healthcare services including primary, secondary and tertiary care, specialty and hospital-based services, and emergency and

58

urgent care facilities necessary to support the needs of the community; and (b) for a period of at least five (5) years after the Effective Time, Buyers shall preserve key service lines within the System, including women's services (including obstetrics and neonatal intensive care services), behavioral health, pediatrics, trauma (including burn), and emergency medicine, with a further commitment to maintain Emergency Access Points in the communities served as of the Closing Date. Buyers further agree to consult with the Advisory Board in advance of any significant changes in such services listed in subsection (b) above after the five (5) year period after the Effective Time.

**11.16. Future Sale or Closing.** For a period of ten (10) years after the Effective Time, Buyers shall not sell or close any of the licensed Hospitals, including any campus of a licensed Hospital providing inpatient acute care services as of the Effective Time, acquired as part of the transactions contemplated hereby unless consented to by the Advisory Board and the Foundation in advance. Notwithstanding anything herein to the contrary, the prohibition of this Section 11.16 shall not apply to:  (a) any sale or closure required by a Government Entity; (b) any merger, sale or other transaction that does not relate solely or principally to the Assets purchased pursuant to this Agreement; or (c) any corporate-level transactions involving Buyer's stock or securities, including macro-level mergers, recapitalizations or reorganizations or other changes of control of PMH or its parent. In the event of any transactions described in subsections (b) and (c) above, or any other change in control of Buyers after the Effective Time, any successor shall be required to comply with, and shall be bound by, the post-closing covenants and other obligations of Buyers as set forth in this Agreement.

**11.17. Capital Expenditures.** During the first five (5) years following the Effective Time, Buyers shall invest, or enter into binding commitments to invest, at least One Hundred Million Dollars ($100,000,000.00) for routine capital needs of the System and an additional One Hundred Million Dollars ($100,000,000.00) for strategic capital needs of the System, including expenditures in connection with Sellers' current construction project involving an ambulatory care center in Broomall, Pennsylvania, which project is in process as of the Execution Date and the expenditures associated therewith are currently estimated to be about Twelve Million Dollars ($12,000,000.00). As used in this Section 11.17, "capital needs" shall include new equipment, equipment replacement, facility renovations, new facilities, medical office space, development of new services, information systems, physician recruitment, physician practice acquisitions, and other capital improvements, including commitments incurred pursuant to operating or capital/financing leases, or other off balance sheet financing mechanisms.

**11.18. Strategic Planning.** As soon as possible following the Effective Time, Buyers shall commence a strategic planning process (the "Strategic Planning Process"), which shall be led by Buyers' local management team. The Strategic Planning Process shall provide for the evaluation of market data and projections, current and proposed regulatory environments, operational and financial requirements, and capital expenditures models in the markets in which Sellers operated to best determine the use of the Buyers' invested capital pursuant to Section 11.17. Without limiting the generality of the foregoing, within twelve (12) months of the Effective Time, as part of the Strategic Planning Process, Buyers shall specifically review the potential expanded strategic development on the Springfield Hospital campus.

**11.19. Branding and Identity.** For as long as Buyers own and operate one or more of the Hospitals, Hospitals and other provider organizations within the System shall retain their trade names as utilized immediately prior to the Effective Time. For a period of five (5) years after Closing, Buyers, with the approval of the Advisory Board and the Foundation, may choose to append to, or include in Hospitals' or System's trade name in use immediately prior to the Effective Time one or more of Buyers', or Buyers Affiliates', existing corporate or trade names. For a period of five (5) years after the Effective Time, Buyers shall not approve or adopt any branding plan, or materially modify any trade name usage, with respect to the Hospitals and other provider organizations within the System without the prior approval of the Advisory Board, as well as, in the case of branding plans, the prior approval of the Foundation.

**11.20. Corporate Functions and Services.** Promptly after the Effective Time, Buyers shall provide the acquired System with full and complete corporate support from PMH and its Affiliates with respect to the following: (a) comprehensive support and back office services, as more fully described in Schedule 11.20(a); (b) comprehensive physician infrastructure and alignment services, including the Coordinated Regional Care ("CRC") model; (c) expertise in operational efficiencies; (d) inclusion in Prospect's group purchasing organization ("GPO") arrangements; (e) programs, services and infrastructure that support the transition and advancement towards value-based care (*e.g.*, ACO's) and population health management; and (f) quality and patient safety programs and infrastructure.

**11.21. Medical Staff and Physicians.** As a result of the acquisition of the Assets by Buyers, there will be no change or modification to the current staff privileges for physicians on the medical staff of the Hospitals who are in good standing. Buyers shall adopt the current medical staff bylaws of the Hospitals as of the Effective Time. Buyers shall maintain open medical staffs at the Hospitals, except with respect to existing closed departments thereof listed on Schedule 11.21, and Buyers shall continue to work collaboratively with independent physicians. All agreements between Sellers and physicians, including employment agreements, shall be included in the Contracts to be assigned to and assumed by Buyers to the extent assignable and assumable by the terms of such contracts and under applicable law; provided however, that Buyers may elect not to assume any of such agreements on reasonable notice to Sellers prior to Closing should Buyers reasonably determine, based on Buyers' review of applicable federal or state laws or regulations, that assumption thereof would be in violation of such applicable federal or state laws or regulations. Following the Closing, Buyers shall generally make available to the employed and medical staff physicians such physician resources, expertise, intellectual capital, entities and associated operational support functions as generally available to Buyers' Affiliates.

**11.22. Quality Reporting.** Sellers shall submit all quality data required under the Quality Programs to CMS or its agents, and all quality data required under ORYX to The Joint Commission, for any reporting period with reporting deadlines between the date of this Agreement and the Effective Time. If a reporting period ends prior to the Effective Time, but the reporting deadline for such reporting period ends after the Effective Time, Sellers shall prepare and submit the quality data for the System required under the Quality Programs and ORYX in accordance with applicable filing deadlines and in the form and manner required by

60

CMS and The Joint Commission, respectively, or, at the sole option of Buyers, Sellers shall transmit such quality data to Buyers in a form mutually agreeable to Buyers and Sellers or allow Buyers access to such data, to enable Buyers to submit quality data for the System required under the Quality Programs and ORYX for such reporting period. If the Effective Time falls between the first and last day of a reporting period, Sellers shall cooperate with Buyers to ensure that all quality data required to be submitted for the System under the Quality Programs and ORYX for the portion of the reporting period during which Sellers owned the System  can be aggregated with the quality data for the portion of the reporting period during which Buyers owned the System, to enable Buyers and/or Sellers to submit the quality data for the System required under the Quality Programs and ORYX in accordance with applicable filing deadlines and in the form and manner required by CMS and The Joint Commission, respectively.

**11.23.  Continuation of Insurance.** Except as otherwise provided in this Section 11.23, from and after the date of this Agreement through:  (a) a date that is at least seven (7) years from the Effective Time for claims-made policies, whether through the purchase of an extended reporting endorsement/"tail" coverage or otherwise; and (b) the Effective Time for occurrence-based policies, Sellers shall, at their sole cost and expense, maintain in effect without material modification, all existing insurance coverage in effect as of the date hereof other than: (i) professional liability insurance for each of the Hospitals and Sellers' other institutional health care providers in the System, as well as for all employed physicians and other health care professional employees of Sellers for any claims related to the period prior to the Effective Time; and (ii) comprehensive general liability insurance and cybersecurity insurance with respect to Sellers' potential liability for any acts, omissions, events, claims or occurrences arising out of or otherwise related to the System, the Assets, Sellers' employees or the Sellers generally prior to the Effective Time, all to the extent such excepted liabilities remain insured through Cassatt and/or its Affiliates or otherwise as specified below. The insurance described above shall have coverage levels equal to the levels maintained by Sellers immediately prior to Closing. Sellers shall provide Buyers with at least thirty (30) days prior written notice of the cancellation, reduction or termination of any such insurance coverage. For a period of at least seven (7) years from the Effective Time, Buyers, through Cassatt and/or its Affiliates or otherwise, shall maintain claims-made policies, with coverage for "prior acts," for professional liability and comprehensive general liability insurance and cybersecurity insurance set forth in subsections (b)(i) and (b)(ii) above at coverage levels equal to the levels maintained by Sellers immediately prior to Closing.

**11.24.  Cooperation on Payor Matters.**  Following the Closing, the Sellers shall cooperate with Buyers and afford Buyers the opportunity to reasonably participate in any third party payor settlement and/or audit proceedings involving Sellers and/or pre-closing operation of the System, including, without limitation, matters and proceedings related to Medicare, Medicaid and CHAMPUS/TRICARE cost reports and CMS Recovery Audit Contractor appeals or other billing and/or compliance matters involving other audit/review agencies and organizations. Sellers shall not settle any claim, audit, proceeding or investigation concerning billing and/or compliance matters without the prior written consent of Buyers to the extent the terms of such settlement impose any obligations or restrictions on Buyers.

**11.25. Section 4204 Sale of Assets.** Buyers and Sellers each desire to have the withdrawal liability exclusions of Section 4204 of ERISA apply to the sale of assets under this Agreement. As a condition of the Agreement and according to the terms of Section 4204 ERISA, Buyer has agreed to contribute to the Pension Fund of Hospital and Healthcare Employees of Philadelphia and Vicinity (the "Pension Fund") for substantially the same number of contribution base units for which Sellers were obligated prior to the Closing Date of the Agreement. Sellers agree to be secondarily liable for any unpaid portion of withdrawal liability to such Pension Fund that Buyer may incur in the five year period following the Closing Date. In the event of Sellers' distribution of assets or liquidation, then to the extent required in Section 4204(a)(3) of ERISA, Sellers shall provide a bond or an amount in escrow equal to the present value amount of the potential withdrawal liability owed to the Pension Fund, determined as of the Closing Date of the Agreement. If it should be required by the Pension Fund or otherwise necessary in order to meet the requirements of Section 4204 of ERISA, Buyers shall post a bond or place an amount in escrow equal to the amount determined under Section 4204(a)(1)(B) of ERISA or request a variance of such amount from the Pension Fund on or before the Closing Date. Pursuant to the terms of this Section 11.25 of the Agreement, the parties acknowledge that the Pension Fund must first approve any variance requests, and any bonding or escrow arrangements entered into by the parties hereto. Buyers and Sellers, through their appropriate officers and employee representatives, shall take any and all actions necessary and appropriate to fulfill the spirit of this Section 11.25; to ensure that the requirements of ERISA Section 4204 are met; and to make certain that the sale of assets hereunder does not trigger an assessment of current withdrawal liability against the Sellers by the Pension Fund. These actions include, but shall not be limited to, taking any steps necessary and appropriate to timely meet the bonding, escrow and/or variance requirements under ERISA Section 4204 and obtaining any necessary approvals from the Pension Fund.

**11.26. Environmental Matters.** Sellers acknowledge that they are responsible for an ongoing investigation and remediation of an oil discharge at the CCMC property, which discharge has also caused and continues to cause an oil discharge to Ship Creek adjacent the CCMC property. For purposes of this Section 11.256, the presence of petroleum hydrocarbons in soil and/or groundwater at the CCMC property at such concentrations or under such conditions as to require a responsive action under applicable Environmental Laws is hereinafter referred to as the "Ship Creek Discharge." Sellers are conducting the investigation and remediation of the Ship Creek Discharge in consultation with the Pennsylvania Department of Environmental Protection ("PaDEP"). With respect to the Ship Creek Discharge, Sellers agree:

(a)     Sellers' liability to perform an investigation and/or remediation of the Ship Creek Discharge is an Excluded Liability pursuant to Section 1.4(n);

(b)     From and after the Closing Date, Sellers shall promptly undertake and diligently pursue, at Sellers' sole cost and expense, an investigation and remediation of the Ship Creek Discharge in accordance with all applicable laws, including Environmental Laws, and to obtain the cleanup liability protection afforded under Section 501 of the Land Recycling and Environmental Remediation Standards Act ("Act 2"), 35 P.S. § 6026.501, for the Ship Creek Discharge in all affected environmental media. In connection with the performance of the

62

Sellers' obligations under this Section 11.26; Buyers, Sellers agree that the Sellers may demonstrate attainment with a remediation standard consistent with the use of the CCMC property for non-residential purposes in accordance with Act 2. The Sellers shall not rely on any activity and use limitations to attain or maintain the cleanup standard without the prior written consent of Buyers, which consent shall be at Buyers' sole discretion. Sellers shall use reasonable efforts to perform their obligations under this Section 11.26 in a manner so as to minimize disruption to Buyers' business operations at the CCMC property, and (ii) coordinate with Buyers, including, without limitation, providing Buyers with reasonable advance notice of upcoming remedial activities, so that disruptions to Buyers' business operations at the CCMC property are minimized.

(c)     Sellers shall have an ongoing duty to keep Buyers reasonably informed as to the progress of Sellers' performance of their obligations under this Section 11.26 and Sellers shall: (i) provide to Buyers a final draft of any environmental reports or substantive documents that refer or relate to the Ship Creek Discharge and provide to Buyers a meaningful opportunity to review and comment on such documents before they are submitted to the PaDEP; (ii) consider Buyers' comments in good faith; (iii) provide Buyers with a complete copy of any environmental reports or substantive documents submitted to the PaDEP, concurrently with their submittal to the PaDEP; and (iv) promptly provide Buyers with a complete copy of any correspondence received from the PaDEP that refers or relates to the Ship Creek Discharge or Sellers' performance of their obligations under this Section 11.25 .

(d)     Promptly following Sellers' receipt of PaDEP approval of a Final Report for the Ship Creek Discharge in accordance with Act 2, Sellers shall, at their sole cost and expense, promptly decommission, close and/or otherwise remove from the CCMC property (as the case may be) all monitoring wells and remedial equipment (if any) installed as part of the investigation and/or remediation of the Ship Creek Discharge in accordance with all applicable laws and restore the surface of the areas affected by such decommissioning, closure and/or removal.

(e)     The provisions of this Section 11.25 shall survive the Closing of the transactions contemplated herein.

12.     CONFIDENTIALITY.

12.1.   Confidential Information.   It is understood by the Parties hereto that the information, documents, and instruments delivered to Buyers or Sellers and their agents and the information, documents, and instruments delivered to Sellers by Buyers and their agents, as well as the terms and conditions of this Agreement, are of a confidential and proprietary nature (the "Confidential Information"). Each of the Parties hereto agrees that both prior and subsequent to the Closing it will maintain the strict confidentiality of all such Confidential Information and will only use such Confidential Information in connection with the negotiation of this Agreement or in compliance with the terms, conditions, and covenants hereof and will only disclose such Confidential Information to its duly authorized officers, members, directors, representatives, and agents (including consultants, attorneys, and accountants of each Party) and applicable Government Entities in connection with any required notification or application for approval or

63

exemption therefrom. Each of the Parties hereto further agrees that if the transactions contemplated hereby are not consummated, upon written request, it will return all such documents and instruments and all copies thereof in its possession to the other Parties to this Agreement. Each of the Parties hereto recognizes that any breach of this Section 12.1 would result in irreparable harm to the other Parties to this Agreement and their Affiliates and that therefore either Sellers or Buyers shall be entitled to an injunction to prohibit any such breach or anticipated breach, without the necessity of posting a bond, cash, or otherwise, in addition to all of their other legal and equitable remedies. Nothing in this Section 12.1, however, shall prohibit the use of such Confidential Information for such governmental filings as in the opinion of Sellers' counsel or Buyers' counsel are required by law or governmental regulations or are otherwise required to be disclosed pursuant to applicable state law. The Mutual Nondisclosure and Confidentiality Agreement, dated November 12, 2014, between the Parties shall remain in full force and effect.

   **12.2. Public Announcements.** No Party hereto shall prior to Closing release, publish, or otherwise make available to the public in any manner whatsoever any information or announcement regarding the transactions herein contemplated without the prior written consent of the signatories to this Agreement, except for information and filings reasonably necessary to be directed to Government Entities to fully and lawfully effect the transactions herein contemplated or required in connection with securities and other laws.

## 13.   INDEMNIFICATION.

   **13.1. Indemnification by Buyers.** Subject to the limitations set forth in Section 13.3 hereof, Buyers shall jointly and severally defend, indemnify and hold harmless Sellers and their Affiliates, and their respective officers, directors or employees (collectively, "Seller Indemnified Parties"), from and against any and all claims, losses, liabilities, damages, taxes, unclaimed property, costs (including court costs and costs of appeal) and expenses (including reasonable attorneys' fees and fees of expert consultants and witnesses) that such Seller Indemnified Party incurs as a result of or with respect to:

       (i)     any inaccuracy, misrepresentation or breach of a representation or warranty by Buyers under this Agreement;

       (ii)    any breach by Buyers of, or any failure by Buyers to perform, any covenant or agreement of, or required to be performed by, Buyers under this Agreement;

       (iii)any    of the Assumed Liabilities; or

       (iv)    operation of the Assets or System, as acquired by Buyers hereunder, on or following the Effective Time.

   **13.2. Indemnification by Sellers.** Subject to the limitations set forth in Section 13.3 hereof, Sellers shall jointly and severally defend, indemnify and hold harmless Buyers and their Affiliates, and their respective officers, directors or employees (collectively, "Buyer Indemnified Parties"), from and against any and all claims, losses, liabilities, damages, taxes, unclaimed

64

property, costs (including court costs and costs of appeal) and expenses (including reasonable attorneys' fees and fees of expert consultants and witnesses) that such Buyer Indemnified Party incurs as a result of or with respect to:

> (i)    any inaccuracy, misrepresentation or breach of a representation or warranty by Sellers under this Agreement;

> (ii)    any breach by Sellers of, or any failure by Sellers to perform, any covenant or agreement of, or required to be performed by, Sellers under this Agreement;

> (iii)any    of the Excluded Liabilities or Excluded Assets

> (iv)    the Ship Creek Discharge or Sellers' acts or omissions while performing their obligations pursuant to Section 11.26; or

> (v)    operation of the System, the Assets or Sellers generally prior to the Effective Time.

**13.3.   Limitations.**   Buyers and Sellers shall be liable under Section 13.1(i) or Section 13.2(i) (*i.e.*, for inaccuracies, misrepresentations and breaches of warranties), as applicable, only when the cumulative total of all indemnification claims exceeds Five Hundred Thousand Dollars ($500,000.00) (the "Threshold Amount"), at which point Buyers or Sellers, as applicable, shall be liable for the full amount of such claims including the Threshold Amount. Notwithstanding anything to the contrary herein, the indemnification obligations of Sellers with respect to claims by Buyers arising under Section 13.2(i) and/or Section 13.2(ii), with respect to any and all claims arising under any or all of Sections 4.11, 4.12 (only as relates to real property) and 8.3, shall only apply when the cumulative total of any or all indemnification claims exceeds the Threshold Amount, at which point Sellers shall be liable for the full amount of indemnification claims including the Threshold Amount provided that the cumulative total of liability arising under Section 13.2(i) and/or Section 13.2(ii) with respect to any and all claims arising under any or all of Sections 4.11, 4.12 (only as relates to real property) and 8.3 shall not exceed, in the aggregate, the amount of Five Million Dollars ($5,000,000.00), less any credit(s) against the Purchase Price granted to Buyer by Seller for any Cure Estimates ("Indemnification Cap"). For avoidance of doubt, the Threshold Amount shall only be applied once with respect to any and all indemnification claims of Sellers and once with respect to any and all indemnification claims of Buyers regardless of the nature of the underlying indemnification claims. Notwithstanding anything to the contrary, none of the limitations contained in this Section 13.3 shall apply to any indemnification claims arising under Section 13.1(i) or Section 13.2(i) as a result of the intentional misrepresentation or fraud of Buyers or Sellers, respectively. Buyers agree that prior to asserting any claim arising under any or all of Sections 4.11, 4.12 (only as relates to real property) and 8.3 which are in the nature of a title claim, Buyers shall first file a claim and exhaust all rights and remedies against the Title Company under its Owners Title Policy or its Leasehold Title Policy, as applicable. Buyers acknowledge and agree that they shall not have a claim under the warranty of title of the deeds, which is separate and apart from the provisions and limitations of this Section 13.3.

65

For avoidance of doubt, the parties acknowledge and agree that notwithstanding anything to the contrary, there is an aggregate single monetary cap of Five Million and no/100 Dollars ($5,000,000.00), being the Indemnification Cap described above, towards which Indemnification Cap shall be counted: (A) any and all liabilities or obligations of Sellers arising under or pursuant to Section 13.2(i) and/or Section 13.2(ii) with respect to Sections 4.11, 4.12 (only as relates to real property) and 8.3; and (B) any and all credits provided to Buyers at Closing pursuant to either or both of Section 8.3(a), and Section 8.3(d), with respect to any Cure Estimates. Notwithstanding anything to the contrary, once the Indemnification Cap is reached, whether as of Closing or afterwards, and whether by payment of indemnification liabilities under Section 13.2(i) and/or Section 13.2(ii) with respect to Sections 4.11, 4.12 (only as relates to real property) and 8.3 or by credit against the Purchase Price pursuant to Section 8.3(a) and/or Section 8.3(d), Sellers shall have no further liability or obligations to Buyers under Section 13.2(i) and/or Section 13.2(ii) with respect to Sections 4.11, 4.12 (only as relate to real property) and 8.3, except for claims arising under Section 13.2(i) as a result of the intentional misrepresentation or fraud of Sellers.

**13.4.   Indemnification Procedures.** All claims for indemnification by a Party entitled to be indemnified under this Article 13 (an "Indemnified Party") by Sellers or Buyer, as the case may be (an "Indemnifying Party"), shall be asserted as follows:

**(a)   Notice of Claim.** If an Indemnified Party becomes aware of any breach of this Agreement by the Indemnifying Party, any claim or liability asserted by a third party against an Indemnified Party or any other basis for indemnification under this Article 13, which equals or exceeds the Threshold Amount, if and as applicable, the Indemnified Party shall notify the Indemnifying Party in writing of the same within thirty (30) days after becoming aware of such breach or receipt of such written assertion by a third party of a claim or liability, specifying in detail the circumstances and facts which give rise to such alleged breach or claim and the amount or the estimated amount thereof to the extent then feasible, which estimate shall not be conclusive of the final amount of such breach or claim ("Claim Notice"); provided however, that the failure to provide the Claim Notice will not relieve the Indemnifying Party of liability, unless and only to the extent that, such failure to provide the Claim Notice results in the loss of substantive rights or defenses.

**(b)   Notice Period.** Except as otherwise provided in Section 13.4(c) below, the Indemnifying Party shall have thirty (30) days from the receipt of the Claim Notice (the "Notice Period") to notify in writing the Indemnified Party whether or not the Indemnifying Party (i) disputes the liability with respect to such claim or demand; (ii) acknowledges, assumes, and satisfies the claim or demand by the Indemnified Party; or (iii) with respect to claims or obligations asserted by third parties, desires, at its sole cost and expense, to defend the Indemnified Party against such claim or demand pursuant to Section 13.4(c) below; provided however, that Indemnifying Party shall not be entitled to assume the defense of the Indemnified Party unless the Indemnifying Party agrees in writing to accept the obligation to indemnify the Indemnified Party. If the Indemnifying Party does not notify the Indemnified Party within the Notice Period that it disputes its liability to the Indemnified Party, the Indemnified Party shall be

66

liable for the amount of any liability described or estimated in the applicable Claim Notice, as such estimates are finally determined.

        (c)     **Third Party Claims; Control of Litigation.** If any claim or liability is asserted in writing by a third party against an Indemnified Party which would give rise to a claim under this Article 13, which the Indemnifying Party agrees to indemnify, the Indemnifying Party shall have the right to defend such claim and control the defense, settlement, and prosecution of any litigation. If the Indemnifying Party, within ten (10) days after notice of such claim, fails to commence defense of such claim, the Indemnified Party shall (upon further written notice to the Indemnifying Party) have the right to undertake the defense, compromise, or settlement of such claim on behalf of and for the account and at the risk of the Indemnifying Party, subject to the right of the Indemnifying Party to assume the defense of such claim at any time prior to settlement, compromise, or final determination thereof. Anything in this Section 13.4(c) notwithstanding, (i) if there is a reasonable probability that a claim may materially and adversely affect the Indemnified Party other than as a result of money damages or other money payments, the Indemnified Party shall have the right, at its own cost and expense, to defend, compromise, and settle such claim, and (ii) the Indemnifying Party shall not, without the written consent of the Indemnified Party, settle or compromise any claim or consent to the entry of any judgment which does not include as an unconditional term thereof the giving by the claimant to the Indemnified Party of a release from all liability in respect of such claim. The foregoing rights and agreements shall be limited to the extent of any requirement of any third-party insurer or indemnitor. All Parties agree to cooperate fully as necessary in the defense of such matters.

        (d)     **Mitigation.** The Indemnified Party shall take all reasonable steps to mitigate all liabilities and claims, including availing itself as reasonably directed by the Indemnifying Party of any defenses, limitations, rights of contribution, claims against third parties and other rights at law, and shall provide such evidence and documentation of the nature and extent of any liability as may be reasonably requested by the Indemnifying Party. The amount of any indemnification hereunder shall be reduced or reimbursed, as the case may be, by any amount received by the Indemnified Party under any insurance coverage or from any other Party alleged to be responsible therefor. The Indemnified Party shall use reasonable efforts to collect any amounts available under such insurance coverage and from such other Party alleged to have responsibility. If the Indemnified Party receives an amount under any such insurance coverage or from such other Party subsequent to an indemnification provided by the Indemnifying Party pursuant to this Article 13, the Indemnified Party shall promptly reimburse the Indemnifying Party for any payment made or expense incurred by the Indemnifying Party in connection with providing such indemnification up to such amount received by the Indemnified Party. Each Party shall act in a commercially reasonable manner in addressing any liabilities that may provide the basis for an indemnifiable claim (that is, each Party shall respond to such liability in the same manner that it would respond to such liability in the absence of the indemnification provided for in this Agreement). Any request for indemnification of specific costs shall include invoices and supporting documents containing reasonably detailed information about the costs or damages for which indemnification is being sought.

**13.5.   Exclusive Remedy; Set Off.**  The representations and warranties contained in or made pursuant to this Agreement shall be terminated and extinguished upon the earlier of the end of the Survival Period (hereinafter defined) or any termination of this Agreement.  Thereafter, none of Sellers, Buyers or any shareholder, partner, officer, director, principal or Affiliate of any of the preceding shall be subject to any liability or any nature whatsoever with respect to any such representation or warranty.  Moreover, the sole and exclusive remedy for any breach or inaccuracy, or alleged breach or inaccuracy, of any representation and warranty made by Sellers or Buyers shall be the remedies provided by this Article 13.  Notwithstanding the foregoing, each Buyer shall have the right to set off any amounts owed to it by any Seller under this Article 13 against any amounts owed by Buyers to. Sellers hereunder or against any other financial obligations, commitments or liabilities of Buyers hereunder; provided that Buyers shall first provide written notice to Sellers of their intention to set off amounts owed under this Article 13. Notwithstanding anything to the contrary herein, Sellers shall first exhaust all remedies against Buyers (other than PMH) under this Article 13 prior to pursuing any action against PMH under this Article 13 on account of PMH's guaranty of Buyers' obligations pursuant to Section 14.24 or of any joint and several liability of PMH with other Buyers hereunder.

**13.6.   Survival.**  All of the representations, warranties, covenants, and agreements made by the Parties in this Agreement or pursuant hereto in any certificate, instrument, or document shall survive the consummation of the transactions described herein, and may be fully and completely relied upon by Sellers and Buyers, as the case may be, notwithstanding any investigation heretofore or hereafter made by any of them or on behalf of any of them, and shall not be deemed merged into any instruments or agreements delivered at the Closing or thereafter. Notwithstanding anything in this Section 13.6 which may be to the contrary, any claim, demand, or cause of action with respect to a breach of any representation or warranty made in this Agreement (other than representations or warranties contained in Section 4.1, Section 4.2, Section 4.3, Section 4.12, Section 5.1, Section 5.2 and Section 5.3, which shall survive indefinitely, and the representations or warranties contained in Section 4.8, Section 4.9, Section 4.13, Section 4.15, Section 4.17 and Section 4.23, which shall survive until four (4) years after the Effective Time), must be made or brought, if at all, within eighteen (18) months after the Effective Time, provided, however, that any claim, demand, or cause of action with respect to a breach of any representation or warranty made in this Agreement involving fraud or intentional misrepresentation shall survive indefinitely. Notwithstanding the foregoing, the representations and warranties related to the DB Pension Plan shall survive through the completion of the plan termination process described in Section 2.4(c) plus three (3) years. For the avoidance of doubt, this Section 13.6 shall not affect any rights to bring claims after eighteen (18) months based on (x) any covenant or agreement of the Parties which contemplates performance after the Closing, (y) the obligations of Buyers under Section 13.1(ii), Section 13.1(iii) or Section 13.1(iv), or (z) the obligations of Sellers under Section 13.2(ii), Section 13.2(iii), Section 13.2(iv) or Section 13.2(v).  The period from the date hereof until the last date on which a representation, warranty, covenant or other obligation survives pursuant to this Section 13.6 shall be known as the "Survival Period."

)

14.    **MISCELLANEOUS.**

14.1. **Schedules and Other Instruments.**   Each Schedule and Exhibit to this Agreement shall be considered a part hereof as if set forth herein in full.

14.2. **Additional Assurances.** The provisions of this Agreement shall be self-operative and shall not require further agreement by the Parties except as may be herein specifically provided to the contrary; provided, however, at the request of a Party, the other Party or Parties shall execute such additional instruments and take such additional actions as the requesting Party may deem necessary to effectuate this Agreement. In addition and from time to time after Closing, Sellers shall execute and deliver such other instruments of conveyance and transfer, and take such other actions as Buyers reasonably may request, more effectively to convey and transfer full right, title, and interest to, vest in, and place Buyers in legal and actual possession of, any and all of the Assets and the System. Sellers shall also furnish Buyers with such information and documents in their possession or under their control, or which Sellers can execute or cause to be executed, as will enable Buyers to prosecute any and all petitions, applications, claims, and demands relating to or constituting a part of the Assets or the System. Additionally, Sellers shall cooperate and use their best efforts to have their present directors, officers, and employees cooperate with Buyers on and after Closing in furnishing information, evidence, testimony, and other assistance in connection with any action, proceeding, arrangement, or dispute of any nature with respect to matters pertaining to all periods prior to Closing in respect of the items subject to this Agreement.

14.3. **Consented Assignment.**   Anything contained herein to the contrary notwithstanding, this Agreement shall not constitute an agreement to assign any claim, right, contract, license, lease, commitment, sales order, or purchase order if an attempted assignment thereof without the consent of the other Party thereto would constitute a breach thereof or in any material way affect the rights of any Seller thereunder, unless such consent is obtained. Each Seller and Buyer shall use reasonable efforts to obtain any third party consents to the transactions contemplated by this Agreement.

14.4. **Consents, Approvals and Discretion.** Except as herein expressly provided to the contrary, whenever this Agreement requires any consent or approval to be given by a Party, or whenever a Party must or may exercise discretion, the Parties agree that such consent or approval shall not be unreasonably withheld or delayed and such discretion shall be reasonably exercised.

14.5. **Knowledge.**

(a)    The phrase "to the knowledge of Sellers" and similar references to Sellers' knowledge, as used in this Agreement, shall encompass (i) all matters with respect to which any Seller has received written notice (including by electronic transmission), (ii) the actual knowledge of each Seller's officers and senior management, after due inquiry, and (iii) the actual knowledge of those persons listed on Schedule 14.5(a) hereto.

69

**(b)**     The phrase "to the knowledge of Buyers" and similar references to Buyers' knowledge, as used in this Agreement, shall encompass (i) all matters with respect to which any Buyers has received written notice (including by electronic transmission), (ii) the actual knowledge of each Buyer's officers and senior management, after due inquiry, and (iii) the actual knowledge of those persons listed on Schedule 14.5(b) hereto.

**14.6.   Choice of Law.**  The Parties agree that this Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania without regard to conflict of laws principles.  Exclusive venue for any dispute arising out of this Agreement shall be the state or federal courts of the Commonwealth of Pennsylvania.

**14.7.   Benefit/Assignment.**  Subject to provisions herein to the contrary, this Agreement shall inure to the benefit of and be binding upon the Parties hereto and their respective legal representatives, successors, and assigns.  No Party may transfer or assign (via sale, change of control of a Party, asset or stock purchase, operation of law or other method) this Agreement without the prior written consent of the other Parties.

**14.8.   No Brokerage.**  Except as set forth on Schedule 14.8, Buyers and Sellers each represent and warrant to the other that such Parties have not engaged a broker in connection with the transactions described herein.  Each Party agrees to be solely liable for and obligated to satisfy and discharge all loss, cost, damage, or expense arising out of claims for fees or commissions of brokers employed or alleged to have been employed by such Party.

**14.9.   Cost of Transaction.**  Except as otherwise specified herein, including Section 6.5 and Section 7.2, whether or not the transactions contemplated hereby shall be consummated, the Parties agree as follows:  (i) Sellers shall pay the fees, expenses, and disbursements of Sellers and their agents, representatives, accountants, and legal counsel incurred in connection with the subject matter hereof and any amendments hereto; (ii) Buyers shall pay the fees, expenses, and disbursements of Buyers and their agents, representatives, accountants and legal counsel incurred in connection with the subject matter hereof and any amendments hereto; and (iii) Sellers and Buyers shall each pay one-half (1/2) of any applicable real estate transfer taxes, sales taxes and other state and local taxes incurred on account of the transfer of Assets hereunder, and Buyers shall pay state and local recording fees and similar costs with respect to the transactions contemplated by this Agreement.

**14.10.  Waiver of Breach.**  The waiver by any Party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to constitute, a waiver of any subsequent breach of the same or any other provision hereof.

**14.11. Notice.** Any notice, demand, or communication required, permitted, or desired to be given hereunder shall be deemed effectively given when personally delivered, when received by receipted overnight delivery, or five (5) days after being deposited in the United States mail, with postage prepaid thereon, certified or registered mail, return receipt requested, addressed as follows:

**Sellers:**

Prior to the Effective Time:

Crozer-Keystone Health System
Healthplex Pavilion II
100 Sproul Road
Springfield, Pennsylvania 19064
Attention:  Joan K. Richards
President and CEO

And

Crozer-Keystone Health System
Healthplex Pavilion II
100 Sproul Road
Springfield, Pennsylvania 19064
Attention:  Donald Legreid, Esquire
Vice President and General Counsel

With a simultaneous copy to:

After the Effective Time:

Sellers will provide prior to Closing

Buchanan Ingersoll & Rooney, P.C.
Two Liberty Place
50 S. 16th Street, Suite 3200
Philadelphia, Pennsylvania 19102-2555
Attention:  John R. Washlick, Esquire

**Buyers:**

Prospect Medical Holdings, Inc.
10780 Santa Monica Blvd., Suite 400
Los Angeles, California 90025
Attention:  Ellen J. Shin, Esquire
General Counsel

With a simultaneous copy to:

Stevens & Lee, P.C.
620 Freedom Business Center Drive, Suite 200
King of Prussia, Pennsylvania 19406
Attention:  Thomas M. Tammany, Esquire

or to such other address, and to the attention of such other person or officer as any Party may designate, with copies thereof to the respective counsel thereof as notified by such Party.

**14.12. Severability.** In the event any provision of this Agreement is held to be invalid, illegal or unenforceable for any reason and in any respect, such invalidity, illegality, or unenforceability shall in no event affect, prejudice, or disturb the validity of the remainder of this Agreement, which shall be and remain in full force and effect, enforceable in accordance with its terms.

**14.13. Interpretation.** As used in this Agreement, and unless the context requires otherwise:

(a) References to Articles and Sections are references to articles and sections of this Agreement;

(b) The terms "hereto", "herewith", "herein", "hereby", "hereunder" and derivative or similar words refer to this entire Agreement;

(c) References to "include" or "including" mean including but not limited to or including without limitation;

(d) Each Exhibit and Schedule is incorporated in and made a part of this Agreement by reference;

(e) The gender of all words herein include the masculine, feminine, and neuter, and the number of all words herein include the singular and plural; and

(f) The terms "will" and "shall" are used interchangeably in this Agreement and the use of either term requires mandatory performance by the respective Party unless the context clearly states otherwise.

**14.14. Divisions and Headings.** The divisions of this Agreement into sections and subsections and the use of captions and headings in connection therewith are solely for convenience and shall have no legal effect in construing the provisions of this Agreement.

**14.15. Risk of Loss.** Notwithstanding any other provision hereof to the contrary, the risk of loss in respect of casualty to the System or any of the Assets shall be borne by Sellers prior to the Effective Time and by Buyers thereafter.

**14.16. Affiliates.** As used in this Agreement, the term "Affiliate" means, as to the entity in question, any entity that directly or indirectly controls, is controlled by or is under common control with, the entity in question. As used in this definition, the term "control" means possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of an entity, whether through ownership of voting securities, membership interests, by contract or otherwise.

**14.17. Material Adverse Effect.** As used in this Agreement, the term "Material Adverse Effect" means an event, change or circumstance which, individually or together with any other event, change or circumstance would be reasonably expected to have a material adverse effect on the Assets (whether or not covered by insurance) or on the business, operations, results of operations, prospects, or condition (financial or otherwise) of the Hospitals, the business of, or the results of operations of, the System or the Sellers, but excluding any event, change or circumstance attributable to: (i) general economic or political conditions; (ii) either Party's discussions or negotiations regarding any collective bargaining agreement or any demand or request for recognition of any labor organization; (iii) any action required or permitted by this Agreement or any action taken (or omitted to be taken) with the written consent of or at the written request of Buyers; or (iv) the acts or omissions of Buyers.

**14.18. Accounting Date.** The transactions contemplated hereby shall be effective for accounting purposes as of 12:00:01 a.m., Eastern Time, on the first calendar day of the month immediately following the Closing Date, unless otherwise agreed to in writing by Sellers and Buyers, all in accordance with Section 3.1.

**14.19. No Inferences.** Inasmuch as this Agreement is the result of negotiations between sophisticated parties of equal bargaining power represented by counsel, no inference in favor of, or against, either Party shall be drawn from the fact that any portion of this Agreement has been drafted by or on behalf of such Party.

**14.20. No Third Party Beneficiaries.** Except as otherwise provided in Section 14.21 of this Agreement, the terms and provisions of this Agreement are intended solely for the benefit of Buyers, Sellers and their respective permitted successors or assigns, and it is not the intention of the Parties to confer, and this Agreement shall not confer, third-party beneficiary rights upon any other person or entity.

**14.21. Enforcement of Agreement.** The Parties hereto agree that irreparable damage would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached. It is accordingly agreed that the Parties shall be entitled to an injunction or injunctions (without the need to post bond or other security) to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in any court of competent jurisdiction, this being in addition to any other remedy to which they are entitled at law or in equity. Without in any way limiting the remedies prescribed to the Parties under this Section 14.21, and for purposes of clarification, the Parties agree and acknowledge that, while not a Party to this Agreement, the Foundation shall be entitled to an injunction or injunctions and any other such remedies to which the Parties are entitled at law or in equity, but only to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof.

**14.22. Force Majeure.** Whenever a period of time is prescribed herein for action to be taken by either Sellers or Buyers, neither shall be liable or responsible for, and there shall be excluded from the computation for any period of time, any delays due to strikes, riots, acts of God, shortages of labor or materials, war, governmental laws, regulations or restrictions, or any

other cause of any kind whatsoever which is beyond the reasonable control of either Sellers or Buyers, as the case may be.

    **14.23. Entire Agreement/Amendment.**  This Agreement supersedes all previous contracts or understandings, including any offers, letters of intent, proposals or letters of understanding, and constitutes the entire agreement of whatsoever kind or nature existing between or among the Parties respecting the within subject matter, except with respect to that certain side letter (the "Side Letter") signed by the Parties of even date herewith permitting the completion of certain Schedules within a specified time period after the Execution Date and which shall be considered part of this Agreement.  As between or among the Parties, no oral statements or prior written material not specifically incorporated herein shall be of any force and effect.  The Parties specifically acknowledge that in entering into and executing this Agreement, the Parties rely solely upon the representations and agreements contained in this Agreement and no others and no Party shall be entitled to benefits other than those specified herein.  All prior representations or agreements, whether written or verbal, not expressly incorporated herein are superseded, and no changes in or additions to this Agreement shall be recognized unless and until made in writing and signed by all Parties hereto.  Notwithstanding anything to the contrary herein, on or prior to the Closing Date, Buyers shall be permitted to update, supplement, correct and/or revise Exhibit B from time to time upon notice to Sellers.

    **14.24. PMH Guaranty.**  PMH hereby unconditionally and absolutely guarantees the timely performance and observation of Buyers for each and every obligation, covenant and agreement of Buyers arising out of, connected with, or related to, this Agreement or any ancillary documents hereto and any extension, renewal and/or modification thereof.  The obligation of PMH under this Section 14.24 is a continuing guaranty and shall remain in effect, and the obligations of PMH shall not be affected, modified or impaired upon the happening from time to time of any of the following events, whether or not with notice to or consent of PMH:

        **(a)**    The compromise, settlement, release, change, modification, amendment (except to the extent of such compromise, settlement release, change, modification or amendment) of any or all of the obligations, duties, covenants, or agreements of any Buyer under this Agreement or any ancillary documents hereto; or

        **(b)**    The extension of the time for performance of payment of money pursuant to this Agreement, or of the time for performance of any other obligations, covenants or agreements under or arising out of this Agreement or any ancillary documents hereto or the extension or the renewal thereof.

    **14.25. Counterparts.**  This Agreement may be executed in two or more counterparts, which may be delivered by facsimile or electronic transmission, each and all of which shall be deemed an original and all of which together shall constitute but one and the same instrument.

    **14.26. Municipal Resale Certificates.**  To the extent required by applicable law, at Closing, Sellers, at Sellers' expense, shall deliver to Buyers any resale or similar certification required by any municipality in connection with the sale and transfer of the Owned Real Property.  To the extent required by applicable law and to the extent issued by the municipality

74

in which an Owned Real Property is located, at Closing, Sellers, at Sellers' expense, shall deliver to Buyers, a certification from the municipality in which the Owned Real Property is located as to outstanding notices of violations of any applicable laws, statutes, ordinances, and codes of such municipality.   Sellers shall be solely responsible for correcting, prior to Closing, any violations identified by Buyer on any such certifications.   Notwithstanding the foregoing, if Sellers' aggregate reasonable expenses associated with satisfying the requirements of this Section 14.26 are reasonably expected to exceed Five Million Dollars ($5,000,000.00) (the "Code Violation Cure Amount"), then Sellers shall provide written notice thereof, including a description of such expenses, to Buyers and either Sellers or Buyers may terminate this Agreement upon written notice to the other, which termination right must be exercised, if at all, within ten (10) business days of Sellers' expense notice to Buyers, unless prior to the expiration of such ten (10) business day period, Sellers agree, by written notice to Buyers, to assume responsibility for payment of the Code Violation Cure Amount to satisfy the requirements of this Section 14.26, at which point Buyers shall no longer have a right to terminate this Agreement.

*[Signature page follows]*

75

**IN WITNESS WHEREOF**, intending to be legally bound thereby, the Parties hereto have caused this Agreement to be executed in multiple originals by their authorized officers, all as of the date first above written.

**CROZER-KEYSTONE HEALTH SYSTEM**

By: _____
    Name:    Joan K. Richards
    Title:    President and Chief Executive Officer

**PROSPECT CROZER, LLC**

By: _____
    Name:    Samuel S. Lee
    Title:    Chief Executive Officer

**PROSPECT MEDICAL HOLDINGS, INC.**

By: _____
    Name:    Samuel S. Lee
    Title:    Chief Executive Officer

IN WITNESS WHEREOF, intending to be legally bound thereby, the Parties hereto have caused this Agreement to be executed in multiple originals by their authorized officers, all as of the date first above written.

CROZER-KEYSTONE HEALTH SYSTEM

By: _____
   Name:   Joan K. Richards
   Title:    President and Chief Executive Officer

PROSPECT CROZER, LLC

By: _____
   Name:   Samuel S. Lee
   Title:    Chief Executive Officer

PROSPECT MEDICAL HOLDINGS, INC.

By: _____
   Name:   Samuel S. Lee
   Title:    Chief Executive Officer

# EXHIBIT C

ORIGINAL TRANSCRIPT

Page 1

1        IN THE MATTER OF THE ACQUISITION OF

2

3        CROZER-KEYSTONE HEALTH SYSTEM

4

               BY

5

6        PROSPECT MEDICAL HOLDINGS, INC.

7

8                - - -

9

            Wednesday, May 4, 2016

10

11                - - -

12

13    Hearing, held pursuant to notice, at the James E.

14    Clark Education Center Auditorium, Crozer-Keystone Health

15    System, One Medical Center Boulevard, Upland, Pennsylvania

16    19013, at 3:00 p.m. on the above date, before Charlotte F.

17    Marshall, a Court Reporter and Notary Public, in and for

18    the Commonwealth of Pennsylvania.

19

20                - - -

21

22

23

24

Page 2

1
2
3 A P P E A R A N C E S:
4
5    OFFICE OF ATTORNEY GENERAL OF PENNSYLVANIA
     BY: PAMELA S. FINGERHUT, DEPUTY ATTORNEY GENERAL
6    Charitable Trusts & Organizations Section
     21 South 12th Street, 3rd Floor
7    Philadelphia, PA 19107
     215.560.2757
8    pfingerhut@attorneygeneral.gov
     Representing the Commonwealth of Pennsylvania
9
10
11   BUCHANAN INGERSOLL ROONEY, P.C.
     BY: CATHLIN E. SULLIVAN, ESQUIRE
12   Two Liberty Place
     50 South 16th Street, Suite 3200
13   Philadelphia, PA  19102
     215.665.5324
14   cathlin.sullivan@bipc.com
     Representing Crozer-Keystone Health System
15
16
17   STEVENS & LEE
     BY: HARRIET FRANKLIN, ESQUIRE
18   620 Freedom Business Center, Suite 200
     King of Prussia, PA 19406
19   610.205.6014
     hf@stevenslee.com
20   Representing Prospect Medical Holdings, Inc.
21
22         - - -
23
24

Page 3

1              - - -
2            I N D E X
3              - - -
4 STATEMENT OF:                          PAGE
5 Pamela S. Fingerhut, Deputy Attorney General   4, 19,
  Charitable Trusts & Organizations Section      50, 55
6
7 Joan Richards, President and CEO, CKHS          8
8 Thomas Reardon, President of Prospect East      12
9 Mitchell Lew, M.D., Prospect Medical Holdings, Inc. 50
10             - - -
11 TESTIMONY OF:                         PAGE
12 Dr. Christine Donohue-Henry            21
13 Dr. Kevin Caputo                       23
14 Dr. Nathan Okechukwu                   27
15 Dr. Daniel DuPont                      30
16 Leslie Heygood, R.N.                   33
17 Kim Brounce, R.N.                      35
18 Amy Cullinan, R.N.                     36
19 Gail M. Whitaker, Esquire              39
20 Mayor Thaddeus Kirkland                42
21 Mayor Michael Ciach                    46
22 Ms. Annette Pyatt                      47
23 Mr. Kenneth Covert                     48
24

Page 4

1        MS. FINGERHUT: *Good* afternoon. Thank
2 you all for coming today. Thank you for taking the time
3 to come provide testimony or to listen to the
4 information being provided.
5        The purpose of this hearing is to give
6 the citizens of Delaware County the chance to bring to
7 our attention any concerns they may have about the
8 sale of the healthcare assets of Crozer-Keystone
9 Health System to Prospect Healthcare.
10       Your input is important to us because
11 it helps us represent the public's interests in the
12 charitable assets held and represented by
13 Crozer-Keystone Health System.
14       My name is Pamela Fingerhut. I am a
15 deputy attorney general in the Charitable Trusts &
16 Organization Section of the Philadelphia Office of
17 Attorney General. I am here today with Larry Barth,
18 who is a senior deputy attorney general, and senior
19 deputy attorney general Mary Penny, who is outside
20 with the sign-in sheets.
21       If anyone would like to make a
22 statement who is not signed in yet, I would ask that
23 you go back -- and we will be bringing, also, the
24 sign-in sheets in, but if anybody wants to make a

Page 5

1 statement, if they go back and sign in. Actually,
2 there's Mary Penny right there; she has the sign-in
3 sheets.
4        The Office of Attorney General has
5 traditionally been charged with the parens patriae
6 responsibility for public charities in the State of
7 Pennsylvania. That means, the attorney general
8 represents the public's interests in charitable
9 assets.
10       Specifically, in cases such as this,
11 where Crozer-Keystone Health System, a non-profit
12 charitable healthcare corporation, sells its
13 healthcare assets to a for-profit corporation such as
14 Prospect, the Office of Attorney General must review
15 the sale of transactions to determine whether:
16       Full and fair value is being paid by
17 the purchaser for the charitable assets represented by
18 the hospital.
19       The hospital's records of all their
20 fiduciary responsibilities and exercise due diligence
21 in reaching their decision to approve the sale of the
22 hospital. This includes an assessment of the sale to
23 arm's length and free of self-dealing.
24       The sale is free of private inurement.

2 (Pages 2 - 5)

Page 6

1  In other words, we must review the transaction and
2  ensure the sale did not involve promises of private
3  benefits to employees or directors in exchange for
4  their approval of the sale.
5        Specifically, our review will focus on
6  special options, perks, bonuses, contracts for work,
7  post-sale employment contracts, corporate loans,
8  golden parachutes, high salaries or severance
9  packages, and other related party transactions.
10       Also, we examine whether or not the
11 sale negatively impacts the availability of healthcare
12 in the Delaware County area and the Philadelphia
13 region.
14       We also review all restricted
15 charitable funds so that they remain segregated and
16 dedicated to the restricted charitable purposes.
17       The law also requires that the selling
18 nonprofit organization in this case, Crozer-Keystone
19 Health System, petition the Orphan's Court Division of
20 the Delaware County Court of Common Pleas and seek
21 approval of the sale of its assets.
22       In such a proceeding before the
23 Orphan's Court, which will occur in the near future,
24 it will be the Court's duty to make sure that the

Page 7

1  charitable assets will be used for healthcare purposes
2  consistent with the purposes for which they were given
3  to the hospital and are consistent with the prior
4  hospital's charitable mission.
5        The Office of Attorney General, having
6  reviewed the transaction, will then advise the Court
7  as to whether or not they object to the transaction.
8        Does anybody in the audience have any
9  questions with regard to the role of the Office of
10 Attorney General or the purpose of this hearing prior
11 to the beginning of the testimony?
12       All right. If not, I'd like to
13 introduce some of the parties that are present today.
14       Today we have -- thank you -- today we
15 have here from Crozer-Keystone Health System,
16 President and CEO, Joan Richards; and on behalf of
17 Prospect Healthcare, we have Dr. Mitchell Lew,
18 President of Prospect Medical Holdings, Inc.; Thomas
19 Reardon, President of Prospect East; and Jonathon
20 Spees, Senior Vice President for Mergers and
21 Acquisitions. We also have counsel for both parties
22 present here today.
23       We are going to proceed by having the
24 parties provide an overview of the material terms of

Page 8

1  the transaction. Immediately following the overview,
2  we will call our first public speaker.
3        If there are no questions, I will call
4  our first speaker, Joan Richards, President and CEO of
5  Crozer-Keystone Health System.
6        MS. RICHARDS: Thank you. Good
7  afternoon, everyone. I'd like to begin by expressing
8  our thanks to the members of the Attorney General's
9  Office and to members of the health system community and
10 our community at large, who have shown their interest in
11 the future of Crozer-Keystone Health System by attending
12 today.
13       Crozer-Keystone has been serving the
14 healthcare needs of the people of Delaware County for
15 more than a hundred years. Our roots go back to
16 Chester Hospital, founded in 1893; Crozer Hospital,
17 founded in 1902; and Delaware County Memorial
18 Hospital, founded in 1927.
19       Today we have grown into a system of
20 four acute-care hospitals, multiple outpatient
21 centers, and a large physician network. Not only are
22 we the largest healthcare provider in Delaware County,
23 we are the county's largest employer, providing good
24 jobs for more than 6,000 area residents.

Page 9

1        We are proud of our health system, its
2  rich history, and its tradition of service to the
3  community. But we have also had to come to grips with
4  the stark reality of today's healthcare environment.
5        Healthcare is changing rapidly and
6  radically. The impact on not-for-profit health
7  systems like Crozer-Keystone has been profound.
8  Costs, such as pharmaceuticals, have gone up; payment
9  for services by insurance companies and government
10 agencies has gone down. The use of emergency
11 departments has increased, while inpatient volumes
12 have declined.
13       Crozer-Keystone Health System, like
14 other hospitals and health systems across the United
15 States, have been caught in a difficult squeeze. We
16 had to ask ourselves, could we continue to go it
17 alone? Could we meet our community's health needs
18 while we struggled under severe financial pressure?
19       In 2014, our board decided that it was
20 time to search for a partner that would enable us to
21 thrive in the new health care environment and deliver
22 on our promise to the people of Delaware County. We
23 established firm criteria for such a partnership. We
24 simply would not consider a change unless we could be

3 (Pages 6 - 9)



Page 10

1 sure it would position us to meet our community's
2 healthcare needs.
3          Our search was exhaustive. We looked
4 at more than four dozen organizations. Our full board
5 met 15 times during this process, and our Board
6 Strategy Committee met 33 times before Crozer-Keystone
7 identified Prospect Medical Holdings as the right
8 partner for us.
9          We are very excited about this
10 transaction, partly because of the number of things
11 that will not change as a result. None of the
12 hospitals will be closed or sold; the names of our
13 hospitals, outpatient centers, and the physician
14 network will remain. Key service lines with the
15 rules, services, obstetrics, neonatal intensive care
16 services, behavioral health, pediatrics, trauma and
17 burn, and emergency medicine will stay in place.
18          Our employees will keep their jobs at
19 the same salary they earn today. Our charity-care
20 policies, wellness, health education, community, and
21 medical education programs will continue. We will
22 continue to provide key services to vulnerable
23 populations extending community benefits and
24 supporting medical education.

Page 11

1          We will have access to a value-based,
2 accountable care infrastructure and capabilities that
3 will help Crozer-Keystone further develop population
4 health management capabilities.
5          There will be a meaningful role in
6 governance for local community representatives. At
7 the same time, the transaction with Prospect will
8 bring important new benefits to the community.
9          Prospect will make at least a $200
10 million investment in capital over the next five
11 years, allowing us to make needed facility and
12 equipment improvements. Prospect will assume the
13 liabilities, including ensuring that current and past
14 employees get the full benefit of their pension plan;
15 growth and leadership opportunities for employees will
16 expand; and a new foundation, the Crozer-Keystone
17 Community Foundation, will receive the net proceeds of
18 the sale with the mission to support health, social,
19 and educational needs of our community.
20          Crozer-Keystone exists to fulfill its
21 mission to improve the health status of those we
22 serve. This transaction supports continued dedication
23 to that mission. Through our partnership with
24 Prospect Medical Holdings, we will be in a position to

Page 12

1 see that mission through with more resources, more
2 wherewithal, and justice in our commitment to the
3 health of the people of Delaware County.
4          In short, we believe that this
5 transaction is the best thing that could happen for
6 our health system, our employees, our patients, and
7 the Delaware County community. Thank you very much.
8          MS. FINGERHUT: Thank you, Ms. Richards.
9          Our next speaker is Tom Reardon, who is
10 President of Prospect East.
11          MR. REARDON: Good afternoon, everybody.
12 Again, I am Tom Reardon. I'm the President of Prospect
13 East.
14          I'm actually from the Boston area. My
15 colleague to the right, Mitchell Lew, is from Los
16 Angeles, as is John Spees.
17          And I want to thank not only the
18 Attorney General's Office for all of the hard work
19 they've done, but all of you for coming here today.
20 We believe that all healthcare is local. And so as
21 much as we would like to be part of this community,
22 we'll never know the community as well as you do, and
23 so we value your input.
24          I am going to do something I -- I don't

Page 13

1 normally do, which is I'm going to read a statement.
2 This has to go on the record, so I apologize in
3 advance for that.
4          As you know, or as many of you know,
5 Prospect signed a definitive agreement with
6 Crozer-Keystone Health System on January 8th, 2016,
7 whereby the Crozer-Keystone hospitals, physician
8 network, and other facilities and operations will
9 become part of Prospect's healthcare network.
10          By way of background, Prospect was
11 established in 1996 and is a growing healthcare
12 services company offering a unique and innovative
13 healthcare delivery model known as Coordinated
14 Regional Care, or CRC, which focuses on coordination
15 of care and population health management with a
16 specific emphasis on wellness and preventative care.
17          The CRC model helps coordinate quality
18 personalized care for patients through integrated
19 networks, primary and specialty physicians in
20 affiliation with hospitals, clinics, other
21 community-based providers, and health plans.
22          Above all, we at Prospect are committed
23 to quality in all aspects of healthcare delivery,
24 including:

4 (Pages 10 - 13)

Page 14

1           Striving for the best possible patient
2 outcomes; maintaining the highest standards of patient
3 safety; acting with integrity at all times; promoting
4 open communication; and collaborating to better serve
5 the healthcare needs of our communities.
6           Prospect currently owns and operates 14
7 hospitals with roughly 7500 licensed beds as well as
8 40 clinics and outpatient centers. Prospect also
9 manages a provision of healthcare services for over
10 300,000 members enrolled in its networks of over 8900
11 primary care and specialty physicians.
12           Our operations are located in diverse,
13 high-density population areas within five markets in
14 California, Texas, Rhode Island, and most recently in
15 New Jersey. In addition to our Crozer transaction,
16 Prospect has entered into agreements with two
17 healthcare systems in Connecticut -- three hospitals
18 -- with nearly 600 acute-care and over 100
19 subacute-care beds, and a total net revenue of over
20 $600 million.
21           In connection with its acquisitions,
22 Prospect has targeted high-quality hospitals and
23 health systems that can benefit from our capital, our
24 operating expertise, and implementation of our CRC

Page 15

1 model with the goal of ensuring that quality and high
2 value continues to be provided to the communities in
3 need.
4           Accordingly, with respect to
5 Crozer-Keystone, we will support a shared vision to
6 deliver patient-centered quality care in an efficient,
7 cost-effective, and caring manner, meeting the health
8 needs of the communities historically served by
9 Crozer-Keystone. Our goals include the following:
10           1. Continuing the mission and
11 commitment of Crozer-Keystone by providing key
12 services to vulnerable populations, extending
13 community benefits, and supporting medical education.
14           2. Delivering high-value care to the
15 community through a commitment in practicing
16 evidence-based medicine and protocols.
17           3. Providing exceptional growth and
18 leadership opportunities for Crozer-Keystone's
19 employees.
20           4. Supporting strategic needs and
21 initiatives to ensure future growth and
22 sustainability.
23           5. Continuing strong medical staff
24 relationships, improving physician practice

Page 16

1 management, furthering clinical and economic alignment
2 with physicians, and improving physician access.
3           6. Growing healthcare service
4 offerings in the community.
5           7. Furthering value-based, accountable
6 care infrastructure and capabilities -- that's the
7 population management that we do so well.
8           I think this is number eight.
9           8. Recognizing the union relationships
10 that exist with Crozer. We believe having highly
11 skilled, satisfied, and motivated employees is a
12 crucial factor in the delivery of quality healthcare.
13 We will look forward to working together to achieve
14 mutual goals to that regard.
15           And then, a final goal, is ensuring
16 ongoing input from the community -- and we mean that
17 sincerely -- in the strategic direction of delivering
18 healthcare.
19           In pursuit of such goals, Prospect is
20 committed to keep Crozer-Keystone's inpatient
21 acute-care hospitals open, make capital investments in
22 the Crozer-Keystone system totaling at least $200
23 million over the next five years, dramatically
24 increasing the ability of Crozer-Keystone facilities

Page 17

1 to modernize, attract more patients, and expand
2 services in the community, as well as making a $100
3 million contribution to the assets of Crozer's
4 underfunded defined benefit pension plan.
5           We have also committed to terminate the
6 plan within five years of our acquisition of
7 Crozer-Keystone and fully fund 100 percent of the
8 benefits in accordance with applicable laws after the
9 termination -- normally within 12 to 18 months.
10           We've also committed to the critical
11 service lines, such as emergency department, trauma,
12 behavioral health, maternity, and pediatrics who will
13 remain in place or expand. We are an expansion
14 company, not a contraction company.
15           Moreover, Prospect will adopt
16 Crozer-Keystone's charity policies for at least five
17 years and fund wellness, health education, and other
18 community programs consistent with Crozer-Keystone's
19 past practices. Prospect will also maintain
20 Crozer-Keystone's quality assurance and performance
21 improvement programs, consistent with industry best
22 practices and with local board oversight.
23           In addition, Prospect will offer
24 employment for all Crozer-Keystone employees and

5 (Pages 14 - 17)



Page 18

1 management in good standing. And what I mean by good
2 standing, I did come to 20 different employee forums
3 over two days -- a two-day period, including in this
4 auditorium, on several occasions.
5          What we mean by good standing is, if
6 you're not on the CMS exclusion list -- for example,
7 if you committed fraud or you've stolen drugs or
8 something -- if you're not on that list, you're in
9 good standing; you will be offered employment. And
10 there will be no changes in current medical staff
11 privileges or clinical appointments as a result of the
12 transaction.
13         We have committed to establish a local
14 advisory board -- and those local advisory boards are
15 usually 50 percent community members and 50 percent
16 physicians -- to ensure ongoing, meaningful input from
17 local community and physician leaders on matters of
18 importance to the health system and its various
19 constituents, including, importantly, its patients,
20 physicians, and employees.
21         We at Prospect look forward to
22 completing the regulatory approval process and
23 consummating this affiliation with Crozer-Keystone.
24 Prospect seeks to build upon both Crozer-Keystone's

Page 19

1 distinguished history of delivering high-quality,
2 compassionate care and the success of our Coordinated
3 Regional Care model, which has transformed and
4 improved healthcare delivery in communities across the
5 country. We are thrilled to be here. Thank you.
6         MS. FINGERHUT: Thank you, Mr. Reardon.
7         We are now going to hear from members
8 of the public. Once again, if there's anybody who
9 would like to make a statement who hasn't signed up,
10 Ms. Penny's in the back with another -- with the
11 sign-in sheet.
12         The ground rules for today's hearing
13 are as follows:
14         Speakers will be first called from the
15 sign-up sheet in the order that they signed up, and
16 they should come up to the microphone right here to
17 speak. When they come up, if they could identify him-
18 or herself and identify any organization they
19 represent or are speaking for.
20         When the speaker steps up to the
21 microphone, if you could please state your name and
22 spell it. We have a stenographer here today that is
23 going to -- is providing a transcript of the hearing.
24         Each speaker will be given up to five

Page 20

1 minutes to state his or her comments or concerns with
2 regard to the transaction.
3         Only one person representing an
4 organization shall speak, and all speakers should try
5 to avoid repeating what has already been said.
6 However, if you're on the list and you'd like to come
7 up and say that you're in agreement or if there's
8 something you would like to add, you can do that, but
9 I would ask that the testimony not be repetitive. But
10 you can just join in somebody's earlier testimony to
11 keep this moving along.
12         My office, also, will accept written
13 testimony or any exhibits that anybody would like to
14 send to us by May 11th. Our address -- you can look
15 us up -- first of all, it's the Office of Attorney
16 General -- Pennsylvania Office of Attorney General if
17 you want to find our address -- but our address is
18 Charitable Trust and Organizations Section, 21 South
19 12th Street, 3rd Floor, and that's in Philadelphia.
20 And the ZIP is 19107. And, certainly, if you need our
21 address after the hearing, feel free to come up to me,
22 and I can give that out.
23         And I'm going to apologize in advance
24 if I skewer any names or can't read them. So I'm

Page 21

1 going to call our first speaker. Our first speaker is
2 Dr. Christine Donohue. Thank you.
3         DR. DONOHUE-HENRY: Thank you. My name
4 is Christine Donohue-Henry. So that's D-o-n-o-h-u-e,
5 hyphen, H-e-n-r-y. So thank you so much for having me
6 here today. I am currently the physician leader for
7 Primary Care Services here at Crozer-Keystone Health
8 System.
9         I'm a family medicine doctor, and I
10 grew up in Delaware County. I came to Crozer in 2009
11 because I wanted to care for patients in the community
12 where I grew up and the community where I live with my
13 family.
14         So Crozer employs over a hundred
15 primary care physicians and advanced practice
16 clinicians. We also have a strong network of
17 independent primary care physicians that rely on the
18 care that we provide in our acute-care hospitals and
19 outpatient facilities.
20         We train primary care physicians within
21 our family medicine, internal medicine, and pediatric
22 residency programs. And many of our doctors in
23 training come and establish their practices within our
24 33 primary care office locations throughout the

6 (Pages 18 - 21)

1 county.

2        As a family medicine doctor, I strongly
3 believe in the idea of wellness and disease
4 prevention. Our clinicians work hard to try and
5 prevent illness by counseling our patients to stop
6 smoking, to exercise, and to do required screenings
7 for cancer, and so on.

8        We also believe in the concept of
9 population health. So it's not just important to care
10 for the person in front of you in the office, but to
11 care for the community at large.

12        We believe in setting up proper
13 supports for our most critically ill and chronically
14 ill patients that live in our community to have
15 healthier lives and stay out of the hospital.

16        For all of these reasons, our Primary
17 Care clinicians are excited about the care that can be
18 delivered with Prospect. Prospect's model of
19 Coordinated Regional Care is a healthcare innovation
20 that speaks to us and the values that we hold.

21        Coordinated Regional Care is a support
22 system for patients outside of the hospital setting
23 that includes practice-based nurse practitioners,
24 health educators, local pharmacists, social workers,

1 and home-based care that give that extra level of
2 support services that can't be accomplished within a
3 15-minute office visit. We believe this model has the
4 potential to improve the health and well being of
5 patients to a greater extent than traditional care.

6        This is a pivotal time in healthcare in
7 our country as we work to be more fiscally responsible
8 and give better care to our patients before they're
9 admitted with the heart attack or the stroke. While
10 we will always need strong acute-care hospitals for
11 back up, Prospect's model of Coordinated Regional Care
12 will provide more boots on the ground to care for our
13 patients and keep them healthier.

14        As the clinical leader of Primary Care
15 at Crozer, I'm excited to see the even greater impact
16 we will have on our community and the health of those
17 around us. Thank you.

18        MS. FINGERHUT: Thank you. Our next
19 speaker is Dr. Kevin Caputo.

20        DR. CAPUTO: My name is Dr. Kevin Caputo,
21 C-a-p-u-t-o, and I have a long history with
22 Crozer-Keystone Health System. I currently am the
23 chairman and vice president of Psychiatry and Behavioral
24 Health. I am also the president of Community Hospital,

1 the non-acute care hospital in the health system. I'm
2 also the director of a specialty network -- the
3 Specialty Physician Network -- which includes women's
4 health, surgery, medical subspecialties, and behavioral
5 health.

6        I've been here for 29 -- almost 30
7 years, and I came on that train in Philadelphia
8 because I thought that Crozer, in particular, was a
9 place that took care of its community and would allow
10 me to utilize my skills as a psychiatrist to help the
11 community that we live in. And 29 years later, that's
12 been very, very true.

13        We've been able to treat a wide array
14 of patients, and we've been able to expand our
15 behavioral health services. So I speak on behalf of
16 the very vulnerable, fragile population that needs a
17 community steward, and Crozer has been that community
18 steward.

19        The health center that we're -- of
20 which we're an anchor provider, has been around for
21 over 50 years, and Crozer has been what's called a
22 base service unit, playing a very integral part in
23 treatment of behavioral health patients.

24        We currently have partnerships with the

1 Office of Behavioral Health and the county school
2 systems and other providers in the area to provide a
3 rich network of behavioral health treatments for this
4 vulnerable population.

5        In mental health, we have a variety of
6 different services that we provide in both adult,
7 child and adolescent, geriatric, and psycho-social
8 rehab, which is the most fragile of our patients,
9 patients that have been institutionalized and come out
10 of the state hospitals.

11        We also do school-based treatment and
12 have partnerships with the Chester-Upland School
13 District and the Delaware County Intermediate Unit,
14 and we see over 57,000 visits a year in the mental
15 health side.

16        On the substance abuse side, we also
17 have an access center where we have patients that come
18 in for a level of care determination, and we're able
19 to triage the patient to the appropriate setting.
20 Sometimes the appropriate setting is one of our
21 acute-care hospitals, and sometimes it's an outpatient
22 setting. We have a methadone program, and we have an
23 intensive outpatient program for our very vulnerable
24 substance abuse patients.



**Page 26**

1      We also have a unique program that is
2 really the heart and soul of the community of
3 behavioral health, in which we have intensive case
4 managers that are out in the streets taking care of
5 these patients and linking them with medical,
6 psychiatric, and social services. And that is really
7 important that we maintain that level of care for this
8 fragile population.
9      We have inpatient treatment, and we
10 have crisis treatment, which is a psychiatric
11 emergency room, and we recently opened up Fair Acres
12 Rejuvenations Program, which is on the grounds of a --
13 of a local nursing home. We have the geriatric
14 psychiatry unit taking care of that population. That
15 was a partnership with the county, in which we were
16 able to take care of a population that's underserved.
17      We provide a lot of psychiatric
18 services as well in terms of psychotherapy services in
19 collaborations across the whole Philadelphia area, but
20 our heart and soul is in the Chester -- the
21 Crozer-Chester and Crozer-Keystone community.
22      We're excited about the advent of
23 working with Prospect because Prospect is aware that
24 when you treat a patient, you're not just treating the

**Page 27**

1 physical symptoms, you're treating the patient as a
2 whole, and we're eager to collaborate with primary
3 care colleagues in treating the patient and in the
4 Coordinated Regional Care model.
5      I want to thank you today for allowing
6 me to speak on behalf of this vulnerable, fragile
7 patient population and tell you about my excitement in
8 joining the Prospect Medical Holdings team. Thank
9 you.
10      MS. FINGERHUT: Thank you. Our next
11 speaker is Dr. Nathan --
12      DR. OKECHUKWU: Okechukwu.
13      MS. FINGERHUT: Thank you.
14      DR. OKECHUKWU: Hello. I am Dr. Nathan
15 Okechukwu. O-k-e-c-h-u-k-w-u. I am the president of
16 the medical staff of Crozer, Springfield, and Taylor,
17 and the chair of medicine of the same institutions.
18      In my position as the president of the
19 medical staff, I chair the Medical Executive Council,
20 which is a primary governance committee for the
21 medical staff. The MEC -- Medical Executive
22 Committee -- with input from the medical staff, makes
23 key leadership decisions related to medical staff
24 policies, procedures, and rules, with the ultimate

**Page 28**

1 goal of providing high-quality care and ensuring
2 patient safety, engaging in quality and improvement
3 initiatives.
4      Additionally, we, the medical staff,
5 are an integral partner in the provision of graduate
6 medical education. To accomplish these roles, we have
7 two categories. There's two issues that I want to
8 talk about, which is, providing the high-quality care
9 and providing the graduate medical education.
10      Under our patient safety quality
11 umbrella, we've created a robust credential and
12 ongoing platform that ensures that physicians that we
13 have admitted into our medical staff family right here
14 are competent, capable, and qualified to provide
15 high-quality care to our patients, and we guard this
16 very jealously.
17      Within the first six months of an
18 appointment, every physician is subjected to a Focused
19 Professional Practice Evaluation that assesses in real
20 time the individual physician's ability to provide the
21 care that he or she was credentialed to perform.
22      Additionally, after appointment, we
23 have a process called the Ongoing Professional
24 Practice Evaluation -- or the OPPE -- that ensures

**Page 29**

1 that we are following pre-identified and
2 specialty-specific quality and practice metrics.
3      Through our robust practice improvement
4 committees, peer review is also performed. And all
5 the peer review committees report up to our Medical
6 Staff Quality Committee -- a subcommittee of the MEC,
7 which I chair, which reviews all the peer review cases
8 and ensures that all OPPEs and FPPEs are being
9 performed accordingly.
10      Physicians are also provided ongoing
11 medical opportunities by our CMEs, which are funded
12 and supported jointly by the medical staff and the
13 institution at large. Under the project medical
14 education umbrella, we have a total of ten superb
15 residency/fellowship training programs: internal
16 medicine, emergency medicine, pediatrics, family
17 medicine, podiatry, GYN oncology -- OB/GYN obstetrics,
18 transition internal medicine, osteopathic program,
19 sports medicine fellowship, and through Temple
20 University, we also provide a geriatric fellowship
21 program.
22      These programs are not only vital for
23 the larger goal of providing training for our nation's
24 physicians of tomorrow, but our immediate neighborhood

8 (Pages 26 - 29)

Page 30

1  of the Greater Philadelphia area also benefits
2  immensely when their graduates who are often hired to
3  practice in hospitals and practices around us.
4        For example, a number of our
5  hospitalists from our Internal Residency Program come
6  from our Internal Residency Program, and also our
7  physicians that have been admitted to our geriatrics
8  practice and Community Primary Care Network.
9        In summary, our expectation in the new
10  venture -- the new world that we're transitioning
11  into -- based on my interactions with representatives
12  from the Prospect company, we've been reassured and
13  believe and expect that all these initiatives and all
14  these mission -- door missions -- would continue and
15  be immortalized moving forward.  Thank you.
16        MS. FINGERHUT:  Thank you.  Next we have
17  Dr. Daniel DuPont.
18        DR. DuPONT:  Hello.  My name is Dan
19  DuPont, D-u-P-o-n-t.  I am the associate chair of
20  Clinical Medicine for Taylor and Springfield Hospital
21  and Crozer-Chester Medical Center.  I help Dr.
22  Okechukwu.  I have practiced pulmonary and critical care
23  medicine at two of the acute-care hospitals, Taylor
24  Hospital and Springfield Hospital.

Page 31

1        The first thing I want to do is turn
2  and say hi to the audience, because I hate having my
3  back to anyone.
4        I am also involved in the Caring Board
5  of Keystone Health System, and I am also on the
6  Strategy Committee that met 33 times since 2014 in an
7  effort to get where we are today.  I also am in the
8  Quality and Patient Safety Department within the
9  health system.
10        So I have been here for 33 years.  I
11  came here, like Dr. Donohue-Henry and Dr. Caputo,
12  fresh out of my training in Philadelphia, and I've
13  been here ever since.  And our practice is an
14  independent practice.  So network physicians are
15  independent physicians; we work together.
16        I'm on the board, I represent over 600
17  physicians and their best interests, and I'd like to
18  say that my comments in the next few minutes will be
19  representing those physicians.
20        So I have five children; I have three
21  grandchildren.  Every one of my children has had care
22  at Crozer-Keystone Health System Hospital one way or
23  another.  A few of my grandchildren were born in the
24  acute-care hospitals.  I have had personal care here.

Page 32

1  I was an inpatient here seven months ago at one of the
2  hospitals.  I feel very comfortable with the kind of
3  care that Crozer-Keystone Health System has provided
4  for not only our community, but for my family.
5        Quality care -- and the word quality
6  has been brought up quite a bit -- is paramount.  And
7  quality care is something that is being challenged
8  constantly in our country, constantly in our state,
9  and constantly in our community and is being
10  questioned even within our health system as we move
11  forward.
12        I feel very comfortable that the care
13  has been high quality, reliable, and state of the art,
14  to the point where, going forward, I will be very
15  comfortable with turning to the hospital.  I hope I
16  don't have to.  I'm very comfortable having my family
17  return to the hospital, and I hope to have some more
18  grandchildren, and I'd be very happy if they were born
19  here as well.
20        So, with that, I would just simply
21  continue to endorse what has been a journey that I
22  have taken with Mr. Reardon, with Dr. Lew, with
23  Ms. Richards, and with the board.  They got us where
24  we are today, and I feel very comfortable saying that

Page 33

1  this will be the best path forward for the health
2  system.
3        In closing, I will be happy to come
4  back to this microphone if anything comes up later in
5  this session that will require some questions to be
6  answered for you.  I thank you for your time.
7        MS. FINGERHUT:  Thank you.  Our next
8  speaker is Leslie Heygood.
9        MS. HEYGOOD:  Good afternoon, everyone.
10  My name is Leslie Heygood, that's H-e-y-g-o-o-d.  And
11  I'm a resident of the city of Chester, and I'm also a
12  27-year employee of the Crozer-Keystone Health System.
13  I currently work on the surgical trauma unit here at
14  Crozer.  I am also the president of PASNAP, the local
15  nurses union here at Crozer.
16        I fully understand that the acquisition
17  of the hospital must take place.  I come to you with
18  many concerns.  I would like to know, what is your
19  vision for this health system and the many communities
20  that it serves?  We cannot afford to lose any of our
21  services that we provide for this community.
22        While it is my understanding that
23  Prospect plans to invest $200 million into this
24  healthcare system, how much of that will be earmarked

9 (Pages 30 - 33)



Page 34

1 for bodies more sadly at the bedside?
2 What is your commitment to safe
3 staffing levels? What is your commitment to providing
4 supplies and safe working commitment for your staff?
5 What is your commitment to keeping all of our
6 hospitals open to serve their communities with all
7 services intact? How do you -- how will you work with
8 the staff to move this hospital into a new direction
9 where our ideals and opinions are valued?
10         I understand that you are a full-profit
11 organization, but we are here for our patients and
12 their families. They need and deserve to have their
13 hospital to stay intact and improve on the services
14 provided to them at affordable prices. We are not the
15 richest community, but that does not mean that they
16 deserve less when it comes to their healthcare needs.
17         We are the only trauma hospital in
18 Delaware County. I cannot emphasize to you the impact
19 these services have on our community of Chester and
20 beyond our Delaware County border. Their remarkable
21 work speaks for itself.
22         So I ask for you to come, Dr. Lew and
23 Mr. Reardon, come onto the floors and meet the staff
24 and meet the soul -- the heart and soul -- of the

Page 35

1 Crozer community health system, all of the employees
2 that work here. Thank you for your time.
3         MS. FINGERHUT: Thank you.
4         The next speaker is Kim Brown. I
5 apologize, I probably --
6         MS. BROUNCE: Close enough.
7         MS. FINGERHUT: Okay.
8         MS. BROUNCE: Hi. My name is Kim
9 Brounce, B-r-o-u-n-c-e. I have been a nurse here since
10 1979. And while I share a lot of the same history as
11 Dr. DuPont, I am seeing it from a different side. I,
12 too, was born here. I used to bring my family here.
13 But I no longer do that.
14         The efforts that go in to be able to
15 provide good quality care at the bedside is killing
16 the nurses that work within the system. We don't get
17 breaks; we don't get lunch; we work with substandard
18 equipment. The monitors that I work with are the same
19 monitors that were installed in the unit in 1981. You
20 can imagine that a lot has happened technology-wise
21 since those monitors were attached to the walls of the
22 trauma unit.
23         So I, too, look at all of the money
24 that's going to be invested -- and we are very

Page 36

1 grateful for it -- but the question is, how much of
2 that money will come here to Chester and not go out to
3 Haverford and all of the places that are being
4 promoted for what Crozer is to be -- Brinton Lake and
5 those places?
6         We are the biggest hospital, we provide
7 the most specialized services, and yet it is like
8 working on the battlefield when you go to find
9 equipment; it is not there. We can call down, we can
10 run around the hospital, but we cannot find what we
11 need.
12         And so, for me and my family, we will
13 be at Saint Francis or at Christiana until I feel that
14 it is safer to be a patient here. I think I would get
15 care because I'm an employee, as Dr. DuPont was, but
16 for the average patient, they're not getting the care
17 that could be provided by other hospitals around this
18 locality. Thank you.
19         MS. FINGERHUT: Thank you. Our next
20 speaker is Amy Cullinan.
21         MS. CULLINAN: Good afternoon. My name's
22 Amy Cullinan. C-u-l-l-i-n-a-n. I am a nurse on
23 maternity here at Crozer. I have been here for 30
24 years. I chose to come to this hospital because of its

Page 37

1 reputation and how the community sees the hospital. I
2 have remained here, and I plan to retire here.
3         There are some issues, and I know
4 staffing has come up. I would like to just discuss
5 that a little bit, and -- I'm just going to read,
6 if -- if you'll excuse me for doing that.
7         Appropriate nurse staffing is critical
8 for patient safety and well being. Inadequate
9 staffing is known to influence the outcomes of heart
10 attacks, falls, med errors, as well as overall
11 mortality. This is a fact and has been documented in
12 many studies for years.
13         Understanding -- understaffing also
14 depletes morale leading to higher levels of
15 absenteeism and staff turnover.
16         Many times on my unit, which is
17 maternity, we are left with barebones staffing, and
18 ratios of 9 and 10 patients per nurse with no tech and
19 a secretary that we have to share with labor and
20 delivery. This is not only dangerous and unsafe, but
21 unacceptable.
22         There is not a one-size-fits-all
23 solution to nurse staffing. There are many factors
24 involved that differ from institution to institution.

10 (Pages 34 - 37)

1 Crozer's budget-based staffing model is just not
2 working.
3          You must take into account such
4 variables as patient acuity and ancillary support,
5 both of which are ignored on a daily basis at Crozer.
6 It is more than a numbers game. We are continually
7 left with skeleton staffing based on our numbers.
8 When advocating for more staff for safe patient care,
9 it falls on deaf ears. We are then left with doing
10 the best we can.
11          In recent years, we have endured the
12 elimination of critical care team members, such as
13 admission nurses, ID team, phlebotomy, EKG
14 technicians, along with a serious decrease in
15 respiratory therapists, patient care techs, and
16 secretaries. This has had a direct impact on nursing
17 and patient care. Nurses are now expected to carry
18 out those duties.
19          Staffing conditions affect the quality
20 of nursing care and patient outcomes period. Working
21 long hours with inadequate staffing affects nurses'
22 health and increases the risk of injury. Moreover,
23 for every one additional patient added to a nurse's
24 workload, there is a 7 percent increase in hospital

1 mortality.
2          The nurses at Crozer are hopeful that
3 Prospect Medical Holdings will listen to our plea for
4 improved staffing and make a commitment to the
5 patients and nurses for safer staffing. We need a
6 combination of staffing methods tailored to our
7 specific needs and patient base here at Crozer.
8          The budget-based model we currently use
9 is not sufficient on its own. With improved staffing,
10 our patients will be assured that they will receive
11 the best care possible with positive patient outcomes.
12 This will lead to improved patient satisfaction at
13 Crozer and Crozer-Keystone Health System as a whole.
14 Thank you.
15          MS. FINGERHUT: Thank you. I don't know
16 if anybody would like to address anything? No? Okay;
17 okay.
18          So our next speaker is Gail Whitaker.
19          MR. WHITAKER: Good afternoon. My name
20 is Gail Whitaker, W-h-i-t-a-k-e-r. I am currently the
21 chairman of the Health Services Board for
22 Crozer-Keystone Medical System.
23          From that day in 1959 when my appendix
24 was removed, I have appreciated the healthcare

1 services provided by Crozer Hospital.
2          Through the years, I have been
3 associated with the system through working with the
4 Delaware County mental health and drug and alcohol
5 programs, through programs for infants and children,
6 community health, and education programs, and for the
7 last several years, as a member of the Crozer-Keystone
8 Health System Board of Directors and Health Services
9 Board.
10          I have come to learn how our system is
11 designed to operate to the benefit of our communities
12 and how it managed to meet the healthcare needs of the
13 communities that we serve.
14          The entire CKHS staff and the Board of
15 Directors are committed to the CKHS system. We are
16 aware of the community's needs. The entire system has
17 made ongoing effort, separate and united, for more
18 than a hundred years, and has showed me that nonprofit
19 hospitals with dynamic leadership could provide
20 high-quality medical care, healthcare education, and
21 diverse community services. That is, such a system
22 could have -- could do those things until unforeseen
23 changes impact the systems like ours to the point that
24 we were forced to realize that if our communities were

1 to have ongoing healthcare, it would have to be
2 provided by something that I never thought I would
3 welcome to Delaware County, a private healthcare
4 corporation.
5          I've looked at the agreement reached
6 for Prospect's purchase of our health system. I see
7 that Prospect has agreed to continue our mission.
8 They have agreed to take on those obligations that we
9 have incurred over the years for employee pension,
10 continue the employment of our excellent staff,
11 continue the emphasis on our key service areas,
12 continuance of our medical education programs, and
13 continued use of the historic names of our acute-care
14 hospitals. That Prospect has also agreed to a
15 continued role for local community representatives in
16 their system of governance is further assurance that
17 the needs of our communities will be met.
18          I believe firmly that healthcare is a
19 right. I believe even more firmly, however, that the
20 people of our communities must have excellent
21 healthcare in order to survive. And because of the
22 hole into which nonprofit providers across the nation
23 have been driven, if excellent healthcare is to
24 continue to be provided to our communities here in

11 (Pages 38 - 41)



Page 42

1 Delaware County, I guess we are fortunate to have
2 found and to have joined with Prospect Medical
3 Holdings. Thank you.
4       MS. FINGERHUT: Thank you. Our next
5 speaker is Mayor Thaddeus Kirkland.
6       MAYOR KIRKLAND: Good afternoon. I'm
7 Thaddeus, T-h-a-d-d-e-u-s, Kirkland, K-i-r-k-l-a-n-d.
8 Good afternoon, and I guess I'm addressing you as mayor
9 and a state representative and also mostly as a pastor
10 as well, because I wanted to talk about what the Bible
11 says when it says, "What you do for the least of these,
12 you also do unto me."
13       And I want to welcome you. This is a
14 bittersweet moment here in the community.
15 Bittersweet. Bitter because we will no longer be able
16 to see the signs of Crozer-Chester Medical Center that
17 have hung for so -- so many years and have done so
18 much within our community. But sweet to understand
19 that there's a new development, a new partnership, a
20 new relationship coming to our community to provide
21 services to all. And so, let me just start off by
22 saying -- saying, welcome.
23       We -- I'm probably one of the persons
24 -- I've had the pleasure of being an employee here at

Page 43

1 Crozer prior to me becoming an elected official. I
2 worked in what we call the Family Planning Division of
3 Crozer Hospital. And that division dealt with young
4 mothers, mothers-to-be, and I was in outreach, working
5 with HIV counseling -- HIV and AIDS counseling.
6       And so when I looked at the portion
7 that says, "key lines of services including women's
8 services, obstetrics..." and so on and so forth, it
9 said five years -- for at least five years. "What you
10 do for the least of these, you do also unto me." And
11 so I'm hoping this is going to be a continued service
12 for so many needy persons in this -- this community
13 and the surrounding area.
14       I'm also hoping -- because I heard you
15 say that you wanted input from the community. One of
16 the ways we can give that input is if there is another
17 forum -- another setting -- where we sit down and hear
18 from those folks that get off work at 5 o'clock. And
19 have an opportunity for them to not only meet you and
20 welcome you, but for you to have an opportunity to
21 explain to them what services and benefits will be
22 coming their way, by way of Prospect. That would be
23 greatly appreciated.
24       The other thing is, we have a community

Page 44

1 that is an elderly community, a community that --
2 well, there's some -- there's some health issues and
3 serious problems within our communities that whereby
4 we need the service of ambulances.
5       The hope is -- and I heard the other
6 things that were going to be still in place -- I'm
7 hoping that the ambulance service will still be in
8 place; and, if not, you will give us enough time so
9 that we might prepare ourselves as a city to provide
10 those services for the constituency. They desperately
11 need those services, and there's no way that we can
12 help them by -- by discontinuing those services.
13       So if that is something that is not
14 going to be, if we have enough time to know so that we
15 can -- we can prepare as a community, it would be
16 greatly, greatly appreciated.
17       Taxes. Thank you. (Laugher)
18       Hallelujah. (Laugher)
19       Thank you very much. And looking at
20 this, it says, community, you have the distinction of
21 being in two communities. And so we -- we applaud
22 you; we appreciate you; and we wait for your first tax
23 payment -- (laughter) -- with bated breath.
24       So we -- we thank you, we thank you in

Page 45

1 advance in that area.
2       This is a great community to -- to be
3 in, no matter what is said from the outside. They do
4 have hard working people here. You've heard from the
5 nurses and the doctors. They have dedicated their
6 lives to this community and this hospital. And there
7 is no other place that I'd rather be than in this
8 community and representing this community. And you
9 will find that if you open up your hearts and your
10 eyes and your ears to the comments and concerns of
11 each and every one that has come before you that you
12 will find a workforce second to none.
13       I also want to recognize with me today
14 members of the Chester City Council, Councilwoman
15 Elizabeth Williams and Councilman Nifa Nichols. We
16 want to say welcome, and we look forward to your tax
17 dollars. (Laughter)
18       MS. FINGERHUT: Okay. Thank you.
19       That concludes my list. Mary, is
20 there -- do we have any additional?
21       MS. PENNY: If anybody would like also to
22 speak today, just come and see me, and I'll put your
23 name on the list.
24       MS. FINGERHUT: I'd like to call up Mayor

12 (Pages 42 - 45)

Page 46

1 Michael -- is it Ciach?

2 MAYOR CIACH: Thank you. I will keep my
3 comments -- I appreciate -- I apologize in advance. I
4 had a little procedure today. But I just wanted to --

5 UNKNOWN MALE SPEAKER: Here?

6 MS. FINGERHUT: Would you mind --

7 MAYOR CIACH: Yes. (Laughter)

8 MS. FINGERHUT: -- could you spell your
9 last name?

10 MAYOR CIACH: Yes, it's C-i-a-c-h. I'm
11 the mayor of Upland, where Crozer actually does reside.
12 And to my esteemed colleague, not too fast. I didn't
13 serve my final service. (Laughter)

14 While I wanted to actually convey I'm
15 very anxious to see you, and you cannot imagine how
16 much a transaction like this will affect our small
17 Borough of Upland. We have 3300 residents, and at any
18 given time, we double or triple that in -- in the day,
19 depending on what's going on here at Crozer. So --
20 and obviously, that adds to our resources in Upland.

21 So we have been able to -- and I -- my
22 history with Crozer, at least within the borough
23 government, has been for the last 25 years, and we've
24 always been able to maintain a very strong working

Page 47

1 relationship with Crozer, and I hope that would
2 continue going forward.

3 So I am anxious to find out more
4 details about the transaction and also share the
5 sentiment of my esteemed colleague, the mayor, and I
6 look forward to more economy. Thank you.

7 MS. FINGERHUT: Thank you. Is there
8 anyone else?

9 I want to say, I really appreciate all
10 the speakers -- oh.

11 MS. PYATT: My name is on the list.

12 MS. FINGERHUT: I apologize if I missed
13 it on the list. What is --

14 MS. PYATT: Annette Pyatt.

15 MS. FINGERHUT: Yes, I'm sorry.

16 MS. PYATT: That's okay.

17 Good afternoon. My name is Annette
18 Pyatt, spelled P-y-a-t-t. I'm executive director for
19 the Chester Community Improvement Project, which is --
20 which is a community-based organization here in the
21 city of Chester, and we have a long history and
22 partnership with Crozer-Keystone.

23 And my main concern or my question to
24 you is, what are your plans to continue with those

Page 48

1 community partnerships and programs and services?

2 I'm also concerned, being a resident
3 here and having most of my family here, of the quality
4 of care -- healthcare that will continue to take place
5 here at Crozer. I got my mom still living, and I want
6 to make sure she stays a long time. (Laughter)

7 So my main -- and also, I just want to
8 make sure, we -- we partner with Crozer for a lot of
9 programs for our young folks, and I want to make sure
10 that you guys sit down at some point in time -- just
11 like the mayor mentioned -- have some type of forum
12 for the community partners -- our current community
13 partners with Crozer -- so that you can present your
14 plan to the community as to what, your -- you know,
15 our involvement will be in the future.

16 And most of your things on this list
17 have a five-year timeframe. What happens after that?
18 Thank you.

19 MS. FINGERHUT: Thank you.

20 MR. COVERT: My name is on the list.

21 MS. FINGERHUT: Okay.

22 MR. COVERT: Good afternoon. My name is
23 Kenneth Covert. I'm an associate community health
24 navigator for Keystone First.

Page 49

1 And you just got here, but you're going
2 to know that it's a lot of rumors that go around in
3 Chester. One rumor I've been hearing is that of a
4 possible closing of Community Hospital, and that would
5 be very -- it's -- you really can't do that.

6 This is one of our biggest departments.

7 I cover Delaware County, Chester County, and some of
8 Philadelphia County. I have a thousand members in the
9 city of Chester. A lot of them go to Community
10 Hospital. Like if that were to close down, they would
11 be in some -- a real mess.

12 DR. DuPONT: Excuse me. Could you just
13 identify your organization?

14 MR. COVERT: Keystone First.

15 So -- so what I'm saying is that I
16 don't know what is going to go on with that, but it
17 would be crippling to the -- to the community. And
18 like the Mayor Kirkland said, it would be great to get
19 us all together -- all the community people -- because
20 a lot of people in this city care about this
21 community. And the people, we're going to help you as
22 much as we can. Okay?

23 So I just wanted to put that out. God
24 bless and thank you.

13 (Pages 46 - 49)



Page 50

1    THE REPORTER: Excuse me, sir. Could you
2 spell your last name?
3    MR. COVERT: C-o-v-e-r-t. Like covert
4 operations. (Laughter)
5    MS. FINGERHUT: Well, I -- I believe,
6 unless there's anyone else that -- that ends the list.
7    And I wanted to thank everyone for
8 coming today, especially coming up to testify. And I
9 appreciate both mayors coming; I appreciate the
10 nursing staff, the medical staff.
11    I know the nursing staff raised some
12 concerns about quality of care, and I'm sure they're
13 aware that the Department of Health will take those
14 concerns regarding hospitals, and those concerns can
15 be raised with them.
16    And at this time, I -- I don't know.
17 Mr. Reardon, do you still want to make
18 a wrap-up statement?
19    MR. REARDON: Dr. Lew does.
20    MS. FINGERHUT: Oh, Dr. Lew.
21    DR. LEW: Yes, thank you.
22    MS. FINGERHUT: Do you want to go ahead
23 and make the wrap-up?
24    DR. LEW: Yes.

Page 51

1    I want to, on behalf of Prospect
2 Medical, thank the Attorney General's Office. But
3 more importantly, I want to thank the physicians and
4 the employees, and the people of the community. Not
5 only for coming out and -- coming for this hearing,
6 but for your words of support, but also your words of
7 concern.
8    You know, I'm a physician. I've
9 delivered babies for 10 years, and I've worked in
10 hospitals, and I've worked in communities. And I want
11 to reassure you that commitment to healthcare, the
12 communities, physicians, and employees, that's --
13 that's part of my DNA, and that's part of our
14 hospital's DNA. So that all resonates with me and
15 with our company.
16    What Mr. Reardon shared about our
17 company and the 14 hospitals in four states, I think
18 that just touches the surface of who we are. Our
19 roots are in local community hospitals serving
20 underserved populations. Medicaid, primarily
21 government aid, in communities in East Los Angeles,
22 in -- in places where patients come to us because no
23 one else will take them. So -- so we -- that is in
24 our DNA.

Page 52

1    And through our history, when we learn
2 and we merged with the physician group, that's where
3 we learned how to deliver a different model of care.
4    And so when you hear this term,
5 "Coordinated Regional Care," that's what we're
6 referring to. It's taking the hospital segment of
7 what we know how to do on the hospital side, but also
8 working with physicians to really integrate the care
9 and coordinate care with the goal of getting better
10 outcomes and high quality, but not spending a lot of
11 money in having to -- to have duplication of services.
12    And so we took this model of care to
13 different parts of California, and that's how we've
14 grown as a company. And so we're very excited to be
15 here in Pennsylvania, here in Delaware County, and
16 certainly with this Crozer-Keystone partnership.
17    And I must tell you, when we came to
18 this part of the country and we were first meeting
19 with leadership of Crozer-Keystone, it really had all
20 the components in one place of what we really liked
21 with our -- our model. And that is community
22 hospitals with physicians and employees that really
23 care about their health system.
24    But also you have academics; you have a

Page 53

1 teaching hospital -- or a teaching program to -- to
2 teach the next generation of physicians. But you also
3 provide tertiary care. This is really a full-service
4 health system that we are very excited to bring our
5 model to.
6    And just to share a quick story, I was
7 so anxious to hopefully be chosen -- and thank you to
8 the board for these 33 meetings that you held and that
9 we were chosen -- but, you know, I promised Joan that
10 we would bring a championship to the Eagles, the
11 Phillies, the Sixers, or the Flyers, and I failed this
12 year. But Villanova did win the championship. So I
13 did deliver on that. (Laughter)
14    But we're very excited to be here. And
15 I think for the community, I really would want to
16 reassure you that access and quality is what we are
17 about. We are a growth model. We don't shut things
18 down. We want to grow. And we are an open system.
19    For the physicians, I'm excited to have
20 the physicians. You've got a 400-physician group
21 ready to plug into our model. How ideal could that
22 be? And -- and on the cutting edge of the behavioral
23 health side with Dr. Caputo.
24    And for the employees, I hope that you

14 (Pages 50 - 53)



Page 54

1  see that there's stability here.
2      And, Ms. Heygood, I will come to the
3  floor. I want to see what you do on the floor.
4      MS. HEYGOOD: Thank you.
5      DR. LEW: That's -- that's where I work,
6  too.
7      So -- and, Mr. Mayor, Mayor Kirkland,
8  we welcome dialogue. And we will be acquiring or --
9  bringing ambulance services into the -- into the
10  transaction. But we look forward to a continuing
11  dialogue of how we can best meet the needs of the
12  community. We welcome that.
13      And -- and to the hospital, we look
14  forward to the investment in the facilities. And Ms.
15  Brounce brought up about the equipment -- in updating
16  the equipment; absolutely, we need to do that.
17      So -- and also for the state, what
18  we've done in other states, recently Rhode Island,
19  we -- we actually launched a Medicaid pilot program to
20  improve access and improve outcomes at a cost savings
21  to the state. And what I envision here in Delaware
22  County is to do something similar where we can be
23  leaders in the healthcare delivery model for Delaware
24  County and the State of Pennsylvania.

Page 55

1      So we're very excited, you know. I
2  want to thank everybody for their time and their
3  commitment. And I want you to know that I think that
4  Prospect Medical is the right partner, and this is the
5  right time. So thank you so much.
6      MS. FINGERHUT: Thank you very much.
7      At this time, I think that concludes
8  the witnesses and speakers. Again, I want to thank
9  everyone who came here today, both those that
10  testified and those who came to hear the witnesses.
11  We appreciate, on behalf of the Office of Attorney
12  General, everyone taking the time and making the
13  effort on participating today.
14      And, as I said before, if anyone would
15  like to submit any written comments or provide
16  exhibits, our address is 21 South 12th Street, Third
17  Floor, Philadelphia, PA 19107.
18      And if anyone has any questions about
19  the hearing today or the Office of Attorney General,
20  please feel free to come and speak with myself,
21  Mr. Barth, or Ms. Penny at the conclusion of the
22  hearing.
23      If there is no one else who would like
24  to testify at this time, I would like to conclude the

Page 56

1  hearing. Thank you all for your attendance.
2          - - -
3      (Hearing concluded at 4:05 p.m.)
4          - - -
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 57

1          - - -
2      C E R T I F I C A T E
3          - - -
4
5      I do hereby certify that I am a Notary Public in good
6  standing; that the aforesaid proceeding was taken before
7  me, pursuant to notice, at the time and place indicated;
8  that the proceeding was correctly recorded in machine
9  shorthand by me and thereafter transcribed under my
10  supervision with computer-aided transcription; that the
11  transcript is a true record of said proceeding; and that I
12  am neither of counsel nor kin to any party in said action,
13  nor interested in the outcome thereof.
14      WITNESS my hand and official seal this 15th day of
15  May, 2016.
16
17
18
19      Notary Public
20
21
22
23
24

15 (Pages 54 - 57)

[& - anchor]

| & |
|---|
| **&**  2:6,17 3:5 4:15 |

| **1** |
|---|
| **1**  15:10 |
| **10**  37:18 51:9 |
| **100**  14:18 17:2,7 |
| **11th**  20:14 |
| **12**  3:8 17:9 |
| **12th**  2:6 20:19 55:16 |
| **14**  14:6 51:17 |
| **15**  10:5 23:3 |
| **15th**  57:14 |
| **16th**  2:12 |
| **18**  17:9 |
| **1893**  8:16 |
| **19**  3:5 |
| **19013**  1:16 |
| **1902**  8:17 |
| **19102**  2:13 |
| **19107**  2:7 20:20 55:17 |
| **1927**  8:18 |
| **19406**  2:18 |
| **1959**  39:23 |
| **1979**  35:10 |
| **1981**  35:19 |
| **1996**  13:11 |

| **2** |
|---|
| **2**  15:14 |
| **20**  18:2 |
| **200**  2:18 11:9 16:22 33:23 |
| **2009**  21:10 |
| **2014**  9:19 31:6 |
| **2016**  1:9 13:6 57:15 |
| **21**  2:6 3:12 20:18 55:16 |
| **215.560.2757**  2:7 |
| **215.665.5324**  2:13 |
| **23**  3:13 |
| **25**  46:23 |
| **27**  3:14 33:12 |

| **29**  24:6,11 |
|---|

| **3** |
|---|
| **3**  15:17 |
| **30**  3:15 24:6 36:23 |
| **300,000**  14:10 |
| **3200**  2:12 |
| **33**  3:16 10:6 21:24 31:6,10 53:8 |
| **3300**  46:17 |
| **35**  3:17 |
| **36**  3:18 |
| **39**  3:19 |
| **3:00**  1:16 |
| **3rd**  2:6 20:19 |

| **4** |
|---|
| **4**  1:9 3:5 15:20 |
| **40**  14:8 |
| **400**  53:20 |
| **42**  3:20 |
| **46**  3:21 |
| **47**  3:22 |
| **48**  3:23 |
| **4:05**  56:3 |

| **5** |
|---|
| **5**  15:23 43:18 |
| **50**  2:12 3:5,9 18:15 18:15 24:21 |
| **55**  3:5 |
| **57,000**  25:14 |

| **6** |
|---|
| **6**  16:3 |
| **6,000**  8:24 |
| **600**  14:18,20 31:16 |
| **610.205.6014**  2:19 |
| **620**  2:18 |

| **7** |
|---|
| **7**  16:5 38:24 |
| **7500**  14:7 |

| **8** |
|---|
| **8**  3:7 16:9 |
| **8900**  14:10 |

| **8th**  13:6 |
|---|

| **9** |
|---|
| **9**  37:18 |

| **a** |
|---|
| **ability**  16:24 28:20 |
| **able**  24:13,14 25:18 26:16 35:14 42:15 46:21,24 |
| **absenteeism**  37:15 |
| **absolutely**  54:16 |
| **abuse**  25:16,24 |
| **academics**  52:24 |
| **accept**  20:12 |
| **access**  11:1 16:2 25:17 53:16 54:20 |
| **accomplish**  28:6 |
| **accomplished**  23:2 |
| **account**  38:3 |
| **accountable**  11:2 16:5 |
| **achieve**  16:13 |
| **acquiring**  54:8 |
| **acquisition**  1:1 17:6 33:16 |
| **acquisitions**  7:21 14:21 |
| **acres**  26:11 |
| **acting**  14:3 |
| **action**  57:12 |
| **acuity**  38:4 |
| **acute**  8:20 14:18 16:21 21:18 23:10 24:1 25:21 30:23 31:24 41:13 |
| **add**  20:8 |
| **added**  38:23 |
| **addition**  14:15 17:23 |
| **additional**  38:23 45:20 |
| **additionally**  28:4,22 |
| **address**  20:14,17,17 20:21 39:16 55:16 |

| **addressing**  42:8 |
|---|
| **adds**  46:20 |
| **admission**  38:13 |
| **admitted**  23:9 28:13 30:7 |
| **adolescent**  25:7 |
| **adopt**  17:15 |
| **adult**  25:6 |
| **advance**  13:3 20:23 45:1 46:3 |
| **advanced**  21:15 |
| **advent**  26:22 |
| **advise**  7:6 |
| **advisory**  18:14,14 |
| **advocating**  38:8 |
| **affect**  38:19 46:16 |
| **affiliation**  13:20 18:23 |
| **afford**  33:20 |
| **affordable**  34:14 |
| **aforesaid**  57:6 |
| **afternoon**  4:1 8:7 12:11 33:9 36:21 39:19 42:6,8 47:17 48:22 |
| **agencies**  9:10 |
| **ago**  32:1 |
| **agreed**  41:7,8,14 |
| **agreement**  13:5 20:7 41:5 |
| **agreements**  14:16 |
| **ahead**  50:22 |
| **aid**  51:21 |
| **aided**  57:10 |
| **aids**  43:5 |
| **alcohol**  40:4 |
| **alignment**  16:1 |
| **allow**  24:9 |
| **allowing**  11:11 27:5 |
| **ambulance**  44:7 54:9 |
| **ambulances**  44:4 |
| **amy**  3:18 36:20,22 |
| **anchor**  24:20 |

ancillary 38:4
angeles 12:16 51:21
annette 3:22 47:14
47:17
answered 33:6
anxious 46:15 47:3
53:7
anybody 4:24 7:8
19:8 20:13 39:16
45:21
apologize 13:2
20:23 35:5 46:3
47:12
appendix 39:23
applaud 44:21
applicable 17:8
appointment 28:18
28:22
appointments 18:11
appreciate 44:22
46:3 47:9 50:9,9
55:11
appreciated 39:24
43:23 44:16
appropriate 25:19
25:20 37:7
approval 6:4,21
18:22
approve 5:21
area 6:12 8:24 12:14
25:2 26:19 30:1
43:13 45:1
areas 14:13 41:11
arm's 5:23
array 24:13
art 32:13
aspects 13:23
assesses 28:19
assessment 5:22
assets 4:8,12 5:9,13
5:17 6:21 7:1 17:3
associate 30:19
48:23
associated 40:3

assume 11:12
assurance 17:20
41:16
assured 39:10
attached 35:21
attack 23:9
attacks 37:10
attendance 56:1
attending 8:11
attention 4:7
attorney 2:5,5 3:5
4:15,17,18,19 5:4,7
5:14 7:5,10 8:8
12:18 20:15,16 51:2
55:11,19
attorneygeneral.gov
2:8
attract 17:1
audience 7:8 31:2
auditorium 1:14
18:4
availability 6:11
average 36:16
avoid 20:5
aware 26:23 40:16
50:13

**b**

b 35:9
babies 51:9
back 4:23 5:1 8:15
19:10 23:11 31:3
33:4
background 13:10
barebones 37:17
barth 4:17 55:21
base 24:22 39:7
based 11:1 13:21
15:16 16:5 22:23
23:1 25:11 30:11
38:1,7 39:8 47:20
basis 38:5
bated 44:23
battlefield 36:8

becoming 43:1
beds 14:7,19
bedside 34:1 35:15
beginning 7:11
behalf 7:16 24:15
27:6 51:1 55:11
behavioral 10:16
17:12 23:23 24:4,15
24:23 25:1,3 26:3
53:22
believe 12:4,20
16:10 22:3,8,12
23:3 30:13 41:18,19
50:5
benefit 11:14 14:23
17:4 40:11
benefits 6:3 10:23
11:8 15:13 17:8
30:1 43:21
best 12:5 14:1 17:21
31:17 33:1 38:10
39:11 54:11
better 14:4 23:8
52:9
beyond 34:20
bible 42:10
biggest 36:6 49:6
bipc.com 2:14
bit 32:6 37:5
bitter 42:15
bittersweet 42:14,15
bless 49:24
board 9:19 10:4,5
17:22 18:14 31:4,16
32:23 39:21 40:8,9
40:14 53:8
boards 18:14
bodies 34:1
bonuses 6:6
boots 23:12
border 34:20
born 31:23 32:18
35:12
borough 46:17,22

boston 12:14
boulevard 1:15
breaks 35:17
breath 44:23
bring 4:6 11:8 35:12
53:4,10
bringing 4:23 54:9
brinton 36:4
brought 32:6 54:15
brounce 3:17 35:6,8
35:9 54:15
brown 35:4
buchanan 2:11
budget 38:1 39:8
build 18:24
burn 10:17
business 2:18

**c**

c 2:3 23:21 27:15
35:9 36:22 46:10,10
50:3 57:2,2
california 14:14
52:13
call 8:2,3 21:1 36:9
43:2 45:24
called 19:14 24:21
28:23
cancer 22:7
capabilities 11:2,4
16:6
capable 28:14
capital 11:10 14:23
16:21
caputo 3:13 23:19
23:20,20 31:11
53:23
care 8:20 9:21 10:15
10:19 11:2 13:14,15
13:16,18 14:11,18
14:19 15:6,14 16:6
16:21 19:2,3 21:7
21:11,15,17,18,18
21:20,24 22:9,11,17
22:17,19,21 23:1,5



23:8,10,11,12,14
24:1,9 25:18,21
26:4,7,14,16 27:3,4
28:1,8,15,21 30:8
30:22,23 31:21,24
31:24 32:3,5,7,12
35:15 36:15,16 38:8
38:12,15,17,20
39:11 40:20 41:13
48:4 49:20 50:12
52:3,5,8,9,12,23
53:3
caring  15:7 31:4
carry  38:17
case  6:18 26:3
cases  5:10 29:7
categories  28:7
cathlin  2:11
cathlin.sullivan
  2:14
caught  9:15
center  1:14,15 2:18
  24:19 25:17 30:21
  42:16
centered  15:6
centers  8:21 10:13
  14:8
ceo  3:7 7:16 8:4
certainly  20:20
  52:16
certify  57:5
chair  27:17,19 29:7
  30:19
chairman  23:23
  39:21
challenged  32:7
championship
  53:10,12
chance  4:6
change  9:24 10:11
changes  18:10 40:23
changing  9:5
charged  5:5
charitable  2:6 3:5
  4:12,15 5:8,12,17

6:15,16 7:1,4 20:18
charities  5:6
charity  10:19 17:16
charlotte  1:16
chester  8:16 25:12
  26:20,21 30:21
  33:11 34:19 36:2
  42:16 45:14 47:19
  47:21 49:3,7,9
child  25:7
children  31:20,21
  40:5
chose  36:24
chosen  53:7,9
christiana  36:13
christine  3:12 21:2,4
chronically  22:13
ciach  3:21 46:1,2,7
  46:10
citizens  4:6
city  33:11 44:9
  45:14 47:21 49:9,20
ckhs  3:7 40:14,15
clark  1:14
clinical  16:1 18:11
  23:14 30:20
clinicians  21:16
  22:4,17
clinics  13:20 14:8
close  35:6 49:10
closed  10:12
closing  33:3 49:4
cmes  29:11
cms  18:6
collaborate  27:2
collaborating  14:4
collaborations
  26:19
colleague  12:15
  46:12 47:5
colleagues  27:3
combination  39:6
come  4:3 9:3 18:2
  19:16,17 20:6,21
  21:23 25:9,17 30:5

33:3,17 34:22,23
  36:2,24 37:4 40:10
  45:11,22 51:22 54:2
  55:20
comes  33:4 34:16
comfortable  32:2,12
  32:15,16,24
coming  4:2 12:19
  42:20 43:22 50:8,8
  50:9 51:5,5
comments  20:1
  31:18 45:10 46:3
  55:15
commitment  12:2
  15:11,15 34:2,3,4,5
  39:4 51:11 55:3
committed  13:22
  16:20 17:5,10 18:7
  18:13 40:15
committee  10:6
  27:20,22 29:6 31:6
committees  29:4,5
common  6:20
commonwealth  1:18
  2:8
communication
  14:4
communities  14:5
  15:2,8 19:4 33:19
  34:6 40:11,13,24
  41:17,20,24 44:3,21
  51:10,12,21
community  8:9,10
  9:3 10:20,23 11:6,8
  11:17,19 12:7,21,22
  13:21 15:13,15 16:4
  16:16 17:2,18 18:15
  18:17 21:11,12
  22:11,14 23:16,24
  24:9,11,17,17 26:2
  26:21 30:8 32:4,9
  33:21 34:15,19 35:1
  37:1 40:6,21 41:15
  42:14,18,20 43:12
  43:15,24 44:1,1,15

44:20 45:2,6,8,8
  47:19,20 48:1,12,12
  48:14,23 49:4,9,17
  49:19,21 51:4,19
  52:21 53:15 54:12
community's  9:17
  10:1 40:16
companies  9:9
company  13:12
  17:14,14 30:12
  51:15,17 52:14
compassionate  19:2
competent  28:14
completing  18:22
components  52:20
computer  57:10
concept  22:8
concern  47:23 51:7
concerned  48:2
concerns  4:7 20:1
  33:18 45:10 50:12
  50:14,14
conclude  55:24
concluded  56:3
concludes  45:19
  55:7
conclusion  55:21
conditions  38:19
connecticut  14:17
connection  14:21
consider  9:24
consistent  7:2,3
  17:18,21
constantly  32:8,8,9
constituency  44:10
constituents  18:19
consummating
  18:23
continually  38:6
continuance  41:12
continue  9:16 10:21
  10:22 30:14 32:21
  41:7,10,11,24 47:2
  47:24 48:4

[continued - dr]                                                                Page 4

continued  11:22
  41:13,15 43:11
continues  15:2
continuing  15:10,23
  54:10
contraction  17:14
contracts  6:6,7
contribution  17:3
convey  46:14
coordinate  13:17
  52:9
coordinated  13:13
  19:2 22:19,21 23:11
  27:4 52:5
coordination  13:14
corporate  6:7
corporation  5:12,13
  41:4
correctly  57:8
cost  15:7 54:20
costs  9:8
council  27:19 45:14
councilman  45:15
councilwoman
  45:14
counsel  7:21 57:12
counseling  22:5
  43:5,5
country  19:5 23:7
  32:8 52:18
county  4:6 6:12,20
  8:14,17,22 9:22
  12:3,7 21:10 22:1
  25:1,13 26:15 34:18
  34:20 40:4 41:3
  42:1 49:7,7,8 52:15
  54:22,24
county's  8:23
court  1:17 6:19,20
  6:23 7:6
court's  6:24
cover  49:7
covert  3:23 48:20,22
  48:23 49:14 50:3,3

crc  13:14,17 14:24
created  28:11
credential  28:11
credentialed  28:21
crippling  49:17
crisis  26:10
criteria  9:23
critical  17:10 30:22
  37:7 38:12
critically  22:13
crozer  1:3,14 2:14
  4:8,13 5:11 6:18
  7:15 8:5,11,13,16
  9:7,13 10:6 11:3,16
  11:20 13:6,7 14:15
  15:5,9,11,18 16:10
  16:20,22,24 17:7,16
  17:18,20,24 18:23
  18:24 21:7,10,14
  23:15,22 24:8,17,21
  26:21,21 27:16
  30:21 31:22 32:3
  33:12,14,15 35:1
  36:4,23 38:5 39:2,7
  39:13,13,22 40:1,7
  42:16 43:1,3 46:11
  46:19,22 47:1,22
  48:5,8,13 52:16,19
crozer's  17:3 38:1
crucial  16:12
cullinan  3:18 36:20
  36:21,22
current  11:13 18:10
  48:12
currently  14:6 21:6
  23:22 24:24 33:13
  39:8,20
cutting  53:22

d

d  3:2 21:4 30:19
  33:10 42:7,7,7
daily  38:5
dan  30:18

dangerous  37:20
daniel  3:15 30:17
date  1:16
day  18:3 39:23
  46:18 57:14
days  18:3
deaf  38:9
dealing  5:23
dealt  43:3
decided  9:19
decision  5:21
decisions  27:23
declined  9:12
decrease  38:14
dedicated  6:16 45:5
dedication  11:22
defined  17:4
definitive  13:5
delaware  4:6 6:12
  6:20 8:14,17,22
  9:22 12:3,7 21:10
  25:13 34:18,20 40:4
  41:3 42:1 49:7
  52:15 54:21,23
deliver  9:21 15:6
  52:3 53:13
delivered  22:18 51:9
delivering  15:14
  16:17 19:1
delivery  13:13,23
  16:12 19:4 37:20
  54:23
density  14:13
department  17:11
  31:8 50:13
departments  9:11
  49:6
depending  46:19
depletes  37:14
deputy  2:5 3:5 4:15
  4:18,19
deserve  34:12,16
designed  40:11
desperately  44:10

details  47:4
determination
  25:18
determine  5:15
develop  11:3
development  42:19
dialogue  54:8,11
differ  37:24
different  18:2 25:6
  35:11 52:3,13
difficult  9:15
diligence  5:20
direct  38:16
direction  16:17 34:8
director  24:2 47:18
directors  6:3 40:8
  40:15
discontinuing  44:12
discuss  37:4
disease  22:3
distinction  44:20
distinguished  19:1
district  25:13
diverse  14:12 40:21
division  6:19 43:2,3
dna  51:13,14,24
doctor  21:9 22:2
doctors  21:22 45:5
documented  37:11
doing  37:6 38:9
dollars  45:17
donohue  3:12 21:2,3
  21:4 31:11
door  30:14
double  46:18
dozen  10:4
dr  3:12,13,14,15
  7:17 21:2,3 23:19
  23:20,20 27:11,12
  27:14,14 30:17,18
  30:21 31:11,11
  32:22 34:22 35:11
  36:15 49:12 50:19
  50:20,21,24 53:23
  54:5

| | | | |
|---|---|---|---|
| dramatically 16:23 | elimination 38:12 | esteemed 46:12 47:5 | facility 11:11 |
| driven 41:23 | elizabeth 45:15 | evaluation 28:19,24 | fact 37:11 |
| drug 40:4 | emergency 9:10 | everybody 12:11 | factor 16:12 |
| drugs 18:7 | 10:17 17:11 26:11 | 55:2 | factors 37:23 |
| due 5:20 | 29:16 | evidence 15:16 | failed 53:11 |
| duplication 52:11 | emphasis 13:16 | examine 6:10 | fair 5:16 26:11 |
| dupont 3:15 30:17 | 41:11 | example 18:6 30:4 | falls 37:10 38:9 |
| 30:18,19 35:11 | emphasize 34:18 | excellent 41:10,20 | families 34:12 |
| 36:15 49:12 | employee 18:2 | 41:23 | family 21:9,13,21 |
| duties 38:18 | 33:12 36:15 41:9 | exceptional 15:17 | 22:2 28:13 29:16 |
| duty 6:24 | 42:24 | exchange 6:3 | 32:4,16 35:12 36:12 |
| dynamic 40:19 | employees 6:3 10:18 | excited 10:9 22:17 | 43:2 48:3 |
| **e** | 11:14,15 12:6 15:19 | 23:15 26:22 52:14 | fast 46:12 |
| e 1:13 2:3,3,11 3:2 | 16:11 17:24 18:20 | 53:4,14,19 55:1 | feel 20:21 32:2,12 |
| 21:4,5 27:15 33:10 | 35:1 51:4,12 52:22 | excitement 27:7 | 32:24 36:13 55:20 |
| 35:9 39:20 42:7 | 53:24 | exclusion 18:6 | fellowship 29:15,19 |
| 50:3 57:2,2 | employer 8:23 | excuse 37:6 49:12 | 29:20 |
| eager 27:2 | employment 6:7 | 50:1 | fiduciary 5:20 |
| eagles 53:10 | 17:24 18:9 41:10 | executive 27:19,21 | final 16:15 46:13 |
| earlier 20:10 | employs 21:14 | 47:18 | financial 9:18 |
| earmarked 33:24 | enable 9:20 | exercise 5:20 22:6 | find 20:17 36:8,10 |
| earn 10:19 | endorse 32:21 | exhaustive 10:3 | 45:9,12 47:3 |
| ears 38:9 45:10 | ends 50:6 | exhibits 20:13 55:16 | fingerhut 2:5 3:5 |
| east 3:8 7:19 12:10 | endured 38:11 | exist 16:10 | 4:1,14 12:8 19:6 |
| 12:13 51:21 | engaging 28:2 | exists 11:20 | 23:18 27:10,13 |
| economic 16:1 | enrolled 14:10 | expand 11:16 17:1 | 30:16 33:7 35:3,7 |
| economy 47:6 | ensure 6:2 15:21 | 17:13 24:14 | 36:19 39:15 42:4 |
| edge 53:22 | 18:16 | expansion 17:13 | 45:18,24 46:6,8 |
| education 1:14 | ensures 28:12,24 | expect 30:13 | 47:7,12,15 48:19,21 |
| 10:20,21,24 15:13 | 29:8 | expectation 30:9 | 50:5,20,22 55:6 |
| 17:17 28:6,9 29:14 | ensuring 11:13 15:1 | expected 38:17 | firm 9:23 |
| 40:6,20 41:12 | 16:15 28:1 | expertise 14:24 | firmly 41:18,19 |
| educational 11:19 | entered 14:16 | explain 43:21 | first 8:2,4 19:14 |
| educators 22:24 | entire 40:14,16 | expressing 8:7 | 20:15 21:1,1 28:17 |
| effective 15:7 | environment 9:4,21 | extending 10:23 | 31:1 44:22 48:24 |
| efficient 15:6 | envision 54:21 | 15:12 | 49:14 52:18 |
| effort 31:7 40:17 | equipment 11:12 | extent 23:5 | fiscally 23:7 |
| 55:13 | 35:18 36:9 54:15,16 | extra 23:1 | fits 37:22 |
| efforts 35:14 | errors 37:10 | eyes 45:10 | five 11:10 14:13 |
| eight 16:8 | especially 50:8 | **f** | 16:23 17:6,16 19:24 |
| ekg 38:13 | esquire 2:11,17 3:19 | f 1:16 57:2 | 31:20 43:9,9 48:17 |
| elderly 44:1 | establish 18:13 | facilities 13:8 16:24 | fixed 52:20 |
| elected 43:1 | 21:23 | 21:19 54:14 | floor 2:6 20:19 54:3 |
| | established 9:23 | | 54:3 55:17 |
| | 13:11 | | |

floors  34:23
flyers  53:11
focus  6:5
focused  28:18
focuses  13:14
folks  43:18 48:9
following  8:1 15:9
  29:1
follows  19:13
forced  40:24
forth  43:8
fortunate  42:1
forum  43:17 48:11
forums  18:2
forward  16:13
  18:21 30:15 32:11
  32:14 33:1 45:16
  47:2,6 54:10,14
found  42:2
foundation  11:16,17
founded  8:16,17,18
four  8:20 10:4 51:17
fppes  29:8
fragile  24:16 25:8
  26:8 27:6
francis  36:13
franklin  2:17
fraud  18:7
free  5:23,24 20:21
  55:20
freedom  2:18
fresh  31:12
front  22:10
fulfill  11:20
full  5:16 10:4 11:14
  34:10 53:3
fully  17:7 33:16
fund  17:7,17
funded  29:11
funds  6:15
further  11:3 41:16
furthering  16:1,5
future  6:23 8:11
  15:21 48:15

g

g  33:10
gail  3:19 39:18,20
game  38:6
general  2:5,5 3:5
  4:15,17,18,19 5:4,7
  5:14 7:5,10 20:16
  20:16 55:12,19
general's  8:8 12:18
  51:2
generation  53:2
geriatric  25:7 26:13
  29:20
geriatrics  30:7
getting  36:16 52:9
give  4:5 20:22 23:1
  23:8 43:16 44:8
given  7:2 19:24
  46:18
go  4:23 5:1 8:15
  9:16 13:2 35:14
  36:2,8 49:2,9,16
  50:22
goal  15:1 16:15 28:1
  29:23 52:9
goals  15:9 16:14,19
god  49:23
going  7:23 12:24
  13:1 19:7,23 20:23
  21:1 32:14 35:24
  37:5 43:11 44:6,14
  46:19 47:2 49:1,16
  49:21
golden  6:8
good  4:1 8:6,23
  12:11 18:1,1,5,9
  33:9 35:15 36:21
  39:19 42:6,8 47:17
  48:22 57:5
governance  11:6
  27:20 41:16
government  9:9
  46:23 51:21

graduate  28:5,9
graduates  30:2
grandchildren
  31:21,23 32:18
grateful  36:1
great  45:2 49:18
greater  23:5,15 30:1
greatly  43:23 44:16
  44:16
grew  21:10,12
grips  9:3
ground  19:12 23:12
grounds  26:12
group  52:2 53:20
grow  53:18
growing  13:11 16:3
grown  8:19 52:14
growth  11:15 15:17
  15:21 53:17
guard  28:15
guess  42:1,8
guys  48:10
gyn  29:17,17

h

h  21:4,5 27:15 33:10
  39:20 42:7 46:10
hallelujah  44:18
hand  57:14
happen  12:5
happened  35:20
happens  48:17
happy  32:18 33:3
hard  12:18 22:4
  45:4
harriet  2:17
hate  31:2
haverford  36:3
health  1:3,14 2:14
  4:9,13 5:11 6:19
  7:15 8:5,9,11 9:1,6
  9:13,14,17,21 10:16
  10:20 11:4,18,21
  12:3,6 13:6,15,21
  14:23 15:7 17:12,17

18:18 21:7 22:9,24
  23:4,16,22,24 24:1
  24:4,5,15,19,23
  25:1,3,5,15 26:3
  31:5,9,22 32:3,10
  33:1,12,19 35:1
  38:22 39:13,21 40:4
  40:6,8,8 41:6 44:2
  48:23 50:13 52:23
  53:4,23
healthcare  4:8,9
  5:12,13 6:11 7:1,17
  8:14,22 9:4,5 10:2
  12:20 13:9,11,13,23
  14:5,9,17 16:3,12
  16:18 19:4 22:19
  23:6 33:24 34:16
  39:24 40:12,20 41:1
  41:3,18,21,23 48:4
  51:11 54:23
healthier  22:15
  23:13
hear  19:7 43:17 52:4
  55:10
heard  43:14 44:5
  45:4
hearing  1:13 4:5
  7:10 19:12,23 20:21
  49:3 51:5 55:19,22
  56:1,3
heart  23:9 26:2,20
  34:24 37:9
hearts  45:9
held  1:13 4:12 53:8
hello  27:14 30:18
help  11:3 24:10
  30:21 44:12 49:21
helps  4:11 13:17
henry  3:12 21:3,4
  31:11
heygood  3:16 33:8,9
  33:10 54:2,4
hf  2:19
hi  31:2 35:8

**high**  6:8 14:13,22
  15:1,14 19:1 28:1,8
  28:15 32:13 40:20
  52:10
**higher**  37:14
**highest**  14:2
**highly**  16:10
**hired**  30:2
**historic**  41:13
**historically**  15:8
**history**  9:2 19:1
  23:21 35:10 46:22
  47:21 52:1
**hiv**  43:5,5
**hold**  22:20
**holdings**  1:6 2:20
  3:9 7:18 10:7 11:24
  27:8 39:3 42:3
**hole**  41:22
**home**  23:1 26:13
**hope**  32:15,17 44:5
  47:1 53:24
**hopeful**  39:2
**hopefully**  53:7
**hoping**  43:11,14
  44:7
**hospital**  5:18,22 7:3
  8:16,16,18 22:15,22
  23:24 24:1 30:20,24
  30:24 31:22 32:15
  32:17 33:17 34:8,13
  34:17 36:6,10,24
  37:1 38:24 40:1
  43:3 45:6 49:4,10
  52:6,7 53:1 54:13
**hospital's**  5:19 7:4
  51:14
**hospitalists**  30:5
**hospitals**  8:20 9:14
  10:12,13 13:7,20
  14:7,17,22 16:21
  21:18 23:10 25:10
  25:21 30:3,23 31:24
  32:2 34:6 36:17
  40:19 41:14 50:14

51:10,17,19 52:22
**hours**  38:21
**hundred**  8:15 21:14
  40:18
**hung**  42:17
**hyphen**  21:5

**i**

**idea**  22:3
**ideal**  53:21
**ideals**  34:9
**identified**  10:7 29:1
**identify**  19:17,18
  49:13
**ignored**  38:5
**illness**  22:5
**imagine**  35:20 46:15
**immediate**  29:24
**immediately**  8:1
**immensely**  30:2
**immortalized**  30:15
**impact**  9:6 23:15
  34:18 38:16 40:23
**impacts**  6:11
**implementation**
  14:24
**importance**  18:18
**important**  4:10 11:8
  22:9 26:7
**importantly**  18:19
  51:3
**improve**  11:21 23:4
  34:13 54:20,20
**improved**  19:4 39:4
  39:9,12
**improvement**  17:21
  28:2 29:3 47:19
**improvements**
  11:12
**improving**  15:24
  16:2
**inadequate**  37:8
  38:21
**include**  15:9

**includes**  5:22 22:23
  24:3
**including**  11:13
  13:24 18:3,19 43:7
**increase**  38:24
**increased**  9:11
**increases**  38:22
**increasing**  16:24
**incurred**  41:9
**independent**  21:17
  31:14,15
**indicated**  57:7
**individual**  28:20
**industry**  17:21
**infants**  40:5
**influence**  37:9
**information**  4:4
**infrastructure**  11:2
  16:6
**ingersoll**  2:11
**initiatives**  15:21
  28:3 30:13
**injury**  38:22
**innovation**  22:19
**innovative**  13:12
**inpatient**  9:11 16:20
  26:9 32:1
**input**  4:10 12:23
  16:16 18:16 27:22
  43:15,16
**installed**  35:19
**institution**  29:13
  37:24,24
**institutionalized**
  25:9
**institutions**  27:17
**insurance**  9:9
**intact**  34:7,13
**integral**  24:22 28:5
**integrate**  52:8
**integrated**  13:18
**integrity**  14:3
**intensive**  10:15
  25:23 26:3

**interactions**  30:11
**interest**  8:10
**interested**  57:13
**interests**  4:11 5:8
  31:17
**intermediate**  25:13
**internal**  21:21 29:15
  29:18 30:5,6
**introduce**  7:13
**inurement**  5:24
**invest**  33:23
**invested**  35:24
**investment**  11:10
  54:14
**investments**  16:21
**involve**  6:2
**involved**  31:4 37:24
**involvement**  48:15
**island**  14:14 54:18
**issues**  28:7 37:3
  44:2

**j**

**james**  1:13
**january**  13:6
**jealously**  28:16
**jersey**  14:15
**joan**  3:7 7:16 8:4
  53:9
**jobs**  8:24 10:18
**john**  12:16
**join**  20:10
**joined**  42:2
**joining**  27:8
**jointly**  29:12
**jonathon**  7:19
**journey**  32:21
**justice**  12:2

**k**

**k**  27:15,15 39:20
  42:7,7
**keep**  10:18 16:20
  20:11 23:13 46:2
**keeping**  34:5

kenneth 3:23 48:23
kevin 3:13 23:19,20
key 10:14,22 15:11
  27:23 41:11 43:7
keystone 1:3,14 2:14
  4:8,13 5:11 6:18
  7:15 8:5,11,13 9:7
  9:13 10:6 11:3,16
  11:20 13:6,7 15:5,9
  15:11 16:22,24 17:7
  17:24 18:23 21:7
  23:22 26:21 31:5,22
  32:3 33:12 39:13,22
  40:7 47:22 48:24
  49:14 52:16,19
keystone's 15:18
  16:20 17:16,18,20
  18:24
killing 35:15
kim 3:17 35:4,8
kin 57:12
kind 32:2
king 2:18
kirkland 3:20 42:5
  42:6,7 49:18 54:7
know 12:22 13:4,4
  33:18 37:3 39:15
  44:14 48:14 49:2,16
  50:11,16 51:8 52:7
  53:9 55:1,3
known 13:13 37:9

**l**

l 36:22,22 42:7
labor 37:19
lake 36:4
large 8:10,21 22:11
  29:13
larger 29:23
largest 8:22,23
larry 4:17
laugher 44:17,18
laughter 44:23
  45:17 46:7,13 48:6
  50:4 53:13

launched 54:19
law 6:17
laws 17:8
lead 39:16
leader 21:6 23:14
leaders 18:17 54:23
leadership 11:15
  15:18 27:23 40:19
  52:19
leading 37:14
learn 40:10 52:1
learned 52:3
lee 2:17
left 37:17 38:7,9
length 5:23
leslie 3:16 33:8,10
level 23:1 25:18 26:7
levels 34:3 37:14
lew 3:9 7:17 12:15
  32:22 34:22 50:19
  50:20,21,24 54:5
liabilities 11:13
liberty 2:12
licensed 14:7
lines 10:14 17:11
  43:7
linking 26:5
list 18:6,8 20:6
  45:19,23 47:11,13
  48:16,20 50:6
listen 4:3 39:3
little 37:5 46:4
live 21:12 22:14
  24:11
lives 22:15 45:6
living 48:5
loans 6:7
local 11:6 12:20
  17:22 18:13,14,17
  22:24 26:13 33:14
  41:15 51:19
locality 36:18
located 14:12
locations 21:24

long 23:21 38:21
  47:21 48:6
longer 35:13 42:15
look 16:13 18:21
  20:14 35:23 45:16
  47:6 54:10,13
looked 10:3 41:5
  43:6
looking 44:19
los 12:15 51:21
lose 33:20
lot 26:17 35:10,20
  48:8 49:2,9,20
  52:10
lunch 35:17

**m**

m 3:19
m.d. 3:9
machine 57:8
main 47:23 48:7
maintain 17:19 26:7
  46:24
maintaining 14:2
making 17:2 55:12
male 46:5
managed 40:12
management 11:4
  13:15 16:1,7 18:1
managers 26:4
manages 14:9
manner 15:7
markets 14:13
marshall 1:17
mary 4:19 5:2 45:19
material 7:24
maternity 17:12
  36:23 37:17
matter 1:1 45:3
matters 18:17
mayor 3:20,21 42:5
  42:6,8 45:24 46:2,7
  46:10,11 47:5 48:11
  49:18 54:7,7

mayors 50:9
mean 16:16 18:1,5
  34:15
meaningful 11:5
  18:16
means 5:7
mec 27:21 29:6
med 37:10
medicaid 51:20
  54:19
medical 1:6,15 2:20
  3:9 7:18 10:7,21,24
  11:24 15:13,23
  18:10 24:4 26:5
  27:8,16,19,19,21,21
  27:22,23 28:4,6,9
  28:13 29:5,11,12,13
  30:21 39:3,22 40:20
  41:12 42:2,16 50:10
  51:2 55:4
medicine 10:17
  15:16 21:9,21,21
  22:2 27:17 29:16,16
  29:17,18,19 30:20
  30:23
meet 9:17 10:1
  34:23,24 40:12
  43:19 54:11
meeting 15:7 52:18
meetings 53:8
member 40:7
members 8:8,9
  14:10 18:15 19:7
  38:12 45:14 49:8
memorial 8:17
mental 25:5,14 40:4
mentioned 48:11
merged 52:2
mergers 7:20
mess 49:11
met 10:5,6 31:6
  41:17
methadone 25:22
methods 39:6

metrics 29:2
michael 3:21 46:1
microphone 19:16
  19:21 33:4
million 11:10 14:20
  16:23 17:3 33:23
mind 46:6
minute 23:3
minutes 20:1 31:18
missed 47:12
mission 7:4 11:18,21
  11:23 12:1 15:10
  30:14 41:7
missions 30:14
mitchell 3:9 7:17
  12:15
model 13:13,17 15:1
  19:3 22:18 23:3,11
  27:4 38:1 39:8 52:3
  52:12,21 53:5,17,21
  54:23
modernize 17:1
mom 48:5
moment 42:14
money 35:23 36:2
  52:11
monitors 35:18,19
  35:21
months 17:9 28:17
  32:1
morale 37:14
mortality 37:11
  39:1
mothers 43:4,4
motivated 16:11
move 32:10 34:8
moving 20:11 30:15
multiple 8:20
mutual 16:14

**n**

n 2:3 3:2 21:4,5
  30:19 35:9 36:22,22
  42:7

name 4:14 19:21
  21:3 23:20 30:18
  33:10 35:8 39:19
  45:23 46:9 47:11,17
  48:20,22 50:2
name's 36:21
names 10:12 20:24
  41:13
nathan 3:14 27:11
  27:14
nation 41:22
nation's 29:23
navigator 48:24
near 6:23
nearly 14:18
need 15:3 20:20
  23:10 34:12 36:11
  39:5 44:4,11 54:16
needed 11:11
needs 8:14 9:17 10:2
  11:19 14:5 15:8,20
  24:16 34:16 39:7
  40:12,16 41:17
  54:11
needy 43:12
negatively 6:11
neighborhood 29:24
neither 57:12
neonatal 10:15
net 11:17 14:19
network 8:21 10:14
  13:8,9 21:16 24:2,3
  25:3 30:8 31:14
networks 13:19
  14:10
never 12:22 41:2
new 9:21 11:8,16
  14:15 30:9,10 34:8
  42:19,19,20
nichols 45:15
nifa 45:15
non 5:11 24:1
nonprofit 6:18
  40:18 41:22

normally 13:1 17:9
notary 1:17 57:5,19
notice 1:13 57:7
number 10:10 16:8
  30:4
numbers 38:6,7
nurse 22:23 35:9
  36:22 37:7,18,23
nurse's 38:23
nurses 33:15 35:16
  38:13,17,21 39:2,5
  45:5
nursing 26:13 38:16
  38:20 50:10,11

**o**

o 21:4,4 23:21 27:15
  30:19 33:10,10 35:9
  50:3
o'clock 43:18
ob 29:17
object 7:7
obligations 41:8
obstetrics 10:15
  29:17 43:8
obviously 46:20
occasions 18:4
occur 6:23
offer 17:23
offered 18:9
offering 13:12
offerings 16:4
office 2:5 4:16 5:4
  5:14 7:5,9 8:9 12:18
  20:12,15,16 21:24
  22:10 23:3 25:1
  51:2 55:11,19
official 43:1 57:14
oh 47:10 50:20
okay 35:7 39:16,17
  45:18 47:16 48:21
  49:22
okechukwu 3:14
  27:12,12,14,15
  30:22

once 19:8
oncology 29:17
ongoing 16:16 18:16
  28:12,23 29:10
  40:17 41:1
open 14:4 16:21
  34:6 45:9 53:18
opened 26:11
operate 40:11
operates 14:6
operating 14:24
operations 13:8
  14:12 50:4
opinions 34:9
oppe 28:24
oppes 29:8
opportunities 11:15
  15:18 29:11
opportunity 43:19
  43:20
options 6:6
order 19:15 41:21
organization 4:16
  6:18 19:18 20:4
  34:11 47:20 49:13
organizations 2:6
  3:5 10:4 20:18
orphan's 6:19,23
osteopathic 29:18
outcome 57:13
outcomes 14:2 37:9
  38:20 39:11 52:10
  54:20
outpatient 8:20
  10:13 14:8 21:19
  25:21,23
outreach 43:4
outside 4:19 22:22
  45:3
overall 37:10
oversight 17:22
overview 7:24 8:1
owns 14:6

**p**

p  2:3,3 23:21 30:19
  47:18
p.c.  2:11
p.m.  1:16 56:3
pa  2:7,13,18 55:17
packages  6:9
page  3:4,11
paid  5:16
pamela  2:5 3:5 4:14
parachutes  6:8
paramount  32:6
parens  5:5
part  12:21 13:9
  24:22 51:13,13
  52:18
participating  55:13
particular  24:8
parties  7:13,21,24
partly  10:10
partner  9:20 10:8
  28:5 48:8 55:4
partners  48:12,13
partnership  9:23
  11:23 26:15 42:19
  47:22 52:16
partnerships  24:24
  25:12 48:1
parts  52:13
party  6:9 57:12
pasnap  33:14
pastor  42:9
path  33:1
patient  14:1,2 15:6
  25:19 26:24 27:1,3
  27:7 28:2,10 31:8
  36:14,16 37:8 38:4
  38:8,15,17,20,23
  39:7,11,12
patients  12:6 13:18
  17:1 18:19 21:11
  22:5,14,22 23:5,8
  23:13 24:14,23 25:8
  25:9,17,24 26:5

28:15 34:11 37:18
  39:5,10 51:22
patriae  5:5
payment  9:8 44:23
pediatric  21:21
pediatrics  10:16
  17:12 29:16
peer  29:4,5,7
pennsylvania  1:15
  1:18 2:5,8 5:7 20:16
  52:15 54:24
penny  4:19 5:2
  45:21 55:21
penny's  19:10
pension  11:14 17:4
  41:9
people  8:14 9:22
  12:3 41:20 45:4
  49:19,20,21 51:4
percent  17:7 18:15
  18:15 38:24
perform  28:21
performance  17:20
performed  29:4,9
period  18:3 38:20
perks  6:6
person  20:3 22:10
personal  31:24
personalized  13:18
persons  42:23 43:12
petition  6:19
pfingerhut  2:8
pharmaceuticals
  9:8
pharmacists  22:24
philadelphia  2:7,13
  4:16 6:12 20:19
  24:7 26:19 30:1
  31:12 49:8 55:17
phillies  53:11
phlebotomy  38:13
physical  27:1
physician  8:21
  10:13 13:7 15:24
  16:2 18:17 21:6

24:3 28:18 51:8
  52:2 53:20
physician's  28:20
physicians  13:19
  14:11 16:2 18:16,20
  21:15,17,20 28:12
  29:10,24 30:7 31:14
  31:15,17,19 51:3,12
  52:8,22 53:2,19,20
pilot  54:19
pivotal  23:6
place  2:12 10:17
  17:13 24:9 33:17
  44:6,8 45:7 48:4
  52:20 57:7
places  36:3,5 51:22
plan  11:14 17:4,6
  37:2 48:14
planning  43:2
plans  13:21 33:23
  47:24
platform  28:12
playing  24:22
plea  39:3
pleas  6:20
please  19:21 55:20
pleasure  42:24
plug  53:21
podiatry  29:17
point  32:14 40:23
  48:10
policies  10:20 17:16
  27:24
population  11:3
  13:15 14:13 16:7
  22:9 24:16 25:4
  26:8,14,16 27:7
populations  10:23
  15:12 51:20
portion  43:6
position  10:1 11:24
  27:18
positive  39:11
possible  14:1 39:11
  49:4

post  6:7
potential  23:4
practice  15:24 21:15
  22:23 28:19,24 29:2
  29:3 30:3,8 31:13
  31:14
practiced  30:22
practices  17:19,22
  21:23 30:3
practicing  15:15
practitioners  22:23
pre  29:1
prepare  44:9,15
present  7:13,22
  48:13
president  3:7,8 7:16
  7:18,19,20 8:4
  12:10,12 23:23,24
  27:15,18 33:14
pressure  9:18
prevent  22:5
preventative  13:16
prevention  22:4
prices  34:14
primarily  51:20
primary  13:19
  14:11 21:7,15,17,20
  21:24 22:16 23:14
  27:2,20 30:8
prior  7:3,10 43:1
private  5:24 6:2
  41:3
privileges  18:11
probably  35:5 42:23
problems  44:3
procedure  46:4
procedures  27:24
proceed  7:23
proceeding  6:22
  57:6,8,11
proceeds  11:17
process  10:5 18:22
  28:23
professional  28:19
  28:23

**profit** 5:11,13 9:6
  34:10
**profound** 9:7
**program** 25:22,23
  26:1,12 29:18,21
  30:5,6 53:1 54:19
**programs** 10:21
  17:18,21 21:22
  29:15,22 40:5,5,6
  41:12 48:1,9
**project** 29:13 47:19
**promise** 9:22
**promised** 53:9
**promises** 6:2
**promoted** 36:4
**promoting** 14:3
**proper** 22:12
**prospect** 1:6 2:20
  3:8,9 4:9 5:14 7:17
  7:18,19 10:7 11:7,9
  11:12,24 12:10,12
  13:5,10,22 14:6,8
  14:16,22 16:19
  17:15,19,23 18:21
  18:24 22:18 26:23
  26:23 27:8 30:12
  33:23 39:3 41:7,14
  42:2 43:22 51:1
  55:4
**prospect's** 13:9
  22:18 23:11 41:6
**protocols** 15:16
**proud** 9:1
**provide** 4:3 7:24
  10:22 21:18 23:12
  25:2,6 26:17 28:14
  28:20 29:20 33:21
  35:15 36:6 40:19
  42:20 44:9 53:3
  55:15
**provided** 4:4 15:2
  29:10 32:3 34:14
  36:17 40:1 41:2,24
**provider** 8:22 24:20

**providers** 13:21
  25:2 41:22
**providing** 8:23
  15:11,17 19:23 28:1
  28:8,9 29:23 34:3
**provision** 14:9 28:5
**prussia** 2:18
**psychiatric** 26:6,10
  26:17
**psychiatrist** 24:10
**psychiatry** 23:23
  26:14
**psycho** 25:7
**psychotherapy**
  26:18
**public** 1:17 5:6 8:2
  19:8 57:5,19
**public's** 4:11 5:8
**pulmonary** 30:22
**purchase** 41:6
**purchaser** 5:17
**purpose** 4:5 7:10
**purposes** 6:16 7:1,2
**pursuant** 1:13 57:7
**pursuit** 16:19
**put** 45:22 49:23
**pyatt** 3:22 47:11,14
  47:14,16,18

                q
**qualified** 28:14
**quality** 13:17,23
  14:22 15:1,6 16:12
  17:20 19:1 28:1,2,8
  28:10,15 29:2,6
  31:8 32:5,5,7,13
  35:15 38:19 40:20
  48:3 50:12 52:10
  53:16
**question** 36:1 47:23
**questioned** 32:10
**questions** 7:9 8:3
  33:5 55:18
**quick** 53:6

**quite** 32:6

                r
**r** 2:3 21:5 35:9
  39:20 42:7 50:3
  57:2
**r.n.** 3:16,17,18
**radically** 9:6
**raised** 50:11,15
**rapidly** 9:5
**ratios** 37:18
**reached** 41:5
**reaching** 5:21
**read** 13:1 20:24 37:5
**ready** 53:21
**real** 28:19 49:11
**reality** 9:4
**realize** 40:24
**really** 26:2,6 47:9
  49:5 52:8,19,20,22
  53:3,15
**reardon** 3:8 7:19
  12:9,11,12 19:6
  32:22 34:23 50:17
  50:19 51:16
**reasons** 22:16
**reassure** 51:11
  53:16
**reassured** 30:12
**receive** 11:17 39:10
**recognize** 45:13
**recognizing** 16:9
**record** 13:2 57:11
**recorded** 57:8
**records** 5:19
**referring** 52:6
**regard** 7:9 16:14
  20:2
**regarding** 50:14
**region** 6:13
**regional** 13:14 19:3
  22:19,21 23:11 27:4
  52:5
**regulatory** 18:22

**rehab** 25:8
**rejuvenations** 26:12
**related** 6:9 27:23
**relationship** 42:20
  47:1
**relationships** 15:24
  16:9
**reliable** 32:13
**rely** 21:17
**remain** 6:15 10:14
  17:13
**remained** 37:2
**remarkable** 34:20
**removed** 39:24
**repeating** 20:5
**repetitive** 20:9
**report** 29:5
**reporter** 1:17 50:1
**represent** 4:11
  19:19 31:16
**representative** 42:9
**representatives** 11:6
  30:11 41:15
**represented** 4:12
  5:17
**representing** 2:8,14
  2:20 20:3 31:19
  45:8
**represents** 5:8
**reputation** 37:1
**require** 33:5
**required** 22:6
**requires** 6:17
**reside** 46:11
**residency** 21:22
  29:15 30:5,6
**resident** 33:11 48:2
**residents** 8:24 46:17
**resonates** 51:14
**resources** 12:1
  46:20
**respect** 15:4
**respiratory** 38:15
**responsibilities** 5:20

| | | | |
|---|---|---|---|
| responsibility 5:6 | 11:18 | 23:2 24:15 25:6 | small 46:16 |
| responsible 23:7 | satisfaction 39:12 | 26:6,18,18 33:21 | smoking 22:6 |
| restricted 6:14,16 | satisfied 16:11 | 34:7,13,19 36:7 | social 11:18 22:24 |
| result 10:11 18:11 | savings 54:20 | 39:21 40:1,8,21 | 25:7 26:6 |
| retire 37:2 | saying 32:24 42:22 | 42:21 43:7,8,21 | sold 10:12 |
| return 32:17 | 42:22 49:15 | 44:10,11,12 48:1 | solution 37:23 |
| revenue 14:19 | says 42:11,11 43:7 | 52:11 54:9 | somebody's 20:10 |
| review 5:14 6:1,5,14 | 44:20 | serving 8:13 51:19 | sorry 47:15 |
| 29:4,5,7 | school 25:1,11,12 | session 33:5 | soul 26:2,20 34:24 |
| reviewed 7:6 | screenings 22:6 | setting 22:12,22 | 34:24 |
| reviews 29:7 | seal 57:14 | 25:19,20,22 43:17 | south 2:6,12 20:18 |
| rhode 14:14 54:18 | search 9:20 10:3 | seven 32:1 | 55:16 |
| rich 9:2 25:3 | second 45:12 | severance 6:8 | speak 19:17 20:4 |
| richards 3:7 7:16 | secretaries 38:16 | severe 9:18 | 24:15 27:6 45:22 |
| 8:4,6 12:8 32:23 | secretary 37:19 | share 35:10 37:19 | 55:20 |
| richest 34:15 | section 2:6 3:5 4:16 | 47:4 53:6 | speaker 8:2,4 12:9 |
| right 5:2 7:12 10:7 | 20:18 | shared 15:5 51:16 | 19:20,24 21:1,1 |
| 12:15 19:16 28:13 | see 12:1 23:15 25:14 | sheet 19:11,15 | 23:19 27:11 33:8 |
| 41:19 55:4,5 | 41:6 42:16 45:22 | sheets 4:20,24 5:3 | 35:4 36:20 39:18 |
| risk 38:22 | 46:15 54:1,3 | short 12:4 | 42:5 46:5 |
| robust 28:11 29:3 | seeing 35:11 | shorthand 57:9 | speakers 19:14 20:4 |
| role 7:9 11:5 41:15 | seek 6:20 | showed 40:18 | 47:10 55:8 |
| roles 28:6 | seeks 18:24 | shown 8:10 | speaking 19:19 |
| room 26:11 | sees 37:1 | shut 53:17 | speaks 22:20 34:21 |
| rooney 2:11 | segment 52:6 | side 25:15,16 35:11 | special 6:6 |
| roots 8:15 51:19 | segregated 6:15 | 52:7 53:23 | specialized 36:7 |
| roughly 14:7 | self 5:23 | sign 4:20,24 5:1,2 | specialty 13:19 |
| rules 10:15 19:12 | selling 6:17 | 19:11,15 | 14:11 24:2,3 29:2 |
| 27:24 | sells 5:12 | signature 57:18 | specific 13:16 29:2 |
| rumor 49:3 | send 20:14 | signed 4:22 13:5 | 39:7 |
| rumors 49:2 | senior 4:18,18 7:20 | 19:9,15 | specifically 5:10 6:5 |
| run 36:10 | sentiment 47:5 | signs 42:16 | spees 7:20 12:16 |
| **s** | separate 40:17 | similar 54:22 | spell 19:22 46:8 |
| s 2:3,5 3:5 42:7 | serious 38:14 44:3 | simply 9:24 32:20 | 50:2 |
| sadly 34:1 | serve 11:22 14:4 | sincerely 16:17 | spelled 47:18 |
| safe 34:2,4 38:8 | 34:6 40:13 46:13 | sir 50:1 | spending 52:10 |
| safer 36:14 39:5 | served 15:8 | sit 43:17 48:10 | sports 29:19 |
| safety 14:3 28:2,10 | serves 33:20 | six 28:17 | springfield 27:16 |
| 31:8 37:8 | service 9:2 10:14 | sixers 53:11 | 30:20,24 |
| saint 36:13 | 16:3 17:11 24:22 | size 37:22 | squeeze 9:15 |
| salaries 6:8 | 41:11 43:11 44:4,7 | skeleton 38:7 | stability 54:1 |
| salary 10:19 | 46:13 53:3 | skewer 20:24 | staff 15:23 18:10 |
| sale 4:8 5:15,21,22 | services 9:9 10:15 | skilled 16:11 | 27:16,19,21,22,23 |
| 5:24 6:2,4,7,11,21 | 10:16,22 13:12 14:9 | skills 24:10 | 28:4,13 29:6,12 |
| | 15:12 17:2 21:7 | | 34:4,8,23 37:15 |



[staff - traditionally]                                        Page 13

38:8 40:14 41:10
 50:10,10,11
**staffing** 34:3 37:4,7
 37:9,17,23 38:1,7
 38:19,21 39:4,5,6,9
**standards** 14:2
**standing** 18:1,2,5,9
 57:6
**stark** 9:4
**start** 42:21
**state** 5:6 19:21 20:1
 25:10 32:8,13 42:9
 54:17,21,24
**statement** 3:4 4:22
 5:1 13:1 19:9 50:18
**states** 9:15 51:17
 54:18
**status** 11:21
**stay** 10:17 22:15
 34:13
**stays** 48:6
**stenographer** 19:22
**steps** 19:20
**stevens** 2:17
**stevenslee.com** 2:19
**steward** 24:17,18
**stolen** 18:7
**stop** 22:5
**story** 53:6
**strategic** 15:20
 16:17
**strategy** 10:6 31:6
**street** 2:6,12 20:19
 55:16
**streets** 26:4
**striving** 14:1
**stroke** 23:9
**strong** 15:23 21:16
 23:10 46:24
**strongly** 22:2
**struggled** 9:18
**studies** 37:12
**subacute** 14:19
**subcommittee** 29:6

**subjected** 28:18
**submit** 55:15
**subspecialties** 24:4
**substance** 25:16,24
**substandard** 35:17
**success** 19:2
**sufficient** 39:9
**suite** 2:12,18
**sullivan** 2:11
**summary** 30:9
**superb** 29:14
**supervision** 57:10
**supplies** 34:4
**support** 11:18 15:5
 22:21 23:2 38:4
 51:6
**supported** 29:12
**supporting** 10:24
 15:13,20
**supports** 11:22
 22:13
**sure** 6:24 10:1 48:6
 48:8,9 50:12
**surface** 51:18
**surgery** 24:4
**surgical** 33:13
**surrounding** 43:13
**survive** 41:21
**sustainability** 15:22
**sweet** 42:18
**symptoms** 27:1
**system** 1:3,15 2:14
 4:9,13 5:11 6:19
 7:15 8:5,9,11,19 9:1
 9:13 12:6 13:6
 16:22 18:18 21:8
 22:22 23:22 24:1
 31:5,9,22 32:3,10
 33:2,12,19,24 35:1
 35:16 39:13,22 40:3
 40:8,10,15,16,21
 41:6,16 52:23 53:4
 53:18
**systems** 9:7,14
 14:17,23 25:2 40:23

**t**

t 23:21 30:19 39:20
 42:7 47:18,18 50:3
 57:2,2
**tailored** 39:6
**take** 26:16 33:17
 38:3 41:8 48:4
 50:13 51:23
**taken** 32:22 57:6
**talk** 28:8 42:10
**targeted** 14:22
**tax** 44:22 45:16
**taxes** 44:17
**taylor** 27:16 30:20
 30:23
**teach** 53:2
**teaching** 53:1,1
**team** 27:8 38:12,13
**tech** 37:18
**technicians** 38:14
**technology** 35:20
**techs** 38:15
**tell** 27:7 52:17
**temple** 29:19
**ten** 29:14
**term** 52:4
**terminate** 17:5
**termination** 17:9
**terms** 7:24 26:18
**tertiary** 53:3
**testified** 55:10
**testify** 50:8 55:24
**testimony** 3:11 4:3
 7:11 20:9,10,13
**texas** 14:14
**thaddeus** 3:20 42:5
 42:7
**thank** 4:1,2 7:14 8:6
 12:7,8,17 19:5,6
 21:2,3,5 23:17,18
 27:5,8,10,13 30:15
 30:16 33:6,7 35:2,3
 36:18,19 39:14,15
 42:3,4 44:17,19,24

44:24 45:18 46:2
 47:6,7 48:18,19
 49:24 50:7,21 51:2
 51:3 53:7 54:4 55:2
 55:5,6,8 56:1
**thanks** 8:8
**therapists** 38:15
**thereof** 57:13
**thing** 12:5 31:1
 43:24
**things** 10:10 40:22
 44:6 48:16 53:17
**think** 16:8 36:14
 51:17 53:15 55:3,7
**third** 55:16
**thomas** 3:8 7:18
**thought** 24:8 41:2
**thousand** 49:8
**three** 14:17 31:20
**thrilled** 19:5
**thrive** 9:21
**time** 4:2 9:20 11:7
 23:6 28:20 33:6
 35:2 44:8,14 46:18
 48:6,10 50:16 55:2
 55:5,7,12,24 57:7
**timeframe** 48:17
**times** 10:5,6 14:3
 31:6 37:16
**today** 4:2,17 7:13,14
 7:14,22 8:12,19
 10:19 12:19 19:22
 21:6 27:5 31:7
 32:24 45:13,22 46:4
 50:8 55:9,13,19
**today's** 9:4 19:12
**tom** 12:9,12
**tomorrow** 29:24
**total** 14:19 29:14
**totaling** 16:22
**touches** 51:18
**tradition** 9:2
**traditional** 23:5
**traditionally** 5:5

**train** 21:20 24:7
**training** 21:23 29:15
  29:23 31:12
**transaction** 6:1 7:6
  7:7 8:1 10:10 11:7
  11:22 12:5 14:15
  18:12 20:2 46:16
  47:4 54:10
**transactions** 5:15
  6:9
**transcribed** 57:9
**transcript** 19:23
  57:11
**transcription** 57:10
**transformed** 19:3
**transition** 29:18
**transitioning** 30:10
**trauma** 10:16 17:11
  33:13 34:17 35:22
**treat** 24:13 26:24
**treating** 26:24 27:1
  27:3
**treatment** 24:23
  25:11 26:9,10
**treatments** 25:3
**triage** 25:19
**triple** 46:18
**true** 24:12 57:11
**trust** 20:18
**trusts** 2:6 3:5 4:15
**try** 20:4 22:4
**turn** 31:1
**turning** 32:15
**turnover** 37:15
**two** 2:12 14:16 18:3
  18:3 28:7,7 30:23
  44:21
**type** 48:11

**u**

**u** 21:4 23:21 27:15
  27:15 30:19 35:9
  36:22 42:7
**ultimate** 27:24

**umbrella** 28:11
  29:14
**unacceptable** 37:21
**underfunded** 17:4
**underserved** 26:16
  51:20
**understaffing** 37:13
**understand** 33:16
  34:10 42:18
**understanding**
  33:22 37:13
**unforeseen** 40:22
**union** 16:9 33:15
**unique** 13:12 26:1
**unit** 24:22 25:13
  26:14 33:13 35:19
  35:22 37:16
**united** 9:14 40:17
**university** 29:20
**unknown** 46:5
**unsafe** 37:20
**updating** 54:15
**upland** 1:15 25:12
  46:11,17,20
**use** 9:10 39:8 41:13
**usually** 18:15
**utilize** 24:10

**v**

**v** 50:3
**value** 5:16 11:1
  12:23 15:2,14 16:5
**valued** 34:9
**values** 22:20
**variables** 38:4
**variety** 25:5
**various** 18:18
**venture** 30:10
**vice** 7:20 23:23
**villanova** 53:12
**vision** 15:5 33:19
**visit** 23:3
**visits** 25:14
**vital** 29:22

**volumes** 9:11
**vulnerable** 10:22
  15:12 24:16 25:4,23
  27:6

**w**

**w** 27:15 39:20
**wait** 44:22
**walls** 35:21
**want** 12:17 20:17
  27:5 28:7 31:1
  42:13 45:13,16 47:9
  48:5,7,9 50:17,22
  51:1,3,10 53:15,18
  54:3 55:2,3,8
**wanted** 21:11 42:10
  43:15 46:4,14 49:23
  50:7
**wants** 4:24
**way** 13:10 31:22
  43:22,22 44:11
**ways** 43:16
**we've** 17:10 24:13
  24:14 28:11 30:12
  46:23 52:13 54:18
**wednesday** 1:9
**welcome** 41:3 42:13
  42:22 43:20 45:16
  54:8,12
**wellness** 10:20
  13:16 17:17 22:3
**wherewithal** 12:2
**whitaker** 3:19 39:18
  39:19,20
**wide** 24:13
**williams** 45:15
**win** 53:12
**wise** 35:20
**witness** 57:14
**witnesses** 55:8,10
**women's** 24:3 43:7
**word** 32:5
**words** 6:1 51:6,6
**work** 6:6 12:18 22:4
  23:7 31:15 33:13

  34:7,21 35:2,16,17
  35:18 43:18 54:5
**worked** 43:2 51:9
  51:10
**workers** 22:24
**workforce** 45:12
**working** 16:13
  26:23 34:4 36:8
  38:2,20 40:3 43:4
  45:4 46:24 52:8
**workload** 38:24
**world** 30:10
**wrap** 50:18,23
**written** 20:12 55:15

**x**

**x** 3:2

**y**

**y** 21:5 33:10 47:18
**year** 25:14 33:12
  48:17 53:12
**years** 8:15 11:11
  16:23 17:6,17 24:7
  24:11,21 31:10
  36:24 37:12 38:11
  40:2,7,18 41:9
  42:17 43:9,9 46:23
  51:9
**young** 43:3 48:9

**z**

**zip** 20:20

# EXHIBIT D

## THIRD AMENDMENT TO ASSET PURCHASE AGREEMENT

**THIS THIRD AMENDMENT TO ASSET PURCHASE AGREEMENT** (the "Amendment") is made and entered into as of June 30, 2016, by and among **CROZER-KEYSTONE HEALTH SYSTEM,** a Pennsylvania nonprofit corporation ("Crozer"), on behalf of itself and its health system members listed on Exhibit A of the Purchase Agreement ("Crozer Members" with Crozer and the Crozer Members collectively referred to as "Sellers" and with each Crozer Member and Crozer individually referred to as a "Seller"), **PROSPECT MEDICAL HOLDINGS, INC.,** a Delaware corporation ("PMH"), and **PROSPECT CROZER, LLC,** a Pennsylvania limited liability company ("Prospect") on behalf of itself and its wholly-owned affiliates listed on Exhibit B of the Purchase Agreement ("Prospect Members") (PMH, Prospect, and Prospect Members are collectively referred to as "Buyers" and individually referred to as a "Buyer"). (Sellers and Buyers shall each be referred to individually herein as a "Party" and, collectively, as the "Parties.")

### RECITALS:

A.     The Parties previously entered into and executed the Asset Purchase Agreement ("Purchase Agreement") dated January 8, 2016, as amended on April 29, 2016 and on June 15, 2016, whereby, at Closing, Buyers shall acquire substantially all of the assets of Sellers.

B.     The Parties recently concluded that Buyers will not be able to acquire Sellers' interests in Cassatt (defined below) and desire to provide for certain terms and conditions regarding how Sellers' interests in Cassatt will be handled post-Closing.

C.     The Parties desire to include certain dividends to be paid by Cassatt (defined below) to Crozer as part of the Assets to be transferred to Buyers.

D.     The Parties further desire to clarify that Buyers will not assume or be responsible for certain pre-closing contractual liabilities of Sellers notwithstanding any language to the contrary in the assignment documents pertaining thereto.

E.     The Parties further desire to update the Transition Services Agreement to add Crozer as a party thereto and to reflect that certain employees will be temporarily leased to the Foundation.

F.     The Parties further desire to memorialize their understanding regarding extension of the deadline for Buyers to terminate the DB Pension Plan under certain conditions.

G.     The Parties desire to set forth herein their mutual understanding to amend and clarify certain terms and conditions of the Purchase Agreement upon the terms and conditions hereof.

1

NOW, THEREFORE, in consideration of the premises and the agreements, covenants, representations, and warranties hereinafter set forth, and intending to be legally bound hereby, the Parties agree as follows:

1.  Capitalized Terms.  Capitalized terms used in this Amendment but not otherwise defined herein shall have the meanings set forth in the Purchase Agreement.

2.  Included Assets.

a.  Section 1.1(o) of the Purchase Agreement is hereby deleted and replaced in its entirety to read as follows:

all of the stock, limited liability company ("LLC") membership, partnership or other ownership, control or beneficial interests held by one or more of the Sellers in certain specified for profit Affiliates of Sellers (as defined in Section 14.16 below), certain specified wholly-owned LLCs, joint ventures with third parties or other non-wholly owned affiliated organizations all as specifically listed on Schedule 1.1(o), which shall not include any stock or other rights or interests in Cassatt Insurance Company, Ltd. and Cassatt RRG Holding Company (collectively "Cassatt") except as set forth in Section 11.28;

b.  The "and" at the end of Section 1.1(s) of the Purchase Agreement is hereby deleted and current Section 1.1(t) of the Purchase Agreement is hereby renumbered as Section 1.1(u) of the Purchase Agreement.

c.  New Section 1.1(t) of the Purchase Agreement is hereby added to read as follows:

funds in the amount of Three Million Five Hundred Thousand Dollars ($3,500,000.00) representing the special dividend to be paid in full by Cassatt Insurance Company, Ltd. to Crozer on or prior to the Closing Date ("Cassatt Dividend"); and

3.  Crozer For-Profit Affiliates, Joint Ventures and Other Affiliated Organizations.  Schedule 1.1(o) of the Purchase Agreement is hereby deleted in its entirety and replaced with the form attached hereto as Schedule 1.1(o).

4.  Excluded Assets. Section 1.2(a) of the Purchase Agreement is hereby deleted and replaced in its entirety to read as follows:

cash and investment assets, other than the medical staff fund balances referenced in Section 1.1(d) and the funds associated with the Cassatt Dividend referenced in Section 1.1(t);

5.  Excluded Contractual Liabilities.

a.  Section 1.3(a) of the Purchase Agreement is hereby deleted and replaced in its entirety to read as follows:

2

(a) all obligations accruing, arising or to be performed after the Effective Time with respect to the Contracts assigned to and assumed by Buyers, but only to the extent such Contracts are listed on Schedule 1.1(f), and subject to Buyers' rights to have Sellers reasonably amend, terminate or otherwise not assign any such Contract prior to Closing, and notwithstanding anything to the contrary in any assignment and assumption agreements or similar instruments entered into in connection with assigning the Contracts to Buyers hereunder, which instruments might provide that one or more Buyers are partially, jointly and/or severally liable for certain obligations or liabilities accruing, arising or to be performed on or prior to the Effective Time with respect to such Contracts ("Pre-Closing Contractual Liabilities"), which agreements and instruments shall not affect the status of such Pre-Closing Contractual Liabilities as Excluded Liabilities (as defined below) for purposes hereof;

b.      The first paragraph in Section 1.4 of the Purchase Agreement is hereby deleted and replaced in its entirety to read as follows:

Excluded Liabilities. Except for the Assumed Liabilities, Buyers shall not assume and under no circumstances shall Buyers be obligated to pay or assume, and none of the assets of Buyers shall be or become liable for or subject to any liability, indebtedness, commitment, or obligation of Sellers, whether known or unknown, fixed or contingent, recorded or unrecorded, currently existing or hereafter arising or otherwise (collectively, the "Excluded Liabilities"), including the following Excluded Liabilities, which shall not, in any case, include any liabilities that are subject to the Net Working Capital adjustment set forth in Section 2.2, and notwithstanding anything to the contrary in any assignment and assumption agreements or similar instruments entered into in connection with assigning the Contracts to Buyers hereunder, which instruments might provide that one or more Buyers are partially, jointly and/or severally liable for Pre-Closing Contractual Liabilities, which agreements and instruments shall not affect the status of such Pre-Closing Contractual Liabilities as Excluded Liabilities (as defined below) for purposes hereof:

6.      Rollover Contributions.  Section 1.3(g) of the Purchase Agreement is hereby amended by replacing the phrase "excluding outstanding loans" with the phrase "including outstanding loans."

7.      Pension Termination.  Section 2.4(c) of the Purchase Agreement is hereby deleted and replaced in its entirety to read as follows:

(c) Post-Closing Commitment. Within five (5) years after the Effective Time and subject to applicable filing and authorization by the applicable Government Entity, Buyers shall adopt a plan amendment to terminate the DB Pension Plan (the "Plan Termination Amendment") effective within such five (5) year period and thereafter, in accordance with applicable law, shall liquidate, fully fund and satisfy, and pay all benefits owed to participants and beneficiaries of, the DB Pension Plan by providing for lump sum distributions to participants, purchasing

3

annuities for participants who do not elect a lump sum distribution or otherwise in accordance with the terms, conditions and provisions of the DB Pension Plan (as in effect at the Effective Time) and with applicable law.  Notwithstanding the foregoing or anything to the contrary herein if, and only if, the monthly reported Second Segment IRS Section 417(e)(3)(D) Minimum Present Value PPA Monthly Rates with 100% Phase-in (the "IRS Discount Rate") for the months of December 2020 and June 2021 are both lower than four and twelve hundredths percent (4.12%) (the "IRS Discount Rate Threshold"), then the Buyers may defer adoption of the Plan Termination Amendment for a period of one (1) year.  If the IRS Discount Rate for the months of December 2021 and June 2022 are both lower than the IRS Discount Rate Threshold, then Buyers may defer adoption of the Plan Termination Amendment for an additional one (1) year period, but in no event may the adoption of the Plan Termination Amendment and its effective date be deferred longer than the end of the eighty-fourth (84th) full month that follows after (and counting the month that includes) the Effective Time, and such adoption and termination shall be approved then no matter what the IRS Discount Rate is at any time prior thereto.

8.    Closing Deliverables.

a.    The "and" at the end of Section 3.2(q) of the Purchase Agreement is hereby deleted and current Section 3.2(r) of the Purchase Agreement is hereby renumbered as Section 3.2(t) of the Purchase Agreement.

b.    New Section 3.2(r) of the Purchase Agreement is hereby added to read as follows:

An amount equal to Three Million Five Hundred Thousand Dollars ($3,500,000.00) in immediately available funds representing the Cassatt Dividend to an account (or accounts) designated by Buyers prior to Closing;

c.    New Section 3.2(s) of the Purchase Agreement is hereby added to read as follows:

A Limited Power of Attorney in substantially the form attached hereto as Exhibit M (the "Limited Power of Attorney"), fully executed by Crozer and as described in Section 11.28 hereof; and

9.    Conditions to Close.  New Section 8.14 of the Purchase Agreement is hereby added to read as follows:

Payment of Cassatt Dividend.  Cassatt Insurance Company, Ltd. shall have paid to Crozer, and Crozer shall have received, the full amount of the Cassatt Dividend.

4

10. <u>Cassatt Transition</u>. Section 11.28 is hereby added to the Purchase Agreement to read as follows:

**Cassatt Transition.**

(a)     Following the Effective Time, Crozer shall promptly, but by no later than thirty (30) days after the Effective Time, take any and all actions necessary to sell its shares in, and withdraw as a shareholder of, Cassatt Insurance Company, Ltd. ("CICL") on account of ceasing participation in the Cassatt insurance program, which sale and withdrawal shall be effected by Crozer in strict compliance with applicable law and the terms and conditions of the CICL Bye-Laws, dated September 6, 2012, as may be amended (the "CICL Bylaws"), and the CICL Consolidated and Amended Shareholders' Agreement, dated November 16, 2011, as may be amended (the "CICL Shareholders' Agreement" and, collectively with the CICL Bylaws, the "CICL Governing Documents"), and in a manner that preserves Crozer's rights thereunder including the right to receive the Payment (as defined in Section I.C.4.1 of the CICL Shareholders' Agreement to be the lower of the Initial Shareholder Equity Balance and the Final Shareholder Equity Balance, both terms being defined therein) in accordance with the terms and conditions of the CICL Governing Documents ("CICL Buyout").

(b)     Following the Effective Time, Crozer shall promptly, but by no later than thirty (30) days after the Effective Time, take any and all actions necessary to surrender its shares in, and withdraw as a shareholder of, Cassatt RRG Holding Company ("Cassatt Holding") on account of ceasing participation in the Cassatt insurance program, which surrender and withdrawal shall be effected by Crozer in strict compliance with applicable law and the terms and conditions of Cassatt Holding Bylaws, dated September 19, 2012, as may be amended (the "Cassatt Holding Bylaws"), and the Cassatt Holding Amended and Restated Shareholders' Agreement, dated January 5, 2015, as may be amended (the "Cassatt Holding Shareholders' Agreement" and, collectively with the Cassatt Holding Bylaws, the "Cassatt Holding Governing Documents" which, collectively with CICL Governing Documents, shall be referred to as the "Cassatt Governing Documents"), and in a manner that preserves Crozer's rights thereunder including the right to receive payment of Crozer's capital and Dividends (as described and defined in Article VI of the Cassatt Holding Shareholders' Agreement) in accordance with the terms and conditions of the Cassatt Holding Governing Documents ("Cassatt Holding Buyout" and, collectively with CICL Buyout, the "Cassatt Buyout").

(c)     Crozer hereby: (1) represents and warrants to Prospect that Crozer is and was at all times in compliance with its duties and obligations under the Cassatt Governing Documents; and (2) covenants to Prospect that Crozer shall: (A) continue to be in compliance with the Cassatt Governing Documents until such time as the Cassatt Buyout has been completely paid to Crozer; and (B) take all actions and measures necessary or desirable to preserve, or to not prejudice, Crozer's rights to and the value of the Cassatt Buyout, which actions and

5

measures shall include, without limitation, submitting proper and timely notices of termination/withdrawal, obtaining third party consents, confirming Cassatt Buyout amounts and payment/calculation procedures with Cassatt representatives, providing wiring instructions, maintaining files and records and taking any other actions requested by Prospect.

(d)     Promptly upon receipt of any Cassatt Buyout funds, but by no later than two (2) business days after receipt thereof, Crozer shall transfer such funds in full via wire transfer of immediately available funds to an account designated by Prospect.   Notwithstanding the foregoing, upon the reasonable request of Prospect, Crozer shall cooperate with Prospect to establish an account to receive the Cassatt Buyout funds and to automatically sweep or otherwise transfer such funds to an account designated by Prospect. Upon request, Crozer shall provide Prospect with a full accounting of any Cassatt Buyout funds received and Prospect shall be permitted to reasonably audit any relevant files and records of Crozer on a periodic basis in order to confirm proper payment and transfer of such funds. Crozer shall promptly notify Prospect of any actual or threatened breach or default by any party in connection with the Cassatt Governing Documents.

(e)     **Cassatt Governing Documents; Cassatt Buyout.**

(i) As of the Effective Time, Crozer shall take any and all actions and measures necessary or desirable or as otherwise requested by Prospect in order to, to the maximum extent legally possible: (1) provide Prospect with any and all rights and benefits under the Cassatt Holding Governing Documents or otherwise in connection with Crozer's interests in Cassatt Holding; (2) cooperate in any reasonable and lawful arrangement designed to provide such rights and benefits to Prospect; and (3) enforce for the account of Prospect, any rights of Crozer under the Cassatt Holding Governing Documents or otherwise in connection with Crozer's interests in Cassatt Holding. As of the Effective Time, without limiting the generality of the foregoing, Crozer shall grant Prospect the exclusive right to direct Crozer's actions and activities with respect to monitoring, enforcing and pursuing any and all legal and equitable rights and remedies in connection with the Cassatt Holding Buyout or otherwise in connection with the Cassatt Holding Governing Documents, including, without limitation, sending demand letters, investigating potential breaches/monitoring compliance, auditing Cassatt Holding Buyout payments, pursuing arbitration/mediation/dispute resolution and undertaking litigation, all of which actions and activities shall be at the expense of Prospect.

(ii) Effective, if at all, upon the later of the Effective Time and the BMA Approval Date (as defined below), Crozer shall take any and all actions and measures necessary or desirable or as otherwise requested by Prospect in order to, to the maximum extent legally possible: (1) provide Prospect with any and all rights and benefits under the CICL Governing Documents or otherwise in connection with Crozer's interests in CICL; (2) cooperate in any reasonable and lawful arrangement designed to provide such rights and benefits to Prospect; and

6

(3) enforce for the account of Prospect, any rights of Crozer under the CICL Governing Documents or otherwise in connection with Crozer's interests in CICL. Effective, if at all, upon the later of the Effective Time and the BMA Approval Date, without limiting the generality of the foregoing, Crozer shall grant Prospect the exclusive right to direct Crozer's actions and activities with respect to monitoring, enforcing and pursuing any and all legal and equitable rights and remedies in connection with the CICL Buyout or otherwise in connection with the CICL Governing Documents, including, without limitation, sending demand letters, investigating potential breaches/ monitoring compliance, auditing CICL Buyout payments, pursuing arbitration/ mediation/ dispute resolution and undertaking litigation, all of which actions and activities shall be at the expense of Prospect.

(iii)   Without limiting the foregoing, Crozer shall also execute and deliver to Buyers the Limited Power of Attorney in substantially the form attached hereto as Exhibit M in connection with enforcement of Crozer's rights and remedies with respect to Cassatt, which Limited Power of Attorney shall generally be effective as of the Effective Time, except with respect to the provisions thereof as relate to enforcement of Crozer's rights and remedies related to CICL, the CICL Governing Documents and the CICL Buyout, which provisions shall only become effective, if at all, upon the later of the Effective Time and the BMA Approval Date (as defined below).

(f)   Crozer shall remain in existence as a Pennsylvania nonprofit corporation in good standing and as a separate legal entity until receipt of all Cassatt Buyout funds (and transfer thereof to Prospect) and cessation of any other rights, benefits and/or obligations under the Cassatt Governing Documents, unless approved by Prospect in writing as set forth below, and Crozer shall not, without receiving prior written approval from Prospect: (1) undertake any merger, division, liquidation, dissolution, termination, consolidation, conversion, member substitution, sale or other similar fundamental corporate transaction; or (2) assign either the CICL Shareholders' Agreement or the Cassatt Holding Shareholders' Agreement or both or any rights, remedies or benefits thereunder to any third party.

(g)   Notwithstanding the foregoing, the Parties anticipate that Crozer may, at some point after the Effective Time, merge with and into the Foundation, with the Foundation being the surviving entity, which merger transaction or similar transaction may be undertaken by Crozer only upon receiving the prior written approval of Prospect and provided that, prior to consummation thereof, Crozer takes all actions and steps requested by Prospect to preserve all of Prospect's and Crozer's rights, benefits, authority and remedies described in this Section 11.28, which may include, without limitation, obtaining written consent/acknowledgement from CICL and/or Cassatt Holding (or shareholders thereof) as to the transfer of rights to the Cassatt Buyout, obtaining approval of

7

the Bermuda Monetary Authority and entering into an agreement whereby the Foundation assumes Crozer's obligations and liabilities under this Section 11.28.

(h)   Notwithstanding anything to the contrary herein, the provisions of Section 11.28(e) above as relate to CICL, the CICL Buyout and/or the CICL Governing Documents, including the provisions of the Limited Power of Attorney that relate to such matters (the "CICL Provisions"), are subject to, and shall only become effective upon the date on which Prospect (and Crozer, if necessary) receives any necessary consent, approval or order from the Bermuda Monetary Authority ("BMA") approving such CICL Provisions (the "BMA Approval Date"), which Prospect (and Crozer, if necessary) shall seek to obtain using their reasonable best efforts as promptly as possible. If the BMA denies or refuses to grant any necessary consents, approvals or orders with respect to the CICL Provisions, and, upon further appeal, as applicable, such decision becomes final and non-appealable or the Parties mutually agree not to pursue further appeal thereof, the CICL Provisions of Section 11.28(e) above and the CICL Provisions of the Limited Power of Attorney shall not take effect and become null and void and the Parties shall use their reasonable best efforts to promptly amend or replace such CICL Provisions, via amendment of this Agreement or otherwise, in a manner approved by the BMA, to the extent such approval is required, which provisions shall be designed to protect Prospect's interest in and rights with respect to CICL, the CICL Buyout and the CICL Governing Documents as set forth in the CICL Provisions to the maximum extent permissible under applicable law, which provisions might, among other things and to the extent legally permissible, compel Crozer to promptly and fully pursue any and all reasonable legal and/or equitable claims or other actions against CICL to the extent the CICL Buyout that CICL agrees to pay is less than the lower of the Initial Shareholder Equity Balance and the Final Shareholder Equity Balance (as such terms are defined in the CICL Governing Documents).

11.   Address Change.  In Section 14.11 of the Purchase Agreement, the notice address of Buyers is hereby deleted and replaced in its entirety with the following:

**Buyers:**

Prospect Medical Holdings, Inc.
3415 South Sepulveda Blvd, 9th Floor
Los Angeles, California 90034
Attention: Ellen J. Shin, Esquire
General Counsel

With a simultaneous copy to:

Stevens & Lee, P.C.
620 Freedom Business Center Drive, Suite 200
King of Prussia, Pennsylvania 19406
Attention: Thomas M. Tammany, Esquire

8

12.    Amended Transition Services Agreement.    The Transition Services Agreement attached as Exhibit I of the Purchase Agreement is hereby deleted in its entirety and replaced with the form attached hereto as Exhibit I.

13.    Purchase Agreement.    This Amendment shall modify the terms of the Purchase Agreement only to the extent expressly set forth herein.  All other terms and conditions set forth in the Purchase Agreement shall otherwise remain in full force and effect.

14.    Governing Law.    The Parties agree that this Amendment shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania without regard to conflict of laws principles.

15.    Counterparts.    This Amendment may be executed in multiple counterparts, each of which shall be an original and all of which together shall constitute but one and the same instrument and a signed copy of this Amendment delivered by facsimile, email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy.

*[Signature page follows]*

9

IN WITNESS WHEREOF, intending to be legally bound thereby, the Parties hereto have caused this Amendment to be executed by their authorized officers, all effective as of the date first above written.

CROZER-KEYSTONE HEALTH SYSTEM

By: _Joan K. Richards_

Name:   Joan R. Richards
Title:   President and Chief Executive Officer


PROSPECT CROZER, LLC

By: _____

Name:   Samuel S. Lee
Title:   Chief Executive Officer


PROSPECT MEDICAL HOLDINGS, INC.

By: _____

Name:   Samuel S. Lee
Title:   Chief Executive Officer


[Signature Page to 3rd Amendment to Asset Purchase Agreement – Execution Version]

IN WITNESS WHEREOF, intending to be legally bound thereby, the Parties hereto have caused this Amendment to be executed by their authorized officers, all effective as of the date first above written.

CROZER-KEYSTONE HEALTH SYSTEM

By: _____
    Name:    Joan K. Richards
    Title:    President and Chief Executive Officer

PROSPECT CROZER, LLC

By: _____
    Name:    Samuel S. Lee
    Title:    Chief Executive Officer

PROSPECT MEDICAL HOLDINGS, INC.

By: _____
    Name:    Samuel S. Lee
    Title:    Chief Executive Officer

[Signature Page to 3rd Amendment to Asset Purchase Agreement – Execution Version]

## SCHEDULE 1.1(a)

**Crozer For-Profit Affiliates, Joint Ventures and Other Affiliated Organizations**

For-Profit Affiliates/Other Affiliated Organizations:

1. Prospect Provider Group PA, LLC

Joint Ventures:

1. Brinton Lake Management Company, LLC

2. Cyberknife Center of Philadelphia, LLC

3. Delaware Valley Sleep Management Company, LLC

4. Del-Val Equipment Leasing Company, LLC

5. Dialysis Access Centers, LLC

6. Grayhawk Home Care 1, LLC

7. Haverford Management Company, LLC

8. Tech Park Properties, Inc.

9. University Technology Park, Inc.

10. DCMH MOB Associates

## EXHIBIT I

### Transition Services Agreement

See attached.

EXHIBIT M

LIMITED POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS, that CROZER KEYSTONE HEALTH SYSTEM ("Crozer"), a nonprofit corporation duly organized under the laws of the Commonwealth of Pennsylvania, effective as of July 1, 2016, hereby makes, constitutes and appoints PROSPECT CROZER, LLC ("Prospect"), a Pennsylvania limited liability company, as Crozer's true and lawful attorney-in-fact, authorized (but not required) as its agent to take, from time to time, and at any and all times, any and all actions which Crozer itself could take, in Crozer's name, place and stead, to the maximum extent permitted by law, as follows:

1.   Grant of Power.

a.   Effective as of the date first written above, Crozer hereby grants to Prospect, as attorney-in-fact, the power to: (i) take all action, execute all documents and institute and prosecute all proceedings which Prospect may deem proper in order to monitor, assert, collect, enforce or pursue any claim, right, title or interest of any kind, whether at law or in equity, in connection with the Cassatt Holding Buyout or the Cassatt Holding Governing Documents; (ii) defend, compromise or settle any and all claims, actions, suits or proceedings with respect to the Cassatt Holding Buyout or the Cassatt Holding Governing Documents, and to do all acts and things in relation thereto as Prospect may deem advisable; and (iii) take all other actions and pursue all other remedies which Prospect may reasonably deem proper in order to obtain the benefits of the Cassatt Holding Buyout for the account of Prospect, including but not limited to endorsing and depositing into Prospect's account any and all checks payable to Crozer in connection with the Cassatt Holding Buyout, all of which actions shall be undertaken at the expense of Prospect. Prospect shall be entitled to retain for its own account any amounts collected pursuant to the foregoing powers, including any amounts payable as interest in respect thereof. Crozer hereby ratifies and confirms all that Prospect shall lawfully do or cause to be done by virtue of this grant of power. Crozer acknowledges that the foregoing powers are coupled with an interest and shall be irrevocable.

b.   Effective, if at all, upon the later of the date first written above and the date of approval by the Bermuda Monetary Authority, Crozer hereby grants to Prospect, as attorney-in-fact, the power to: (i) take all action, execute all documents and institute and prosecute all proceedings which Prospect may deem proper in order to monitor, assert, collect, enforce or pursue any claim, right, title or interest of any kind, whether at law or in equity, in connection with the CICL Buyout or the CICL Governing Documents; (ii) defend, compromise or settle any and all claims, actions, suits or proceedings with respect to the CICL Buyout or the CICL Governing Documents, and to do all acts and things in relation thereto as Prospect may deem advisable; and (iii) take all other actions and pursue all other remedies which Prospect may reasonably deem proper in order to obtain the benefits of the CICL Buyout for the account of Prospect, including but not limited to endorsing and depositing into Prospect's account any and all checks payable to Crozer in connection with the CICL Buyout, all of which actions shall be undertaken at the expense of Prospect. Prospect shall be entitled to retain for its own account any amounts collected pursuant to the foregoing powers, including any amounts payable as

interest in respect thereof. Crozer hereby ratifies and confirms all that Prospect shall lawfully do or cause to be done by virtue of this grant of power. Crozer acknowledges that the foregoing powers are coupled with an interest and shall be irrevocable.

2.     Limitations. Notwithstanding anything to the contrary herein, the authority granted by Crozer in favor of Prospect hereunder shall in no way be construed to give Prospect the right or authority to:

    (i) Amend or otherwise alter the terms of the Asset Purchase Agreement, dated January 8, 2016, as amended, by and among Crozer, its affiliates, and Prospect, its affiliates ("Purchase Agreement") or any of the agreements referred to therein; or

    (ii) Provide any consents or approvals required or permitted under the Purchase Agreement or any of the agreements referred to therein.

3.     POA Statute. To the extent the authority granted by Crozer in favor of Prospect hereunder is deemed to be subject to Section 5601 *et seq.* of Chapter 56 of Title 20 of the Pennsylvania Consolidated Statutes, as amended (the "POA Statute"), then Crozer hereby irrevocably waives all duties set forth in Section 5601.3 of the POA Statute that otherwise apply to Prospect as agent under such power of attorney to the extent such duties are waivable. Crozer hereby acknowledges and agrees that in view of the commercial nature of the relationship between Crozer and Prospect, there is no expectation that Prospect shall have a duty hereunder to act in the best interest of Crozer, and it is agreed that the Prospect shall have no such duty. It is further agreed that the authority granted to Prospect hereunder shall be exercised for the benefit of Prospect and not for the benefit of Crozer and, in acting hereunder, Prospect shall have no fiduciary duty to Crozer.

4.     Governing Law. This instrument shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania without regard to conflicts of laws principles.

5.     Amendment. This instrument may not be revoked or changed orally but may be amended or revised in writing with prior written consent from Prospect.

6.     Successors. This instrument shall inure to the benefit of and be binding upon Crozer, Prospect and their respective legal representatives, successors and assigns.

7.     Assignment. Prospect shall be permitted to assign this Limited Power of Attorney to any affiliate, successor or acquirer of Prospect without the consent or approval of Crozer.

8.     Capitalized Terms. Capitalized terms used herein but not otherwise defined herein shall have the meanings set forth in the Purchase Agreement.

IN WITNESS WHEREOF, the duly authorized representative of Crozer has signed this Limited Power of Attorney, intending to be legally bound hereby, on this 30th day of June, 2016.

CROZER-KEYSTONE HEALTH SYSTEM

By: _____
Patrick J. Gavin
Executive Vice President & Chief Operating Officer

COMMONWEALTH OF PENNSYLVANIA:
                                          :ss.
COUNTY OF DELAWARE            :

BE IT KNOWN, that on the 30th day of June in the year 2016 before me personally came Patrick J. Gavin on behalf of Crozer-Keystone Health System as Executive Vice President & Chief Operating Officer, and who executed the foregoing instrument, and he acknowledged to me that he executed the same.

_____
Notary Public

[Signature Page to Limited Power of Attorney]

# EXHIBIT E

# STATE OF RHODE ISLAND

PROVIDENCE, SC.                                    SUPERIOR COURT

[FILED:   June 12, 2024]

PETER F. NERONHA, RHODE        :
ISLAND ATTORNEY GENERAL,       :
    *Petitioner,*                  :
                               :
v.                             :              C.A. No. PC-2023-05832
                               :
PROSPECT MEDICAL HOLDINGS,     :
INC.,                          :
        *Respondent.*              :

## DECISION

**STERN, J.** Before the Court is Petitioner, Rhode Island Attorney General, Peter F. Neronha's

(Petitioner or RIAG) Motion for a Preliminary Injunction to prevent Respondent, Prospect Medical

Holdings, Inc. (Respondent or PMH) from continued violation of Petitioner's June 1, 2021

Decision regarding the sale of Ivy Holdings, Inc., Respondent's holding company that owns

Prospect CharterCARE, LLC, which in turn owns and operates Roger Williams Medical Center

(RWMC) and Our Lady of Fatima Hospital (OLF) (collectively, the Hospitals). Jurisdiction is

pursuant to Super. R. Civ. P. 65(a), and G.L. 1956 §§ 8-2-13 and 23-17.14-28.

## I

## Facts and Travel

On November 8, 2023, Petitioner filed an action against Respondent that included a request

to enjoin Respondent from failing to pay the Hospitals' supplies vendors, which caused its

accounts payable[1] days outstanding to exceed ninety days for multiple quarters. *See* Pet. Petitioner

---

[1] According to Black's Law Dictionary, "accounts payable" means "an account reflecting a
balance owed to a creditor." *Black's Law Dictionary* (11th ed. 2019).

requests that the Court order Respondent to pay accounts payable more than ninety days outstanding as of December 31, 2023 and continue quarterly compliance with its financial obligations to keep accounts payable under ninety days. (Pet'r's Suppl. Mem. in Supp. of his Mot. for Inj. (Pet'r's Suppl. Mem.) 10.)

Petitioner is tasked with preserving and protecting public and charitable assets by reviewing, monitoring, and enforcing hospital conversions pursuant to the Hospital Conversions Act (HCA). *See* G.L. 1956 chapter 17.14 of title 23. Petitioner is authorized to seek immediate relief in the Superior Court to enforce any conditions of approval of a hospital conversion pursuant to § 23-17.14-28.

Respondent is a healthcare services company incorporated in Delaware with its principal place of business in Los Angeles, California. (Pet'r's Ex. A., at 9.) Respondent owns and operates hospitals and health care entities, along with managing the provision of health care services for managed care enrollees through a network of specialists and primary care physicians. *Id.* One of the entities Respondent owns is PCC, a Rhode Island limited liability company that owns and operates the Hospitals. *Id.*

## A

### History of the Hospitals and Prior Conversions

OLF is a Rhode Island licensed 312-bed acute care hospital located in North Providence, Rhode Island that has served the surrounding community since 1954. (Resp't's Ex. 11 (Liebman Aff.) ¶ 4.) RWMC is a Rhode Island licensed 220-bed acute care hospital located in Providence, Rhode Island that has provided healthcare in Providence since 1922. *Id.* ¶ 3. The Hospitals treat a large number of individuals from low-income and underserved communities that rely significantly on Medicaid and may not have the same options for healthcare as those from more affluent

2

communities. (Hr'g Tr. 19:14-20; *see also* Pet'r's Ex. K, (Harvey Aff.) at Ex. 2.)

Petitioner and the Rhode Island Department of Health (RIDOH) are statutorily obligated to review every hospital conversion proposal and approve, deny, or approve with conditions each hospital conversion. Sections 23-17.14-3, 23-17.14-5, 23-17.14-5, 23-17.14-28(c). Prior to the Decision at issue in the present case, Petitioner approved two previous hospital conversions of the Hospitals. (Pet'r's Ex. A., at 16.) In 2009, Attorney General Patrick Lynch approved a conversion with conditions where the Hospitals affiliated through CharterCARE Health Partners (CCHP), a combined system created to stem losses suffered by both RWMC and OLF. *Id.*

While the first conversion allowed for more efficiency in operating the Hospitals, the system still struggled with "operating losses, aging plants, and capital needs." *Id.* CCHP began searching for a partner in 2011 and selected Respondent, proposing a joint venture with Respondent holding 85% ownership and CCHP owning the remaining 15%. *Id.* The joint venture also created a new governing structure, PCC, which was divided equally with half of the board appointed by Respondent's ownership interest and the other half appointed by CCHP's ownership interest. *Id.* The agreement required Respondent to directly fund a $50 million long-term capital commitment and PCC to provide an annual $10 million commitment. *Id.* at 16-17. Attorney General Peter F. Kilmartin approved the joint venture with conditions in 2014. *Id.*

After the 2014 conversion approval, RIAG continued to monitor Petitioner's activity using various consultants to ensure Respondent met its obligations. (Resp't's Ex. 1, at 3.) On December 23, 2020, a report by one such consultant, Affiliated Monitors Inc., stated:

> "In complying with the terms of the [2014] HCA Decision, as well as the related Asset Purchase Agreement, [Respondent] met its commitment to an important healthcare resource serving the Rhode Island community. They not only shored up aging buildings, they helped the hospitals sustain and grow their outreach services, attracted new physicians and established a business entity for the

3

physicians to negotiate with health insurance payors (including Medicare) thereby making the practices more accessible to local residents." (Resp't's Ex. 6 at 35.)

**B**

**The 2021 Hospital Conversion**

The most recent hospital conversion was initiated on December 13, 2019, when Respondent, along with Chamber Inc., Ivy Holdings Inc., Ivy Intermediate Holding Inc., Prospect East Holdings, Inc., Prospect East Hospital Advisory Services, LLC, Prospect CharterCARE, LLC, Prospect CharterCARE SJHSRI, LLC, and Prospect CharterCARE RWMC, LLC (Transacting Parties) filed an initial application with Petitioner.[2] (Pet'r's Ex. A., at 8.) Ivy Holdings Inc. is the parent company of Respondent, and Respondent owns PCC, the entity that owns and operates the Hospitals. *Id.* at 8-9. The application proposed a buy-out of Ivy Holdings Inc. *Id.* At the time the application was filed, Samuel Lee (Lee), Respondent's Chief Executive Officer (CEO), and David Topper (Topper), Respondent's Senior Vice President, collectively owned approximately 40% of Ivy Holdings, Inc. *Id.* Under the proposal, Lee and Topper would purchase the remaining 60% of shares owned by Leonard Green & Partners (Leonard Green), a private equity investor, and other minority shareholders. *Id.* at 9. As a result, Lee and Topper would assume complete ownership of Ivy Holdings Inc. through a new entity called Chamber Inc. *Id.* at 8-9.

Over the course of a year and a half, Petitioner conducted a review of the application and an investigation of Respondent's owners at the time, including thousands of pages of documents,

---

[2] The application was resubmitted on February 4, 2020, and Petitioner informed the Transacting Parties of deficiencies in the application on March 4, 2020, requesting additional information. (Pet'r's Ex. A., at 20.) On March 25, 2020, Petitioner received a letter addressing the deficiencies, and Petitioner and RIDOH subsequently began the review process. *Id.*

hundreds of written questions, and multiple witness testimonies. *See* Pet. 4-5 ¶ 14; *see also* Pet'r's Ex. A. On June 1, 2021, Petitioner released his decision (Decision), approving the hospital conversion proposal subject to a set of conditions (Conditions).[3] *See* Pet'r's Ex. A. In the Decision, Petitioner stated that he found it appropriate to impose the Conditions because financial experts for Petitioner and RIDOH determined that Respondent's financial status and "'patterns in operational performance and recapitalization'" show its "'somewhat limited ability, in the form of current liquidity especially after recoupment of MAAP[4] funds, to weather additional or continued financial challenges.'" *Id.* at 6 (quoting Pet'r's Ex. A, App. D (PYA Expert Report) 16).

Petitioner also cited the "concerning" decisions by relevant boards and directors of the Transacting Parties, namely Respondent's boards, as a reason for imposing the Conditions. *Id.* at 6. Petitioner noted the boards also "employed no objective criteria, no outside or independent consultants, and no discernible analyses in the process of deciding upon the transaction [Petitioner] review[s]." *Id.* In one example, Petitioner averred that Respondent's Board of Directors assumed $1.12 billion in debt obligations in the Fiscal Year 2018, and subsequently authorized $457 million of the borrowed funds to be distributed as dividends. *Id.* at 4-5. The primary beneficiaries of the dividends were Leonard Green, Topper, and Lee. *Id.* at 5. Petitioner's expert James P. Carris, CPA, reported that "'the 2018 [dividend] transaction substantially weakened the balance sheet of

---

[3] On the same day, RIDOH released its own decision approving the application subject to an additional set of conditions. (Pet. at 5 ¶ 14.)

[4] "[Respondent] received approximately $276 million in federal funds under the CARES Act as advances on Medicare reimbursement, which will be recouped by the federal government from Medicare reimbursements due to the hospitals under . . . CMS's Accelerated and Advance Payment Program or Medicare Advance Payment Program (the 'MAAP Program') . . . $27.5 million of these 'MAAP' funds are due to be recouped from the Rhode Island Hospitals." (Pet'r's Ex. A., at 5-6.)

[Respondent], benefitting the shareholders while providing minimal or no funds to any of the local operating entities.'" *Id.* (quoting Pet'r's Ex. A, App. C (Carris Report) 2-3).

Petitioner stated that, based on his findings from documents, expert analysis, and financial reports, as well as testimony from "people 'on the ground' at these hospitals," the

> "Transacting Parties['] financial decisions and choices remain a decisive factor, revealing as they do a focus on wealth that puts at risk the well-being of institutions and people who communities in five states rely upon for care, often (as is the case with healthcare) at the time of greatest need." *Id.* at 7.

Most notably, the Transacting Parties provided Respondent's audited financial statements from fiscal years ending September 30, 2015 through fiscal years ending in September 30, 2020, which revealed a trend of Respondent's growing liabilities. *Id.* at 4. In 2017, Respondent's assets exceeded its liabilities by approximately $67 million. *Id.* (citing PYA Expert Report at 12). However, by 2020, Respondent's liabilities exceeded its assets by over $1 billion, with total assets of $2,042,389,000 and total liabilities of $3,102,004,000. *Id.*

Ultimately, Petitioner concluded that the Transacting Parties' application would be approved subject to "conditions imposed to assure financially secure, continually operating, and better governed healthcare institutions here in Rhode Island, subject to effective monitoring to the full extent of the Attorney General's statutory authority." *Id.* at 7. The Conditions included requirements that Respondent and Leonard Green:

> "(1) immediately set aside $80 million in either escrow or letter of credit for the sole benefit of the Rhode Island Hospitals, payable at closing, which funds can only be accessed if PMH fails to comply with Conditions requiring payment of operating losses and capital expenditures, or in the event of insolvency; (2) pay all operating losses over the next five (5) years; (3) invest $72 million in capital expenditures through the end of fiscal year 2026 based on the schedule set forth in the Conditions below (at a minimum of $10 million each year); (4) forego any management fees; (5) amend the TRS Note to extend its maturity date and remove the sale/leaseback

option for the Rhode Island Hospitals during such an extension, and thereafter only with the approval of the Attorney General; (6) assume payment of the MAAP and PACE liabilities of the Rhode Island Hospitals; (7) maintain essential health services throughout the PCC System; (8) take actions to reform Board practices and constitute the local Board with community members; and (9) provide monitoring and reporting to the Attorney General to ensure oversight and compliance with all Conditions." *Id.* at 7-8.

The Conditions include a "Monitoring Period," requiring Respondent to act in accordance with the Conditions through September 30, 2026 and allowing Petitioner to monitor Respondent during that time period to ensure compliance. *Id.* at 72.

## C

### Events Following the 2021 Conversion

Following the Decision, Respondent and Leonard Green complied with certain conditions in the Decision and received distributions totaling $35,208,887 in escrow funds (including accrued interest) from Petitioner as a result.[5] (Resp't's Ex. 1, at 5-6.) However, by the end of 2022, Respondent's unpaid bills to vendors began to pile up. According to days payable outstanding (DPO) calculations, Respondent's DPO was 99.47 at the end of the quarter on December 30, 2022.[6] (Harvey Aff., Ex. 8.) This failure to pay vendors violated Condition 7.2 of the Decision, which states: "PCC shall ensure its vendors are paid on a timely basis. In the event accounts payable days outstanding is greater than 90 days, PMH shall provide funding to PCC so that accounts payable

---

[5] Specifically, Petitioner has returned the entirety of the MAAP Escrow, which required $27,000,000 from Respondent that would be restored upon satisfaction of its MAAP obligations. (Resp't's Ex. 12 (Sabillo Aff.) ¶ 9; Pet'r's Ex. A, at 76.) Petitioner has also returned $8,000,000 from the CAPEX Escrow, which required $14,200,000 from Respondent to be reduced according to compliance with certain conditions set forth in Section 6.4 of the Decision. (Resp't's Ex. 1, at 5; Pet'r's Ex. A, at 76.)

[6] "DPO" is a term used in accounting and finance to represent the average number of days it takes to pay vendors and suppliers from invoice receipt to payment issued. (Sabillo Aff. ¶ 15.) DPO is calculated through dividing accounts payable by the cash operating expenses divided by the number of days in the period. *Id.* ¶ 16.

are less than 90 days at the next quarterly measurement."[7] (Pet'r's Ex. A, at 79.)

By March 30, 2023, the end of the following quarter, Respondent's DPO was still in violation of Condition 7.2 at 102.96. (Harvey Aff. Ex. 9.) Respondent managed to bring the DPO into compliance at 89.06 on the following quarter, June 29, 2023. *Id.* at Ex. 10. Supplier Balance Aging Reports (Supplier Reports) from June 29, 2023 show that RWMC owed vendors approximately $1,990,773 three months overdue and $2,361,451 *more than* three months overdue. (Pet'r's Ex. B) (emphasis added). On June 29, 2023, OLF owed vendors approximately $1,627,422 three months overdue and $2,786,156 *more than* three months overdue. (Pet'r's Ex. C) (emphasis added).

On August 1, 2023, Respondent's computer network, along with the networks of its subsidiaries, suffered a cyber-attack that purportedly rendered it unable to bill payors for eight weeks during August and September 2023. *See* Resp't's Ex. 9 (Kroll Report); *see also* Resp't's Ex. 13 (Pillari Aff.) ¶ 5. Respondent engaged numerous consultants, including Kroll, to remedy the attack, but it could not bill for over $450 million of its revenues during that period. (Pillari Aff. ¶¶ 5-6.) Respondent submitted a business interruption insurance claim for $48,647,630 and states that it expects its insurer will pay the claim in April or May 2024.[8] *Id.* ¶¶ 7-8; *see also* Resp't's

---

[7] While both parties refer to a violation of Condition 7.2 as two consecutive quarters with accounts payable exceeding ninety days, the Court notes that the language of Condition 7.2 states "PCC *shall* ensure its vendors are paid on a timely basis." (Pet'r's Ex. A, at 79) (emphasis added). The use of "shall" indicates that any failure to pay vendors on a timely basis could be considered a violation of Condition 7.2, whether it occurs over two consecutive quarters or not. *See In re Estate of Chelo*, 209 A.3d 1181, 1184 (R.I. 2019) (quoting *Castelli v. Carcieri*, 961 A.2d 277, 284 (R.I. 2008)) ("'[T]he use of the word shall contemplates something mandatory or the imposition of a duty.'").

[8] During depositions, George Pillari, Respondent's Senior Vice President, Chief Performance Officer, clarified that at the time he completed the affidavit, April or May was "the best estimate [Respondent] had" from its consultants and, as of the deposition on March 19, 2024, the insurer had not responded other than to acknowledge receipt of the claims. (Pet'r's Ex. P (Pillari Dep.)

8

Ex. 10. As of March 19, 2024, Respondent has collected approximately $400 million out of the estimated $450 million that it could not bill during the cyber-attack. (Pet'r's Ex. P (Pillari Dep.) 15:11-16.)

Respondent's debts to vendors continued to grow in 2023. Respondent's DPO as of September 30, 2023 was 118.34, placing it back in violation of Condition 7.2. (Harvey Aff. Ex. 11.) Supplier Reports from September 29, 2023 indicate that RWMC owed vendors approximately $2,378,621 three months overdue and $7,236,583 exceeding three months overdue. (Pet'r's Ex. D.) On September 29, 2023, OLF owed vendors $2,361,393 three months overdue and $6,997,877 exceeding three months overdue. (Pet'r's Ex. E.)

In October 2023, RIDOH visited the Hospitals as agents of CMS to review the Hospitals' compliance with the conditions of participation. (Hr'g Tr. 33:8-14.) Approximately 70% of the Hospitals' funding is provided by the Center for Medicare and Medicaid Services (CMS), which requires each hospital to remain in compliance with CMS's conditions of participation. *Id.* at 33:8-25, 34:1-10. The CMS survey was conducted in response to complaints received regarding nineteen cancelled elective surgeries. [9] *Id.* at 34:11-17, 37:11-18; *see also* Pet'r's Ex. U. These included cancelled surgeries at both hospitals for procedures like spinal, knee and eye surgeries, as well as endoscopies and ENT (ear, nose, and throat) operations intended to correct sleep apnea. *See* Pet'r's Ex. U.

In its findings, CMS attributed the cancelled surgeries to a lack of supplies caused by credit holds from vendors. *Id.* The survey first reviewed cancelled surgeries at RWMC, stating that the

---

20:8-11, 16:3-8.) At the hearing, Pillari further testified that he had not read the insurance carrier's response to the insurance claim prior to the deposition or the hearing. (Hr'g Tr. 399:5-10.)

[9] Eighteen of the surgeries have been rescheduled. One surgery was not rescheduled because the patient did not attend their pre-operative visit. (Resp't's Ex. 11 (Liebman Aff.) ¶ 20.)

Hospitals' CEO was unable to manage the hospital finances, "as evidenced by the number of vendors placed on credit hold due to lack of payment resulting in the failure to obtain necessary supplies/equipment necessary resulting in 6 surgical procedures being cancelled in October 2023." *Id.* at 12. The survey review of OLF stated that "the hospital's parent company failed to provided funding necessary for the Chief Executive Officer[,] who is responsible for managing the hospital, to make sufficient payments to its vendors resulting in several unpaid vendor accounts. This failure to pay these vendor accounts resulted in the cancellation of several scheduled surgeries." *Id.* at 22-23.

As corrective action, the Hospitals developed the "AP Task Force Group" ("AP Task Force"), which is charged with the comprehensive review of supplies in relation to payables and ensuring the "Supplies Status List" is constantly monitored to identify any possible interruption of services due to lack of supplies or funds. *Id.* at 3-4, 13-14. The AP Task Force consists of leading figures at PCC and the Hospitals, including the CEO, Chief Operating Officer (COO), Chief Nursing Officer, Chief Financial Officer (CFO), Vice President of Quality, AP Director, Executive Director of Surgery, Director of Pharmacy, Lab Director, and Director of Supply Chain. *Id.* at 4, 14. The AP Task Force is required to meet at least three times per week with mandatory attendance, although meetings are reported to occur daily. *Id.* at 3, 14; *see also* Hr'g Tr. 58:13-21; Resp't's Ex. 11 (Liebman Aff.) ¶ 19.

Still struggling to pay down its accumulating accounts payable outstanding, Respondent sent a letter to Petitioner through counsel on November 3, 2023 requesting a waiver of Condition 7.2. *See* Pet'r's Ex. H. Specifically, Respondent sought an extension and waiver of compliance with Condition 7.2 up to and including March 31, 2024. *Id.* Respondent stated that the cyber-attack affected its ability to pay vendors, but assured Petitioner that it would be able to address accounts

payable outstanding in the next three to four months and that its insurance claim regarding lost revenue during the cyber-attack was "near completion." *Id.* Rather than agreeing to Respondent's proposal, Petitioner chose to file an action in the Court.

**D**

**Current Litigation and Events**

On November 8, 2023, Petitioner filed to enforce the Decision pursuant to the HCA. *See* Petition. The Petition alleged that Respondent violated multiple Conditions under the Decision, namely Conditions 5.2, 7.1, 7.2, 10, 13, 14, 15, 16.2, 21, 23, and 33. (Petition ¶ 55.) Petitioner requested that the Court enter an injunctive order requiring Respondent to comply with all the Conditions; order Respondent to comply with all operating covenants under the Decision; and order Respondent to pay a penalty of up to two million dollars per violation of the HCA pursuant to § 23-17.14.30. *Id.* at 14-15 ¶¶ 1-4. Petitioner contemporaneously filed a Motion for a Temporary Restraining Order (TRO) and Preliminary Injunction. *See* Pet'r's Mot. for Temporary Restraining Order and Preliminary Injunction. On February 2, 2024, Petitioner submitted a supplemental memorandum withdrawing the request for a TRO and instead focusing the motion on injunctive relief for Respondent's alleged violations of Condition 7.2. *See* Pet'r's Suppl. Mem.

Since the beginning of the current action, further incidences of noncompliance with both the Conditions of the Decision and requirements from other agencies have been recorded at the Hospitals. On November 17, 2023, the Occupational Safety and Health Administration (OSHA) sent a letter to OLF reporting that it had received notice of alleged hazards at OLF, including mold; bedbug infestations; cockroaches unaddressed by a pest control service; mice in various areas; a lack of functioning buttons to monitor radiation exposure; and leaking ceilings and pipes causing slip and fall hazards. (Pet'r's Ex. U, at 27.) OSHA declined to investigate and instead required

11

OLF to investigate and report their findings before November 27, 2023.[10] *Id.* at 28.

Despite ongoing litigation regarding its failure to comply with Conditions, Respondent still failed to fund the payment of sums owed to vendors for another consecutive quarter. Respondent's DPO was higher than ever on December 30, 2023 at 127.51. (Harvey Aff. Ex. 12.) On December 30, 2023, "Supplier Reports" show RWMC owed vendors approximately $2,205,202 three months overdue and $8,339,791 more than three months overdue. (Pet'r's Ex. F.) On December 30, 2023, OLF owed vendors approximately $2,491,035 three months overdue and $8,439,663 more than three months overdue. (Pet'r's Ex. G.)

The Joint Commission (JC) completed accreditation reports for OLF on February 8, 2024 and RWMC on March 14, 2024. (Harvey Aff. Ex. K at Exs. 5, 6.) Each hospital received "Requirements for Improvement" following instances of noncompliance recorded at both facilities. *Id.* The JC's reports include rankings for the likelihood of an observed condition causing harm to a patient, visitor, or staff. *Id.* The report for RWMC featured two recorded conditions with a high likelihood to cause harm, while the report on OLF featured ten recorded conditions with a high likelihood to cause harm. *Id.*

Examples of incidents recorded by the JC at OLF included employees failing to follow proper risk assessments before and during operations; a lack of documentation of devices and inventory; expired filters on osmosis devices; water damage on walls and ceilings; a lack of competency assessments for nurses administering sedation and performing blood-glucose testing; improper sterilization techniques; unsecured supplies and medications that could be taken by unauthorized individuals; expired medications; improper sedation of patients; failure to record

---

[10] While these issues have been addressed by OSHA, there is no evidence before the Court that these alleged hazards have been remedied.

vital signs during blood transfusions; and a lack of proper inspection for AED devices. *Id.* at Ex. 5.

Examples of incidents recorded by the JC at RWMC included brown water flowing from an eye wash device; empty oxygen cylinders mixed in with full oxygen cylinders; failure to inspect and evaluate devices; black substances observed on walls; improper sterilization; failure to wear personal protective equipment for hazardous medications like chemotherapy; lack of education or evaluation regarding procedures for anesthesia staff; failure to record vital signs following blood transfusions; discharge instructions issued to patients in the wrong language; a lack of process for ensuring suppliers of implantation tissues are registered with the FDA; and failure to create and implement infection prevention and control. *Id.* at Ex. 6.

Following the JC reports, OLF was required to submit evidence of standards compliance within sixty calendar days from the final posted report date, and an unannounced Medicare Deficiency Survey would be conducted within 45 calendar days from the last day of the JC survey. *Id.* at 278. RWMC received the same requirements as a follow-up activity to resolve noncompliance for its hospital program. *Id.* at 316. RWMC was also required to submit evidence of standards compliance for its home care program within sixty calendar days from the final posted report date. *Id.*

On March 29, 2024, as the hearing for this motion was ongoing, RIDOH conducted a complaint investigation survey of RWMC and determined that the condition of the hospital posed an "Immediate Jeopardy" to the health and safety of patients based on the report. (Pet'r's Ex. CC, at 1-2.) RIDOH later verified that the condition that created the "Immediate Jeopardy"—water leaking through the ceiling and into a light fixture with live electrical wires—was removed, but substantial noncompliance with CMS conditions remained. *Id.* Examples of noncompliance

13

included failure to maintain emergency lighting systems; failure to maintain fire suppression systems in the hospital's kitchen; and extensive water leaks in multiple areas of the hospital. *Id.* The report stated that "the hospital failed to maintain the condition of the physical [building] and overall hospital environment in a manner to ensure the safety and well-being of patients." *Id.* at 13.

In the instant motion, Petitioner requests a preliminary injunction ordering Respondent to immediately fund the payment of the 90-day or more accounts payable of the Hospitals amounting to $21,475,691 as of December 30, 2023 and requiring Respondent's continued quarterly compliance to fund the accounts payable pursuant to Condition 7.2 of the Decision. (Pet'r's Suppl. Mem. 9-10.) On March 26 and April 3, 4, and 5, the Court held a hearing where both parties presented and examined witnesses and evidence. *See* Hr'g Tr. Closing arguments were heard on April 30, 2024. *See* Closing Arg. Hr'g Tr.

## II

### Standard of Review

"'[T]he decision to grant a preliminary injunction rests within the sound discretion of the hearing justice[.]'" *Vasquez v. Sportsman's Inn, Inc.*, 57 A.3d 313, 318 (R.I. 2012) (quoting *Town of Coventry v. Baird Properties, LLC*, 13 A.3d 614, 620 (R.I. 2011)).

> "Before granting a preliminary injunction, a trial justice must consider whether the party seeking an injunction: (1) has a reasonable likelihood of success on the underlying merits of its claim; (2) will suffer irreparable harm if the court refuses to grant the injunctive relief; (3) has the balance of equities, which includes an analysis of the possible hardships to each party and the public interest; and (4) has demonstrated that a preliminary injunction will preserve the status quo." *Griggs & Browne Pest Control Co., Inc. v. Walls*, 305 A.3d 1256, 1260 (R.I. 2024).

The hearing justice may grant a preliminary injunction if the moving party has "'established a

14

prima facie case warranting preliminary injunctive relief[.]'" *Finnimore & Fisher Inc. v. Town of*

*New Shoreham*, 291 A.3d 977, 983 (R.I. 2023) (quoting *Gianfrancesco v. A.R. Bilodeau, Inc.*, 112

A.3d 703, 708 (R.I. 2015)). "When a preliminary injunction is mandatory in nature in—that it

commands action from a party rather than preventing action—a stricter rule applies and such

injunctions should be issued only upon a showing of very clear right and great urgency." *King v.*

*Grand Chapter of Rhode Island Order of Eastern Star*, 919 A.2d 991, 995 (R.I. 2007) (citing

*Giacomini v. Bevilacqua*, 118 R.I. 63, 65, 372 A.2d 66, 67 (1977).

### III

### Analysis

### Mandatory Preliminary Injunction

A preliminary injunction is mandatory when "it commands action from a party rather than

preventing action." *King*, 919 A.2d at 995. "'[W]hen an injunction mandatory in its nature is asked

for, a stricter rule obtains. Owing to the extraordinary character of the remedy[,] it should be

granted on preliminary application only in cases of great urgency and when the right of the

complainant is very clear.'" *Giacomini*, 118 R.I. at 65, 372 A.2d at 67 (quoting *Smart v. Boston*

*Wire Stitcher Co.*, 50 R.I. 409, 415, 148 A. 803, 805 (1930)). The Rhode Island Supreme Court

discussed the standard for mandatory preliminary injunctions in *King*:

> "The trial justice properly articulated the onerous standard for
> granting a preliminary injunction that is mandatory in nature:
> 'Parties seeking such relief must establish first that there is a
> likelihood of success on the merits of the underlying complaint;
> second, that irreparable harm will result if injunctive relief is not
> granted; third, that the balance of the equities in the public interest
> is served by injunctive relief; and, fourth, that the status quo between
> the parties will most likely be maintained by the injunctive relief
> sought . . . When an injunction mandatory in its nature is asked for,
> a stricter rule obtains than when an injunction that preserves the
> status quo is sought. Owing to the extraordinary character of the
> remedy, it should be granted on preliminary application only in

15

cases of great urgency, and when the right of the complainant is very clear[.]'" *King*, 919 A.2d at 1000.

The Court finds that Petitioner's injunctive request is mandatory in nature. While Petitioner seeks to prevent Respondent from violating Condition 7.2, Respondent would be required to pay down the outstanding accounts payable through an affirmative act. Because this is a request for a mandatory preliminary injunction, the Court considers the four elements of a preliminary injunction—likelihood of success on the merits, irreparable harm, balance of the equities, and status quo—and the two additional elements required for mandatory preliminary injunctions, very clear right and great urgency. *See Faraone v. Wood*, C.A. No. 84-3716, 1985 WL 663387 (R.I. Super. Feb. 1, 1985) (evaluating a request for a mandatory preliminary injunction using the four elements of a preliminary injunction first before applying the two elements of a mandatory injunction).

## A

### Elements of Preliminary Injunction

#### 1

#### Reasonable Likelihood

Courts "do not require a certainty of success" to grant a preliminary injunction. *Fund for Community Progress v. United Way of Southeastern New England*, 695 A.2d 517, 521 (R.I. 1997). Rather, the moving party is only required to "'make out a prima facie case.'" *DiDonato v. Kennedy*, 822 A.2d 179, 181 (R.I. 2003) (quoting *Fund for Community Progress*, 695 A.2d at 521).

Petitioner argues he has a substantial likelihood of success given his requirement as the Attorney General to enforce the HCA and the Decision, and Respondent's repeated violations of Condition 7.2 of the Decision. (Pet'r's Suppl. Mem. 2-5.) Petitioner asserts that Respondent neglected to pay its accounts payable consecutively, with the September 29, 2023 quarter showing

16

a failure to pay since June 30, 2023, and the December 30, 2023 quarter showing a failure to pay since September 29, 2023. *Id.* at 6. Respondent argues that Petitioner has not demonstrated that he has a substantial likelihood of success on the merits because Respondent has claimed a defense of impracticability and Petitioner has not successfully rebutted the claim. (Resp't's Post-Hr'g Mem. 15-16.)

Before evaluating the reasonable likelihood of success prong, the Court will address the parties' disagreement regarding the method that should be used to determine whether Condition 7.2 was violated, as well as the amount of money required to bring accounts payable outstanding into compliance. To determine whether Condition 7.2 was violated, Petitioner references the quarterly Supplier Reports, which feature a chart with entries for money owed to vendors with separate columns for "3 Months Overdue" and "Over 3 Months Overdue." *See* Pet'r's Exs. B-G. Petitioner asserts that Condition 7.2 does not contain language requiring a DPO calculation, but rather notes that the Respondent shall provide funding so that accounts payable are less than ninety days at the next quarterly installment. (Closing Arg. Tr. 10:1-9.) Using Petitioner's method, Respondent must pay $21,475,691 in order to render accounts payable less than ninety days as of December 30, 2023. (Pet'r's Post-Hr'g Mem. 15.)

Respondent argues that Petitioner's method of computing accounts payable is incorrect because the plain language of Condition 7.2, specifically the term "accounts payable days outstanding," indicates that the number of *days* must be below ninety. (Resp't's Mem. 26.) Respondent asserts that "accounts payable days outstanding" is a recognized accounting term where the average number of days it takes a business to pay its bills is determined by an accounting formula. *Id.* at 25. Respondent avers that Petitioner does not assert that Respondent's accounts payable days outstanding exceeded ninety days, but rather alleges that Respondent had certain

17

accounts payable that exceeded ninety days outstanding at various quarters. *Id.* at 25-26. Respondent uses DPO calculations instead of the Supplier Reports to assess its compliance under Condition 7.2. *Id.* at 8 ("[A]t the next quarterly measurement, June 30, 2023, Prospect CharterCARE's DPO was 89.06."). Using Respondent's DPO calculations, Respondent would need to pay $17,326,526 in order to render accounts payable less than ninety days as of December 30, 2023. (Harvey Aff. at 5.)

For the purposes of deciding this motion, the Court will apply the DPO calculations as suggested by Respondent to determine whether Condition 7.2 was violated. The Court will definitively decide whether DPO calculations or another method should be used to calculate accounts payable days outstanding at the time of the hearing. If the Court finds that the factors for a mandatory preliminary injunction are met, Respondent will be required to pay $17,326,526, which is the amount necessary to bring accounts payable below ninety days as of December 30, 2023. *Id.*

Considering the evidence presented by Petitioner, there is more than a reasonable likelihood that Petitioner will succeed on the merits. Petitioner produced various documents showing that Respondent violated Condition 7.2 because its accounts payable exceeded ninety days multiple times, and, in at least two instances, for consecutive quarters. (Harvey Aff. Exs. 8-12.) Respondent's DPO calculations, which were completed for the end of each quarter, show it was out of compliance with Condition 7.2 on December 30, 2022; March 30, 2023; September 30, 2023; and December 30, 2023. *Id.* at Exs. 8, 9, 11, 12. Petitioner also produced Respondent's Supplier Reports—likewise issued on a quarterly basis—from June 30, 2023; September 29, 2023; and December 30, 2023 that document the increasing millions of dollars owed to vendors quarter after quarter. (Pet'r's Exs. B-G.)

18

Moreover, counsel for Respondent sent a letter to Petitioner on November 3, 2023 admitting that the accounts payable days outstanding exceeded ninety days on September 30, 2023—purportedly due to the cyber-attack, although the accounts payable outstanding already exceeded ninety days for quarters ending on December 30, 2022 and March 30, 2023. In the letter, it was noted that accounts payable must be less than ninety days at the next quarterly measurement on December 31, 2023, but Respondent failed to pay down the accounts payable outstanding by that date. *Id.* at Ex. 12. Respondent's own admissions and DPO calculations show its repeated violations of Condition 7.2 and confirm Petitioner's likelihood of success on the merits at trial.

### 2

### Irreparable Harm

"'A party seeking injunctive relief must demonstrate that it stands to suffer some irreparable harm that is presently threatened or imminent and for which no adequate legal remedy exists to restore that plaintiff to its rightful position." *Nye v. Brousseau*, 992 A.2d 1002, 1010 (R.I. 2010) (quoting *National Lumber & Building Materials Co. v. Langevin*, 798 A.2d 429, 434 (R.I. 2002)). "Such irreparable injury must be either presently threatened or imminent. Injuries which are prospective in nature, or which might not occur, cannot form the basis for injunctive relief." *In re State Employees' Unions*, 587 A.2d 919, 925 (R.I. 1991). "The moving party seeking a preliminary injunction must demonstrate that it stands to suffer some irreparable harm that is presently threatened or imminent and for which no adequate legal remedy exists to restore that plaintiff to its rightful position." *Fund for Community Progress*, 695 A.2d at 521.

19

### i.

### The HCA and the Attorney General

Pursuant to § 23-17.14-3, the HCA's purpose is, *inter alia*, to "assure the viability of a safe, accessible and affordable healthcare system that is available to all of the citizens of the state" and "to assure that standards for community benefits continue to be met . . . ." Section 23-17.14-3. Importantly, after the attorney general reviews and approves a conversion, the conversion "shall remain subject to the authority of the attorney general pursuant to § 23-17.14-21 hereof." Section 23-17.14-5. Moreover,

> "If any person knowingly violates or fails to comply with any provision of this chapter or willingly or knowingly gives false or incorrect information:
> "(1) The director or *attorney general* may, after notice and opportunity for a prompt and fair hearing to one or more transacting parties, deny, suspend, or revoke a license, or in lieu of suspension or revocation of the license, may order the license to admit no additional persons to the facility, to provide health services to no additional persons through the facility, or *to take any corrective action necessary to secure compliance under this chapter*, and impose a final of not more than two million dollars ($2,000,000)."
> Section 23-17.14-30 (emphasis added).

In *R.I. Turnpike & Bridge Authority v. Cohen*, our Supreme Court proffered that "[i]n limited instances, courts have recognized that, by statute, the Legislature may abrogate the irreparable-harm requirement." *R.I. Turnpike & Bridge Authority v. Cohen*, 433 A.2d 179, 182 n. 5 (R.I. 1981) (citing *Fleming v. Salem Box Co.*, 38 F. Supp. 997, 998-99 (D. Or. 1940); *Arizona State Board of Dental Examiners v. Hyder*, 562 P.2d 717, 719 (Ariz. 1977)). Here, Petitioner argues "the General Assembly . . . has effectively abrogated the requirement of irreparable harm in seeking injunctive relief." (Pet'r's Mem. 14 (citing § 23-17.14-28(d)(4)). According to Petitioner, immediate injunctive relief is the only means to enforce his decision under the HCA. *Id.*

20

The Court finds Petitioner's argument as to irreparable harm and his citation to *R.I. Turnpike & Bridge* persuasive. In a recently decided case, the Rhode Island Superior Court surveyed neighboring states and their disposal of the proof of irreparable harm requirement during injunctive proceedings. *State v. BTTR, LLC*, No. PC-2022-04492, 2023 WL 3183738, at *3 (R.I. Super. Apr. 24, 2023) (McHugh, J.) The *BTTR, LLC* Court—albeit in the context of a different statute—stated that other courts have held "that their legislatures presumed irreparable harm by authorizing their attorney[s] general[] to seek injunctions for violations of the statute. *Id.* (citing *Commonwealth v. Massachusetts CRINC*, 466 N.E.2d 792, 798-99 (Mass. 1984) ("The Attorney General is not required to demonstrate irreparable harm . . . the judge who decides whether an injunction should issue needs to consider specifically whether there is a likelihood of statutory violations and how such statutory violations affect the public interest."); *Department of Transportation v. Pacitti*, 682 A.2d 136, 139 (Conn. App. Ct. 1996) ("Irreparable harm need not be shown in a statutory interpretation injunction case . . . enactment of the statute by implication assures that no adequate alternative remedy exists and that the injury was irreparable[.]")

Beyond the cases addressed by *BTTR, LLC*, there is other caselaw in which the irreparable harm requirement for a preliminary injunction was waived in actions brought under statute by a state's attorney general. *See e.g.*, *City of New York v. Golden Feather Smoke Shop, Inc.*, 597 F.3d 115, 120 (2nd Cir. 2010) ("In certain circumstances, generally when the party seeks a statutory injunction, [the Second Circuit has] dispensed with the requirement of showing irreparable harm, and instead employ[s] a presumption of irreparable harm based on a statutory violation"); *Department of Financial Institutions v. Mega Net Services*, 833 N.E.2d 477, 485-86 (Ind. Ct. App. 2005) ("When the per se rule is invoked, the trial court has determined that the defendant's actions have violated a statute, and, thus, that the public interest is so great that the injunction should issue

21

regardless of whether the plaintiff has actually incurred irreparable harm . . . .")

While the HCA does not expressly allow for the issuance of injunctive relief for violation of the statute, it provides that Petitioner is authorized "to take any corrective action necessary to secure compliance under this chapter[,]" and "the attorney general may seek *immediate relief in the superior court to enforce any conditions of approval of a conversion*[.]" Section 23-17.14-28(d)(4) (emphasis added). The Court finds that the language of the statute is sufficiently broad to encompass injunctive relief as one of the remedies available to Petitioner to ensure compliance with the HCA. *See id.* Accordingly, Petitioner need not prove that irreparable harm was caused by Respondent. Notwithstanding this, Petitioner has made a sufficient irreparable harm showing.

### ii.

### Evidence of Irreparable Harm

### a.

### Petitioner's Statutory Authority

Petitioner asserts that the high amount of outstanding accounts payable has not meaningfully improved since the Hospitals incurred the supply shortages and that vendors faced with unpaid bills cannot be expected to indefinitely supply the Hospitals while they are in arrears. (Pet'r's Suppl. Mem. 8.) Petitioner argues that irreparable harm is shown by the nineteen cancelled surgeries that occurred in October 2023 and the reported deficiencies discovered by the Department of Health and Human Services Centers for Medicare and Medicaid in November 2023. *Id.* at 7. Respondent argues that there is no risk of irreparable harm because Respondent and the Hospitals are constantly managing the supplies to ensure continued safe clinical care. (Resp't's Mem. in Supp. of its Obj. to Pet'r's Mot. for Inj. (Resp't's Mem.) 17.) Respondent also asserts that Petitioner can access the escrows and use the funds to pay down the accounts payable outstanding

22

if Respondent violates certain conditions. *Id.* at 19.

"In Rhode Island, the attorney general is vested with all the powers that that office possessed at common law. *State v. Lead Industries Association, Inc.*, 951 A.2d 428, 471 (R.I. 2008) (citing *Suitor v. Nugent*, 98 R.I. 56, 58, 199 A.2d 722, 723 (1964)). "Indeed, the Rhode Island constitution recognizes the Office of the Attorney General and provides for its continued existence with all the powers inherent at common law; it also provides that the General Assembly may imbue the Attorney General with powers in addition to those common law powers." *Lead Industries Association, Inc.*, 951 A.2d at 471 (citing *Suitor*, 98 R.I. at 58, 199 A.2d at 723)).

"Unlike other attorneys who are engaged in the practice of law, the Attorney General 'has a common law duty to represent the public interest.'" *Id.* (quoting *Newport Realty, Inc. v. Lynch*, 878 A.2d 1021, 1032 (R.I. 2005)). "The Attorney General of the State of Rhode Island holds a constitutional office with specific and significant responsibilities to the people of Rhode Island." *Mottola v. Cirello*, 789 A.2d 421, 424 (R.I. 2002) (citing *State v. Peters*, 82 R.I. 292, 297, 107 A.2d 428, 431 (1954) ("[The Attorney General] is in effect the representative of the people and not an advocate in the ordinary meaning of that term . . . . He represents all the people of the [state] . . . .").

"It is the duty of the Attorney General to see to it 'that justice shall be done' . . . while he or she carries out all the functions of that high office-including engagement in litigation in the civil arena." *Lead Industries Association, Inc.*, 951 A.2d at 473 (citing *Berger v. United States*, 295 U.S. 78, 88 (1935)). "Accordingly, the *Attorney General in Rhode Island* has broad powers and responsibilities pursuant to the Rhode Island Constitution, several Rhode Island statutes, and the common law. *Id.* "In view of the Attorney General's position as a constitutional officer and in view of his or her considerable discretionary powers, [our Supreme Court] has historically tended,

23

whenever appropriate, to give deference to the strategic and tactical decisions made by those who hold that high office." *Id.* at 474 (citing *Mottola*, 789 A.2d at 425).

An examination of the Decision supports the Court's conclusion that Respondent is not in compliance with Condition 7.2, hindering Petitioner's statutory enforcement power. Specifically, Petitioner emphasized the necessity of the financial conditions in the Decision, stating "[w]hether PMH will continue to subsidize PCC and its Rhode Island Hospitals is a major concern." (Pet'r's Ex. A, at 28.) The Decision also provided that Petitioner was apprehensive about the difference in the Hospitals' revenue and expenses in 2021, given that RWMC and OLF experienced $16.6 million and $8.7 million in losses, respectively. *Id.* at 27. Auditors for the Hospitals, and PCC categorized the entities as "'financially dependent on [their] parent company.'" *Id.* Petitioner's grim prediction that Respondent may be without a long-term strategy when "the light starts (or continues) flickering in Rhode Island[]" seems to have come to fruition. *Id.* at 29.

The Court finds that Petitioner's regulatory enforcement power as a government agent has been irreparably harmed by Respondent's repeated failure to adhere to Condition 7.2 in the Decision. *See generally* Pet'r's Ex. A. In accordance with § 23-17.14-28(d), the acquiror under the HCA must comply with the conditions set by the Attorney General for five years following the conversion. Petitioner carefully crafted various conditions to protect the Hospitals as invaluable sources of healthcare for Rhode Island's vulnerable populations. Petitioner credibly established that Respondent failed to uphold Condition 7.2 of the Decision on multiple instances, undermining Petitioner's regulatory authority and causing Petitioner harm.[11]

---

[11] The Court's finding of irreparable harm based on hindrance of the Attorney General's statutory enforcement power finds support in other jurisdictions. The Court believes this conclusion is akin to an attorney general not needing to prove irreparable harm because the harm is presumed. *See Commonwealth*, 466 N.E.2d at 799; *State ex rel. Office of Attorney General, Bureau of Consumer*

24

**b.**

**Respondent's Use of Accounts Payable**

Beyond its defiance of the Petitioner's regulatory regime pursuant to the HCA, Respondent is effectively using the Hospitals' accounts payable as a line of credit to pay the bills for its other hospitals around the country. In the Decision, Petitioner warned that "Rhode Islanders can ill afford their healthcare infrastructure serving as a private bank for private investors." (Pet'r's Ex. A, at 50.) Petitioner's trepidation in approving Respondent's purchase of the Hospitals has proven to be well-placed as Respondent benefits from the Hospitals' government assistance while refusing to pay the Hospitals' expenses.[12]

The Hospitals' AP Director, Steve Salisbury, requests funding weekly from Respondent, but the amount received in return is constantly lower than the amount necessary to keep the Hospitals well-stocked and in good standing with suppliers. (Pet'r's Ex. S, at 6 ("Steve Salisbury discussed uncertainty of the amount of money he will receive for this week. Last week $730,000 was released[,] but some payment agreement plans were not paid."); 7 ("There have only been [two] payment plans paid both last week and none were the large surgical vendors. [Salisbury] continued to be concerned with the uncertainty of the amount of money he will receive for this

---

*Protection v. NOS Communications, Inc.*, 84 P.3d 1052, 1054 (Nev. 2004); *United States v. Barnes*, 912 F. Supp. 1187, 1195-96 (N.D. Iowa).

[12] Petitioner noted in the Decision that Respondent benefitted from federal and state aid provided to the Hospitals, especially during the COVID-19 pandemic. (Pet'r's Ex. A, at 33, 38.) Petitioner quoted Leonard Green Partner John Baumer's own description of Respondent's pattern of acquiring hospitals that are "'often losing money and going out of business'" and "load[ing] [them] up with debt." *Id.* at 38 ("PMH and its subsidiaries received hundreds of millions of dollars in financial aid from federal and state governments in 2020, and are hoping for more.")

week. Last week . . . he asked how the hospital can get more money."); 10 ("We currently owe [$]42 million, of that, [$]22 million are over 90 days and [$]8 million is over 120 days. [Two] weeks ago[,] we only received $730,000 and last week $990,000 for bills."); 23 ("There was no money received yesterday. Today's ask was $1.6 million, and Steve does not think it will be received. Many non-surgical vendors as well as physicians are in need of payment."); 25 ("The hospital owes $43 million to 726 vendors. $1.2 million is over 365 days, $9.4 million is over 210 days. $24.4 million is over 90 days.").)

While its Rhode Island ventures struggle, Respondent prioritizes its California investments. Respondent states that, in order to meet regulatory requirements for licensing by the California Department of Managed Healthcare, it must have over $130 million in cash or cash equivalents available. (Hr'g. Tr. 364:11-14.) Specifically, Alfredo Sabillo (Sabillo), CFO of PMH, testified that "in the last year our regulator, the California regulators and the Department of Managed Healthcare and our lenders have required us to replace our collateral into cash for what is being needed to meet [California Department of Managed Healthcare] requirements." *Id.* at 364:22-25. When asked whether Respondent could use any of the $138 million in cash to pay the accounts payable, Sabillo responded "[u]nfortunately, no. We cannot." *Id.* at 364:7-9.

Although the Court understands Respondent's position that it must stay in compliance with California's regulations to keep its operations in Rhode Island ongoing, the Court is troubled at Respondent's prioritization of its entities in one state over another, particularly to Rhode Islanders' detriment. Respondent agreed to certain financial conditions to take ownership of the Hospitals in 2021. Respondent's obligation to comply with regulatory requirements imposed upon it by Rhode Island is no less important or stringent than its obligation to comply with California requirements.

The Hospitals are not the only medical facilities that have been neglected under

26

Respondent's ownership. On March 12, 2024, the Delaware County Court of Common Pleas ordered Respondent to provide adequate security—$20 million in escrow—for the rent, taxes, and other costs associated with hospitals Respondent owns in Springfield, Pennsylvania through its subsidiary, Crozer Health. (Pet'r's Ex. BB, at 3.) The Foundation for Delaware County brought a motion requesting the order because Respondent owed $490,000 in back rent and fees as well as $1.6 million in taxes for its Springfield campus properties as of November 2023. *Id.*

Respondent's actions in Pennsylvania match its pattern of noncompliance and financial maneuvering in Rhode Island. In 2022, Respondent attempted to close Delaware County Memorial Hospital to convert it to a behavioral health hospital in violation of the conditions of its purchase agreement of Crozer Health, which required that Crozer hospitals be kept open as acute care hospitals until 2026. *Id.* In another parallel between its Pennsylvania and Rhode Island entities, Respondent is both seeking a buyer for Crozer Health in Pennsylvania and waiting on a pending HCA application to sell PCC and the Hospitals to the Centurion Foundation, Inc. in Rhode Island. *See id.*; Harvey Aff. at Ex. 7.

Respondent's use of the Hospitals as a private bank and treatment of accounts payable as a credit facility loan in violation of the Conditions and the HCA constitutes irreparable harm. Petitioner imposed financial conditions on Respondent because he noted Respondent's history of using safety-net hospitals to avoid taxes, benefit from government subsidiaries, and provide debt-financed dividends to private investors. (Pet'r's Ex. A, at 38, 49.) Petitioner decided financial conditions were "necessary to protect the State and its citizens from the fallout of such previous practices and from the practices themselves going forward." *Id.* at 50. Respondent cannot be permitted to dig the Hospitals into deeper debt and pocket profits created through operating crucial healthcare facilities with bare minimum funding.

27

Moreover, Respondent claims that funding the Hospitals' debts would induce its bankruptcy, despite the fact that its 2023 liability figures indicate that it is already operating with a $2 billion deficit. *See* Hr'g Tr. 376:15-19, 377:1-17 (Sabillo discussing Respondent's total assets of $2 billion and total liabilities of $4 billion). Requiring Respondent to fulfill financial conditions by paying the Hospitals' debts to vendors in the amount of $17 million would be negligible in comparison. It is difficult to categorize compliance with Condition 7.2 as the proverbial straw breaking the camel's back when Respondent is already operating in debt and recently received a court order for payment of a similar amount to its Pennsylvania entities. *See* Ex. CC.

**c.**

**The Hospitals' Supply Issues**

Finally, the lack of reliable supplies at the Hospitals is causing irreparable harm through interrupting important services; threatening the Hospitals' licensing and accreditation; diverting resources to manage supplies and payments to vendors; and ruining the Hospitals' reputation with suppliers. The consequences of Respondent's debts to vendors manifested in October 2023 when nineteen surgeries were cancelled due to lack of supplies. (Pet'r's Ex. U (Spooner Aff.) 6-19.) During an investigation by CMS, the Director of Supply Chain was interviewed:

> "[T]he last 4-6 weeks they have had an increase in the number of vendors on credit holds. He stated that there were currently 251 vendors who had placed the hospital on credit holds due to unpaid accounts. He stated that there have been credit holds on accounts for approximately the past 13-14 months. He stated that some of the vendors will release some supplies, some will send a portion of the requested orders, and some will not send any more until the past due accounts are paid. He stated that it changes weekly depending on what companies are paid." *Id.* at 8-9.

On October 30, 2023, CMS investigators interviewed the CEO of the Hospitals, Dr. Liebman:

28

> "[H]e revealed that he was unaware that surgical cases were cancelled due to credit holds. He further revealed that the hospital receives an 'allowance' every week and he doesn't know how much money that will be from week to week, and that he can request a certain amount of money but may only receive half of that amount. He indicated that he does not have enough money in the 'allowance' to pay all the vendors that are owed money." *Id.* at 25.

On November 1, 2023, Dr. Liebman was interviewed a second time:

> "[H]e stated that he was unaware of the endoscopy cases cancelled. He was also unaware that the cases were cancelled due to a credit hold on the company Boston Scientific which provides the supplies necessary to complete the procedures. Additionally, he reports he has daily meetings relative to the finances and that the hospital is on credit holds with some vendors as the hospital does not receive enough money from 'California' to cover all the expenses." *Id.* at 9.

At the hearings, Dr. Liebman was asked if the surgeries were cancelled because the Hospitals did not pay vendors to release the supplies. (Hr'g Tr. at 43:6-10.) Dr. Liebman was reluctant to admit that the lack of supplies was caused by unpaid vendors withholding service: "I don't know that for a fact. So[,] there are times we have delays in supply delivery, for example. All I know is that the supplies weren't there." *Id.* at 43:11-13. Regardless of Dr. Liebman's hesitancy to discuss the credit holds during his testimony, it appears the statements he made to CMS in 2023 that "California" (Respondent) does not send enough money to cover the Hospitals' expenses are still pertinent, as evidenced by Steve Salisbury's repeated reports in AP Task Force meeting minutes through 2024 that Respondent does not provide requested funding. *See* Pet'r's Ex. S.

The AP Task Force was formed to address supply shortages that caused surgery cancellations in October 2023. However, rather than creating a reliable stock of supplies at the Hospitals, the AP Task Force seems to divert resources away from patient care or staffing management and towards balancing the ever-growing list of accounts on hold due to outstanding

debt, mitigating supply shortages by chasing down supplies from other hospitals, and pleading for funding from Respondent, who rarely provides the money requested. *See* Pet'r's Ex. S, at 27 ("There is constant balancing to try to pay surgical needs as well as keeping other disciplines up and running smoothly."). The AP Task Force requires significant time and energy from some of the Hospitals' most important figures: the Hospitals' CEO, CFO, COO, Chief Nursing Officer, Vice President of Quality, AP Director, Executive Director of Surgery, Director of Pharmacy, Lab Director, and Director of Supply Chain. *See* Pet'r's Ex. O.

AP Task Force meeting minutes repeatedly show that there are critically low supplies or no supplies at all at both Hospitals. (Pet'r's Ex. S, at 5 ("Critical: Arthrex continues on credit hold, risk of inability to book ACL."); 6 ("Critical: Arthrex continues on credit hold at both sites. They are on list for payment this week;" "MTF – Order not released and currently on credit hold."); 7 ("Lynn Leahey shared with the group that if Arthrex is not paid by next Monday, 2 cases of Dr. Mirrer's, both shoulder, may need to be cancelled."); 23 ("Stryker and Globus are major concerns. Both are continuing to support cases but are requesting large payments per payment plan. There is no supply on shelves as these supplies are ordered as cases are booked."); 28 ("Implant vendors [] are a major concern requiring large payment because these are not stocked items and the hospital will have no advance notice if on credit hold until the companies do not deliver.")).

Each week, the AP Task Force reviews spreadsheets compiled by hospital employees, like the Supply Chain Manager or Surgical Service Director, documenting the status of surgical, lab, and medsurge[13] supplies at the Hospitals. *See* Pet'r's Ex T; Hr'g Tr. 63:6-11. Spreadsheets from

---

[13] "Medsurge supplies" refers to medical surgical supplies used to support patients before and after surgery. *See* Hr'g Tr. 16:23-24 ("[The supplies] support a number of different departments in the hospital, and that's the same for MedSurge, what happens after you get out of surgery[.]); *id.* at 87:18-20 ("[Medsurge] means that anywhere that we might have a medical surgical type of patient in the entire breadth of service.").

November 2023 through February 2024 show multiple instances of "red" urgent matters claiming

supplies have ran critically low or are completely out of stock at the Hospitals.[14] *See* Pet'r's Ex. T.

The spreadsheets are rife with phrases like "none on hand," "cannot outsource," "cannot pull

records till paid," "orders on hold," and "need payment to release orders." *Id.* at 8, 9, 15, 20, 104,

120. In every spreadsheet, the column for the total amount owed to vendors ranges from $5,000 or

less to over $350,000, with "$0" appearing as a rarity. *See* Pet'r's Ex. T.

Some spreadsheet entries are particularly disturbing, like the red cells documenting the

status of vendor BioCare on the Lab Supply Review spreadsheet for December 12, 2023: "stains

and antibody tests for patient diagnosis . . . will turn away cancer patients 12/15/2023 . . . Orders

are not being released; the entire balance needs to be paid to release orders." *Id.* at 96. Another

alarming entry from a February 28, 2024 spreadsheet shows a "Run Out Date" of supplies from

vendor Immucor on "1/19/2024," stating "[c]an't give out blood or perform surgeries without this

vendor . . . NEED TO RECEIVE CHECK BEFORE ORDERS ARE RELEASED." *Id.* at 182.

As Petitioner stated during the hearing, these supply spreadsheets show that "[the AP Task

Force] ha[s] rung the urgency bell more than 300 times in three months[.]" (Closing Arg. Tr. 18:23-

25.) Respondent argued that the spreadsheets "aren't accurate," were created by "someone in

accounts payable" who was "overzealous maybe in some of their entries," and included "repeat[s]

of the same entry." (Closing Arg. Tr. 45:6-8, 45:22-25, 46:7-13.) Assuming Respondent's

assertions are true, the Court finds it troubling that a task force created to address deficiencies

discovered by CMS and meet conditions of participation for Medicare and Medicaid services is

---

[14] The spreadsheets are color-coded: entries in red cells indicate the need for supplies to ensure procedures are completed as scheduled is "urgent," yellow cells convey a "warning" that the demand for supplies on schedule may be greater than what the Hospitals have in stock; and green cells mean there are no issues looking forward. (Hr'g Tr. 64:10-14, 64:23-25, 65:1-7.)

frequently meeting to review inaccurate spreadsheets and produce meeting minutes reporting the same inaccurate information contained in the spreadsheets.

Respondent claims that there is no threat of irreparable harm because the escrow funds "would cover the alleged accounts payable" and promotes the use of the escrow as a solution to pay down its debts to vendors. (Resp't's Mem. 19.) Section 6.4(b) of the Decision provides:

> "The funds in the Escrows shall, at the written direction of the Attorney General, be distributed to the Agent/Trustee, *if, as determined by the Attorney General* (1) Prospect fails to comply with its obligations under II. Financial Conditions (Conditions 5-11) or Condition 22 (Continuity of Services), and/or (ii) an Insolvency Event occurs." (Pet'r's Ex. A, at 77.) (emphasis added).

The language of Section 6.5(a) places the discretion in Petitioner's hands regarding disbursal of the escrow funds in the event of noncompliance or insolvency. *Id.* In this case, Petitioner has determined that "[t]his $45 million [in escrow funds] is to keep these hospitals afloat." (Hr'g Tr. 36:8-9.)

Furthermore, Petitioner stated in the Decision that the escrow funds served a two-fold purpose: (1) to protect hospital operations in the case of an insolvency event and (2) to prevent Respondent from using the Hospitals "like it has those in other states: as assets available for encumbrance by [Respondent] in order to forestall a liquidity crunch or insolvency crisis brought on by a business model that has prioritized returns on investment over the needs of safety-net hospitals." *Id.* at 50. If escrow funds were used to pay debts Respondent accrued in violation of Condition 7.2, it would reward Respondent for the very conduct that the escrow was designed to prevent.

**3**

**Balance of the Equities**

In balancing the equities, "the relief which is sought must be weighed against the harm

which would be visited upon the other party if an injunction were to be granted . . . In connection

with any such balancing equation, the court is obliged to consider, as an integral factor, the public

interest." *In re State Employees' Unions*, 587 A.2d at 925. The Rhode Island Supreme Court has

stated that:

> "'in considering the equities, the hearing justice should bear in mind
> that 'the office of a preliminary injunction is not ordinarily to
> achieve a final and formal determination of the rights of the parties
> or of the merits of the controversy, but is merely to hold matters
> approximately in status quo, and in the meantime to prevent the
> doing of any acts whereby the rights in question may be irreparably
> injured or endangered.'" *Fund for Community Progress*, 695 A.2d
> at 521 (quoting *Coolbeth v. Berberian*, 112 R.I. 558, 564, 313 A.2d
> 656, 659 (1974)).

Petitioner argues an injunction will advance the public interest of Rhode Islanders and

safeguard the quality of medical care provided by the hospitals to the public and patients. (Pet'r's

Suppl. Mem. 8.) Petitioner asserts that Respondent would suffer no meaningful harm if it were

compelled to maintain compliance with its obligations under Condition 7.2. *Id.* Respondent asserts

that the balance of equities tips in its favor because a preliminary injunction requiring Respondent

to pay outstanding accounts payable could result in Respondent's bankruptcy and the subsequent

closure of the Hospitals. (Resp't's Mem. 26.) Respondent argues that granting the injunction would

result in a loss of faith in Respondent and the Hospitals, meaning medical staff would leave,

academic affiliations would end, patients would choose not to visit, and vendors would no longer

provide supplies. *Id.* at 27.

In 2021, Respondent assumed full ownership of the Hospitals with the understanding that

the transaction was subject to the Conditions established by Petitioner under the HCA. The Rhode Island legislature promulgated the HCA "because hospitals in Rhode Island that have provided and continue to provide important services to communities [] submit[ted] that their survival may depend on the ability to enter into agreements that result in the investment of private capital and their conversion to for-profit status" and the Rhode Island General Assembly had "concerns that hospital networks may engage in practices that affect the quality medical services in the community as a whole and for more vulnerable members of society in particular." Section 23-17.14-2(6)-(8). The purpose of the HCA is "to protect public health and welfare and public and charitable assets" through establishing the necessary "standards and procedures for hospital conversions." Section 23-17.14-2(9).

Petitioner is positioned to enact and enforce conditions to protect the public interest:

> "[a]ny approval of a conversion involving a for-profit corporation as an acquiror shall be subject to any conditions as determined by the attorney general, provided those conditions relate to the purpose of this chapter. The conditions may include, but not be limited to, the acquiror's adherence to a minimum investment to protect the assets, financial health, and well-being of the new hospital and for community benefit." Section 23-17.14-28(c).

Petitioner is also charged with protecting the public interest under the HCA and brought the current action against Respondent to enforce the Conditions he established to maintain accessible and quality care for the communities that benefit from the Hospitals. *Id.* It is clear to the Court that Petitioner has proved that Respondent failed to adhere to its obligations as set forth in the Conditions multiple times. *See* Harvey Aff. Exs. 8-12. Respondent's multitude of explanations purportedly justifying these failures are unavailing.

To this point, Respondent's insistence that paying down its debts would result in a loss of faith in the Hospitals is difficult to believe. Evidence provided, including Respondent's own

records, shows that vendors are refusing to provide supplies until Respondent funds the Hospitals' unpaid bills. *See* Pet'r's Exs. S, T. In one example, AP Task Force supply sheets from the week of November 27, 2023 reported that Respondent owed $272,000 to Access RN, a vendor that provides nurse staffing, and that Access RN would stop services on the same day due to Respondent's debt. (Pet'r's Ex. T, at 39; Hr'g Tr. 192:4-25; 193:1.) The most recent supply sheet available to the Court, dated February 29, 2024, shows that Respondent finally paid $53,700 to Access RN on January 15, 2024, but still owed $214,250 to Access RN as of February 29, 2024, $102,925 of which was owed past sixty days. (Pet'r's Ex. T, at 244.) Moreover, at several AP Task Force meetings the minutes relay that "physicians are in need of payment" and "[p]ayments are being made to physicians who complain along with payment plan which are overpromising some physicians but not others." (Pet'r's Ex. S, at 23, 32.)

It does not logically follow that paying vendors for outstanding debts would result in the same vendors refusing to provide supplies, or that employees would abandon the Hospitals if payments were issued resulting in access to supplies and staffing. To the contrary, it seems more likely that medical staff, patients, and vendors would recover confidence lost in the Hospitals if Respondent paid its debts. During the CMS investigation in October 2023, a surgeon was interviewed about the cancellation of two surgeries for his patients and stated, "it is embarrassing to tell patients that their surgery is being cancelled because the hospital is not paying the supplier."[15] (Spooner Aff. Ex. 1, at 19.) He also said that "one of the [cancelled] cases has multiple health issues and that the patient's Primary Care Physician, Cardiologist, and family are anxious for the patient to have the procedure." *Id.* Respondent's inability to timely pay its debts appears to

---

[15] The surgeon also reported that he had spoken with other surgeons that were impacted by vendors placing the hospital on credit holds. (Spooner Aff. 20.)

negatively affect both medical staff and patients.

The Court does not consider requiring Respondent's compliance with Conditions that it is already obliged to follow as a significant hardship on Respondent. In comparison, if Respondent does not pay its debts and an insolvency event or an unforeseen circumstance occurs, Petitioner would likely suffer hardship in finding the funds to settle Respondent's debts while keeping the Hospitals open and functioning. With Respondent's accounts payable outstanding alone amounting to approximately half of the remaining escrow funds, such an event, compounded by additional debt, would leave the Hospitals in jeopardy. Finally, the "integral factor" of public interest weighs in favor of the Petitioner by nature of the HCA and its compelling mission to protect Rhode Island communities that rely on the Hospitals.

### 4

### Status quo

In a preliminary injunction, courts determine the status quo and subsequently weigh whether granting the requested relief will preserve that status quo. *See Fund for Community Progress*, 695 A.2d at 521 (quoting *Coolbeth*, 112 R.I. at 564, 313 A.2d at 659) ("'the office of a preliminary injunction is not ordinarily to achieve a final and formal determination of the rights of the parties or of the merits of the controversy, but is merely to hold matters approximately in status quo[.]'"). However, in this case, where the Court finds that Petitioner is entitled to a mandatory preliminary injunction, the status quo is the least important factor to be weighed. *See King*, 919 A.2d at 995 (explaining that a preliminary injunction becomes mandatory when it "commands action from a party rather than preventing action[.]"). Accordingly, this Court moves forward to assess the elements of a mandatory preliminary injunction.

36

## B

### Elements of Mandatory Preliminary Injunction

### 1

### Very Clear Right

Petitioner argues his right is very clear in this case because he is required to enforce the Conditions set forth in the Decision that Respondent has subsequently violated. (Pet'r's Suppl. Mem. 7.) Petitioner asserts that it is undisputed Respondent failed to fulfill its obligations under the Decision. *Id.* at 5. Respondent argues Petitioner does not have a right to relief because the doctrine of impracticability excuses Respondent's alleged inability to perform under the conditions; Petitioner failed to follow the enforcement provision set forth in the Conditions that it seeks to enforce; Petitioner failed to accurately allege damages; and there is no irreparable harm. (Resp't's Mem. 12.) Respondent asserts that the Hospitals are successfully monitoring and securing necessary supplies and have not canceled any surgeries for a lack of supplies or inability to perform such procedures since the referenced procedures in October 2023. *Id.* Respondent also notes that the Petitioner holds escrow funds that exceed the amount at issue. *Id.*

The HCA was intended to address concerns about the exact situation before the Court today: a hospital network "engage in practices that affect the quality medical services in the community as a whole and for more vulnerable members of society in particular." Section 23-17.14-2(8).

The Petitioner is expected to use the HCA to protect communities during a hospital conversion from non-profit to for-profit, and enforce the HCA when noncompliance occurs in order to promote the public interest. *Id.* These Hospitals serve socioeconomically disadvantaged, vulnerable, and underserved communities, with 70-75% of the patients at both hospitals relying

37

on Medicare and Medicaid. (Hr'g Tr. 52:3-14; *see also* Harvey Aff. at Ex. 2.) CMS, which approves and accredits hospitals for Medicare and Medicaid, found significant noncompliance with its conditions for participation in Medicare and Medicaid programs during both the October 2023 and April 2024 surveys at the Hospitals. *See* Pet'r's Ex. CC; Spooner Aff. 6-19.

It is undisputed that Respondent violated Condition 7.2 through its failure to pay vendors resulting in accounts payable outstanding exceeding ninety days for consecutive quarters in September and December 2023. *See* Harvey Aff. Exs. 11-12. Condition 7.2 of the Decision unambiguously states Respondent: "shall ensure its vendors are paid on a timely basis. In the event accounts payable days outstanding is greater than 90 days, PMH shall provide funding to [Respondent] so that accounts payable are less than 90 days at the next quarterly measurement." (Pet'r's Ex. A, at 79.) Given Respondent's concession that it allowed its accounts payable to exceed ninety days outstanding in violation of Condition 7.2, it follows that Petitioner has satisfied the "very clear right" element required to issue a mandatory injunction. *See King*, 919 A.2d at 1001.

### 2

### Great urgency

Petitioner argues that great urgency exists because the patients of the hospitals suffer irreparable harm due to Respondent's continued noncompliance with Condition 7.2. (Pet'r's Suppl. Mem. 8.) Petitioner asserts that the unpaid vendors cannot be expected to indefinitely supply hospitals that continue to be in arrears. *Id.* Petitioner notes that the General Assembly has conferred upon him statutory authorization to seek immediate relief from the Court to maintain compliance with hospital conversion conditions. *Id.* at 7. Respondent contends there is no great urgency because the hospitals have continued to successfully operate and provide quality care and

have performed 5,624 inpatient and outpatient surgeries and procedures since November 1, 2023 through February 29, 2024 without a single cancellation for lack of supplies or equipment. (Resp't's Mem. 12.) Respondent asserts that Petitioner can access escrow funds in excess of the amount at issue, indicating there is no great urgency. *Id.*

One indicator of the great urgency in this case is the continuous claims that the Hospitals are relying on borrowing supplies from other hospitals. *See* Hr'g Tr. 73:22-25, 74:1 ("We trade supplies in between hospitals especially in the city, the greater city of Providence all the time. We trade lab supplies. We trade surgical supplies with other institutions."). In the November 2023 CMS Report, the Operating Director and the Administrator of Surgical Services discussed borrowing supplies: "[She] indicated that the hospital can obtain some supplies and equipment from other facilities and from other hospitals that they have working relationships with. Additionally, she indicated that the hospital is also trying to obtain the necessary equipment from other vendors who have similar products." (Pet'r's Ex. U, at 21.)

The November 2023 CMS Report also emphasized that the Hospitals' Governing Body meeting minutes failed to include information relative to the hospital[s] borrowing supplies and equipment from other facilities to perform certain procedures and surgeries. *Id.* at 4. Despite the adoption of the AP Task Force to address supply shortages, it appears there are no methods in place to track whether the Hospitals have borrowed supplies from other facilities. *See* Hr'g Tr. 212:7-8 ("It says that we didn't have any inventory on hand, but it doesn't say whether or not we were borrowing from others.") (referring to the supply spreadsheets).[16] Moreover, some supply

---

[16] It should be noted that many of the supplies that are purportedly "borrowed" are single-use products, like COVID-19 tests. *See* Hr'g Tr. 117:24-25; 118:1-4 (Q: "Is this line telling us that [RWMC] and [OLF] had no COVID tests as of January 5, 2024?" A: "No, I think what it's telling you that we may not have our own, but we could have borrowed it and continued testing that

spreadsheets reviewed by the AP Task Force mention an inability to outsource or borrow certain supplies: "they will not ship the part until past due balances are paid and we cannot outsource this testing, out of stock." (Pet'r's Ex. T, at 9.)

Dr. Liebman testified during the hearing that he was unaware of cancelled surgeries and critical failures in the supply chain in October 2023. (Hr'g Tr. 35:8-11, 59:22-25, 60:1-2.) The corrective plan mandated by the November 2023 CMS Report does not seem to have increased Dr. Liebman's awareness of the supply chain, despite his mandated attendance of AP Task Force meetings and review of supply spreadsheets. Dr. Liebman repeatedly stated that he "didn't recall" particular solutions for urgent supply issues where spreadsheets reported that the items would run out in a few days or had already run out, and resorted to assuming "[w]e probably borrowed[.]" (Hr'g Tr. 74:14-19, 161:2-10; 79:7-11.) Dr. Liebman admitted that no documents actually indicate supplies were on hand and being used at times where the supply spreadsheets reported they had run out, but stated that he "know[s] services continued" and the Hospitals must have obtained the supplies, because the labs, services, and Hospitals did not "shut down." *Id.* at 141:17-25, 142:1-13, 215:6-10; *see also id.* at 79:16-19 ("It means the hospital borrowed supplies because we're continuing to do the testing. Obviously, they didn't have supplies on hand so they went and they found supplies from some place else.").)

While Dr. Liebman claimed that no interruptions have occurred because any supply or services issue "should have been reported" and if a critical item was not supplied he "would have

---

way.") By the nature of these supplies, they cannot be borrowed because they are not returned after use. The Court finds this "borrowing" concerning, as Respondent is taking single-use supplies from other Rhode Island hospitals, like Miriam Hospital in Providence. *Id.* at 118:23-25. ("I could have borrowed supplies from Miriam Hospital, for example, who is given the same [COVID] tests[.]") Such frequent "borrowing" places the burden on other hospitals in Rhode Island to fill the gaps created by Respondent's debts and threatens to deplete the supplies of facilities that actually pay their vendors in a timely manner.

known because that would have impacted the whole hospital," there appears to be no confirmation available to prove that numerous documented urgent supply matters were resolved. *Id.* at 79:7-9, 84:1-4.) With many vendors on credit hold due to outstanding accounts payable and services relying on an untraceable system of borrowing to fill widening gaps in supplies, it appears that the Hospitals are operating under a state of "great urgency" around the clock.

Beyond supply issues, the conditions in the Hospitals themselves have been labeled as urgent by government agencies and reflect a lack of funding from Respondent. On April 2, 2024, while hearings were ongoing for this action, CMS inspected the Hospitals and determined that the conditions at RWMC posed an "Immediate Jeopardy" to the health and safety of patients. (Pet'r's Ex. CC, at 1.) The condition identified as causing "Immediate Jeopardy" was a recessed light fixture which was surrounded by wet ceiling titles and accumulating leaking water. *Id.* at 13. The condition was fixed after the survey was conducted, but CMS stated that "substantial noncompliance" remained, which could result in the termination of the facility from the Medicare Program if not addressed through a plan of correction and subsequent remedial actions. *See* Pet'r's Ex. CC, at 1-3.

Aside from the light fixture, CMS observed that the RWMC generators were not properly maintained for emergency power; emergency lighting was not in compliance; fire suppression systems in the kitchens were non-compliance; electrical wiring was not up to code; and there were multiple areas of leaking water, often accompanied by a waste basket collecting water, blankets sopping with water, or covered barrels collecting water through hoses. *Id.* at 4-21. According to one Operating Room ("OR") Nurse Manager, barrels collecting water that were found in operating room suites had been there since July 2023—prior to the August cyber-attack. *See id.* at 19 ("During surveyor interview with the OR Nurse Manager, at the time of the observation, she

informed the surveyor that the barrels have been in the OR since she started to work at the hospital in *July of 2023.* She states that the maintenance department takes care of emptying the barrels when needed.") (emphasis added).

Combined with the defiance of Petitioner's financial conditions and its use of accounts payable as a bank mentioned as part of irreparable harm, Respondent has created a situation of great urgency at the Hospitals by refusing to provide proper funding quarter after quarter. Not only are the Hospitals scrambling to obtain supplies day to day, but other areas of the Hospitals are falling into disrepair. Both employees of the Hospitals themselves and outside agencies investigating the Hospitals have attested to the urgent situation caused by Respondent. This Court finds that great urgency exists that requires Respondent to fund outstanding accounts payable to mitigate the risk of losing the Hospitals as reliable healthcare facilities for Rhode Islanders.

## C

### Impracticability

"A party's performance under a *contract* is rendered impracticable upon the occurrence of an event or a manifestation of a circumstance the nonoccurrence of which was a basic assumption on which the contract was made." *Iannuccillo v. Material Sand & Stone Corporation,* 713 A.2d 1234, 1238 (R.I. 1998) (citing to 2 Restatement (Second) *Contracts* § 261 (1981)) (emphasis added). "A valid contract requires competent parties, subject matter, a legal consideration, mutuality of agreement, and mutuality of obligation." *DeAngelis v. DeAngelis,* 923 A.2d 1274, 1279 (R.I. 2007). "When evaluating the sufficiency of contractual consideration, [the Rhode Island Supreme Court] employ[s] the bargained-for exchange test." *Andoscia v. Town of North Smithfield,* 159 A.3d 79, 82 (R.I. 2017) (quoting *DeLuca v. City of Cranston,* 22 A.3d 382, 384 (R.I. 2011)).

42

Respondent argues that the doctrine of impracticability excuses it from any alleged inability to perform under Condition 7.2 of the Decision. (Resp't's Post-Hr'g Mem. 16.) Respondent asserts that it was the subject of a massive and unexpected cyber-attack in August 2023 that prevented Respondent from accessing electronic medical records and billing systems for forty-five days. *Id.* at 17. Respondent states that more than $450 million of its revenues could not be billed over an eight-week period in August and September due to the cyber-attack. *Id.* Respondent contends that it was temporarily impractical to perform under Condition 7.2. *Id.* at 18.

Petitioner did not address the cyber-attack in his Post-Hearing Memorandum, but did state in closing arguments that impracticability is a contract-based defense and this case involves compliance with an enforcement order of an agency of a court. (Closing Arg. Hr'g Tr. 10:16-25, 11:1-3.) Petitioner argues that Respondent attempts to invoke a temporary impracticability defense, which has never been adopted as a defense in Rhode Island. *Id.* at 11:4-23. Petitioner asserts that this cyber-attack is foreseeable and requires a system in place for prevention, meaning that Respondent must show the standard practice for safeguarding a hospital system against a cyber-attack in 2023 and must show they acted pursuant to the standard practice to display they were without fault for the cyber-attack. *Id.* at 12:5-20. Petitioner also states that Respondent does have the funding to pay the outstanding accounts payable, but chooses not to as a priority preference rather than an impracticability. *Id.* at 16:9-17.

Respondent provides no legal support for its conclusion that the contractual defense of impracticability applies when no contract exists. (Resp't's Mem. 16-18.)  In fact, Respondent's plethora of case citations discuss impracticability in the context of a breach of contract action. *Id.* (citing *United States v. Winstar Corporation*, 518 U.S. 839, 904 (1996) (analyzing impracticability on contractual grounds); *Iannuccillo*, 713 A.2d at 1238 (discussing impracticability in a breach of

43

contract action); *Opera Co. of Boston, Inc. v. Wolf Trap Foundation for Performing Arts*, 817 F.2d 1094, 1100 (4th Cir. 1987) (addressing impracticability in contractual dispute); *International Minerals and Chemical Corp. v. Llano, Inc.*, 770 F.2d 879, 886 (10th Cir. 1985) (examining impracticability in a breach action)).

The elements of a contract cannot be met by the Decision. The HCA provides for review and approval of hospital conversions by Petitioner and RIDOH, and allows Petitioner to impose conditions where he deems them necessary. Sections 23-17.14-5, 23-17.14-7. There *is no* mutuality of obligation or bargained-for exchange between Respondent and Petitioner. Respondent was an applicant in a hospital conversion and Petitioner reviewed and approved the application with conditions as directed by statute. Based on the HCA and the law of contracts, the Decision does not function as a contract between Petitioner and Respondent, but rather an application approval and enforcement order from a state legal agency.

Assuming *arguendo* that the impracticability defense is available to Respondent and the cyber-attack excused Respondent's DPO of 118.34 on September 30, 2023, Respondent was already out of compliance months before the incident occurred. *Id.* at Exs. 8, 9 (showing DPO of 99.47 on December 30, 2022 and 102.96 on March 30, 2023). Moreover, the cyber-attack against Respondent occurred on August 1, 2023, rendering Respondent unable to bill $450 million in revenue for an eight-week period. (Resp't's Ex. 12 (Sabillo Aff.) ¶ 19.) As of March 19, 2024, Respondent recovered $400 million of the $450 million through delayed billing. (Hr'g Tr. 18:1-5; Pet'r's Ex. P (Pillari Dep.) 14:8-21.)

Despite recovering from the cyber-attack, Respondent was still in violation of Condition 7.2 on December 30, 2023, with a DPO of 127.51. (Harvey Aff. Ex. 12.) Minutes from an AP Task Force meeting on December 4, 2023 reveal the Hospitals' worsening arrears and Respondent's

reluctance to provide necessary funds: "[w]e currently owe 42 million, of that, 22 million are over 90 days and 8 million is over 120 days. 2 weeks ago we only received 730,000 and last week 990,000 for bills. We are currently spending 1.6-1.7 million per week which is adding to the deficit." (Pet'r's Ex. S, at 10.) Accordingly, the Court rejects Respondent's argument that the cyber-attack made performance of the accounts payable condition in the Decision impracticable because there is no contract between the parties, Respondent was in violation of Condition 7.2 prior to the cyber-attack, and Respondent has almost fully recovered from the cyber-attack.

## IV

## Conclusion

For the reasons outlined herein, Petitioner's Motion for a Preliminary Injunction is **GRANTED**. Respondent is ordered to pay the accounts payable equal to or exceeding ninety (90) days for the Hospitals as of December 30, 2023, amounting to $17,326,526, within ten (10) days of this Decision. In addition, the Respondent shall comply with Section 7.2 through trial. Counsel shall prepare the appropriate order.

# EXHIBIT F



CROZER HEALTH

# Springfield Hospital

## Related Pages

**Outpatient Physical Therapy & Rehabilitation**

## Address

190 W. Sproul Road
Springfield, PA 19064

**Main Line:**

610-328-8700

**Physician Practices**            Find a Practice at this Location

**Providers at this Location**            Find a Provider

## About the Hospital

Springfield Hospital is centrally located in Delaware County between the Springfield Mall and Springfield Country Club, attracting patients from across the county and the Main Line.

**Please note that, as of January 14, 2022,** Crozer Health has temporarily suspended all hospital-based services at the Springfield Hospital.

Outpatient services located in the Healthplex Pavilion office building adjacent to Springfield Hospital – including Physical Medicine & Rehabilitation, wound care, cardiac rehab services, and physician offices – will remain open and operational.

# Featured Services

Physical Therapy and Rehabilitation

Speech Therapy

Nutrition

Obstetrics and Gynecology (OBGYN)

Primary Care

Endocrinology

Urogynecology

Ophthalmology

# Contact Us

**Hospital Billing:**
1-877-884-1564
**CHMG or HAN Physician Billing:**
610-490-7900
**Physician Referral:**
800-254-3258

# News & Reviews

 (https://www.facebook.com/Springfield-Hospital-103410959719480/)

 (https://www.google.com/maps/place/Springfield+Hospital/@39.922215,-75.3494163,15z)

 (https://www.yelp.com/biz/springfield-hospital-springfield-2?osq=springfield+Hospital)

# Contact Us

# EXHIBIT G

# CROZERHEALTH

September 23, 2022

Re:   Discontinuation of services

Dr. Monica Taylor, Chair
Delaware County Council
201 West Front Street
Media, PA 19063

TaylorM@co.delaware.pa.us

Dear Dr. Taylor

As you have been notified previously, you are now receiving this letter as part of the Worker Adjustment and Retraining Notification Act, Delaware County Memorial Hospital intends to permanently discontinue Acute Care Service Lines and Ancillary Support Services at Delaware County Memorial Hospital, located at 501 N. Lansdowne Ave. Drexel, PA, 19026.

The effective date of the discontinuation is November 26, 2022. There are 334 total employees impacted at Delaware County Memorial Hospital consisting of 258 union represented and 76 non-represented. There are no bumping rights that exist, however, Crozer Health has positions available within the system for all impacted staff.

Please contact me directly at 610-447-6332 for further information.

Sincerely,

Thomas R Shull
Vice President of Human Resources
Crozer Health

*Be Well, Do Good.*

# EXHIBIT H

# CROZER HEALTH
# Stabilization / Transformation Plan



# Burning Platform

- Hospitals are experiencing the worst margins of the pandemic
  - Over half of all hospitals are operating in the red in 2022
- Labor Expense – aggressive hiring; however high demand has resulted in record costs
- Behavior Health Crisis – not enough resources to meet the need; exacerbated by the Covid-19 Pandemic
- Record Inflation for Supplies and Pharmaceuticals
- Accelerated Paradigm shift of care from Hospital Based to Outpatient/Ambulatory Based
- No Payer recognition of above pressures in the way of increased reimbursements
- Public Health Emergency Timeline – October 31, 2022?
- Strategic Planning  cannot be lost or curtailed despite the urgency of day-to-day operations



# Industry Update: Kaufman Hall August 2022 Report



**Kaufman Hall Operating Margin Index' YTD by Month**

Source: *National Hospital Flash Report (August 2022)*



# HAP: Addressing Behavioral Health Crisis



**Behavioral Health**

Pennsylvania hospitals know that access to behavioral health services is at a crisis point, exacerbated by workforce shortages and the pandemic.

*Andy Carter*
HAP President and CEO



# Crozer Health – Future State

- Crozer Health:
  - Not-For Profit Conversion – submit application by 12/1; 9 to 12 month timeline
- Springfield Hospital Campus:
  - Convert to ASC License and Re-open as a Comprehensive Outpatient Complex with an Urgent Care Center, Medical Offices, Ancillary Services and Ambulatory Surgery Center in the current OR suites in collaboration with Premier Orthopedics.  Timing: 6-months; w/Urgent Care target 1/1/23
- Delaware County Memorial Hospital Campus:
  - Convert from Acute Care Hospital to Behavioral Health Hospital include Adult Inpatient Geropysch Inpatient, Acute Detox/Rehab, and Crisis unit.  Crozer health will consolidate and expand all Behavioral Services with the exception of the Crozer Chester Crisis unit which will remain on that campus. Timing: March 2023
- Taylor Hospital
  - Remain as an acute care hospital and continue to serve the community and deliver care with excellent patient outcomes with services inclusive of ICU level of care through the continuum up to and including Rehabilitation.
- Crozer-Chester Medical Center
  - Remain as our tertiary medical center providing such high-end clinical services such as our Burn Program, Trauma, Comprehensive Stroke Care, Neurosciences Institute and more.



# Crozer Health – Pre-Pandemic

- 4 Acute Care Hospitals
  - Tertiary Facility
    - Crozer Chester Medical Center (CCMC)
  - Community Hospitals
    - Delaware County Memorial Hospital (DCMH)
    - Taylor Hospital
    - Springfield Hospital
- 4 Hospital Outpatient Centers
  - Brinton Lake – Surgery Center, Outpatient Diagnostic Testing, Physician Offices
  - Haverford Surgery Center, Physician Offices
  - Broomall Outpatient Diagnostic Testing/Physician Offices
  - Media Medical Plaza –Outpatient Diagnostic Testing/Physician Offices/Premier PT/Urgent Care

- Medical Group – Employed multi-specialty physicians

- GME Residents – Teaching the next generation of physicians



# Crozer Health – Future State Summary

- 2 Acute Care Hospitals
  - Tertiary Facility
    - Crozer Chester Medical Center (CCMC)
  - Community Hospital
    - Taylor Hospital
- 1 Behavioral Health Hospital
  - 100 Beds with a 2nd Crisis Center
- 1 Comprehensive Outpatient Center (Springfield Campus)

- 4 Hospital Outpatient Centers
  - Brinton Lake – Surgery Center, Outpatient Diagnostic Testing, Physicians Offices
  - Haverford Surgery Center. Physician Offices
  - Broomall Outpatient Diagnostic Testing/Physicians
  - Media Medical Plaza –Outpatient Diagnostic Testing/Physician Offices/Premier PT/Urgent Care

- Medical Group – Employed multispecialty physicians
- GME Residents – Psych Residency Program started 7/1/22



# Next Steps......Partnership

- Merge DCMH and CCMC Licenses
  - DOH Notification completed
  - CHOW/855 Notification 9/21
- DCMH Reconfiguration
  - County Notification 9/20; DOH 9/21.
  - Employee Notification 9/21
  - Requesting County Support for capital fit-out and annual support for Acute Detox and Crisis.
  - Requesting waiver of 180-day notification due to staffing, patient safety, and start of construction.
- Springfield
  - County Notification 9/20; DOH 9/21
  - Township Notification TBD



# EXHIBIT I

**Medicare Open Enrollment**

Click Here

## Crozer-Chester Medical Center Named Among Top in Pennsylvania for Serving the Community

*Hospital among best in nation for community investment, according to healthcare think tank*

Crozer-Chester Medical Center has been recognized by the Lown Institute for its generous contributions to community health and well-being, receiving an "A" grade in community benefit on the 2024-25 Lown Institute Hospitals Index for Social Responsibility. The hospital achieved this honor due to strong performance on financial assistance spending, service of Medicaid patients, and investing in community health needs, out of more than 3,500 hospitals nationwide.

## Letter of Intent Between Prospect Medical and CHA Partners, LLC

Prospect Medical Holdings, Inc. and CHA Partners, LLC (CHA) have signed a letter of intent for CHA to acquire Crozer Health. This acquisition will involve transitioning Crozer Health's hospitals back to not-for-profit status. This action formally begins the process necessary to complete a definitive agreement for the acquisition of Crozer Health. In this endeavor, CHA will be working closely with Healthcare Preferred Partners (HCPP), a firm with which it has a long-standing relationship.

## Crozer Health Requests Community , Legislative Support

Crozer Health placed a full page ad – a letter to the community – in the September 8th issue of the Delaware County Daily Times, requesting that residents ask their local legislators to support the vital services the health system provides every day. Read the letter here:

CROZERHEALTH



## Crozer-Chester Medical Center is nationally recognized for its commitment to providing high-quality stroke care

Crozer-Chester Medical Center has received the American Heart Association's Get With The Guidelines® – Stroke GoldPlus quality achievement award for its commitment to ensuring stroke patients receive the most appropriate treatment according to nationally recognized, research-based guidelines, ultimately leading to more lives saved and reduced disability.

**Read more Crozer Health news and updates.**



# Please Encourage Your Legislators to Support
# Vital Healthcare Services in Your Community

Dear community members,

Crozer Health plays a critical role in meeting the healthcare needs of our community, and we need your help to encourage your local legislators to support the vital healthcare services we provide every day.

Crozer Health operates two inpatient acute care hospitals, Crozer-Chester Medical Center in Upland and Taylor Hospital in Ridley Park, both with 24-hour Emergency Department services. We also have outpatient/surgery centers in Glen Mills (Brinton Lake), Haverford, Broomall, Springfield, and Media, as well as 37 primary and specialty care locations throughout Delaware County.

In addition, we have the only Level II Trauma Center, Regional Burn Center, and mental health Crisis Center in the county, and our EMS team provides lifesaving services daily for nearly all of Delaware County. Our facilities provide essential medical care that can mean the difference between life and death.

Crozer Health employs thousands of dedicated healthcare professionals and support service staff who depend on us for their livelihood. We are a medical training site for local universities, providing education and training for the next generation of medical students, residents, and fellows.

It is imperative that we protect access to quality healthcare for all residents of Delaware County and the surrounding communities, but we can't do it alone. We need you to contact your local elected officials to encourage them to preserve these critical healthcare services in your community. Find your local legislator here: https://www.legis.state.pa.us/cfdocs/legis/home/findyourlegislator/

We thank you in advance for your support and look forward to caring for our community members well into the future.

Cordially,

Crozer Health Leadership



# EXHIBIT J